IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MUSTAFA A. WHITFIELD,                   :
                                        :
            Plaintiff,                  :
                                        :
v.                                      :    C.A. No. 06-541 GMS
                                        :
WILMINGTON POLICE DEPARTMENT,  :
                                        :
            Defendant.                  :

APPENDIX TO DEFENDANT WILMINGTON POLICE DEPARTMENT'S
OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS OR, IN THE ALTERNATIVE,
MOTION FOR SUMMARY JUDGMENT

Vol. II

Andrea J. Faraone, Esquire (I.D. #3831)
Assistant City Solicitor
City of Wilmington Law Department
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendant Wilmington Police
Department

Dated:   January 8, 2007

## TABLE OF CONTENTS

Vol. I

Plaintiff's § 1983 Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Civil Docket Sheet for *Whitfield v. Wilmington Police Dep't and Delaware Attorney General's Office*, D. Del., C.A. No. 1:06-cv-00541-GMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Memorandum Opinion dated November 16, 2006 in *Whitfield v. Wilmington Police Dep't and Delaware Attorney General's Office*, D. Del., C.A. No. 06-541-GMS. . . . . . . . . . . . . . . . . . . . 10

Order dated November 16, 2006 in *Whitfield v. Wilmington Police Dep't and Delaware Attorney General's Office*, D. Del., C.A. No. 06-541-GMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Delaware Superior Court Criminal docket as of December 21, 2006 in *State of Delaware v. Whitfield*, I.D. No. 0210009174 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Order dated June 13, 2003 in *State of Delaware v. Whitfield*, I.D . No. 0210009174 (Del. Super. Ct.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Order dated July 7, 2003 in *State of Delaware v. Whitfield*, I.D . No. 0210009174 (Del. Super. Ct.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Deputy service sheet - subpoena return dated January 29, 2004 . . . . . . . . . . . . . . . . . . . . . . . . 31

Subpoena to Jamila J. Reed dated January 22, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Notice of Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Motion for Habeas Corpus filed by Mustafa Whitfield in the Delaware Superior Court on November 2, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Delaware Superior Court Order dated November 3, 2004, denying Mustafa Whitfield's Petition for a Writ of Habeas Corpus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Petition for a Writ of Habeas Corpus filed by Mustafa Whitfield in the Delaware Superior Court on October 19, 2004, with attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Delaware Superior Court's Order dated November 17, 2004, denying Mustafa Whitfield's petition for habeas corpus and pro se motion to compel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Motion for Post Conviction Relief filed by Mustafa Whitfield in the Delaware Superior Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Delaware Superior Court Order dated June 27, 2005 denying Mustafa Whitfield's Motion for Post Conviction Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Delaware Supreme Court dockets for appeals filed by Mustafa Whitfield . . . . . . . . . . . . . . . . 71

Delaware Supreme Court Opinion dated December 29, 2004, denying
Mustafa Whitfield's direct appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Supreme Court Order dated December 13, 2005 denying Mustafa Whitfield's applications for
post-conviction relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Docket Sheet for Whitfield's federal Petition for a Writ of Habeas Corpus, D. Del., C.A. No.
1:06-cv-00137-GMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Vol. II

Mustafa Whitfield's federal Petition for Writ of Habeas Corpus dated February 28, 2006
w/attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Initial Crime Report prepared by Patrolman Matthew Derbyshire . . . . . . . . . . . . . . . . . . . . . . . 136

Supplemental Crime Report prepared by Patrolman David Prado . . . . . . . . . . . . . . . . . . . . . . . 139

Delaware Superior Court Trial Transcript for *State v. Whitfield, et al.* - January 29, 2004 . . . . 141

Delaware Superior Court Trial Transcript for *State v. Whitfield, et al.*- January 30, 2004 . . . . 155

Vol. III

Delaware Superior Court Trial Transcript for *State v. Whitfield, et al.*- February 3, 2004 . . . . 194

Delaware Superior Court Trial Transcript for *State v. Whitfield, et al.*- February 6, 2004 . . . . 221

Delaware Superior Court Verdict Transcript for *State v. Whitfield, et al.*- February 6, 2004 . . 252

Delaware Superior Court Hearing Transcript in *State v. Whitfield, et al.* - March 5, 2004 . . . . 259

Affidavit of Stephen Misetic w/attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

Investigative Reports Prepared by Detective Stephen Misetic . . . . . . . . . . . . . . . . . . . . . . . . . . 266

Detective Stephen Misetic's handwritten notes of his October 15, 2002 interview of the victim at
Christiana Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 298

Arrest warrant application prepared by Detective Stephen Misetic for the arrest of Mustafa

Whitfield . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306

Transcript of Detective Misetic's October 18, 2002 interview of the victim . . . . . . . . . . . . . 313

**ORIGINAL**

Page 2

PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

06 - 1 3 7

| United States District Court | District: Delaware |
|---|---|
| Name (under which you were convicted): | Docket or Case No.: |
| Place of Confinement: Delaware Correctional Center | Prisoner No.: 317479 |

Petitioner (include the name under which you were convicted)   Respondent (authorized person having custody of petitioner)

v.

Mustafa A. Whitfield    Thomas Carrol

The Attorney General of the State of   Carl Danberg

**F I L E D**

FEB 28 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:
   New Castle County Superior Court
   500 King Street Wilmington Delaware 19802
   (b) Criminal docket or case number (if you know): 0210009174
2. (a) Date of the judgment of conviction (if you know): February 6, 2004
   (b) Date of sentencing: April 16, 2004
3. Length of sentence: 11 years (level 5)
4. In this case, were you convicted on more than one count or of more than one crime? Yes ☑ No ☐
5. Identify all crimes of which you were convicted and sentenced in this case:
   Att. Robbery 1st (4 years level 5) Aslt 2nd (1 level 5) PFDCF
   (3 years level 5) Reck End 1st (2 years level 3) PFDCF (3 years
   level 5) Disguise (2 years level 2) Consp 2nd (1 year level 2)

6. (a) What was your plea? (Check one)
   (1) Not guilty ☑     (3) Nolo contendere (no contest) ☐
   (2) Guilty ☐         (4) Insanity plea ☐
   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? N/A

000102

(c) If you went to trial. what kind of trial did you have? (Check one)

Jury ☑     Judge only ☐

7.  Did you testify at a pretrial hearing. trial. or a post-trial hearing?

Yes ☑  No ☒

8.  Did you appeal from the judgment of conviction?

Yes ☑  No ☐

9.  If you did appeal. answer the following:

(a) Name of court: _Delaware Supreme Court_

(b) Docket or case number (if you know): _021000 9174_

(c) Result: _Denied_

(d) Date of result (if you know): _December 29, 2004_

(e) Citation to the case (if you know): _N/A_

(f) Grounds raised: _① Charges included in each other ②_
_a compromise verdict from the jury and ③ Superior_
_Court judge abused discretion when denying Washington_
_jury instructions._

(g) Did you seek further review by a higher state court?     Yes ☐  No ☑

If yes, answer the following:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Result: _____

(4) Date of result (if you know): _____

(5) Citation to the case (if you know): _____

(6) Grounds raised: _____

(h) Did you file a petition for certiorari in the United States Supreme Court?     Yes ☐  No ☑

If yes, answer the following:

(1) Docket or case number (if you know): _____

000103

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10. Other than the direct appeals listed above, have you previously filed any other petitions,

applications, or motions concerning this judgment of conviction in any state court?

Yes ☑ No ☐

11. If your answer to Question 10 was "Yes." give the following information:

(a) (1) Name of court: New Castle County Superior Court

(2) Docket or case number (if you know): 0210009174

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: Motion to compel

(5) Grounds raised: I requested a copy of my affidavit
for probable cause to be signed. Meaning I requested
a copy which had a judges signature on it

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or

motion?      Yes ☐   No ☑

(7) Result: Denied

(8) Date of result (if you know): _____

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: New Castle County Superior Court

(2) Docket or case number (if you know): 0210009174

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: Motion for Hebeas Corpus

(5) Grounds raised: My arrest was illegal and illegal search and
seizure .

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?        Yes ☐   No ☑

(7) Result: _Denied_

(8) Date of result (if you know): _____

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: _New Castle County Superior Court_

(2) Docket or case number (if you know): _0210009174_

(3) Date of filing (if you know): _March 8, 2005_

(4) Nature of the proceeding: _Motion for Postconviction Relief_

(5) Grounds raised: _Illegal arrest and illegal search and seizure._ _Illegal arrest: Officer lied to establish probable cause_ _for my arrest. Illegal search and seizure: Officer lied_ _to seize evidence._

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?        Yes ☐   No ☑

(7) Result: _Denied_

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1)  First petition:       Yes ☐    No ☑

(2)  Second petition:    Yes ☐    No ☑

(3)  Third petition:      Yes ☑    No ☐

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_On the first and second I didn't know I could appeal._

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: Illegal Arrest and Detention

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

On October 15, 2002 I was arrested for a robbery. I was Charge because my affidavit stated that two police officers by the names off David Prado and Matthew Derysuire positively identified me as a suspect. Which was false because they never saw the suspects faces, couldn't tell their races and according to Prado only saw dark clothing from over a block away on a dimly lit Street, yet I was positively identified by them according to the affidavit.

(b) If you did not exhaust your state remedies on Ground One, explain why: N|A

(c) Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☑

(2) If you did not raise this issue in your direct appeal, explain why: My attorney said it was legal for the police to lie in affidavits because probable cause covers a broad area.

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?     Yes ☑   No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: postconviction and habeas corpus

Name and location of the court where the motion or petition was filed: New Castle County Court House 500 King Street Wil, DE. 19802

Docket or case number (if you know): _____

Date of the court's decision: June 27, 2005

Result (attach a copy of the court's opinion or order, if available): The court cited that I was convicted on circumstantial evidence at trial or abundant circumstantial evidence linked me to the crime residence which didn't ?

(3) Did you receive a hearing on your motion or petition?

  Yes ☐   No ☑

(4) Did you appeal from the denial of your motion or petition?

  Yes ☑   No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

  Yes ☑   No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Delaware Supreme Court 55 The Green P.O. Box 476 Dover Delaware 19903

Docket or case number (if you know): No. 327, 2005

Date of the court's decision: December 13, 2005

Result (attach a copy of the court's opinion or order, if available): The Supreme Court agreed with the Superior Court but it didn't illaborate. (See attached) (Pages 1-3)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: N/A

_____
_____
_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: Motion for Rehearing Enbank denied. (Page 4)
_____

GROUND TWO: Illegal Search and Seizure.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): Warrants with false information. DNA warrants which have misleading information say Whitfield was seen running with suspects and a victims description of the suspects which doesn't agree with the real statement which was on tape. →

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _N/A_____

_____

_____

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐  No ☑

(2) If you did **not** raise this issue in your direct appeal, explain why: _My attorney_
_said it was legal to lie because probable cause_
_has a broad area_

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ☑  No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _Post conviction Relief_

Name and location of the court where the motion or petition was filed: _New Castle_
_County Superior Court 500 King Street Wilmington DE. 19801_

Docket or case number (if you know): _____

Date of the court's decision: _June 27, 2005_

Result (attach a copy of the court's opinion or order, if available): _N/A_

_____

(3) Did you receive a hearing on your motion or petition?

Yes ☐  No ☑

(4) Did you appeal from the denial of your motion or petition?

Yes ☑  No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☑  No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _Delaware Supreme_
_Court 55 The Green P.O. Box 476 Dover Delaware 19903_

Docket or case number (if you know): 327, 2005

Date of the court's decision: December 13, 2005

Result (attach a copy of the court's opinion or order, if available): Pages 1-3

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: N/A

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: I filed for a motion for Rehearing Enbanc, which was denied. (Page 4)

**GROUND THREE:** Prosecution Misconduct

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): State prosecutors knowingly prosecuted off false reports. They new the police didn't identify me, even though the prosecution said they would. The State's case was base off a identification which was false and they knew it but still prosecuted.

(b) If you did not exhaust your state remedies on Ground Three, explain why: The Delaware Supreme Court never ruled on it, even though I put it in my appeal for post conviction relief.

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?
Yes ☐ No ☑

(2) If you did not raise this issue in your direct appeal, explain why: I did not see it.

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a
state trial court?      Yes ☐   No ☑

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: N/A

Name and location of the court where the motion or petition was filed: N/A

Docket or case number (if you know): N/A

Date of the court's decision: N/A

Result (attach a copy of the court's opinion or order, if available): N/A

(3) Did you receive a hearing on your motion or petition?
Yes ☐   No ☑

(4) Did you appeal from the denial of your motion or petition?
Yes ☐   No ☑

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?
Yes ☑   No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Delaware Supreme
Court 55 The Green Dover Delaware 19903

Docket or case number (if you know): 327,2005

Date of the court's decision: December 13, 2005

Result (attach a copy of the court's opinion or order, if available): The Court never
ruled on it. (See pages 1-3)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this
issue: N/A

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative
remedies, etc.) that you have used to exhaust your state remedies on Ground Three: 
Motion for Rehearing EnBanc Denied (Page 4)

000110

GROUND FOUR: _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

_____

(c) **Direct Appeal of Ground Four:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑   No ❑

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____ _____ _____

_____

(d) **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a

    state trial court?       Yes ❑ No ❑

    (2) If your answer to Question (d)(1) is "Yes," state:   .

    Type of motion or petition: _____ _____ _____

    Name and location of the court where the motion or petition was filed: ____ _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____ _____

    Result (attach a copy of the court's opinion or order, if available): ____ _____

    _____

    (3) Did you receive a hearing on your motion or petition?

        Yes ❑   No ❑

    (4) Did you appeal from the denial of your motion or petition?

        Yes ❑   No ❑

000111

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ❏  No ❏

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?    Yes ☑  No ❏

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: __N/A_____

_____

_____

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: __N/A_____

_____

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?    Yes ❏  No ☑

000112

If "Yes," state the name and location of the court. the docket or case number. the type of proceeding, the issues raised. the date of the court's decision. and the result for each petition. application. or motion filed. Attach a copy of any court opinion or order. if available. _N/A_

15. Do you have any petition or appeal <u>now pending</u> (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?      Yes ❑    No ☑

If "Yes," state the name and location of the court. the docket or case number. the type of proceeding, and the issues raised. _N/A_

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: _N/A_

(b) At arraignment and plea: _N/A_

(c) At trial: _Joseph M. Bernstein, Esquire 900 N. King Street - Suite 302 Wilmington DE. 19801_

(d) At sentencing: _Joseph M. Bernstein, Esquire 900 N. King Street Suite 302 Wilmington Delaware 19801_

(e) On appeal: _Joseph M. Bernstein (same address above)_

(f) In any post-conviction proceeding: _N/A_

(g) On appeal from any ruling against you in a post-conviction proceeding: _N/A_

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      Yes ❑    No ☑

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: N/A

(b) Give the date the other sentence was imposed: N/A

(c) Give the length of the other sentence: N/A

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?    Yes ☐  No ☑

18.  TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.* Because my conviction was final December 29, 2004 (The Date the Delaware Supreme Court denied my direct appeal) or it could have been finale in February '05 when the Court (Delaware Supreme) denied my motion for Rehearing Enbanc. The time stopped on March 5, 2005 when my post-conviction relief was filed. The judgment on my post-conviction relief was denied (Rehearing Enbanc) on January 9, 2006. For almost a year I've been going through my post-conviction relief. I haven't had the time to file these issues.

_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)  A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of —

(continued...)

Page 15

Therefore, petitioner asks that the Court grant the following relief: *That I be released or given a fair trial.*

or any other relief to which petitioner may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on

_____ (month, date, year).

Executed (signed) on _____ (date).

*Mustafa Whitfield*
Signature of Petitioner

_____
*(...continued)
(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;
(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

000115

AMOUNT
**$2.7!**
0000

UNITED STATES
POSTAL SERVICE

U.S.M.S.
MAIL TRAY

From: Mustafa Whitfield

3124119-21

D.C.C. 1181 Paddock Road

1181 Paddock Road Snyrna, Delaware 19977

To: Us District Court

Lockbox 18 Boggs Federal

Building 844 King Street

Wilm. Del. 19801



000116

Ready▼Post.

REDACTED

06-137

Appendix   (Included as Facts)

000117

Please excuse the writting on the papers ...

Pages 1-3 : Delaware Supreme Court denied appeal (post convict

Page 4 : Motion Rehearing En Banc Denied .

Pages 5-6 : Affidavit saying I was positively identified by officers (David Prado and Matthew Derbyshire) as a suspect.

Page 7 : Matthew Derbyshire testifing he didn't see the suspects faces. (Prosecution questioning)

Page 8-A : Matthew Derbyshire saying he got a good look at the suspects backs. (Defense questioning)

Page 9 : David Prado testifing he could not tell the suspect races . (Prosecution questioning)

Page 10 : David Prado testifing you couldn't tell facial wise who it was, all you saw was dark clothing (Defense questioning)

Page 11 : Prosecutor Martin B. O'Connor claiming David Prado and Matthew Derbyshire would testify they saw Me (Mustafa Whitfield) and Emmanuel Robinson jump a brick wall. And O'Connor claiming Prado recognized us as suspects.

Page 12 : Warrant stateing the victim described what myself and

Emmanuel Robinson had on and it states that Mustafa Whitfield and Emmanuel Robinson were seen running seconds after the crime.

Page 13: The victims actual description of the suspects wearing military like clothing looking like twins.

Page 13-A: The victim (Anthony Meek) testifing all he remembered was they looked like twins. (Which you don't see on page 12)

Page 14: Matthew Derbyshire testifing the last time he was the two suspects who jumped over the fence that night, was when they jumped over the fence and he type a report.

Page 15: Detective Stephen Misetic claiming Matthew Derbyshire and David Prado saw me jump over a fence.

Page 16: Detective Misetic claiming Mustafa Whitfield was positively identified as the suspects seen running with Coleman

Niether Prado or Derbyshire testified the saw me nor positively identified me like Misetic warrants and reports say, and like the State claimed they would and every report is based off this information.

000118

17

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MUSTAFA WHITFIELD, | § | |
| | § | |
| Defendant Below- | § | No. 327, 2005 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware, |
| | § | in and for New Castle County |
| STATE OF DELAWARE, | § | Cr. ID. 0210009174 |
| | § | |
| Plaintiff Below- | § | |
| Appellee. | § | |
| | § | |

Submitted: October 7, 2005
Decided: December 13, 2005

Before **STEELE**, Chief Justice, **BERGER**, and **RIDGELY**, Justices.

## O R D E R

This 13th day of December 2005, upon consideration of the parties' briefs and the record below, it appears to the Court that:

(1)    The appellant, Mustafa Whitfield, filed this appeal from the Superior Court's denial of his first motion for postconviction relief. We find no merit to Whitfield's appeal. Accordingly we affirm the Superior Court's judgment.

(2)    The record reflects that, in February 2004, a Superior Court jury convicted Whitfield and two codefendants of multiple offenses including attempted first degree robbery and weapon charges. The Superior Court sentenced Whitfield to eleven years in prison followed by decreasing

①                                    000119

levels of supervision. This Court affirmed Whitfield's convictions and sentences on direct appeal.[*] In his motion for postconviction relief, Whitfield asserted two claims entitled, respectively, "Illegal Arrest and Detention" and "Search and Seizure in Violation of the Fourth Amendment." In essence, however, both claims challenge the veracity of the arresting officers' testimony and the lack of forensic evidence linking him to the crime. The Superior Court noted that Whitfield's identity as one of the perpetrators was argued vigorously at trial. The Superior Court concluded that the circumstantial evidence that tied Whitfield to the crime was abundant and thus sufficient for the jury to find him guilty beyond a reasonable doubt.

(3)    After careful consideration of the parties' respective positions and the record below, we find it manifest that the judgment of the Superior Court should be affirmed on the basis of the Superior Court's well-reasoned decision dated June 27, 2005. The Superior Court did not err in concluding that Whitfield's motion for postconviction relief was without substantive merit. Moreover, because the sufficiency of the evidence was challenged on direct appeal, Whitfield's postconviction motion is barred as previously adjudicated under Superior Court Criminal Rule 61(i)(4).

---

[*] *Whitfield v. State*, 867 A.2d 168 (Del. 2004).

000120

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

Chief Justice

000121

3

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MUSTAFA WHITFIELD, | § | |
| | § | |
| Defendant Below- | § | No. 327, 2005 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware, |
| | § | in and for New Castle County |
| STATE OF DELAWARE, | § | Cr. ID. 0210009174 |
| | § | |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted: December 21, 2005
Decided: January 9, 2006

Before **STEELE**, Chief Justice, **HOLLAND, BERGER, JACOBS**, and **RIDGELY**, Justices, constituting the *court en banc*.

### *O R D E R*

This 9th day of January 2006, the Court having considered the appellant's Motion for Rehearing *En Banc* dated December 21, 2005, and it appearing that the motion should be denied.

NOW, THEREFORE, IT IS ORDERED that the appellant's motion be and the same hereby is,

**DENIED**.

BY THE COURT:

Chief Justice

000122

(page 1) 'Facts                                                    page 1

State of Delaware vs. MUSTAFA A. WHITFIELD          Case: 02 10 009174

## Exhibit B

SBI Number: 00317479                    Also Known As: **MUSTAFE WITFIELD**
Date of Birth/Age:      **1985 (17)**    Sex: Male                    Race: **Black**
Eye Color: **Brown**      Hair Color: **Black**      Height: **5'11"**   Weight: **138 lbs**
Driver's License:                        Social Security Number:**000000000**
Address: **622 W 6TH STREET**
         **622 WEST 6TH STREET**
         **WILMINGTON, DE 19801**
Phone:
Employer:

Date and Times of Offense: **Between 10/14/2002 at 2352 and 10/15/2002 at 0015**
Location of Offense: **500 WILLING ST - Wilmington, 19801**

000123

Your affiant STEPHEN MISETIC can truly state that:
 1.) That this affiant is employed b ythe City of Wilmington as a police officer and has been for the past six years. This affiant is currently assigned to the Criminal Invetstigation Division.
 2.) That this affiant can state that this incident occurred in the 500 Block of Willing Street, which is located in the City of Wilmington, County of New Castle, State of Delaware.
 3.) That this affiant can state that on 2352 hours of 14 October 2002 wwhile on routine patrol officers in the area of 4th and West Streets, observed three subjects running East on 5th Street then North on West Street. The subjects were described as black males. Suspect #1 was wearing a white t-shirt and dark pants. Suspect #2 was wearing a dark grey sweatshirt and dark pants. Suspect #3 was wearing all dark clothing.
 4.) Your affiant can state that suspect #2 and supect #3 jumped over a fence in the 500 Block of North West Street, traveling east bound. The patrolofficers became suspicious of the subjects, as they appeared to be running with a purpose. The patrol officers decided to stop suspect #1, who was still running northbound in the 500 Block of North West Street.
 5.) Your affiant can state that upon sstopping suspect #1, they observed him sweating and having trouble talking due to running. The patrol officers checked the area that the other two subjects were along with suspect #1 on the East side of North West Street. While checking this area a black in color handgun was located on the sidewalk in the 500 block.
 6.) Your affiant can state that the other two suspects were stopped in the 200 block of West 4th Street. Patrol officers positively identified these subjects that were seen running with suspect # iII
 7.) That this affiant can state that while the suspects were stopped, Wilcom dispatched another patrol vehicle to the 500 Block of Willing Street in reference to a shooting. This location is half a block from where the suspects were seen running from, moments before the call came over the air.
 8.) That this affiant can state that the victim was located and a scene was also located in the 500 Block of Willing Street. At this scene a 9mm round was located along with a 9mm shell casing. The scene was held until Evidence Detection Unit arrived and collected same. Also located at the scene was a white in color t-shirt.

_____
Affiant

Sworn and subscribed before me this 15th day of October AD, 2002

_____
Judge/Master/Commissioner/Court Official



(page 2) Facts                                                                    page 2

State of Delaware vs. MUSTAFA A. WHITFIELD                    Case: 02 10 009174

9.) That this affiant can state that the victim was transported to Christiana Hospital by ambulance for a gun shot wound to the left foot. The victim was seen by Doctor Dunlap, who treated him for a shattered first Metatarsal bone and a shattered first Proximal Phalanx. He was admitted for the night.

10.) Your affiant can state that the victim waas interviewed at the hospital. The victim stated that while exiting his vehicle in the 500 Block of Willing Street three subjects approached him. Suspect #1 brandished a black in color Semi-automatic Handgun. Suspect #1 was wearing a white in color t-shirt and dark pants. Suspect #2 was wearing dark clothing and a dark grey shirt, while suspect #3 was wearing dark clothing. Both of these suspect's were donning white in color masks, possibly t-shirts, which covered their entire face, but their eyes.

11.) Your affiant can state that suspect #1 told the victim to "give it up". One of the other two suspects stated, "grab the keys". Either suspect #2 of #3 went to grab for the keys, as they did the victim grabbed this suspect. Both the victim and either suspect #2 or #3 fell back into the brush area along the east side of the street. This suspect got off the ground and suspect #1 fired a shot at the victim. This shot missed and all three suspects ran together south in the 500 Block Of Wiilling Street. The victim then gave chase, at which point suspect #1 stopped, turned around and fired another shot at the Victim. This shot struck the victim in his left foot. The victim was ab able to observe the suspects run east on 5th Street towards West Street, until he lost sight of them. Either sutpect #2 or #3 told #1 to, "Shoot Him".

12.) That this affiant can state that the victim was shown a photo lineup, at which point he positively identified, Suspect #1, Akeem Coleman BMN-16 D.O.B.of    -1986 as the individual who fired two shots at him.

13.) That this affiant can state that the weapon recovered in the 500 Block of North West Street was a black in color Smith and Wesson 9mm handgun which contained a total of five 9mm rounds, including one in the chamber.

14.) That this affiant can state that the other two subjects who had a white in color object covering their faces were positevely identified as Mustafa Whitfield BMN-17 D.O.B. of    985 and Emmanuel Robinson BMN-17 D.O.B. ol    1985. These two subjects along with Akeem Coleman were transported to Central for further investigation.

15.) That this affiant can state that while at central a white in color t-shirt was retrieved from the property of Akeem Coleman that he was not wearing and Mustafa Whitfield was wearing a white t-shirt under a grey sweater

16.) That this affiant can truly state that all attempts to notify the guradians of the juvenile suspects. Ms. Brown, who is the mother of Emmanuel Robinson, stated that we could speak to him. Ms. Neal, who is the mother of Mustafa Whitfield, stated we could not speak to her son. With the number provided by Akeem Coleman an attempt was made to contact his guardian. A male answered the phone and stated that Akeem Coleman did not live there. This was presented to Akeem Coleman, who responded that he gave us the right number.

17.) That this affiant can state that Emmanual Robinson after being read his Miranda Rights, Mr. Robinson stated that he was walking home with Mustafa Whitfield and has no idea of a shooting, nor who Akeem Coleman.

18.) That this affiant can state that Akeem Coleman was read his Miranda Rights and stated that he was walking home to Elsemere from the east side. He does not know the other two subjects and has no idea about a shooting.

Affiant: STEPHEN MISETIC (07056) of WILMINGTON PD

Victim:                          Date of Birth              Relationship Victim to Defendant
                                        Stranger

000124

_____
                    Affiant
Sworn and subscribed before me this 15th day of October AD, 2002

_____
                    Judge/Master/Commissioner/Court Official



(page 6) FACTS

77

1  Because obviously we found a gun on the ground he might

2  be armed.

3      Q.  I'm going to show you what has been marked

4  State's Exhibit 29. Could you tell the jury what that

5  is?

6      A.  That's a picture of the brick wall in the 500

7  block of West where the two suspects jumped over the

8  fence and the tree is approximately on the ground.

9  Behind the tree is where the gun was on the sidewalk.

10     Q.  If you could use the laser and show the jury

11 the area where you located the gun?

12     A.  Right about there behind that tree on the

13 ground.

14     Q.  Was it on the sidewalk?

15     A.  Yes, it was on the sidewalk.

16     Q.  Now, is there anything significant about where

17 you are standing in this picture?

18     A.  That is the wall, the exact area of the two,

19 Mr. Robinson and Whitfield, jumped over the fence.

20     Q.  So where you are standing?

21     MR. BERNSTEIN:  Objection.  I don't think that

22 it has been established this witness has identified

23 anyone.  He just mentioned two people by name who

78

1  jumped over the fence and I don't think that is -- he

2  has never been asked to identify these people.  I don't

3  know where this is coming from.

4      THE COURT:  Can you rephrase your question?

5      MR. DONAHUE:  Yes, your Honor.

6  BY MR. DONAHUE: .

7      Q.  Where you are standing, that is where the two

8  individuals jumped over the fence?

9      A.  Correct.

10     Q.  And which direction in this picture were the

11 individuals that jumped the fence running?

12     A.  That would be eastbound.

13     Q.  So if you could use the laser and show the

14 direction the way they were running?

15     A.  Over that fence to the courtyard.

16     Q.  But from which direction would they enter this

17 picture?

18     A.  Right where I was standing.

19     Q.  So from right to left; is that fair to say?

20     A.  Yes.

21     X THE COURT:  Are you saying they are going

22 behind you?

23     X THE WITNESS:  Correct.  Over the fence is east

79

1  x and they kept going eastbound through the courtyards.

2      Q.  Were you able to get a good look at the two

3  individuals that jumped over the wall?

4      A.  I got a look, not a great look, but good

5  enough at the clothing description.

6      Q.  You didn't see their faces?

7      A.  No.

8      Q.  Now, could you -- I'm going to show you what's

9  been marked as State's Exhibit 30.  Could you please

10 tell the jury what this is?

11     A.  Again, that's the eastern most sidewalk in the

12 500 block of West Street.

13     Q.  And --

14     A.  Looking north on west.

15     Q.  And can you depict the area where you located

16 the gun?

17     A.  Right there in that area right there.

18     Q.  And where did Officer Prado stop Akeem

19 Coleman?

20     A.  Probably up around there.

21     Q.  Now, when you located the gun, what did you

22 do?

23     A.  I picked it up to make the weapon safe, which

80

1  is to see if it was loaded and there is a magazine in

2  the clip -- or clip in the gun.  At that point I made

3  it safe by ejecting the one round out of the chamber

4  and removing the clip.

5      Q.  So was there a round in the chamber?

6      A.  Yes.

7      Q.  And was there a magazine?

8      A.  Yes.

9      Q.  Do you know if the magazine had any bullets in

10 it?

11     A.  It did.

12     Q.  Were you able to take a look at the bullets

13 that were in the magazine?

14     A.  Yes.

15     Q.  And were you able to identify those bullets?

16     A.  Hollow point nine-millimeter rounds.

17     THE COURT:  Do you have the trigger lock?

18     THE BAILIFF:  Yes, your Honor.

19     THE COURT:  Would you like to bring it up and

20 put it on, please?

21 BY MR. DONAHUE:

22     Q.  I'm handing you State's Exhibit 14.  Could you

23 please open that envelope.  Can you tell the jury what

000125

1  where you were in between there and there.

2  Q. That's far away and I'm going to guesstimate

3  that's maybe 30 feet?

4  A. I guess so.

5  Q. And at that distance are these people going

6  over the wall?

7  A. Yes.

8  Q. And you are still in your car?

9  A. Getting ready to get out, yes.

10  Q. Getting ready to get out?

11  A. Yes.

12  Q. You get out of your car and you go up -- are

13  you running up the street by now?

14  A. Yeah. I ran towards where I saw them jump

15  over.

16  Q. You are running on the east side of West

17  Street along that wall; correct?

18  A. Right where I saw they jumped I went to that

19  spot and --

20  Q. When you saw these two people go over the wall

21  how far away from them were you? Back here or closer?

22  A. About that distance.

23  Q. Okay.

---

1  wearing head gear.

2  Q. Could you see their faces?

3  A. No, I saw them more from the back.

4  Q. Their backs were towards you, right? They are

5  not running towards you running away from you; correct?

6  A. Yes.

7  Q. So you get a good look at their backs, don't

8  you?

9  A. Yes.

10  Q. I noticed in one of the earlier pictures there

11  was a figure standing up against the wall; was that

12  you?

13  A. Yes.

14  Q. You don't quite come over the wall?

15  A. No.

16  Q. You got to jump over to see the -- jump up to

17  see over the wall?

18  A. Yes.

19  Q. Did do you that?

20  A. Yes.

21  Q. You didn't go over the wall; what did you do?

22  A. I looked to see if I was close enough to see

23  if I could pursue them on foot to catch them.

---

98

1  A. I can't be sure, they were moving.

2  Q. You weren't five feet away, were you?

3  A. No.

4  Q. You weren't here, were you?

5  A. No.

6  Q. No way. And from where you were you were

7  able to see they were black males?

8  A. Yes.

9  Q. Correct?

10  A. Yes.

11  Q. And they were wearing dark clothing?

12  A. Dark. I think one had a gray sweatshirt on.

13  Q. You could tell it was gray?

14  A. Uh-huh.

15  Q. Not black?

16  A. No. Looked like a gray in color shirt.

17  Q. Not dark green?

18  A. No.

19  Q. You are positive it was gray?

20  A. Yes.

21  Q. Were they wearing any head gear, caps, hats,

22  anything like that?

23  A. I don't recall. I don't think they were

---

100

1  Q. Did you have to jump up?

2  A. Pull myself up.

3  Q. So you are hanging?

4  A. Looking enough to see over the fence and --

5  Q. What do you see?

6  A. Nothing. They were gone.

7  Q. They are gone. Okay. Now did you call this

8  incident in to Recom?

9  A. Wilcom, yes.

10  Q. Wilcom, okay. And those calls are all

11  recorded; correct?

12  A. Yes.

13  Q. Does the identification 17C mean anything to

14  you?

15  A. Yes.

16  Q. What was that?

17  A. The call sign 17 District, Car C, Platoon

18  Charles.

19  Q. So if it is recorded that 17 C did something,

20  that's you?

21  A. Yes.

22  Q. I want to show you a document that's been

23  represented to me to be a Wilcom dispatch entry; do you

---

*(handwritten: (page 4) facts)*

*(handwritten, vertical left margin: David Arado questioned by the state)*

1    Q.   Were they close enough to touch each other?

2    A.   It is hard to say.  Distance wise you can't --

3    perception wise you can't tell if they were that close

4    to touch each other, but they were in a group.

5    Q.   Now, you testified that two of the

6    individuals --

7    A.   -- made it over the wall, correct.

8    Q.   And one didn't?

9    A.   Correct.

10   Q.   Did you see the one who didn't make it over

11   attempt to get over the wall?

12   A.   Yes.  Yes.

13   Q.   And he could not get over?

14   A.   Correct.

15   Q.   Were you able to get a description of the two

16   individuals who went over the wall?

17   A.   Being that that area is not well lit, I mean,

18   it is dimly lit, dark clothing, they were thinner, you

19   could tell they were a lot smaller than the one

20   individual.  But they were thin in stature and they

21   were able to jump over this wall pretty easily without

22   any problems.

23   Q.   Could you tell what race they were?

                                                118

1    A.   No.

2    Q.   Now, upon seeing the individuals running, what

3    did you and your partner do?

4    A.   As soon as we saw them running and that occur,

5    we had already started through the light going into the

6    middle of the block, 400 block of West Fourth Street.

7    The larger individual who didn't make it over the wall

8    proceeded to walk northbound on the 500 block of West

9    Fifth.  We exited our patrol vehicle, stopped him and

10   asked to speak with him.

11   Q.   The individual you stopped in that area do you

12   see that individual in court today?

13   A.   Yes.  It is Mr. Coleman.

14        MR. DONAHUE:  Let the record reflect the

15   witness has identified Defendant Akeem Coleman.

16   BY MR. DONAHUE:

17   Q.   Who took the Defendant Coleman into custody?

18   A.   We had both got out of the vehicle.  I was a

19   passenger, I believe, that night, so I had first

20   hands-on with him because Officer Derbyshire walked

21   towards the direction of where the other two were spied

22   jumping over the wall.

23   Q.   And what did you do when you contacted

1    Coleman?

2    A.   Usually it is our normal protocol, we will

3    bring them over to the vehicle, place hands on vehicle,

4    just a normal stop and proceeded to ask questions.

5    Q.   What, if anything, did Officer Derbyshire?

6    A.   As he was walking down towards the last

7    location we had seen the subjects together, he

8    immediately found a weapon, a handgun,

9    Q.   And what, if you know, what did he do with

10   that weapon?

11   A.   He immediately told me that he found a weapon,

12   and as soon as we called in the stop we were advised by

13   Wilcom, our radio room, they had just received a call

14   for shots fired and that's -- you know, that's when

15   Officer Derbyshire had located the weapon.

16   Q.   Did they broadcast the shots were fired?

17   A.   They were given the -- I can't recall exactly

18   if it was -- it was the 500 Block of Willing Street,

19   but I don't exactly recall.

20   Q.   Is the 500 block of Willing in New Castle

21   County State of Delaware?

22   A.   Yes.

23   Q.   Now, after -- strike that.

                                                120

1         What did you and Derbyshire do with Defendant

2    Coleman?

3    A.   We detained him immediately.  Placed handcuffs

4    on him immediately and placed him in the patrol

5    vehicle.  And I think at that time that's when we made

6    the weapon safe.  And from that point that's where I

7    went to backtrack to see if we could locate the two

8    other individuals.

9    Q.   Where did you backtrack?

10   A.   Went back to the same location that Derbyshire

11   had found the weapon.  I jumped over the brick wall

12   to -- about six feet, jumped over that, went in the

13   courtyard of St. Peter's cathedral.

14   Q.   What did you do then?

15   A.   Went through the courtyard of St. Peter's

16   Cathedral and checked some of the darker areas.  There

17   is a chain link fence in the back of St. Peter's

18   Cathedral, a six-foot tall chain link fence went

19   throughout the courtyard, was in between the school and

20   church, went through that courtyard and then came out

21   on Sixth Street, jumped over a smaller brick wall onto

22   Sixth Street between the church and school.

23   Q.   And once you were onto Sixth Street which

them?

2    A.    Fourth and West which is about a block and a

3    half.

4    Q.    Were you on Fourth Street or facing north on

5    West?

6    A.    North on West facing Fourth Street.

7    Q.    Waiting for the light to change?

8    A.    Yes.

9    Q.    So did you see these guys where they came out

10   of?

11   A.    They were coming east on Fifth Street so you

12   can't tell where they are coming from because there is

13   a church and fence but they were coming.

14   Q.    Did it appear they observed you?

15   A.    No. I don't think they observed us it didn't

16   seem like they saw us.

17   Q.    Who was driving that night?

18   A.    I'm sure I was a passenger that night because

19   when we got out of the vehicle I was the first one that

20   approached Mr. Robinson -- Mr. Coleman.

21   Q.    So you believe you were the passenger that

22   night?

23   A.    Correct.

138

1    Q.    And Derbyshire would have been driving?

2    A.    Correct.

3    Q.    When you saw these guys running did they mash

4    down and accelerate?

5    A.    No. Because when we saw them running that's

6    when we went through the light. They were at high

7    speed, high tailing it, and it was around the middle of

8    the block was when they were already jumping over the

9    wall. So we didn't speed up or anything because

10   Coleman began to walk, so we were just going to stop

11   them so there was no need to really high tail it.

12   Q.    Let me see if I can follow this then. You are

13   at Fourth and West?

14   A.    Correct.

15   Q.    And so you have got the light in front of you

16   and four lane Fourth Street ahead of you; correct?

17   A.    Correct.

18   Q.    You have to go in the 400 block of West Street

19   and you have Friends Meeting House and a little

20   cemetery there on the your left?

21   A.    Yes.

22   Q.    And go across Fifth Street and 500 block of

23   West Street now and it is about halfway up between

.1    Fifth and Six that the two individuals who went over

2    the wall went over the wall; is that correct?

3    A.    No. They -- where they jumped over the wall,

4    it is I would say maybe 15 feet away from the front

5    door of the rectory. St. Peter's Cathedral rectory is

6    where they jumped over the wall.

7    Q.    For purposes is that fully up the block,

8    halfway, three quarters?

9    A.    No. The rectory is at the corner of Fifth and

10   West.

11   Q.    So it is closer to Fifth Street than Sixth

12   Street where they went over the wall?

13   A.    Correct.

14   Q.    And when they are going over the wall,

15   approximately where is your vehicle?

16   A.    We are already into the intersection going in

17   to the 400 block of West is when they are jumping over

18   the wall.

19   Q.    Going 20 to 25 miles per hour?

20   A.    I can't tell. Normal speed. Again, we

21   weren't speeding to the location.

22   Q.    So you are better than a block away and they

23   are already going over the wall?

140

1    A.    Correct.

2    Q.    Could you see them clearly from that distance?

3    A.    Only thing you could see was they were taller,

4    one was larger than the other two, but it was dark

5    clothing so you couldn't tell facial wise or who it

6    was, it was dark clothing.

7    Q.    You indicated two of them got over and the

8    larger one tried to get over but couldn't get over?

9    A.    Correct.

10   Q.    Are you sure about that?

11   A.    Yes.

12   Q.    Because your partner testified that you didn't

13   necessarily see anybody try -- the third person try to

14   go over the wall?

15   A.    That's what I saw. I was on the passenger

16   seat so I have the better view of what was going on.

17   We both saw them running, but I had the better view of

18   what they were doing because he was of course driving.

19   But that's --

20   Q.    Then that individual just continued walking up

21   the block?

22   A.    Yes. Started walking north on West Street.

23   Q.    When he is walking north on West Street did

(page 5) Facts    Included as facts    Page F

**5**

1 Individuals have what he described at the time is a
2 white type mask wrapped around their heads, the third
3 individual didn't have a mask, the third individual had
4 a firearm. That individual went up to Anthony Meeks as
5 he exited his car and said: "Give up the keys. Give
6 up the keys."
7        The other two individuals walked around the
8 side of him to essentially block Anthony Meeks in where
9 his car was. As I said, the individual with the gun
10 didn't have a mask on. Anthony Meeks is going to tell
11 you that the individual with the gun is this defendant,
12 Akeem Coleman. He identified him that day and the
13 State anticipates he will identify him in court for
14 you.
15        There were two other individuals with him. As
16 I said, they had these type things wrapped around their
17 heads. "Give up the keys. Give up the keys." He has
18 his keys in his hand. So another defendant -- and the
19 State suggests the evidence will at least substantially
20 show that that defendant is Mustafa Whitfield with the
21 reddish type sweatshirt on, is standing there. And the
22 evidence will also show that Emmanuel Robinson in Anthony
23 defendant in the back row, grabbed the keys in Anthony

**6**

1 Meeks' hand. Anthony Meeks, trying to defend himself,
2 or the evidence will suggest that, grabbed him around
3 the neck and he started to struggle. As he is
4 struggling with him, Akeem Coleman is still, "Give"
5 the keys. Give up the keys" pointing the gun. He
6 struggles with him and falls back.
7        You will see a photograph where his car is
8 parked, there is short curb with ivy and a fence. He
9 is going to tell you he fell back into that and
10 tripped. The evidence will show that Emmanuel Robinson
11 fell on top of him. At that point bam, a shot is fired
12 out of the gun held by Akeem Coleman.
13        Mustafa Whitfield and Robinson get up and
14 start running southbound on Willing Street. Anthony
15 Meeks is pretty angry, he is going to tell you that.
16 He decides to follow them. He starts chasing them down
17 Willing Street towards West Street. As he is chasing
18 them he is going to tell you Akeem Coleman turned
19 around and shot another shot at him. When he fired
20 another shot he felt pain in his foot. The evidence
21 will show he got shot in the foot. He stopped running,
22 went back up to his mother's house where he lived, told
23 his mother where he what happened and 911 was called.

**7**

1        Fortuitously, about the same time patrolman
2 Prado and Derbyshire were on patrol in the City of
3 Wilmington. They were at the intersection of
4 Washington -- sorry West Street and Fourth, just a
5 block down here, Willing is down here.
6        What the defendants did, what the evidence
7 will show, is took a left-hand turn out of Willing
8 Street towards West, running together. When they got
9 to West they crossed the street and started going up
10 the sidewalk. Derbyshire and Prado will tell you two
11 of the defendants, Mustafa Whitfield and Emmanuel
12 Robinson jumped a brick wall that surrounds St. Peter's
13 Roman Catholic church here.
14        Akeem Coleman continued to run straight up the
15 street. You will see the wall is pretty high and of
16 the three codefendants Akeem Coleman is the biggest
17 guy, he would have had trouble getting over the wall
18 probably. The police stopped Akeem Coleman. They had
19 also pursued Whitfield and Robinson because now they
20 are trespassing on church property, almost midnight on
21 a Friday night. As they are talking to Akeem Coleman
22 they realize there is a firearm on the ground by a tree
23 where these guys were walking. You will hear

**8**

1 ballistics testimony that that firearm fired a shell
2 casing which was found right in the middle of Willing
3 Street, essentially in the area of where Anthony Meeks
4 says he was shot at the second time.
5        Akeem Coleman is taken into custody here.
6 Patrolman Prado ends up going over the wall, coming
7 back out on Sixth Street, looks south on Tatnall and
8 sees Whitfield and Robinson, the other two defendants,
9 together down that way. He recognizes them as the same
10 two guys who had jumped over the wall at the church.
11 He confronts them or they actually catch up to him at
12 an apartment complex in the 200-block of Fifth Street
13 and they stopped.
14        At that point Emmanuel Robinson has no shirt
15 on. He is not wearing any shirt at all. He is
16 sweating, heart beating, he is excited. Mustafa
17 Whitfield is in the same type of physical condition.
18 It is 46, 45 degrees outside and they were walking.
19        The evidence will show that a T-shirt, after
20 the struggle with Anthony Meeks, was left by his car.
21 You will see a photograph, there is a white T-shirt
22 left there which is what is wrapped around this guy's
23 head. You will hear testimony from a forensic

Page 3

likely likly

south. This street has parking available on both sides, east and west of it. The victim had just parked his vehicle when he noticed three subjects traveling in a southerly direction towards him on Willing Street. Two of the subjects, Emmanuel Robinson and Mustafa Whitfield placed white in colored t-shirts over their face in attempt to obscure their identity, by only allowing their eyes to be seen. The third suspect, Akeem Coleman pointed a black in color semi-automatic handgun to the head of the victim and stated, "Give it up". Either Emmanuel Robinson or Mustafa Whitfield stated, "Grab the Keys", while the other one grabbed the hand and some of the keys of the victim. A struggle then ensued, in which the victim wrapped his arms around the suspect who had a hold of his hand and keys. The victim used the suspect he had a hold of as shield from Akeem Coleman, who was moving the handgun around in an attempt to get a clear path to shoot him. The suspect who stated, "Grab the keys" told Akeem Coleman to, "Shoot him". While moving around with the suspect the victim and the suspect fell backwards over a curb. The suspect either Emmanuel Robinson or Mustafa Whitfield was able to free themselves. As the victim was attempting to get up off the ground, Akeem Coleman fired a shot at the victim. After firing this shot all three subjects, Akeem Coleman, Mustafa Whitfield and Emmanuel Robinson started to run together, south on Willing Street towards 5th Street. The victim was able to get up and began to run after the suspects. While running towards the suspects, Akeem Coleman turned around, stopped and fired another shot at the victim. The suspects then continued to run south on Willing Street then East on 5th Street towards West Street out of sight. The victim is unsure which shot struck his foot, but after the second shot he limped over to the alley way ▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ The victim eventually made it inside and told his mother that he had been shot and for her to call the police, which she did.

The three suspects were seen running together away from the shooting scene by Patrolman Mathew Derbyshire and Patrolman David Prado. They were seen running together Eastbound on 5th Street then North in the 500 Block of West Street. Two of the suspects were observed attempting and eventually jumping over a fence onto the property of 500 West Street (Saint Peter's Cathedral). This raised the suspicion of the patrol officers as the subjects were running together and two of the suspects, Emmanuel Robinson and Mustafa Whitfield jumped over a fence onto private property (Trespassing). The patrol officers began to travel north on West Street towards the suspects. The third suspect, Akeem Coleman continued to run north on West Street until he was stopped by Patrolman Derbyshire and Prado. Akeem Coleman was wearing a white t-shirt and dark pants. While speaking to Akeem Coleman, Patrolman Derbyshire observed a black in color handgun lying on the eastern side of the street on the sidewalk in the 500 block of West Street, where the suspects were seen running and jumping over the fence. Akeem Coleman was placed into custody and transported to central for further investigation. During this stop a call came over main dispatch Channel 'A' stating that there was a shooting in the 500 Block of Willing Street. This location is less then half a block away from where the suspects were seen running from and the black in color handgun was located.

Patrolman Prado hopped the wall where the other two suspects were last observed and headed east towards Tatnall Street. The other two subjects were located walking east bound on 5th Street from Tatnall Street, which is consistent with the direction they were last seen running from. Patrolman Prado and Patrolman William Draper observed the two

page 4

Page: 3
02-106294/106295
MISETIC

suspects walk into the apartment complex located in the 200 block of 4th and 5th Streets. These two suspects were stopped and positively identified as the two suspects who were seen running with Akeem Coleman and observed jumping over the fence. The suspects were identified as Emmanuel Robinson and Mustafa Whitfield. Although it was cold this night somewhere between 40 to 45 degrees, Emmanuel Robinson was bare-chested and was carrying his shirts. Both subjects were also noticeably sweating and had an accelerated heart rate for just walking. These suspects were taken into custody and transported to central for further investigation.

The victim was transported to Christiana Hospital for a single gunshot wound to his left foot. While at the hospital the victim was treated by Doctor Denise Dunlop for a possible fracture. Through the x-rays it showed the victim suffered a shattered 1st Metatarsal Bone and a shattered 1st Proximal Phalanx. It is unknown at this time if there will be any future problems with walking or running, although according to Doctor Dunlop the victim could have certain limitations from the injury. This detective along with Detective James Diana responded to the Christiana Hospital and conducted an initial interview of the victim. During this interview the victim was shown two separate photo lineups. One lineup contained a photo of suspect, Emmanuel Robinson and the other contained a photo of Akeem Coleman. The victim was unable to identify a photo of Emmanuel Robinson as one of the suspects involved in the incident as he was unable to see his face due to the white in color clothing around his face. When shown the second lineup, the victim positively identified Akeem Coleman as the person who displayed the black in color handgun and fired both shots at him. This detective along with Detective James Diana then responded to the crime scene, 500 block of Willing Street and noted the lighting conditions along with any vehicles in the block.

This detective along with Detective James Diana received permission from Eugene Robinson mother to interview her son. An interview was conducted. An attempt was made by Detective James Diana to contact the mother of Akeem Coleman with the number Mr. Coleman supplied. This attempt was met with negative results, so an interview was conducted with Mr. Coleman. Detective James Diana contacted the mother of Mustafa Whitfield, who stated that she did not want her son interviewed and no interview was conducted.

An area canvas search was conducted by patrol officers, who responded to the area. During this canvas search several individuals were located that heard shots fired in the area. One witness was located who heard a commotion in the 500 block of Willing Street. This witness looked out his window and observed a heavy set male holding a black in color handgun towards another male. He then observed this heavy set male fire a shot at the male. The male with the gun and two other subjects began to run towards 5th Street, while the victim ran after them. The heavy set male then turned around and fired two more shots at the victim, who then started limping.

The three suspects were booked on the below listed charges and arraigned at Justice of the Peace Court #20. They were all committed to New Castle County Detention Center. Due to several other robberies and carjackings in the surrounding area, search warrants for the addresses of the suspect's were executed for possible evidence related to these robberies and carjackings. During the search warrant at Mustafa Whitfield's residence, 622 West 6th Street Wilmington, Delaware, Detective Brian Ellis located crack/cocaine and heroin in Mustafa's jacket, which was located in his bedroom. This

000131

(16)

*(page 13) rous* ⋯ *Included in facts* *page 3 (three)*

## PROBABLE CAUSE

1. Your affiant is Detective Stephen Misetic, a police officer with the Wilmington Department of Police who has served in this capacity since September 30th, 1996. Your affiant is currently assigned to the Criminal Investigation Division and has been since April 16th, 2002.

2. Your affiant can truly state that on 14 October 2002 Wilmington Police were on routine patrol in the area of 4th and West Streets in the City of Wilmington. At approximately 2352 hours they observed three black males running together East on West 5th Street then north on West Street. Two subjects scaled a fence on the east side of the street. At the time the patrol officers were able to stop the one subject who did not jump over the fence, as the others continued through the fenced in property. At the location where they stopped the one subject, in the 500 Block of Willing Street the officers located a loaded 9mm handgun this was also within close proximity of where the subjects were seen jumping over the fence. The other two subjects, who were seen jumping over the fence were stopped in the 200 block of West 4th and West 5th Street.

3. Your affiant can truly state that simultaneous to the stop of the first subject, Wilmington Police Communications dispatched units to the 500 block of Willing Street in reference to a shooting. This location is approximately half a block away from where the subject was stopped and was the location where all three subjects were seen running away from together. At the scene a 9mm casing was located as well as a white t-shirt, which was located where the victim and one of the suspects were involved in a struggle and fell backwards. There were no other subjects observed in the area by the patrol officers. Through interviews with the victim, who was shot in the left foot, the three subjects approached him and attempted to carjack him. The victim described the shooter as a black male wearing a white t-shirt and described the other two subjects as black males who had their faces covered with white t-shirts except their eyes. He added that one of these subjects was wearing a dark gray shirt and the other was wearing a dark or black colored shirt.

4. Your affiant can truly state that due to the suspicious actions of the three subjects along with the close proximity of the shooting scene as well as a 9mm handgun to them, the three subjects were brought to the police station for further investigation. While at the police station, their photo lineups were completed with two of subject's pictures and shown to the victim. The victim positively identified Akeem Coleman BMN-16 D.O.B.    1986 as the subject who displayed a handgun and shot him. Mr. Akeem Coleman BMN-16 D.O.B.    -1986 was the initial person who was stopped by the patrol officers.

5. Your affiant can truly state that due to the suspicious actions of the other two subjects, Mustafa Whitfield D.O.B. BMN-17    1985 and Emmanuel Robinson BMN-17 D.O.B.    .985, and the fact they were seen running together with the identified shooter, Akeem Coleman BMN-16 D.O.B. 1986, seconds after the shooting, it is believed that they are the other two suspects involved in the this incident. Furthermore, your affiant can state that upon being stopped, Mustafa Whitfield BMN-17 D.O.B.    -1986 was wearing a dark gray sweater with a white t-shirt under it and Emmanuel Robinson BMN-17 D.O.B.    1985 was wearing a black shirt.

The victims description of the suspect (page 5

STATEMENT/ANTHONY MEEK
CASE NO. 02-106295
PAGE 7

A49    Yeah, yeah.

Q50    Everything was the same?

A50    Yeah.

Q51    Okay um how about what their clothing?

A51    Uh they had the white tee shirt uh whatever that was over their face and it was like uh a
matching outfit like gray or dark black or charcoal uh...

Q52    Okay.

A52    Like a shirt in their pants like a uh was it uh like a I'm trying to think of that (CU)
military might wear.  Like you might go to the store and get you know like a matching, a
whole outfit.

Q53    Okay.

A53    Like that but it was just that same color (CU) outfit.

Q54    Both of them had on the same or...?

A54    Yeah seemed it seemed to be (CU)

Q55    Okay.

A55    (CU)

Q56    Okay, alright uh I know you said that some of them uh made some statements um
actually let me go back.  When when they start walking towards you you said one of
them uh one of the guys with the mask um you said he snuck he was coming around?

A56    He tried to yeah that was this was like right when they came around the corner and I
guess they saw me look up at them, cause I looked dead at them and he looked like he
tried to duck down. But then like he was trying to duck and come around behind me then
then he stopped, then they both all three of them came around from uh towards the
driver's side.

Q57    When you now when you came down um you came off of 6th down Willing.

A57    Right.

Q58    So so you're heading South bound at that point?

000133

57

1  O'Connor is wearing?

2  A. Gray, dark gray.

3  Q. You are familiar with the lighting conditions

4  where you park your car at night on Willing Street?

5  A. Pretty much.

6  Q. Given those conditions, whether it is bright

7  as daylight or dark or whatever they are, under those

8  lighting conditions were you able to distinguish colors

9  or how well or how poorly were you able to distinguish

10  colors?

11  A. At that time colors were not on my mind.

12  Q. Were you asked to describe the color of the

13  gun? What did you say?

14  A. Told them it was black.

15  Q. You remembered it was a gun?

16  A. I remember the gun, yeah.

17  Q. And you are sure it was black?

18  A. Yes.

19  Q. Not gray, not dark blue, black?

20  A. It was black.

21  Q. When you were asked at the hospital to

22  describe the clothing, do you remember what you said?

23  A. No. I don't remember what I said.

58

1  Q. Would you like to look at something maybe to

2  refresh your memory?

3  A. Sure. Why not.

4  Q. Do you remember telling the police officer who

5  interviewed you at the hospital that you described the

6  two other suspects as wearing matching dark clothing,

7  possibly a dark gray shirt with white scarves around

8  their faces; do you remember saying that?

9  A. That's what I said then?

10  Q. At the hospital.

11  A. That's what I said, that's what was said.

12  Q. You don't have a recollection sitting here

13  today that you said that?

14  A. I remember saying that they looked like twins,

15  that I remember.

16  Q. When you say twins in terms of the way they

17  were dressed?

18  A. Dress and the build and the size of them in

19  the way they were dressed.

20  Q. Kind of the same build and they were dressed

21  kind of the same?

22  A. Yes.

23  Q. You said they both had white scarves covering

59

1  their faces?

2  A. T-shirts, scarves covering their face.

3  Q. Clothing pants, light or dark?

4  A. It wasn't white.

5  Q. Dark, not khakis?

6  A. No.

7  Q. How about shirts? Could you distinguish

8  colors? Because apparently the person who recorded

9  your interview recorded that you said possibly a dark

10  gray shirt.

11  A. That's what was written.

12  Q. Let me ask you this, do you think if you were

13  standing on Willing Street at night right now you could

14  distinguish somebody wearing a dark gray shirt or a

15  black shirt?

16  A. I don't know. They would have to be out

17  there.

18  Q. You have been out there many many times?

19  A. When you're on Willing Street or any street

20  you don't think about person's colors, you think about

21  your position, who are they, where are they, if they

22  are trying to do something or not. You are not

23  thinking about if the guy has rainbow socks on, that

60

1  doesn't come to mind.

2  Q. I'm not asking that if you could distinguish

3  between colors?

4  A. It is possible.

5  Q. I'm not saying whether you did or didn't that

6  night, but if you were to go out there tonight and look

7  at people wearing clothing could you tell whether

8  someone was wearing a dark gray shirt or dark green

9  shirt?

10  A. It is possible.

11  Q. Or a dark gray shirt or black black shirt or

12  dark blue shirt?

13  A. It is possible.

14  Q. Do you think your vision is better today than

15  it was 18 months ago or about the same?

16  A. About the same. About the same.

17  Q. Did you notice anything unusual about any of

18  the clothing worn by any of these three people that you

19  saw?

20  A. Unusual as in what?

21  Q. Say if one of them was wearing a top hat a

22  foot tall, would you have remembered that?

23  A. Something abstract like that, yes.

000135

see that? Do you recognize that document?

2    A.   Yes.

3    Q.   Look at the bottom three lines where it says

4    17C, do you see that?

5    A.   Yes.

6    Q.   What does it say?

7    A.   17C had one stopped, two fled, jumped over the

8    fence by church, suspect male, gray black sweatshirt

9    jumped over the fence towards Orange Street.

10   Q.   Is there a time recorded there?

11   A.   23:59.

12   Q.   What is the time next to the 17C?

13   A.   00:06.

14   Q.   What time would that be?

15   A.   12:06.

16   Q.   Six minutes after midnight?

17   A.   Correct.

18   Q.   Earlier you mentioned two individuals, Mr.

19   Whitfield and Rob --

20   A.   Robinson.

21   Q.   -- Robinson by name?

22   A.   Correct.

23   Q.   You didn't know anybody's name at three

'102

1    minutes after 12?

2    A.   At that time?

3    Q.   You didn't know anybody's name except that

4    they were black males?

5    A.   Yes.

6    Q.   Were you personally involved in the

7    apprehension of Robinson and Coleman?

8    A.   No.

9    Q.   You were not?

10   A.   No.

11   Q.   Did you ever see those two people again that

12   night?

13   A.   No.

14   Q.   Did you ever see them the next day?

15   A.   Next day, no.

16   Q.   Do you know who was involved in arresting

17   those two people and apprehending them?

18   A.   I believe Officer Prado and Officer Draper.

19   Q.   Okay. But you were not?

20   A.   No.

21   Q.   Did you have any involvement with this

22   incident after you apprehended Mr. Coleman and picked

23   up this weapon?

1    A.   Other than that, I went back to -- transported

2    them back to Central for booking purposes.

3    Q.   You mean you transported Coleman?

4    A.   Coleman. Coleman, correct. Then I wrote the

5    incident, whatever we had done that night and our

6    actions.

7    Q.   That was it?

8    A.   Yes.

9    Q.   Other than going back a couple months later

10   taking some photos or you don't remember that?

11   A.   I remember taking a photo yesterday.

12   Q.   All right.

13        MR. BERNSTEIN: Excuse me for a minute.

14        That's all, your Honor. Thank you.

15        THE COURT: Anything further?

16        MR. DONAHUE: Very brief.

17   BY MR. DONAHUE:

18   Q.   Officer, is it possible that Akeem Coleman

19   dropped the gun and you didn't see it?

20        MR. O'CONNELL: Objection. Calls for

21   speculation. The question was phrased is it possible.

22        MR. DONAHUE: I will rephrase.

23   BY MR. DONAHUE:

104

1    Q.   From your position would you have been able to

2    see Akeem Coleman drop a gun?

3    A.   No.

4    Q.   I didn't say that.

5    A.   If he had it down by his side cars would be

6    blocking my view, trees there.

7    Q.   Which cars?

8    A.   The ones parked on the -- like in the picture

9    east side of the block.

10        MR. DONAHUE: No further questions.

11        MR. O'CONNELL: Nothing further.

12        MR. BAYARD: Nothing further.

13        MR. BERNSTEIN: Nothing further, your Honor.

14        THE COURT: Very well. You may step down.

15        State's next witness please.

16        MR. O'CONNOR: State calls Francisco Failey,

17   somewhat out of order. But Francisco Failey.

18        FRANCISCO FAILEY,

19   the witness herein, having first been duly

20   sworn on oath, was examined and testified as follows:

21   BY MR. O'CONNOR:

22   Q.   Mr. Failey, where do you live?

23   A.   515 West Street, Wilmington.





| Page: 1 | Report Date 10/15/2002 | Wilmington PD | | 30-02-106295 |
|---|---|---|---|---|

| Reported Date and Time TUE 10/15/2002  0224 | Initial Crime Report | Occurred: MON 10/14/2002 2352 thru TUE 10/15/2002 0015 |
|---|---|---|

**Location:**
500  WILLING ST     Wilmington, DE 19801
ST SIDE OF THE BLOCK

**Name and Incident Overview:**
THE SUSPECTS WERE OBSERVED RUNNING NORTH BOUND IN THE 500 BLK. OF WEST ST. AS A LOADED HANDGUN WAS LOCATED IN THE SUSPECTS GENERAL LOCATION.

| Grid 222-222 | Sector 16 | County New Castle | Domestic Related ☐Yes ☒No | 4-F-14 Sent? ☐Yes ☒No | Gen Broadcast Sent? ☐Yes ☒No |
|---|---|---|---|---|---|

## Victim Information

| Victim Number 001 | Name MEEK, ANTHONY | | | | | |
|---|---|---|---|---|---|---|
| Type **Individual** | Sex **Male** | Race **Black** | | Ethnic Origin **Non-Hispanic** | Age **29** | D.O.B. **04/26/1973** |

| Address | Resident Status **Full Time** | Home Telephone **(302)** | Employer/School | Work Telephone |
|---|---|---|---|---|

| Reporting Person? ☐Yes ☒No | Victim Injured? ☒Yes ☐No | Victim Deceased? ☐Yes ☒No | Officer Comments |
|---|---|---|---|

| Injuries | Description of Injuries **GUN SHOT WOUND TO THE VICTIMS LEFT FOOT.** |
|---|---|

## Suspect/Defendant Information

| Sequence 001 | Type **Suspect** | SBI Number | Name **COLEMAN, AKEEM** | | | Nick Name | |
|---|---|---|---|---|---|---|---|
| Sex **Male** | Race **Black** | Ethnic Origin **Non-Hispanic** | Age **16** | D.O.B. **02/17/1986** | Height | Weight | Skin Tone | Eye Color |
| Hair Color | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |

| Disguise | Disguise Color(s) | Resident Status **Full Time** | Unusual Characteristics | Armed With **Automatic Handgun** |
|---|---|---|---|---|

| Address 1118 RODMAN RD Wilmington, DE 19805 | Home Telephone (302) 658-4412 | Employer/School | Work Telephone |
|---|---|---|---|

| Arrest Number | Suspect's Clothing Description |
|---|---|

| Sequence 002 | Type **Suspect** | SBI Number | Name **WHITFIELD, MUSTAFA** | | | Nick Name | |
|---|---|---|---|---|---|---|---|
| Sex **Male** | Race **Black** | Ethnic Origin **Non-Hispanic** | Age **17** | D.O.B. **05/10/1985** | Height | Weight | Skin Tone | Eye Color |
| Hair Color | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |

| Disguise | Disguise Color(s) | Resident Status **Full Time** | Unusual Characteristics | Armed With **Automatic Firearm** |
|---|---|---|---|---|

| Address 622 W 6TH ST Wilmington, DE 19801 | Home Telephone (302) 778-2220 | Employer/School | Work Telephone |
|---|---|---|---|

| Arrest Number | Suspect's Clothing Description |
|---|---|

| Sequence 003 | Type **Suspect** | SBI Number | Name **ROBINSON, EMMANUEL** | | | Nick Name | |
|---|---|---|---|---|---|---|---|
| Sex **Male** | Race **Black** | Ethnic Origin **Non-Hispanic** | Age **17** | D.O.B. **03/12/1985** | Height | Weight | Skin Tone | Eye Color |
| Hair Color | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |

| Disguise | Disguise Color(s) | Resident Status **Full Time** | Unusual Characteristics | Armed With **Automatic Handgun** |
|---|---|---|---|---|

| Address 717 E 4TH ST Wilmington, DE 19801 | Home Telephone (302) 654-9087 | Employer/School | Work Telephone |
|---|---|---|---|

| Arrest Number | Suspect's Clothing Description |
|---|---|

## Crimes and Associated Information

| Victim Number 001 | Crime Seq 001 | Statute DE:11:0613:00A4:F:C | Crime Description **Assault First Degree Intentional Reckless Serious Injury During Commission Fel** |
|---|---|---|---|

| Location Type hway/Roadway/Alley | Status **Pending-Active** | Involvement ☐Alcohol ☐Drugs ☐Computer | General Offense |
|---|---|---|---|

| Suspected Hate/Bias ☐Yes ☒No - N/A | Crime Code **13234A - Aggravated Assault/Non-Family Firearm** |
|---|---|

000136

| Reporting Officer PTLMN DERBYSHIRE   - 7232 2 | Supervisor Approval MICHAEL J MORRISSEY  OJWIMJM  Date 10/15/2002 0720 |
|---|---|

Case 1:06-cv-00541 Document 13 Filed 01/08/2007 Page 40 of 96

## Crimes and Associated Information

| Burglary Force Involved<br>☐Yes   ☐No | Weapon/Force Used<br>**Automatic Handgun** | |
|---|---|---|

### Victim - Suspect/Defendant Relationships

| Victim - 001<br>**MEEK, ANTHONY** | Suspect/Defendant - 001<br>**COLEMAN, AKEEM** | Victim Offender Relationship<br>**Stranger** |
|---|---|---|
| Victim - 001<br>**MEEK, ANTHONY** | Suspect/Defendant - 002<br>**WHITFIELD, MUSTAFA** | Victim Offender Relationship<br>**Stranger** |
| Victim - 001<br>**MEEK, ANTHONY** | Suspect/Defendant - 003<br>**ROBINSON, EMMANUEL** | Victim Offender Relationship<br>**Stranger** |

### Witness Information

| Sequence<br>001 | Type<br>Witness | Name<br>**FAILEY, FRANSISCO** | | | Sex<br>Female | Race<br>Black | Age<br>56 | D.O.B.<br>05/03/1946 |
|---|---|---|---|---|---|---|---|---|
| Address | | | Home Telephone | Employer/School | | | | Work Telephone |

### Investigative Narrative

17C (DERBYSHIRE/PRADO) WERE ON ROUTINE PATROL IN OUR MARKED PATROL VEHICLE AS WE WERE STOPPED
AT A RED LIGHT AT THE INTERSECTION OF 4TH AND WEST STS.  AS WE WERE SITTING AT THE RED LIGHT
WE OBSERVED THREE BLACK MALES RUNNING EAST BOUND ON W. 5TH ST. AND THEN NORTHBOUND ON WEST
STREET. UPON THESE OFFICERS OBSERVING THE THREE BLACK MALES WEARING DARK CLOTHING RUNNING
NORTHBOUND IN THE 500 BLK. OF WEST ST.  WE OBSERVED TWO OF THEM ATTEMPTING TO JUMP OVER A
FENCE ON THE EAST SIDE OF THE STREET AFTER THEY OBSERVED THESE OFFICERS QUICKLY APPROACH THEIR
LOCATION IN OUR MARKED PATROL VEHICLE.  ONE OF THE SUSPECTS WAS WEARING A GRAY SWEATSHIRT AND
DARK PANTS AND THE OTHER WAS WEARING DARK CLOTHING AS WELL.  BOTH SUSPECTS JUMPED THE FENCE
OVER THE FENCE BEFORE THESE OFFICERS COULD STOP THEM.  THEY WERE LAST SEEN RUNNING EASTBOUND
TOWARDS TATNALL ST. , SUSPECT-1 (COLEMAN, AKEEM DOB 02/17/86) CONTINUED TO RUN NORTHBOUND ON
WEST ST. BEFORE THESE OFFICERS STOPPED HIM IN THE 500 BLK. OF WEST ST.  HE WAS WEARING A WHITE
T-SHIRT AND DARK PANTS.  UPON THESE OFFICERS STOPPING (COLEMAN) WE COULD CLEARLY OBSERVE THAT
HE WAS SWEATING AND HE HAD TROUBLE TALKING BECAUSE HE WAS OUT OF BREATH FROM RUNNING.  IT
S   JLD BE KNOWN THAT THE TEMPERATURE WAS APPROX. 40 DEGREES AT THE TIME (COLEMAN) WAS STOPPED.
.   .IS OFFICER THEN WALKED OVER TO THE SIDEWALK IN THE 500 BLK. OF WEST ST (EAST SIDE OF
STREET) WHERE I LAST SAW THE BLACK MALE IN THE GRAY SWEAT SHIRT JUMP OVER THE AFOREMENTIONED
FENCE.  I OBSERVED A BLACK HAND GUN WHICH WAS LAYING ON THE EASTERN MOST SIDEWALK IN THE 500
BLK. OF WEST ST.  IMMEDIATLY AFTER FINDING THE HANDGUN THIS OFFICER NOTIFIED OFFICER PRADO AT
WHICH POINT HE PLACED (COLEMAN) INTO CUSTODY WITHOUT INCIDENT.  UPON PLACING THE SUSPECT INTO
CUSTODY THESE OFFICERS COULD FEEL THAT HIS HEART WAS BEATING AT AN ACCELERATED RATE.  WE
ASKED (COLEMAN) WHY HE WAS RUNNING WITH THE OTHER TWO SUBJECTS AT WHICH POINT HE ADVISED THAT
HE DID NOT KNOW THEM AND THEY TRIED TO ROB HIM.  (COLEMAN) OBSERVED THAT THESE OFFICER HAD
LOCATED A HAND GUN AT WHICH POINT HE STATED ''THAT'S NOT MY GUN, I'M AFRAID OF GUNS, BY
BROTHER WAS KILLED BY A GUN.''


ASSISTING UNITS LOCATED SUSPECT-2 (WHITFIELD, MUSTAFA DOB 05/10/85) AND SUSPECT-3 (ROBINSON,
EMMANUEL DOB 03/12/85) AS THEY WERE WALKING IN THE 200 BLK. OF W. 4TH ST.  BOTH (WHITFIELD)
AND (ROBINSON) WERE ALSO SWEATING AND BREATHING VERY QUICKLY AS IF BOTH HAD BEEN RUNNING.  ALL
THREE SUSPECTS WERE PLACED INTO CUSTODY WITHOUT INCIDENT AND TRANSPORTED TO CENTRAL BY THIS
UNIT AND 30 CHARLES (DRAPER).


THESE OFFICERS STOPPED THE SUSPECTS AT 2352 HRS.  WILCOM THEN DISPATCHED 10 DAVID (WALKER) TO
THE 500 BLK OF WILLING ST. IN REFERENCE TO A POSSIBLE SHOOTING WITH AN INJURED VICTIM AT 2353
HRS.  (WALKER) DID LOCATE THE VICTIM (MEEK, ANTHONY DOB 04/26/73) IN THE 500 BLK. OF WILLING
ST. ON THE EAST SIDE OF THE STREET.  (MEEK) HAD A GUNSHOT ENTRANCE WOUND ON HIS LEFT FOOT AS
.E WAS TRANSPORTED TO THE CHRISTIANA HOSPITAL VIA AMBULANCE.  HE WAS ADMITTED BY HOSPITAL
STAFF AND WAS IN THE PROCESS OF BEING INTERVIEWED BY DETECTIVES AT THE TIME OF THIS WRITING.
THESE OFFICERS  NEVER SPOKE WITH (MEEK).  EDU WAS NOTIFIED AND RESPONDED TO THE 500 BLK. OF
   ING ST. TO PROCESS THE SCENE WHICH HAD BEEN SECURED BY 18 CHARLES (HAMMOND/WHITEHEAD).
... ALSO RESPONDED TO THE CHRISTIANA HOSPITAL FOR THE VICTIM.

000137

| Reporting Officer<br>**PTLMN DERBYSHIRE   - 7232 2** | Supervisor Approval<br>**MICHAEL J MORRISSEY  OJWIMJM  Date 10/15/2002 0720** |
|---|---|

Case 1:06-cv-00541-GMS   Document 13   Filed 01/08/2007   Page 41 of 96

## Investigative Narrative - Continued

IT SHOULD BE KNOWN THAT THE GUN WHICH WAS RECOVERED WAS A SMITH AND WESSON 9 MILLIMETER HAND GUN, BLACK IN COLOR (SERIAL #VDM5793)MODEL #910.  THE GUN HAD A ROUND CHAMBERED.  THERE WAS ?  ?O  A SILVER 10 SHOT MAGAZINE AND FOUR 9 MILLIMETER ROUNDS EACH A BRASS ROUND WITH A SILVER ING (LUGER HOLLOWPOINT ROUNDS).  SUSPECT-3 (ROBINSON, EMMANUEL) HAD ACTIVE WARRANTS FOR BURGLARY 2ND, ASSAULT 3RD, AND CONSPIRACY.  THESE OFFICERS ALSO SPOKE WITH WITNESS #1 (FAILEY, FRANSISCO DOB 05/03/46).  SEE WITNESS STATEMENTS FOR FURTHER.

## Statement of Witness 001 - FRANSISCO FAILEY

FAILEY SAID THAT HE HEARD SOME PEOPLE ARGUING OUTSIDE OF HIS APARTMENT SO HE LOOKED OUT OF HIS WINDOW TO SEE WHAT WAS GOING ON.  HE SAW THE VICTIM STANDING IN THE BUSHES.  HE SAW THE BIGGER OF THE THREE GUYS WEARING DARK CLOTHING POINTING A GUN.  I SAW THE SUSPECT TRY TO SHOOT THE VICTIM AND NOTHING HAPPENED, HE THEN TRIED TO RUN AWAY AT WHICH POINT HE SHOT THE VICTIM AGAIN.  I SAW THE THREE SUSPECTS RUN SOUTHBOUND ON WILLING TOWARDS THE CEMETARY AND THEN I CALLED THE POLICE.

000138

| Reporting Officer  PTLMN DERBYSHIRE  - 7232 2 | Supervisor Approval  MICHAEL J MORRISSEY  OJWIMJM  Date 10/15/2002 0720 | | | | |
| Detective Notified | Referred To | | | | |
| Solvability Factors | ☐ Witness  ☐ Suspect Located | ☐ M. O.  ☐ Suspect Described | ☐ Trace Stolen Property  ☐ Suspect Identified | ☐ Suspect Named  ☐ Suspect Vehicle Identified | Status  **Has Follow Up** |

30-02-106295

Supplemental Report - #4

| Original Occurrence Dates and Times: | | | Grid | Sector | | |
|---|---|---|---|---|---|---|
| MON 10/14/2002 2352 thru TUE 10/15/2002 0015 | | | 222-222 | 16 | | 000139 |

Location:
50. WILLING ST    Wilmington, DE 19801
EAST SIDE OF THE BLOCK

## Original Victim Information

| Victim Number | Name | | | | | | |
|---|---|---|---|---|---|---|---|
| 001 | MEEK, ANTHONY | | | | | | |
| Type | Sex | Race | | | Ethnic Origin | Age | D.O.B. |
| Individual | Male | Black | | | Non-Hispanic | 29 | 04/26/1973 |

| Address | | Resident Status | Home Telephone | Employer/School | | Work Telephone |
|---|---|---|---|---|---|---|
| | | Full Time | (302) | | | |

| Reporting Person? | Victim Injured? | Victim Deceased? | Officer Comments |
|---|---|---|---|
| ☐Yes ☒No | ☒Yes ☐No | ☐Yes ☒No | |

## Original Suspect/Defendant Information

| Sequence | Type | SBI Number | Name | | | Nick Name | |
|---|---|---|---|---|---|---|---|
| 001 | Suspect | | COLEMAN, AKEEM | | | | |
| Sex | Race | Ethnic Origin | Age | D.O.B. | Height | Weight | Skin Tone | Eye Color |
| Male | Black | Non-Hispanic | 16 | 02/17/1986 | | | | |
| Hair Color | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses | |

| Address | Home Telephone | Employer/School | Work Telephone |
|---|---|---|---|
| 118 RODMAN RD Wilmington, DE 19805 | (302) 658-4412 | | |

| Arrest Number | Suspect's Clothing Description |
|---|---|
| | |

## Original Crime and Associated Information

| Victim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 01 | 001 | DE:11:0613:00A4:F:C | Assault First Degree Intentional Reckless Serious Injury During Commission Fel |

| Location Type | Status | Involvement | General Offense |
|---|---|---|---|
| Highway/Roadway/Alley | Pending-Active | ☐Alcohol ☐Drugs ☐Computer | |

| Bias And Hate/Bias | Crime Code | | |
|---|---|---|---|
| ☒No - N/A | 13234A - Aggravated Assault/Non-Family Firearm | | |

| Burglary Force Involved | Weapon/Force Used |
|---|---|
| ☐Yes ☐No | Automatic Handgun |

## Investigative Narrative

17C PRADO AFTER STOPPING AKEEM COLEMAN IN THE 500 BLOCK OF WEST ST. OFFICER DERBYSHIRE RECOVERED SMITH & WESSON 9MM HANDGUN ON THE SAME SIDE OF THE STREET. THIS WRITER PLACED AKEEM COLEMAN INTO CUSTODY AND PLACED HIM INTO OUR PATROL VEHICLE. THIS WRITER WENT ON FOOT TO LOCATE THE OTHER TWO MALES WE OBSERVED RUNNING WITH COLEMAN, WHO JUMPED OVER THE ST. PETERS CATHEDRAL WALL, INTO THEIR COURTYARD OUT OF SIGHT. THIS WRITER JUMPED OVER THE SAME WALL ON THE EAST SIDE OF THE 500 BLOCK OF WEST ST. THIS OFFICER WALK THROUGHOUT THE COURTYARD LOOKING FOR ANY EVIDENCE WHICH MAY HAVE BEEN LEFT BEHIND BY THE OTHER RUNNING SUSPECTS. THIS WRITER DID NOT FIND ANY EVIDENCE IN THE COURTYARD. THIS WRITER THEN JUMPED OVER THE WALL WHICH IS CLOSET TO THE   CHURCH ON THE 300 BLOCK OF W. 6TH ST., I THEN WALKED EAST BOUND ON W. 6TH ST.

THEN SOUTH BOUND ON TATNALL ST. AS THIS WRITER REACHED 5TH AND TATNALL I OBSERVED TWO BLACK MALES WALKING EAST BOUND ON 5TH ST. BOTH SUBJECTS DID NOT SEE THIS WRITER, THEYTHEN BOTH ENTERED THE APARTMENT COMPLEX LOCATED IN THE 200 BLOCK OF 4TH AND 5TH ST. THIS WRITER WITH OFFICER DRAPER STOPPED BOTH SUSPECTS INSIDE OF HE COURT COMPLEX. IT SHOULD BE KNOWN, THAT BOTH SUSPECTS WERE SWEATING AND THEIR HEARTS WERE RACING.  SUSPECT (EMMANUEL ROBINSON) WAS BARE CHESTED AND HAD BEEN CARRYING HIS SHIRTS. IT SHOULD BE KNOWN, THAT THE WEATHER WAS APPROXIMATELY 40 DEGREES THIS NIGHT. BOTH SUSPECTS EMMANUEL ROBINSON AND MUSTAFA WHITFIELD WERE TAKEN INTO CUSTODY AND TAKEN TO CENTRAL FOR QUESTIONING.

THIS WRITER THEN BEGAN TO WALK TO THE 500 BLOCK OF WILLING ST. WHERE THE SCENE WAS LOCATED AND THE VICTIM WAS SHOT. UPON ARRIVAL, THE VICTIM WAS ALREADY TAKEN TO THE CHRISTIANA HOSPITAL FOR A GUN SHOT WOUND. AT THE SCENE  THERE WAS A SPENT CASING AND AN UNSPENT CASING BY THE VICTIMS RED    CAVALIER DE 213162. THERE WAS ALSO A WHITE TEE SHIRT NOT BELONGING TO THE VICTIM BEHIND HIS VEHICLE, COINS AND KEYS WERE ALSO LOCATED AROUND THE VEHICLE.

THIS WRITER ALSO SPOKEWITH THE WITNESS (FRANCISCO FAILEY OF 515 WEST ST APT 2 655-4325 5/3/46)

| Reporting Officer | Pending Supervisory Review |
|---|---|
| PATROL PRADO  - 7190 | |

ON RETURN TO CENTRAL ALL THREE SUSPECTS WERE MIRANDIZED, MUSTAFA WHITFIELD DID NOT WANT TO SPEAK
C ┌HIS WRITER. MUSTAFA ONLY STATED THAT HE WAS GOING TO THE APARTMENT COMPLEX TO  MEET A GIRL, WHO
E  D NOT HAVE A NAME FOR.

MUSTAFA STATED THAT HE MET THE FEMALE ON THE INTERNET AND SHE WAS AN OLDER FEMALE NO FURTHER
ESCRIPTION.


EMMANUEL ROBINSON WHEN STOPPED AT THE 200 BLOCK OF W. 4TH ST APARTMENTS ON THE 5TH ST SIDE HAD
IS SHIRT OFF. ROBINSON WHEN ASKED WHY HE WAS BARE CHESTED, STATED HE AND WHITFIELD WERE WRESTLING
ND WHITFIELD PULLED  HIS SHIRT OFF. HE ALSO STATED THAT, THATS WHY HE WAS WINDED AND SWEATING.
FTER BEING TRANSPORTED TO CENTRAL UNDER MIRANDA ROBINSON STATED THAT HE AND WHITFIELD WERE
RESTLING AND THAT WHITFIELD KEPT TELLING ROBINSON THAT HE WAS SKINNY. ROBINSON KEPT TELLING
HITFIELD THAT HE WAS BIG NOT SKINNY.  ROBINSON THEN STATED, THAT HE WAS UPSET WITH WHITFIELD FOR
AYING THAT HE WAS SKINNY, SO ROBINSON TOOK OFF HIS OWN SHIRT TO SHOW WHITFIELD THAT HE WAS NOT
KINNY.

THIS WRITER ASKED ROBINSON WHY HE AND  WHITFIELD ENTERED THE APARTMENT COMPLEX. ROBINSON STATED
HAT HE AND WHITFIELD WENT THERE TO MEET A FEMALE SUBJECT. THIS WRITER ASKED WHO THE FEMALE WAS,
OBINSON STATED HE DID NOT KNOW. HE AND WHITFIELD MET THE FEMALE EARLIER THIS DATE WHILE THEY
ERE WALKING AROUND THE CITY. WHEN ASKED HOW OLD THE FEMALE WAS, ROBINSON STATED ABOUT 16-18 YEARS
LD. IT SHOULD BE KNOWN, THAT WHITFIELD STATED THE FEMALE WAS AN OLDER FEMALE AND HE MET HER ON
HE INTERNET.

THIS WRITER ALSO SPOKE WITH AKEEM      COLEMAN UNDER MIRANDA COLEMAN STATED THAT HE DID NOT KNOW
HE OTHER TWO INDIVIDUALS. IT SHOULD BE KNOWN, HE WAS OBSERVED RUNNING WITH THE OTHER TWO
IDIVIDUALS WHO JUMPED OVER THE RECTORY WALL. AKEEM THEN STATED, THAT THOSE TWO INDIVIDUALS
TTEMPTED TO ROB HIM.

H  WRITER ASKED WHERE COLEMAN LIVED, HE STATED ELSMERE. WHEN ASKED WHAT HE WAS DOING IN THE
L.  HE STATED THAT HE WAS LEAVING HIS AUNTS AND GOING TO THE STORE AT 10TH AND PENNSYLVANIA AVE.
' SHOULD BE KNOWN, THAT 10TH AND          PENNSYLVANIA AVE DO NOT INTERSECT THEY BOTH RUN EAST
ID WEST. WHEN ASKED WHERE HIS AUNT LIVES, HE STATED 25TH AND JESSUP ST. WHICH IS NORTH OF THE
)CATION WHERE HE WAS STOPPED. COLEMAN REFUSED TO SPEAK AFTER HE WAS ADVISED OF THE LOCATIONS HE
.S GIVING.


HE WEAPON AT CENTRAL WAS RAN THROUGH DATA TO SEE IF IT WAS STOLEN IT CAME BACK NEGATIVE, IT WAS
SO TAGGED AND PLACED INTO EVIDENCE.

ETECTIVES TOOK THE CASE OVER (SEE DETECTIVES REPORTS)

000140

| orting Officer | | Pending Supervisory Review | | |
| --- | --- | --- | --- | --- |
| TROL PRADO  - 7190 | | | | |
| ability Factors | ☒ Witness | ☐ M. O. | ☐ Trace Stolen Property | ☐ Suspect Named |
| | ☒ Suspect Located | ☐ Suspect Described | | |

1

STATE OF DELAWARE,    ID#0210009174
ID#0210009188
ID#0210008663

v.

MUSTAFA WHITFIELD,
EMMANUEL ROBINSON,
AKEEM COLEMAN,
    Defendants.

BEFORE:
    HONORABLE SUSAN C. DEL PESCO J.
    and jury

APPEARANCES:
    MARTIN B. O'CONNOR, ESQ.
    JOHN DONAHUE, ESQ.
    Deputy Attorneys General
    for the State

    JOSEPH M. BERNSTEIN, ESQ.
    for Mustafa Whitfield
    JAMES A. BAYARD, ESQ.
    for Emmanuel Robinson
    KEVIN O'CONNELL, ESQ.
    for Akeem Coleman

000141

- - - - -
TRIAL TRANSCRIPT
JANUARY 29, 2004
- - - - -

SUPERIOR COURT OFFICIAL REPORTERS
500 King Street - Wilmington, Delaware 19801
(302) 255-0651

---

2

JANUARY 29, 2004

2:50 p.m.

Courtroom No. 4E

3  PRESENT:

4      As noted.  ORIGINAL

5      - - - - -

6      THE COURT: We are going to have to swear the

7  jury when they come in.

8      Is the State ready to proceed with its

9  opening?

10      MR. O'CONNOR: Yes, your Honor.

11      THE COURT: Defense?

12      MR. O'CONNELL: Yes, your Honor.

13      MR. BERNSTEIN: Yes.

14      MR. BAYARD: Yes.

15      THE COURT: Let's get the jury, please.

16      (The jury entered the courtroom at 2:50 p.m.)

17      THE COURT: Swear the jury, please.

18      THE PROTHONOTARY: Yes, ma'am.

19      (The jury was sworn.)

20      THE COURT: The State may open.

21      MR. O'CONNOR: Thank you, your Honor.

22      May it please the Court, counsel, ladies and

23  gentlemen of the jury. Good afternoon.

---

3

1      As you learned before my name is Martin

2  O'Connor, I'm a prosecutor with the Attorney General's

3  office here in Wilmington. Sitting next to me is John

4  Donahue, he is also a prosecutor. Next to him is Steve

5  Massetic, he is a seven-year veteran of the Wilmington

6  Police Department and he is known as what is the chief

7  investigating officer of this criminal case.

8      You heard earlier this case involves an

9  attempted robbery, firearm, reckless Endangering

10  charge, person prohibited charges, a slew of events and

11  they all circle around the night of October 14, 2002

12  into the early morning hours of October 15, 2002. What

13  I would like to do now is give you an overview of the

14  evidence the State anticipates you will hear in this

15  case. I will then talk about the charges and the law

16  that the State believes will apply to this case. And

17  then I will talk to you about what the State expects

18  the verdicts to be in this case.

19      This case occurred in the City of Wilmington.

20  This is a map of a part of the City of Wilmington.

21  This is Fourth Street, this is Market Street. So we

22  are talking about an area which is four or five blocks

23  west of where we are today. The courthouse is not on

---

4

1  this map.

2      You will see in the middle of the map Willing

3  Street. Willing Street is a one-way street which runs

4  north to south. Willing Street you will see in

5  photographs is essentially a parking lot. You pull in

6  the street and cars can park on both sides. What

7  happens on Willing Street is people will park in

8  Willing Street at the rear of their residences or will

9  walk in the back doors of their houses to go into their

10  houses.

11      Anthony Meeks lived in the 500 block of

12  Washington Street. He worked at Delaware Park

13  Racetrack as a valet. He got let off work around 11:30

14  p.m. October 14th. He drove home, got to Willing

15  Street around 11:50, 11:40 or 11:50. He parked his

16  car, and you will see photographs where he backs his

17  car into a spot on the eastbound side of Willing

18  Street. He actually lives on the westbound side up

19  near Washington Street. This is Washington Street. As

20  he is parking his car and backing in he turns his head

21  to the right, to the entrance of Willing Street. When

22  he turns his head to the right he sees three

23  individuals coming in his direction. Two of the three

5

1  individuals have what he described at the time is a
2  white type mask wrapped around their heads, the third
3  individual didn't have a mask, the third individual had
4  a firearm. That individual went up to Anthony Meeks as
5  he exited his car and said: "Give up the keys. Give
6  up the keys."
7      The other two individuals walked around the
8  side of him to essentially block Anthony Meeks in where
9  his car was. As I said, the individual with the gun
10  didn't have a mask on. Anthony Meeks is going to tell
11  you that the individual with the gun is this defendant,
12  Akeem Coleman. He identified him that day and the
13  State anticipates he will identify him in court for
14  you.
15      There were two other individuals with him. As
16  I said, they had these type things wrapped around their
17  heads. "Give up the keys. Give up the keys." He has
18  his keys in his hand. So another defendant -- and the
19  State suggests the evidence will at least substantially
20  show that that defendant is Mustafa Whitfield with the
21  reddish type sweatshirt on, is standing there. And the
22  evidence will also show that Emmanuel Robinson, the
23  defendant in the back row, grabbed the keys in Anthony

6

1  Meeks' hand. Anthony Meeks, trying to defend himself,
2  or the evidence will suggest that, grabbed him around
3  the neck and he started to struggle. As he is
4  struggling with him, Akeem Coleman is still, "Give" up
5  the keys. Give up the keys" pointing the gun. He
6  struggles with him and falls back.
7      You will see a photograph where his car is
8  parked, there is short curb with ivy and a fence. He
9  is going to tell you he fell back into that and
10  tripped. The evidence will show that Emmanuel Robinson
11  fell on top of him. At that point bam, a shot is fired
12  out of the gun held by Akeem Coleman.
13      Mustafa Whitfield and Robinson get up and
14  start running southbound on Willing Street. Anthony
15  Meeks is pretty angry, he is going to tell you that.
16  He decides to follow them. He starts chasing them down
17  Willing Street towards West Street. As he is chasing
18  them he is going to tell you Akeem Coleman turned
19  around and shot another shot at him. When he fired
20  another shot he felt pain in his foot. The evidence
21  will show he got shot in the foot. He stopped running,
22  went back up to his mother's house where he lived, told
23  his mother where he what happened and 911 was called.

7

1      Fortuitously, about the same time patrolman
2  Prado and Derbyshire were on patrol in the City of
3  Wilmington. They were at the intersection of
4  Washington -- sorry West Street and Fourth, just a
5  block down here, Willing is down here.
6      What the defendants did, what the evidence
7  will show, is took a left-hand turn out of Willing
8  Street towards West, running together. When they got
9  to West they crossed the street and started going up
10  the sidewalk. Derbyshire and Prado will tell you two
11  of the defendants, Mustafa Whitfield and Emmanuel
12  Robinson jumped a brick wall that surrounds St. Peter's
13  Roman Catholic church here.
14      Akeem Coleman continued to run straight up the
15  street. You will see the wall is pretty high and of
16  the three codefendants Akeem Coleman is the biggest
17  guy, he would have had trouble getting over the wall
18  probably. The police stopped Akeem Coleman. They had
19  also pursued Whitfield and Robinson because now they
20  are trespassing on church property, almost midnight on
21  a Friday night. As they are talking to Akeem Coleman
22  they realize there is a firearm on the ground by a tree
23  where these guys were walking. You will hear

8

1  ballistics testimony that that firearm fired a shell
2  casing which was found right in the middle of Willing
3  Street, essentially in the area of where Anthony Meeks
4  says he was shot at the second time.
5      Akeem Coleman is taken into custody here.
6  Patrolman Prado ends up going over the wall, coming
7  back out on Sixth Street, looks south on Tatnall and
8  sees Whitfield and Robinson, the other two defendants,
9  together down that way. He recognizes them as the same
10  two guys who had jumped over the wall at the church.
11  He confronts them or they actually catch up to him at
12  an apartment complex in the 200-block of Fifth Street
13  and they stopped.
14      At that point Emmanuel Robinson has no shirt
15  on. He is not wearing any shirt at all. He is
16  sweating, heart beating, he is excited. Mustafa
17  Whitfield is in the same type of physical condition.
18  It is 46, 45 degrees outside and they were walking.
19      The evidence will show that a T-shirt, after
20  the struggle with Anthony Meeks, was left by his car.
21  You will see a photograph, there is a white T-shirt
22  left there which is what is wrapped around this guy's
23  head. You will hear testimony from a forensic

000142

9

1 scientist that DNA from that T-shirt is Emmanuel
2 Robinson's.
3      So that's an overview of the case. Now how
4 does it apply to the indictment or the charge? These
5 defendants went up to Anthony Meeks and said, "Give up
6 your keys. Give up your keys." Attempted to take his
7 property and attempted to use a gun to facilitate that.
8 That is attempted robbery, essentially.
9      They had a firearm at the time. Possession of
10 a Firearm During the Commission of a Robbery. They are
11 charged with Reckless Endangering First Degree because
12 he fired a bullet which didn't hit anybody, but fired a
13 bullet in the direction of Anthony Meeks. They are
14 also charged with possessing a firearm during that
15 felony.
16      They are charged with Assault in the Second
17 Degree, that is he used a firearm to cause physical
18 injury to Anthony Meeks. And you will see photographs
19 and hear from Mr. Meeks about the injuries he sustained
20 in his foot from being shot with the gun.
21      They are also charged with Possession of a
22 Firearm by Person Prohibited. It is not legal in
23 Delaware to possess a firearm if you are under 18

10

1 unless it is for hunting type purposes.
2      They are also charged with Conspiracy. That
3 is, they agreed with each other to commit this criminal
4 act.
5      Now, the other thing I want to talk about the
6 law briefly is a thing called Accomplice Liability.
7 Accomplice Liability means that a person and their
8 coconspirators, codefendants, are all equally liable
9 for the conduct of each other. So for example, there
10 is only one gun fired in this case, but they are all
11 equally liable because intending to commit a robbery or
12 attempted robbery, they all aided Akeem Coleman in
13 doing that. They all attempted to restrain Anthony
14 Meeks. They were yelling at him. They did things to
15 intimidate, things to get his vehicle. You will hear
16 more about Accomplice Liability later. But the
17 liability Akeem Coleman holds for shooting the gun is
18 shared by two codefendants because they aided him in
19 the commission of those crimes.
20      Those are the only legal principles I want to
21 talk to you about.
22      As the judge told you, this case will take a
23 few days. It is going to be a little fragmented, but

11

1 will take a few days. At the end of this case the
2 State is going to ask you to find the defendants guilty
3 of the indicted offenses beyond a reasonable doubt.
4      Beyond a reasonable doubt is not an absolute
5 standard. It is not 100 percent, it is not absolute.
6 It is something that leaves you firmly convinced that
7 the person who is charged with the crime did it.
8 That's what it means. And the State intends that at
9 the end of this trial after closing arguments that we
10 will have shown you beyond a reasonable doubt that all
11 three defendants are guilty of the charges -- of the
12 crimes charged in the indictment.
13      Thank you very much for your time.
14      THE COURT: Mr. O'Connell.
15      MR. O'CONNELL: Good afternoon ladies and
16 gentlemen.
17      You may recall from when we did the
18 introductions before my name is Kevin O'Connell and I
19 represent Akeem Coleman. And I need the podium.
20      Mr. Coleman has been seated next to me
21 throughout the proceedings and you will see him during
22 the trial. This is an important day for Mr. Coleman,
23 and the next several days will be important for him.

12

1 He has waited approximately 16 months to get to this
2 point, and that is to go before 12 people -- 14 people
3 like yourselves and for you to listen to the facts,
4 decide what the facts are, and determine whether or not
5 he bears any responsibility for the conduct that the
6 State has described.
7      You, ladies and gentlemen, are the criminal
8 justice process now. You are the most important part,
9 your willingness to serve, sit there, listen to the
10 evidence, be attentive and go back in the jury room and
11 as a group make a decision whether or not the State has
12 met its burden of proof beyond a reasonable doubt as to
13 the charges that they brought, and understand your role
14 in the process.
15      I have used some terms and the judge, Judge
16 Del Pesco, will explain some of them at the end of the
17 case. But I think it is good to understand at the
18 front of the case. One is the presumption of
19 innocence. You may have read the book or saw the
20 movie, everyone who comes into a court is presumed
21 innocent. It is something we pay lip service, but in
22 our hearts I don't know that we embrace the concept. I
23 think most of us read that a person has been arrested

000143

13
15

1 and you sort of convict him. You see a person sitting
2 in prison garb, in a courtroom, indictment brought
3 against him, then they must have done something, they
4 must have done what the State said they did. That's
5 not how it works in the United States. In the United
6 States you are presumed innocent. And you have to do
7 what is essentially a very difficult thing to do. In
8 this day and age the way media is people are convicted
9 from the moment they are arrested and you have to
10 decide you are going to put on constitutional glasses
11 as it were and look at the evidence in such a way that
12 you believe when Mr. Coleman was brought into this
13 courtroom and you saw him for the first time that he is
14 cloaked with innocence. As he sits there right now.
15 He is innocent unless and until the State proves his
16 guilt beyond a reasonable doubt. So what I want you to
17 do when I leave here today is think for a moment about
18 how you felt when you looked at him for the first time
19 and you saw what he was wearing, when you saw the
20 guards around him, when you saw the color of his skin,
21 and see if for a moment you didn't think for a moment
22 robbery, firearms, maybe pre-judge him a little bit.
23 Doesn't make you a bad person, makes you a human. But

1 maybe you served in a civil case, you may recall that
2 in a civil case the burden of proof is upon the
3 plaintiff. The person who is in there suing the
4 defendant. Let's say there was an intersectional auto
5 accident and they are hurt and suing the guy that ran
6 the red light and caused the injury. They bear what is
7 called preponderance of the evidence. In law school we
8 learned that scales of justice may tip ever so slightly
9 to the party who bears the burden of proof. And if
10 they do that ever so slightly in their favor they win,
11 they met their burden of proof by a preponderance of
12 the evidence.
13      If it were a civil fraud case, the burden of
14 proof might be a little bit higher, that's called clear
15 and convincing evidence. It is more than just tipping
16 the scales, you must be clearly convinced by the
17 evidence. But beyond a reasonable doubt is the
18 standard that the framers of the Constitution decided
19 was the best way to have people brought before justice
20 who might lose their life or liberty, so the State is
21 held to a high burden of proof that is beyond a
22 reasonable doubt. Is that absolute certainty? No. We
23 know there is death and taxes, the only absolute

14
16

1 you have to try to undo that now because you have taken
2 an oath and you have sworn to believe that he is
3 innocent unless and until the State meets its burden of
4 proof.
5      What is that burden of proof? First of all
6 let's understand that they bear the burden of proof.
7 The State has to come forward in our system and prove
8 to you beyond a reasonable doubt. It is their burden
9 they have to push the ball forward with evidence to
10 show you that he is guilty beyond a reasonable doubt.
11 He cannot put on any evidence, he cannot have his
12 lawyer cross-examine any of the witnesses, he can just
13 sit there. He bears no burden to show or do anything,
14 it is the State's burden. And they get some advantages
15 of that. They get to go first, and they get to go
16 last. And I will explain how that works to their
17 advantage, but they should get that advantage because
18 they bear the burden of proof.
19      What is that burden of proof? Proof beyond a
20 reasonable doubt. Beyond a reasonable doubt. And
21 that's something I will talk to you about in closing
22 statements in a little more detail. But just to
23 explain, if you have ever served on a jury before,

1 certain things in our lives, but it is pretty darn
2 close to it. And if you have some doubt after you have
3 heard the evidence, some nagging suspicions that maybe
4 you are just not getting the whole story, something is
5 missing from it. That, ladies and gentlemen, is
6 reasonable doubt.
7      We have the urge in our society where we watch
8 movies and TV shows and so many of them deal with court
9 cases and solving mysteries. We want to solve
10 mysteries and want to make every story we hear work
11 out. We want the guilty party to burst through the
12 doors and say I did it. We want things wrapped up in a
13 neat package always. But I got news for you, in the
14 courtrooms of America it doesn't always work that way.
15 Sometimes at the end of the day you are left with
16 nagging suspicions. You might say you know that he
17 probably did it, but you know what? I just can't be
18 positive. I'm not totally there. That, ladies and
19 gentlemen, that is reasonable doubt. And that's what
20 the State's burden is. They must prove to you beyond a
21 reasonable doubt that Akeem Coleman did the things they
22 say he did.
23      In terms of the State's evidence in this case

000144

17

1  I'm not going to recount that. Mr. O'Connor has ably
2  said it before you, and what you are going to have to
3  understand what I'm doing, what he's doing, the other
4  lawyers will do is not evidence. It is only what you
5  hear from the witness stand right there, people
6  testifying. People being examined by the lawyers and
7  cross-examined by the lawyers, testing the truth of
8  what they have to say. Making sure that you are
9  hearing only the best evidence. That's the evidence
10  that you are allowed to consider, not good arguments
11  but evidence.
12       You have heard what the State is going to put
13  in front of you. Let's talk about what you didn't hear
14  and what you won't here. You are not going to hear
15  that there is any physical evidence to link Akeem
16  Coleman to this crime. There is no fingerprint on a
17  windshield, no fingerprint on a gun, no fingerprint on
18  a key, no fingerprint on some change. There is no
19  fiber evidence from a shirt, there is no DNA left on
20  anything at the scene. There is nothing physical to
21  corroborate a statement of the victim in this case that
22  Akeem Coleman is the one who did this. Akeem Coleman
23  has the bad fortune of being a person who was a block

18

1  away from a crime scene about five minutes after it
2  happened. Other than that, you are just going to hear
3  the victim say that in the dark with a gun being
4  pointed at him, wrestling with two other individuals
5  that he believes that this is the person who held the
6  weapon.
7       What you are going to have to do at the end of
8  the day is decide, based upon what you hear, based upon
9  the conditions that you hear about, the lighting
10  conditions, the emotional conditions, the opportunity
11  to observe, whether or not you believe that beyond a
12  reasonable doubt. Because bottom line that's all you
13  are going to hear about Akeem Coleman is that
14  eventually the victim is shown a photo lineup and says
15  that's the one who did it. You will hear he pointed to
16  somebody before in the photo line and says that's the
17  guy who did it. The one that occurred a
18  year-and-a-half ago in police interview room convinces
19  you that Akeem Coleman is the person who participated
20  and isn't somebody who happened to be walking up West
21  Street between Fifth and Sixth at the wrong time of
22  day.
23       Bottom line is you are going to have to

19

1  determine what evidence you want to give credit to.
2  And how do we do that? We wouldn't have lawyers --
3  wouldn't that be a great day? Wouldn't have lawyers if
4  people stand at a red light and as long as the red
5  light didn't go off they were telling the truth or
6  weren't mistaken, but if they were or weren't then the
7  red light goes off. We are not that lucky to have that
8  kind of system. We have the next best thing, human
9  beings like yourself listen to other human beings
10  testify while a third set of human beings asks them
11  some tough questions.
12       So you are going to have to pay attention to
13  certain things. You have to listen to the details of
14  what the people say. All the different people who come
15  to the plate and tell you what they saw. And you have
16  to say to yourself, if they are not mistaken, wouldn't
17  these stories pretty much corroborate each other?
18  Wouldn't what witness A says corroborate what witness B
19  saw? Does physical evidence corroborate what that
20  person says? In other words, if they are saying that
21  this person was at the scene is there anything to show
22  he was at the scene, fiber, fingerprint, DNA, anything?
23       Ultimately, at the end of the day it is going

20

1  to come down to your gut. Does it have the ring of
2  truth? When I really -- I scrutinize it, when I look
3  long and hard at it do I have doubt that maybe, maybe
4  they might be mistaken, not necessarily a liar, might
5  be mistaken.
6       Ultimately, as I said, you are going to hear
7  evidence from the State and you are going to hear
8  evidence from the defense and you are going to hear
9  arguments by the State and defense, and you will hear
10  the State one more time. What I want to urge you to do
11  right here and now before you get started is to promise
12  one thing, that is to listen to both sides. Because
13  there is a thing, a sociopsychological rule called the
14  rule of primacy, that is, the first thing we hear is
15  what we believe and once we make up our mind it is very
16  difficult to unmake it if that makes sense.
17       So the judge is going to tell you until you
18  have heard all of the evidence, both the direct
19  examination and the cross-examination, the State's
20  evidence and the defense evidence, don't make up your
21  mind, don't begin to make up your mind. You are not
22  allowed to do that until you get in the room and the 12
23  of you are allowed to talk and listen to each other.

21

1  So resist the rule of primacy, don't make up your mind
2  until you have heard it all. Don't make up your mind
3  until you have heard both sides.
4       I was lucky enough when I went to college that
5  I was a long way from home, but in the town where my
6  grandmother lived. And occasionally I went to her
7  house and she would do my laundry and make my lunch.
8  And I would sit in the kitchen and she would say a lot
9  things grandmother's say. And when you are 18 years
10  old you would roll your eyes and say that's great,
11  grandma. But I have been in this courtroom for a long
12  time and start to realize a lot of things she said are
13  based on good life experience. She knew what she was
14  talking about. One of the things she would always say
15  was, "Kevin, my boy, no matter how thin you make a
16  pancake it always has two sides. Please keep in mind
17  there are to sides to a trial.
18       MR. O'CONNOR: May we approach?
19       THE COURT: Yes.
20       (A side-bar discussion.)
21       MR. O'CONNELL: Mr. O'Connell made a reference
22  to color of defendant's skin during opening statement.
23  I think that is impermissible to get the jury to think

22

1  about race.
2       Second thing, there were several references to
3  television, what you see on TV, what you see on shows
4  whodunit that kind of thing. I think that ultimately
5  ends up asking the jury to decide the case or consider
6  things that are outside the evidence in this case.
7  They are going to draw on CSI to decide whether or not
8  the evidence in this case points to his client or some
9  other client. I don't think that is permissible. They
10  have to focus on the evidence they hear, not things
11  they see on TV or impressions they have from that. So
12  I didn't want to interrupt but wanted to put my
13  objections to his statements on the record. I'm not
14  asking for a curative, but ask that he be instructed to
15  refrain from comments like that.
16       MR. O'CONNELL: Sounds like you are not asking
17  the Court to do anything, so I don't want to muck
18  things up by opening my mouth.
19       THE COURT: Okay. Ready to proceed?
20       (Following a side-bar discussion:)
21       THE COURT: Mr. Bayard.
22       MR. BAYARD: Ladies and gentlemen, good
23  afternoon. My name is Jim Bayard. My client Emmanuel

23

1  Robinson is sitting at the second table.
2       Much of what has been said already by defense
3  counsel is going to be repeated by another defense
4  counsel, me, Mr. Robinson's counsel now.
5       All of us as American citizens have a cloak of
6  innocence as part of our citizenship. That can be
7  shattered if the jury comes back with a unanimous
8  verdict of guilty beyond a reasonable doubt. But right
9  now the cloak is over all three of the young men. One
10  of the things I think is being suggested here is bias
11  and sympathy. You are going to hear about a gentleman
12  who unfortunately got shot. When you hear about
13  somebody getting shot one could be sympathetic about
14  it. One could feel empathy towards a person who
15  received a bullet in their body. That's not what you
16  are here for. You are here to decide whether there is
17  culpability. Why these young men, and in particular
18  Mr. Robinson, are here. So bias again is another thing
19  that has to be checked at the door. And sympathy has
20  to be checked at the door when you take on the job as a
21  juror, particularly as a collective group. It is not
22  easy, but it is something that is going to have to be
23  done in order to render a true and correct verdict in

24

1  this case.
2       The evaluation of witnesses, that was done in
3  part, it was an evaluation done by the attorneys when
4  you all were chosen as jurors. Now it is your turn to
5  do the evaluating. You get to evaluate the people who
6  are going to be up on the witness stand. One of the
7  initial things that one is always prone to doing, and
8  it has already been noted, is buying into the first
9  story that you hear. The very first story you hear has
10  a ring of truth to it, there is something to it,
11  probably right.
12       But again, because you are jurors that has to
13  be checked at the door and you have to say, you know,
14  that is interesting, fascinating, but I need to hear
15  more. Until I hear everything I'm not prepared to kick
16  into action and start rendering any opinions or
17  thoughts.
18       You will hear the Court, already mentioned
19  earlier after you left the courtroom earlier, after
20  being chosen as jurors not to discuss it among
21  yourselves. You will be told this evening not to
22  discuss it with people you see this evening. You have
23  to stay independent and above the fray. You are in a

000146

25

1  helicopter and all this nonsense is going on down below
2  you, you are detached from it. That's the only way you
3  can be objective and render a true and fair verdict.
4      These are things that are being asked of you
5  that are somewhat contrary to our basic human nature.
6  But basic human nature didn't exactly understand the
7  role of the juror. That's what you all have to do
8  right now, take on a role of the juror.
9      Each of the crimes -- you are going to hear
10  about different crimes -- it is a different verdict
11  because there is nine different things. You hear about
12  weapons, person prohibited, hear about robbery,
13  conspiracy, each one of these things are a different
14  crime, so you need nine different verdicts. But more
15  complicated than that, it is nine times three, three
16  separate human beings sit there. Each one is
17  different. Not one is the same, so it is 27 verdicts.
18  Now life is getting a whole lot complicated. You have
19  to come up with actually 27 verdicts. So you have to
20  pay attention. What I heard, was that relevant to Mr.
21  One, two or three or was it only relevant to Mr. Two
22  and one. And not Mr. Three. You have to keep all of
23  that juggled in your mind. Because each one of these

26

1  men deserve a separate verdict on each separate charge.
2  And that is going to require some concentration on
3  everybody's part.
4      You have heard -- but you won't hear about the
5  victim, Mr. Meeks, in this case talks about Mr.
6  Robinson, saying I went through photo I Ds and I found
7  him or he will come in the courtroom and without a
8  doubt he will point there to the fellow in the back row
9  and say, yeah, that guy was there, he participated, and
10  Mr. Meeks is the victim in this case. Yet you will
11  hear about a T-shirt that through DNA is going to,
12  quote, connect Mr. Robinson to this case. That on its
13  face sounds simple, but you have to ask a more probing
14  question. How did a T-shirt get there? Who had last
15  control over the T-shirt? What is the origin of the
16  T-shirt? Like so many things they are simple on their
17  face. Once they get through the surface they get more
18  complex. Like an iceberg, you see a little bit on the
19  water and there is a whole lot underneath.
20      Ladies and gentlemen the case will take some
21  time, but it is going to take more than that. It is
22  going to take your participation and concentration.
23  That's all we are asking for. Thank you.

1      THE COURT: Mr. Bernstein.
2      MR. BERNSTEIN: Yes, your Honor. Thank you.
3      In a few minutes I'm going to sit down and we
4  will hear the evidence in the case. Before I sit down
5  I get a chance to talk to you and tell you a little bit
6  about this case that is going to happen in this trial.
7      As you know by now, by process of elimination
8  if nothing else, I'm Joe Bernstein and I represent
9  Mustafa Whitfield. As I'm sitting here I have a
10  checklist I want to cover in opening statements. And
11  sometimes it is just one defendant on trial, sometimes
12  two, sometimes three. And by the fact I'm going last,
13  I certainly don't want to bore you by repeating what
14  anybody else said. I kind of mentally checked off what
15  the other attorneys said and I kind of said to myself,
16  well, don't repeat yourself and don't say those things.
17  But there are a couple of things I didn't check off so
18  I want to talk to you about those things. The first
19  thing I want to talk to you about is something that Mr.
20  O'Connor mentioned and that is the term Accomplice
21  Liability.
22      You are going to hear a lot about that in this
23  case because that is one of the State's theories about

28

1  this case. An accomplice is somebody who doesn't
2  actually commit all of the what the lawyers call the
3  element of the crime. And an accomplice is somebody
4  who helps somebody else commit a crime without the
5  accomplice necessarily doing everything. To give you
6  an example, let's say there are two people charged with
7  robbing a liquor store, for example, and the State's
8  evidence is that only one of the two people actually
9  went into the liquor store pointing a gun, if you will,
10  at somebody and said give me the money, took the money
11  and ran out. And the State's theory is the other
12  person on trial waited in the car or stood outside to
13  make sure nobody went in or out or cops didn't come by,
14  and the State's theory against that person as well is
15  responsible for the robbery. What the other guy did,
16  behaved as an accomplice, he helped him by doing
17  something.
18      So, the lesson to be learned there is that to
19  be an accomplice you got to do something. You can't
20  just be there, you have to decide did this alleged
21  accomplice participate? Did he do anything? What did
22  he do? What did the accomplice do? What was the
23  accomplice's intent? If you can figure that out. It

29

1 is not just being someplace that makes you an
2 accomplice. So you are going to have to listen
3 carefully to the evidence and you are going to have to
4 figure out who was doing what, and the persons who
5 weren't doing that, what were they? Were they
6 accomplices? Were they helping? What were they doing?
7      Now, another thing I want to talk about is
8 evidence in this case. You heard Mr. O'Connor tell you
9 in kind of summary fashion, well, here is what Witness
10 Number one is going to say, Number two, et cetera, set
11 et cetera. He kind of gave you an overview what the
12 State intends to prove in this case. As Mr. O'Connell
13 told you, what we all say isn't evidence. You haven't
14 heard a thing yet. You won't start hearing evidence
15 until the first witness gets up on the witness stand
16 and is questioned by whoever called that person as a
17 witness and then is cross-examined. So, that whole
18 process is putting evidence in in a trial.
19      We haven't heard anything yet. What comes to
20 mind when -- I'm not -- I have been an attorney in a
21 number of trials, it is not new to me, it is probably
22 new to most of you. But I always thought of opening
23 statements as kind of thinking, about a month ago I

30

1 took my kids to the movies and before the main feature
2 starts they didn't want to sit, you have to sit through
3 all the pre-views and they are endless, and if you
4 think about it why do they show you all the previews
5 once they got you in the theater, they have your money,
6 they want you to come back, want you to see what is
7 coming next week or next month and these previews are
8 designed to get you to come back. And how do they do
9 that? They show you all the good stuff. Of course
10 they don't show you the bad stuff because if they did,
11 do you think you'd come back? Of course not. Think
12 you'd plunk down another ten bucks to watch some dump
13 of a movie? Of course not. So this is like the
14 previews, you have to sit here. And you didn't pay any
15 money, but you will have to sit through the trial and
16 listen to the evidence and you have to decide how good
17 it is. Does it convince you beyond a reasonable doubt
18 that crimes were committed? And this is just as
19 important as finding that a crime was committed; who
20 committed it?
21      There are three people on trial here. There
22 are in effect three different trials going on. And you
23 are going to have to weigh the evidence separately,

31

1 individually, independently as to each one of these
2 three people. It is not all or nothing or if one is
3 guilty they are all guilty, that's not what Accomplice
4 Liability is about. That's not what trials are about.
5      The State can try more than one person
6 together for the same crimes, but that doesn't relieve
7 the State in any way of any burden of proving that more
8 than one person is guilty. So when you listen to this
9 evidence, not only are you going to have to figure out
10 well, how does it fit in with these crimes that are
11 charged and how does it point or not point to the
12 involvement of one or more of these people, you are
13 also going to have to weigh the evidence against each
14 one individually.
15      So, it is very complicated, you have a tough
16 job to do. And I would suggest to you that in order to
17 do that job successfully, what you need to do is pay
18 attention to everything the witnesses say, not just --
19 witnesses are witnesses, they are here because they
20 know something. It doesn't matter whether the State
21 calls them or whether the defense calls them, they are
22 just witnesses. They are here because they have a
23 story to tell.

32

1      Back on October 14th, in the 500 block of
2 Willing Street, I wasn't there, Mr. O'Connor wasn't
3 there, none of you were there, I hope, so, we don't
4 know anything about this case. We are all going to
5 learn about this case based on what we hear from people
6 who were there, who saw something, who observed
7 something, who know something, who recovered a piece of
8 evidence from this case. They are the people whose
9 testimony counts. Not just what they say on direct
10 examination but what they say on cross-examination.
11 Look at it as a whole. Pay attention to what they say.
12      After you hear the evidence all of us will get
13 another chance to talk to you about the evidence and by
14 then we will have heard all of the evidence that you
15 are going to hear in this case. And we have an
16 opportunity to in closing arguments, and we are
17 advocates make no mistake about that, convince you what
18 we think the evidence shows or doesn't show. Does it
19 add up to crimes? Does it add up to participation?
20 Does it add up to identification, who did it, what was
21 done, who I participated? You are going to hear a lot
22 about that in closing arguments. You are not going to
23 hear a lot about that now, especially from me because I

000148

33

1  haven't heard any witnesses yet. So I'm going to do
2  the same thing I asked you to do, pay attention to the
3  witnesses. After you have heard all of the witnesses
4  pay attention to closing arguments.
5      Thank you very much.
6      THE COURT: Mr. O'Connor.
7      MR. O'CONNELL: One witness I need to take out
8  of order due to an availability problem.
9      THE COURT: Okay.
10     MR. O'CONNOR: State calls Corporal David
11  Rhoades.
12          DAVID ROADS,
13     the witness herein, having first been duly
14  sworn on oath, was examined and testified as follows:
15          DIRECT EXAMINATION
16  BY MR. O'CONNOR:
17     Q.  Good afternoon.
18     A.  Good afternoon.
19     Q.  How long have you worked for Wilmington Police
20  Department?
21     A.  Fifteen years.
22     Q.  Can you tell the jury what your present job at
23  is at Wilmington Police Department?

34

1      A.  Evidence Detection Unit.
2      Q.  What does Evidence Detection Unit do?
3      A.  We respond to crime scenes such as assaults,
4  burglaries, thefts, shootings, robberies.
5      Q.  Why do you do that?
6      A.  Once we respond there, we collect evidence,
7  document evidence as to where it was located,
8  photographed, videotaped when necessary, sketched when
9  necessary.
10     Q.  Did you respond to a scene on October 14, 2002
11  into the early morning?
12     A.  Yes.
13     Q.  Where was that?
14     A.  500 block of Willing Street.
15     Q.  Do you remember what time you got there?
16     A.  Roughly around midnight, right before
17  midnight, I believe.
18     Q.  What did you do when you got there?
19     A.  Once I got there I talked to the responding
20  officer, the first officer that arrived, which is
21  officer Prado who advised me that a subject while
22  exiting his vehicle was being robbed and while doing so
23  he was shot in the foot.

35

1      Q.  Did you see anything at that location that you
2  thought was worthy of documenting or collecting?
3      A.  Correct. At that time I do a walk through of
4  the scene to locate any evidence which may be pertinent
5  to the case. I then document that evidence with
6  photographs. I also put placards next to the evidence
7  to number them to make it easier in a photograph later
8  on so you can ID them. I then collect the evidence,
9  place them in the bags, then I turn them in to the
10  evidence locker.
11     Q.  Can you describe the evidence locker to the
12  jury; what is that?
13     A.  Evidence locker is located in the police
14  department at Fourth and Walnut. And it is just a
15  large room that only one person has access to. It is a
16  safe, has a combination lock on it, that's where the
17  evidence is placed until trial or if they have to send
18  it out to be analyzed.
19     Q.  Who maintains control of that?
20     A.  Officer by the name of Danny Sullivan, he is a
21  police officer.
22     MR. O'CONNOR: Your Honor I have 11
23  photographs I would like to have marked as exhibits, if

36

1  there is no objection from the defendant.
2      MR. O'CONNELL: No objection.
3      MR. BERNSTEIN: No objection.
4      MR. BAYARD: No objection.
5      MR. O'CONNOR: I would like to have this
6  opportunity for them to take a moment to look at the
7  other evidence.
8      I would like to offer these six items into
9  evidence.
10     THE COURT: Do you want to tell us what they
11  are?
12     MR. O'CONNOR: I will as we go through.
13  BY MR. O'CONNOR:
14     Q.  Corporal Rhoades, I'm going to hand you what
15  has been marked State's Exhibit 1. Can you look at
16  that and tell me if you recognize it.
17     A.  500 block of Willing Street, east side of the
18  street.
19     Q.  What direction is the picture showing?
20     A.  Facing northbound.
21     Q.  That would be the right-hand side of the
22  street?
23     A.  Right-hand side of the street.

000149

37

1    Q.   Is this a photograph you took in the early
2    morning of October 15th, 2002?
3        A.   Yes.
4        Q.   There are placards in the photograph, can you
5    again explain what those are for?
6        A.   Those are there to best visualize the picture.
7    You can notice where the evidence is when you refer to
8    my report, Evidence Item Number 1 is here and you can
9    refer to the report as to what it is.
10       Q.   Thank you.
11           Next is State's Exhibit 2.
12       A.   Closer up version of the crime scene and the
13   placards and vehicle in question that this victim came
14   out of.
15       Q.   Next is State's Exhibit 3.
16       A.   Again this is a closer version of the vehicle
17   and some items of evidence.
18       Q.   State's Exhibit 4.
19       A.   This is also a close up picture of the items
20   of evidence located near the vehicle.
21       Q.   State's Exhibit 5, if you could show that to
22   the jury and describe what that is.
23       A.   Item 1, a shell casing located, if you refer

38

1    back to picture -- close up picture, this is Item
2    Number 1 and that would be that item there, just a
3    close up, that's where it falls relative to the scene.
4        Q.   Next is State's Exhibit 15.  Does that refer
5    to the item in State's Exhibit 5 which is the placard
6    Number 1?
7        A.   Correct.
8        Q.   Is what in State's Exhibit 15?
9        A.   If you refer back to my report, again, it says
10   it is a nine-millimeter Luger shell casing, which means
11   it is a spent round.
12       Q.   That was located in the area of placard Number
13   1?
14       A.   Correct.
15       Q.   I'm going to hand you State's Exhibit Number 6
16   showing placard Number 2?
17       A.   Again, this is a close up of Item Number 2
18   which is located off to the side right here by the
19   vehicle.  And that is also -- I believe it is
20   nine-millimeter Luger hollow point, which is a live
21   round, which has not been shot.
22       Q.   I'm going to hand you State's Exhibit 14.
23       A.   That's what it is.

39

1    Q.   That's the item you photographed and
2    documented?
3        A.   Correct.
4        Q.   Next photograph is State's Exhibit 7 seven.
5        A.   Item Number three is change, numerous
6    denominations of change that equalled $1.60.  This was
7    one of the coins located in the general area, which is
8    mostly condensed to the rear tire area of the vehicle.
9    When you get a chance to look at it you will see where
10   the coin has been circled.
11       Q.   I'm also going to hand you State's Exhibit
12   Number 8.
13       A.   And it is again a close up of the coins
14   located, as well as Item 4, which I believe is photo
15   IDs.
16       Q.   This is State's Exhibit 17.  Can you take a
17   look at that?
18       A.   This is the change that I tagged that equalled
19   the $1.60 and that's the change you would see in the
20   photographs.
21       Q.   State's Exhibit 13.
22       A.   This would be the two photo IDs.
23       Q.   That's where placard Number 4 is in Exhibit 8?

40

1    A.   Correct.
2        That's the two photo IDs belonging to Anthony
3    Meeks.
4        Q.   And the next photograph is State's Exhibit
5    Number 9?
6        A.   This is Item 5, located right here at the
7    white shirt, sitting up on the little curb by some ivy,
8    that's a close up version of it.
9        Q.   I'm going to hand you State's Exhibit Number
10   12 if you look at the tag first.
11       A.   This is the green evidence tag we place on
12   items.  You don't see it on these because we take a
13   stamp and stamp and it is easier to maintain.  This
14   actually gets its own tag, which is my handwriting,
15   says one white shirt, and that's what is in there a
16   white T-shirt.
17       Q.   Is that the T-shirt you found in the curb
18   area, State's Exhibit Number 9?
19       A.   Correct.
20       Q.   Looking at that bag for State's Exhibit 12,
21   was there anything on there that wasn't there before?
22       A.   Yeah.  There is writing and this purple tape
23   down here and that is not for Wilmington Police.

41

1  Q. Do you know if that item was sent out for

2  analysis.

3  A. I believe it was but I'm not a hundred percent

4  sure, but I believe it was. I didn't send it out

5  though.

6  Q. Next is State's Exhibit 10, a photograph.

7  A. Item 6, a key ring with a key on it. Again,

8  if you look at the overall photographs you can look at

9  where the item was found, which is right here.

10  Q. Finally State's Exhibit 11.

11  A. It is an -- I believe it is an -- it is an --

12  I believe it is change. But I have a gold 50 cent

13  piece from Delaware Park that I tagged, Item 8.

14  Q. I'm going to hand you Item 60.

15  A. That is more evidence I tagged. This is the

16  coin, the 50 cent piece from Delaware Park.

17  Q. Did that have a placard based on your report?

18  A. It should have had a placard, Item 8, but it

19  could be that I located it later after the machine had

20  been collected why it would not have one. Sometimes we

21  find things later.

22      MR. O'CONNOR: May I have one second, your

23  Honor?

42

1  BY MR. O'CONNOR:

2  Q. The items you recover you essentially just

3  pick them up where you find them?

4  A. Correct.

5  Q. Do you know at all if they move or if they are

6  stationery or what happens before you got there?

7  A. What happens to them before I got there I have

8  no idea. But once I get there they are not messed with

9  and I photograph and collect them.

10  Q. Did do you have any idea what the weather was

11  like that evening.

12  A. Cooler, 35, 40 degrees if I remember.

13  Q. Did you have any issue with finding these

14  items, vision in the parking area, lighting?

15  A. No, not that I recall. I mean I looked

16  underneath the vehicle, all around it. But I don't

17  recall having any specific issues with finding

18  evidence.

19  Q. Or seeing generally in the parking lot?

20  A. No not really.

21      MR. O'CONNOR: No further questions.

22      THE COURT: Cross-examine.

23          CROSS-EXAMINATION

43

1  BY MR. O'CONNELL:

2  Q. Good afternoon. How are you?

3  A. Fine. Thanks.

4  Q. Some of the photographs that you identified,

5  for instance, State's Exhibit Number 3 of the red

6  vehicle, did you take that photograph?

7  A. Yes.

8  Q. What kind of a camera were you using?

9  A. Minolta.

10  Q. Like a 35-millimeter?

11  A. Correct.

12  Q. Did it have a flash?

13  A. Yes.

14  Q. So when we see the lighting conditions in this

15  picture you can actually see the flash going off the

16  car, that is a reflection of the flash you were using?

17  A. I would assume so, yes.

18  Q. So the lighting you see in the photographs has

19  been enhanced by the flash of your Minolta camera;

20  hasn't it?

21  A. Correct.

22  Q. So, the lighting that we are seeing when we

23  look at these various photographs of the signs, are

44

1  enhanced a little bit more than the lighting was when

2  for instance Mr. Meeks might have been looking at the

3  people who were?

4  A. Yeah. There is somewhat illumination comes

5  from the flash.

6  Q. I looked at a report that you prepared. It

7  indicates that I took some fingerprints; did you not?

8  A. Yes.

9  Q. Briefly just tell the jury why you take

10  fingerprints and what they are?

11  A. I dust for fingerprints with black volcano

12  ash, and dusted the side of the vehicle of the victim

13  just because there could have been a chance one of the

14  suspects had touched or scuffle ensued, and I dusted

15  for fingerprints there, and list them and put them on a

16  little card and turn them in to officer and if they

17  develop a suspect or whatever, they try to match the

18  prints up.

19  Q. So from a scene you can take the fingerprints

20  you lift from the scene and compare them later to a

21  suspect's prints when he is booked, fingerprints off of

22  tips and palm print?

23  A. We take a ten print, ten fingers and the palms

45

1  one just because somebody touches something you are not

2  going to leave a print on if it is cold or if you have

3  dry.

4      Q.  How about if you are nervous or upset or

5  afraid?

6      A.  A lot of times it does.  But like again, it

7  just comes and goes as different people.

8      Q.  What sort of objects can you leave prints on?

9      A.  Pretty much anything.

10     Q.  But you use different type of materials to

11 process items?  Like rough material you use different

12 items, and smooth material.  If I picked up the court

13 reporter's bottle, is it a possibility there would be

14 fingerprints left from that?

15     A.  Possibility.

16     Q.  If I put my finger print on the gun like one

17 of the C.O.'s could it leave fingerprints on the gun?

18     A.  It could.

19     Q.  Are you aware a gun was seized in this

20 investigation from about a block away?

21     A.  Yes.

22     Q.  Did you dust that gun for fingerprints?

23     A.  No, I didn't.

46

1      MR. O'CONNELL:  I have no further questions.

2      THE COURT:  Mr. Bayard.

3  BY MR. BAYARD:

4      Q.  Good afternoon.

5      As far as the fingerprints are concerned, you

6  are the collector but not the analyzer; that is a fair

7  statement?

8      A.  Correct.

9      Q.  So it wouldn't be fair for me or any one of us

10 to ask what your opinion was of any of these

11 fingerprints; would that be fair?

12     A.  Correct.

13     Q.  Did I understand you to say that a gun was

14 collected in this case?

15     A.  I believe so, yes.

16     Q.  Now, that was something that -- you are the

17 Evidence Detection Unit officer for this case, were you

18 the one who collected it or did somebody else collect

19 it?

20     A.  A control unit collected it.  I believe they

21 found subjects and took them into temporary custody or

22 however they did it and picked the gun up and secured

23 it and name tagged it.

47

1      Q.  So there is not any photos of the location it

2  was found?

3      A.  No.  They had already taken the gun into

4  custody.

5      Q.  So you were deprived of that opportunity?

6      A.  Correct.

7      Q.  Some of the evidence that you mentioned here

8  today, did you collect all that the evening of the 14th

9  going into the 15th of October or was it something that

10 you were given or found later on?

11     A.  Stuff that I collected that evening.

12     Q.  Even the coins and all of that?

13     A.  It was located right around the rear tire.

14     Q.  Did any evidence come to you subsequent to

15 that evening?

16     A.  I don't recall that, no

17     MR. BAYARD:  No further questions.

18     THE COURT:  Mr. Bernstein.

19 BY MR. BERNSTEIN:

20     Q.  Good afternoon, Corporal.

21     A.  Hi.

22     Q.  Can you give me an idea of the scope of your

23 search?  This area is a one block street where cars are

48

1  parked?

2      A.  Yeah.  They park on both sides of the street.

3      Q.  You mentioned, and when we saw the

4  photographs, a number of items that were very close to

5  this ref vehicle; correct?

6      A.  Yes.

7      Q.  Can you give me some idea how far out your

8  search went in terms of that one block area?  Did you

9  cover the whole block or just the area around the car

10 or did you go up on Fifth Street or down on Sixth

11 Street?

12     A.  There was a shot fired and a subject was hit,

13 it was in his foot so there could have been entry and

14 exit.

15     Q.  Did you know whether there was an entry and

16 exit?

17     A.  I said there could be just because it was the

18 foot and it is possible because it is a thin area it

19 can enter and exit, just from going on experience.  So

20 I would look for projectile whether it would be under

21 the car, which I did get on my hands and knees and

22 looked under the car, looked by the curb, looked to the

23 building line to make sure it didn't hit into a window

000152

49

1    and somebody inside could be hit, so you look up and

2    down the block of Willing Street.

3        Q.   That's what you did up and down the whole

4    block?

5        A.   Yes.

6        Q.   Did you use flashlights?

7        A.   Yes.

8        Q.   Trying to cover as much ground area as you

9    could?

10       A.   Whatever evidence I could find that would be

11   helpful towards this case.

12       Q.   What you found was basically what we have seen

13   here today?

14       A.   Correct.

15       Q.   But you did get a hold of?

16       A.   Yes, I did.

17       MR. BERNSTEIN:  Okay.

18            REDIRECT EXAMINATION

19   BY MR. O'CONNOR:

20       Q.   The just to be clear, you are not the keeper

21   of all the evidence related to this case?

22       A.   No.  Other people collect evidence.  If

23   somebody collects an item around the block and they

50

1    pick it up and once they pick it up and maintain

2    possession of, there is no need for me to take it

3    because I'm only going to do the same thing they are

4    going to do is put a green slip on it and turn it into

5    the evidence locker not do anything special to it.

6        Q.   Based on your experience, if I understood you

7    right, a person could leave fingerprints on an item but

8    there is a lot of factors that go into that?

9        A.   Correct.

10       Q.   Would it surprise you -- does it surprise you

11   in your job that you don't find fingerprints on --

12       A.   Yeah, it doesn't surprise me that I don't find

13   fingerprints on a glass somebody picks up.  Sometimes

14   they do and sometimes they don't.  If you have dry

15   skin, if you are a bricklayer, certain occupations

16   where your fingers are rough and scaly and dry they are

17   not apt to leave fingerprints.  If you have a bad

18   surface or good surface it doesn't matter.  It is luck

19   of the time when they put their hands on that item,

20   basically.

21       MR. O'CONNOR:  Nothing further.

22            RECROSS-EXAMINATION

23   BY MR. O'CONNELL:

51

1        Q.   But you didn't dust for prints?

2        A.   On the vehicle, yes.

3        Q.   Not the gun?

4        A.   I never had the gun given to me, I believe

5    somebody else did, but I didn't.

6        Q.   You said somebody else dusted for prints?

7        A.   I can't be a hundred percent sure, I believe

8    somebody did.

9        MR. O'CONNELL:  Nothing further.

10       MR. BERNSTEIN:  Nothing further.

11       MR. BAYARD:  Nothing further.

12       THE COURT:  Ladies and gentlemen that

13   completes the presentation of evidence for today.  We

14   will resume tomorrow morning at 10:30.

15       I remind you that while serving on the jury

16   you are not permitted to discuss the case with anyone

17   or among yourselves.  I don't know if there is going to

18   be media coverage.  I don't ever know whether the media

19   will choose to cover a case.  Should you look at

20   anything that might be related to this case ignore it

21   and don't read it.  You can catch up with your

22   newspaper reading when the case is over.

23       You are excused until tomorrow morning at

52

1    10:30.

2        (The jury exited the courtroom at 4:05 p.m.)

3        THE COURT:  Counsel anything before we

4    adjourn?

5        MR. O'CONNOR:  No, your Honor.

6        MR. O'CONNELL:  No, your Honor.

7        MR. BAYARD:  No, your Honor.

8        Mr. Bernstein:  No, your Honor.

000153

NEW CASTLE COUNTY:

     I, Christine Mason Baird, RPR, CRR and
Official Court Reporter of the Superior Court, State of
Delaware, do hereby certify that the foregoing is an
accurate transcript of the proceedings had, as reported
by me in the Superior Court of the State of Delaware,
in and for New Castle County, in the case therein
stated, as the same remains of record in the Office of
the Prothonotary at Wilmington, Delaware, and that I am
neither counsel nor kin to any party or participant in
said action nor interested in the outcome thereof.

     WITNESS my hand this 22nd day of
July , 2004

     Christine Mason Baird, RPR, CRR
     Certification #157-PS

000154

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,      ID#0210009174
                       ID#0210009188
                       ID#0210008663

v.

MUSTAFA WHITFIELD,
EMMANUEL ROBINSON,
AKEEM COLEMAN,

                     Defendants.

BEFORE:
     HONORABLE SUSAN C. DEL PESCO, J.
          and jury

APPEARANCES:
     MARTIN B. O'CONNOR, ESQ.
     JOHN DONAHUE, ESQ.
     Deputy Attorneys General
          for the State

     JOSEPH M. BERNSTEIN, ESQ.
          for Mustafa Whitfield
     JAMES A. BAYARD, ESQ.
          for Emmanuel Robinson
     KEVIN J. O'CONNELL
          for Akeem Coleman

- - - - -

TRIAL TRANSCRIPT
JANUARY 30, 2004
- - - - -

ORIGINAL

SUPERIOR COURT OFFICIAL REPORTERS
500 King Street - Wilmington, Delaware  19801
(302) 255-0651

23

---

**2**

1                    JANUARY 30, 2004

                       11:00 a.m.

2                 Courtroom No. 4E

3    PRESENT:

4         As noted.

5              - - - - -

6         THE COURT:  Ready?

7         MR. O'CONNOR:  I need to approach about one

8    matter when everyone is here.

9         THE COURT:  Oh.  Who is not here?

10        MR. BERNSTEIN:  I have to take up one matter

11   when the defendants are here.

12        THE COURT:  Let's get everyone in.

13        MR. O'CONNOR:  I would ask to approach the

14   bench.  We don't need the court reporter.

15        THE COURT:  All right.

16        MR. O'CONNOR:  You will understand.

17        THE COURT:  All right.

18        (A side-bar discussion was held off the

19   record.)

20        MR. BERNSTEIN:  When I got back to my office

21   yesterday I found a letter from ODC indicating that Mr.

22   Whitfield had filed a complaint against me, looks like

23   it is dated December 31st.  And ODC indicated they were

000155

---

1    not taking any action on it, but I wanted to make the

2    Court aware of the matter and the content of Mr.

3    Whitfield's letter.

4         THE COURT:  Have you discussed this with him?

5         MR. BERNSTEIN:  I have not discussed it with

6    him.  The only thing I can say is that Mr. Whitfield,

7    at least from my experience, has been very difficult to

8    deal with.  I'm sure he would say the same thing about

9    me and I'm not going to say anything else.

10        THE COURT:  All right.

11        MR. BERNSTEIN:  But I felt obligated to bring

12   it to the Court's attention.  I'm not asking to be

13   relieved, but I just want to make the Court aware of

14   the situation.

15        THE COURT:  What is the nature of the

16   allegations of misconduct?

17        MR. BERNSTEIN:  Well, it is a five page

18   letter.  I can hand it up to the Court and the Court

19   can look at it, maybe not now but at the luncheon

20   recess or some other time.  I would have had extra time

21   but the copy machine was broken this morning.

22        THE COURT:  Mr. Whitfield, this trial has

23   begun, this jury has been sworn.  What do you want at

---

**4**

1    this point?  Are you interested in representing

2    yourself?

3         THE DEFENDANT:  Yes, ma'am.

4         THE COURT:  What is the nature of your

5    complaint with Mr. Bernstein?

6         THE DEFENDANT:  We are not seeing eye to eye

7    on some things.  And I feel as though I would represent

8    myself better without him.

9         THE COURT:  How old are you?

10        THE DEFENDANT:  Eighteen.

11        THE COURT:  If you are 18 I assume you have

12   never been involved in an adult court proceeding

13   before; correct?

14        THE DEFENDANT:  Correct.

15        THE COURT:  What is your education?

16        THE DEFENDANT:  I have a tenth grade

17   education.

18        THE COURT:  Tenth grade education.

19        Mr. Whitfield we can suspend this trial and I

20   can go through a review with you of the considerations

21   necessary to make a determination of whether or not you

22   are capable of representing yourself.  This is very

23   high risk stuff here.  You are at risk of a very

5

1  substantial sentence if you were to be convicted of
2  these crimes. You will not be given alternate counsel.
3  The choice isn't Mr. Bernstein or someone else, the
4  choice is Mr. Bernstein or going it alone. And a
5  failure to object or to present some evidence or
6  strategic error in deciding whether or not to testify
7  on your own behalf can make a huge difference in a
8  case -- in any case, especially when you are talking
9  about a case where there are long sentences involved if
10 you are convicted. Have you previously written to the
11 Court and requested to represent yourself?
12     MR. BERNSTEIN:  He did. I don't think there
13 was any action taken on it. I want to say that was
14 three or four months ago.
15     THE DEFENDANT:  About that time, yeah.
16     I did that because I used to write Mr.
17 Bernstein all the time for information and he never
18 give me none or give me a little bit or parts of it.
19 Like all of a sudden towards trial he started to comply
20 but I was asking him for information back in
21 October 2003.
22     THE COURT:  Well, the question is whether or
23 not you now have a clear understanding of what the

6

1  charges are. Your attorney can't predict everything
2  that the State is going to present, but it looks to me
3  like you have a pretty good size file. Have you seen
4  all the documents produced to your attorney? Are you
5  aware of the evidence as much as you can understand it
6  as this stage of the proceedings?
7      THE DEFENDANT:  Yeah. I just recently -- I
8  think I just recently got all of the documents.
9      THE COURT:  So you have seen everything?
10     THE DEFENDANT:  Yeah.
11     MR. BERNSTEIN:  Mr. Whitfield got everything
12 when I got everything. Whatever I got he got in a
13 timely way.
14     THE COURT:  That, Mr. Whitfield, is sometimes
15 frustrating if you are back at the prison because you
16 don't know what he has. But he has to get it out of
17 the State. So if he is working on getting it from the
18 State and turning it over to you. We are at a critical
19 moment here and that is whether we are going to proceed
20 with this trial, either you representing yourself or
21 Mr. Bernstein representing you. Those are the two
22 options available to you. Have you had a conversation
23 with him about this?

7

1      THE DEFENDANT:  No.
2      THE COURT:  You didn't say yesterday I want to
3  represent myself.
4      THE DEFENDANT:  Yesterday, he said -- never
5  mind. He said if you want to represent yourself you
6  can, something like that.
7      THE COURT:  Did you tell him at that time that
8  you wanted to represent yourself?
9      THE DEFENDANT:  Yeah. I was mad or
10 something.
11     THE COURT:  Well, yesterday was it your
12 intention when you came in here to represent yourself?
13     THE DEFENDANT:  No. Because of some
14 complications we were having I just decided all right
15 if he want to say something like that I will do it.
16     MR. BERNSTEIN:  Mr. Whitfield said I was
17 working for the State.
18     THE COURT:  This was yesterday?
19     THE DEFENDANT:  Oh, yeah, you going to say
20 what you said too?
21     MR. BERNSTEIN:  I told him he was a moron.
22     THE DEFENDANT:  That's it?
23     THE COURT:  Here is the point. You were here

8

1  at the courthouse. Have you said in the presence of
2  the judge, yesterday or before yesterday that you
3  wanted to represent yourself?
4      THE DEFENDANT:  No.
5      THE COURT:  So were you aware this
6  conversation was going to happen this morning?
7      THE DEFENDANT:  Kind of figured it was going
8  to happen this morning because before I left yesterday
9  he said something that was going to happen or
10 something.
11     THE COURT:  Well, I have not had brought to my
12 attention that you had any intent to represent yourself
13 until now. Had you said to Mr. Bernstein in the last
14 couple of days that you desired to represent yourself?
15     THE DEFENDANT:  I said it last night when he
16 said the things that he said to me.
17     THE COURT:  Before jury selection did you say
18 anything to him about wanting to represent yourself?
19     THE DEFENDANT:  I think I did. I don't
20 really speak to him, but I write him a lot. I think I
21 wrote him. I wrote him like every week.
22     THE COURT:  When you walked in here yesterday
23 when we began jury selection did you intend to

9

1  represent yourself?  Did you have the desire to
2  represent yourself?
3      THE DEFENDANT:  No, ma'am.
4      THE COURT:  Okay.  Well, that being the case
5  then I find the request to represent yourself untimely
6  and I will not further entertain such an application
7  and we will proceed with the trial.
8      MR. BERNSTEIN:  Does the Court want a copy of
9  Mr. Whitfield's correspondence?
10     THE COURT:  Is that a copy?
11     MR. BERNSTEIN:  No.
12     THE COURT:  When you can make a copy submit
13 one and have it marked as a Court's Exhibit.
14     Let's proceed.  The jury is going to wonder
15 what we have been doing.
16     Jury please.
17     (The jury entered the courtroom at 11:20 a.m.)
18     THE COURT:  Good morning, ladies and
19 gentlemen.  Sorry to keep you waiting.  I can assure
20 you we have been busy.  But I know that when you are
21 sitting there wondering she said get here at 10:30 and
22 now it is almost 11:30 what is going on.  But you have
23 not been forgotten.

10

1      Is the State ready to proceed?
2      MR. O'CONNOR:  State calls and Anthony Meeks.
3          ANTHONY MEEKS,
4      the witness herein, having first been duly
5  sworn on oath, was examined and testified as follows:
6          DIRECT EXAMINATION
7  BY MR. O'CONNOR:
8  Q.  Good morning, Mr. Meeks.
9  A.  **Good morning.**
10 Q.  Where do you live?
11 A.  **Wilmington.**
12 Q.  What street do you live on?
13 A.  **Washington.**
14 Q.  And what unit block is that?
15 A.  **500.**
16 Q.  Where were you born and raised?
17 A.  **500 Washington.**
18 Q.  Have you essentially lived in that house all
19 your life?
20 A.  **Yes.**
21 Q.  Have you lived in Delaware all your life?
22 A.  **No.**
23 Q.  Where else have you lived?

11

1  A.  **Atlanta.**
2  Q.  How long were you in Delaware before you went
3  to Atlanta?
4  A.  **Eighteen years.**
5  Q.  How long were you in Atlanta?
6  A.  **Ten.**
7  Q.  And you moved back to Wilmington and moved
8  back into the house you grew up in?
9  A.  **Yes.**
10 Q.  Do you go to school?
11 A.  **Yes.**
12 Q.  Where do you go to school?
13 A.  **Del-Tech.**
14 Q.  What are you studying?
15 A.  **Services.**
16 Q.  Are you pursuing a degree?
17 A.  **Yes.**
18 Q.  What degree?
19 A.  **Associates.**
20 Q.  Do you work?
21 A.  **Yes.**
22 Q.  Where do you work?
23 A.  **Delaware Park.**

12

1  Q.  What do you do at Delaware Park?
2  A.  **Valet.**
3  Q.  How long have you worked at Delaware Park?
4  A.  **Two years, two-and-a-half.**
5  Q.  Working at Delaware Park, is that a general
6  time you would be scheduled to go to work?
7  A.  **Yes.**
8  Q.  Is it shift work?
9  A.  **Yes.**
10 Q.  What is your general time that you work now?
11 A.  **Now?  Morning -- morning, afternoon and**
12 **evenings, all three.**
13 Q.  What would be a morning shift?
14 A.  **11 to seven.**
15 Q.  Did you go to work on October 14, 2002?
16 A.  **Yes.**
17 Q.  What shift were you working that day?
18 A.  **Morning.**
19 Q.  11 to seven?
20 A.  **Yes.**
21 Q.  Did you end up working another shift that day?
22 A.  **Yes.**
23 Q.  Can you please explain to the jury why it is

13

1  you worked a second shift that day?

2      A.  A fellow worker of mine called and asked me to

3  work for him.  And I said yeah I would work a double

4  for him in exchange for another day that he would work

5  for me.

6      Q.  Is that what you did?

7      A.  Yes.

8      Q.  Do you recall when you got off work on

9  October 14, 2002?

10     A.  Yes.

11     Q.  And what time was that?

12     A.  11, 11:15.

13     Q.  What did you do when you got off from work?

14     A.  I went home.

15     Q.  Into Wilmington?

16     A.  Yes.

17     Q.  Do you own a car?

18     A.  Yes.

19     Q.  What kind of car do you have?

20     A.  Chevy Cavalier.

21         MR. O'CONNOR:  Your Honor, may I approach the

22  witness?

23         THE COURT:  Yes.

14

1  BY MR. O'CONNOR:

2      Q.  I'm going to show you what has previously been

3  marked as State's Exhibit 1; do you recognize that car?

4      A.  Yes.

5      Q.  Is that yours?

6      A.  Yes.

7      Q.  Did you own the same Chevy Cavalier in 2002?

8      A.  Same car.

9      Q.  How long did it take you to get home from

10  Delaware Park?

11     A.  Twenty minutes, 20, 30 minutes, 15, 20,

12  somewhere around there, 20 minutes.

13     Q.  Do you live with anybody in Wilmington?

14     A.  Yes.

15     Q.  Who do you live with?

16     A.  My mother and my brother.

17     Q.  Back in October 2002 who was living with you?

18     A.  My mother, brother and father.

19     Q.  When you got home where did you park your car?

20     A.  Behind the house.  Call it the parking lot.

21     Q.  Have you learned since then what the parking

22  lot actually is?

23     A.  Yes.

15

1      Q.  What is it?

2      A.  Willing Street.

3      Q.  I'm going to put State's Exhibit 1 on this

4  machine.

5         MR. O'CONNOR:  May I ask the witness to step

6  down?

7         THE COURT:  Yes.

8  BY MR. O'CONNOR:

9      Q.  Mr. Meeks this is the same photograph I just

10  showed you.  If you could step to the side so the

11  jurors can see.  Is this Willing Street on this

12  photograph?

13     A.  Yes.

14     Q.  Can you explain to the jury what is at the top

15  end of this photograph, bottom end and how it is laid

16  out?

17     A.  Here would be Sixth Street.  The lot goes

18  straight down and this way and at the bottom there is a

19  graveyard that sits at the bottom, you have to go left

20  or right.

21     Q.  What does Willing Street constitute,

22  essentially?

23     A.  Parking lot, houses.

16

1      Q.  So the people that live on Washington Street,

2  the back of their houses is Willing Street?

3      A.  Willing Street.

4      Q.  And the back of West is the street and people?

5      A.  Yes.

6         MR. O'CONNOR:  Your Honor, I had pre-marked as

7  an exhibit State's Exhibit 18 without objection by the

8  defense.

9         MR. BERNSTEIN:  That's correct.

10         MR. O'CONNOR:  It is a map of the City of

11  Wilmington.  If you could step over.

12         Mr. Meeks, just to orient you a little bit,

13  Willing Street is right here.  Here is Washington.  And

14  Fourth Street.  Can you indicate with this pen where on

15  Willing Street it was that you parked your car.

16         And you described you would go from Washington

17  to Sixth.  Can you write the direction Sixth Street is

18  on that map?

19     Q.  What direction does Washington Street go?

20  These are one way streets?

21     A.  Yes.

22     Q.  What direction does Willing Street go?  One

23  way?

000158

17

1    A.  Yeah, essentially.

2    Q.  Fifth Street would go where, which direction?

3    How about West?

4    A.  West Street?

5    Q.  All one way streets?

6    A.  They are.

7    Q.  Now you said you parked on Willing Street so

8    you would have had to take a -- would have had to come

9    east on Sixth then take a right on Willing; is that

10   correct?

11   A.  Yes.

12   Q.  Thank you.  You can return to the stand.

13       From the picture, State's Exhibit 1.  It

14   indicates that your car was backed in; is that

15   accurate?

16   A.  Yes.

17   Q.  Is that how you parked it that night?

18   A.  Yes.

19   Q.  Were there a lot of other cars on Willing

20   Street in the parking lot area that night?

21   A.  A few.

22   Q.  How many would you estimate?

23   A.  Couldn't say.  Not that many.  It wasn't like

18

1    it was full, never really full except on Sundays.

2    Q.  Looking at State's Exhibit 1 there are no cars

3    to your left if you are in the driver's seat; is that

4    the way it was when you parked?

5    A.  Right.  None to my left.

6    Q.  Are there lights on Willing Street?

7    A.  Yes.

8    Q.  And in relation to your vehicle where are

9    there street lights?

10   A.  There is one not far from it because the light

11   pole is right a couple feet from me, I guess, pretty

12   much.

13   Q.  I hate to ask you to come down, but if you can

14   come down.

15       This light pole, is that the light pole you

16   are referring to?

17   A.  Yes.

18   Q.  Is it your recollection that there was a light

19   that was operational that night on that pole?

20   A.  Yes.

21   Q.  Okay.  Thank you.

22       When you were parking your car, did anything

23   grab your attention?

19

1    A.  Yes.  Three individuals, three black males

2    walking down towards me coming around the corner

3    towards me.

4    Q.  Coming from Sixth Street down Willing?

5    A.  Yes.

6    Q.  What do you remember about their appearance or

7    what they looked like or anything like that?

8    A.  What I saw was one -- the three that came

9    together and had something wrapped around their faces.

10   Two had something wrapped around their face and I

11   thought this kind of looked weird.  Until they got up

12   on me I realized what was going on.  It just didn't sit

13   right when they came around the corner in the manner

14   they came around the corner.

15   Q.  What was it when they came around the corner,

16   what were they doing?

17   A.  One tried to duck down and like tried to slide

18   off from the other two and duck down, but then he stood

19   back up and then he fixed the T-shirt or white thing

20   around his face when he came around.

21   Q.  Was there anybody else out that evening, aside

22   from yourself, in the Willing Street area, aside from

23   yourself?

20

1    A.  Nobody there.

2    Q.  You indicated three black males started coming

3    toward you?

4    A.  Yes.

5    Q.  Were you in your car?  Where were you?  What

6    were you doing?

7    A.  Getting out of the car, getting my stuff,

8    change from work, my badge, getting out of the car.

9    Q.  What do you recall happened next?

10   A.  Got out of my car, locked the door and some

11   odd reason I was like basically like everyday routine,

12   when I go to work lock the car, go home.  When they

13   came around they came around the front of the car and I

14   was standing there and he had the gun in his hand.

15   Q.  You saw one individual with a weapon?

16   A.  Oh, yes.

17   Q.  Can you describe the weapon to the jury?

18   A.  Handgun, semiautomatic.

19   Q.  What color was it, if any?

20   A.  The defendant?

21   Q.  No, the gun?

22   A.  Black.

23   Q.  The person with the gun, did he have something

000159

**21**

1  wrapped around his head?

2  A.  **No, he didn't have anything wrapped.**

3  Q.  Are you familiar with guns?

4  A.  **Yes, I am.**

5  Q.  How is it you are familiar?

6  A.  **I own several myself.**

7  Q.  What types of guns do you own?

8  A.  **Semiautomatic handguns.**

9  Q.  When these three individuals were approaching

10  you did anybody say anything to you?

11  A.  **Yes.**

12  Q.  Let's step back.  The person with the gun --

13  A.  **Yes.**

14  Q.  What did the person say to you?

15  A.  **Give up the keys.  Give up the keys.**

16  Q.  In relation to your car where were you

17  standing at this point?

18  A.  **By the driver's side of the door.**

19  Q.  Where were these three individuals when that

20  statement was made?

21  A.  **They were in front of me.  At the front of my**

22  **car on the driver's side.**

23  Q.  The person said what?

**22**

1  A.  **Give up the keys.  Give up the keys.**

2  Q.  What do you do in response to that?

3  A.  **I told them, how could you rob me?  I live**

4  **here, this is my neighborhood.  How you going to rob me**

5  **right behind my house?  And essentially he just kept**

6  **saying give up the keys.  Give up the keys.  Didn't say**

7  **anything other than that.**

8  Q.  Do you see the person in the courtroom today

9  that had the gun and said give up the keys.  Give up

10  the keys?

11  A.  **Yes.**

12  Q.  Can you identify him?

13  A.  **Sitting rights there.**

14  Q.  What is he wearing?

15  A.  **All white.**

16  Q.  Right here?

17  A.  **Yes.**

18  MR. O'CONNOR:  Please let the record reflect

19  the person has identified Akeem Coleman as the person

20  with the handgun.

21  BY MR. O'CONNOR:

22  Q.  How was Akeem Coleman holding the gun?

23  A.  **Like this.**

**23**

1  Q.  You are indicating with your right hand out,

2  down, up by your eye range?

3  A.  **Yes.**

4  Q.  Right hand or left hand?

5  A.  **It was his right.  His right.**

6  Q.  Do you remember anything else specifically

7  that Akeem Coleman was wearing that night?

8  A.  **No, I don't specifically, no.  He didn't have**

9  **a jacket on I know that.  No.**

10  Q.  Had you ever seen him before?

11  A.  **No, I hadn't.**

12  Q.  How about the other two people that were with

13  him?

14  A.  **They had T-shirts wrapped around their head, I**

15  **couldn't see nothing, only their eyes.**

16  Q.  How would you describe them height, weight,

17  race, gender?

18  A.  **Black men, black male, pretty much around the**

19  **same height.  Pretty much around the same weight.**

20  Q.  Was Akeem Coleman a similar size, larger,

21  smaller?

22  A.  **He was larger.**

23  Q.  In what way?

**24**

1  A.  **Width, size.**

2  Q.  How close were you to these three individuals

3  while this conversation was going on about taking your

4  keys or getting your keys?

5  A.  **Two, three feet, maybe.**

6  Q.  From you to the court reporter?

7  A.  **Yes.**

8  Q.  How about in relation to one another?  Were

9  they spread out, close together?

10  A.  **Close together.**

11  Q.  When you said something when he asked for your

12  keys, what happened next?

13  A.  **I told him how you going to rob me?  This is**

14  **my neighborhood.  And he told another, I guess, one of**

15  **the other ones to grab my keys.**

16  Q.  Did somebody grab your keys?

17  A.  **Yes.**

18  Q.  How were you holding them?

19  A.  **Holding the keys?**

20  Q.  How were you holding the keys?

21  A.  **I locked my car door, still in my hand.  So**

22  **the whole time I still got the keys in my hand like**

23  **this, I haven't put them in my pocket yet, they are in**

000160

25

1  my hand.

2  Q.  What happened next?

3  A.  He reached for my keys.

4  Q.  What did you do in response to that?

5  A.  I wrapped him up.

6  Q.  Can you describe to the jury what wrapped him

7  up means?

8  A.  He reached for my keys, I got behind him like

9  this, started walking backwards.

10 Q.  Indicated you put your right arm around his

11 neck?

12 A.  Yes.

13 Q.  Walking backwards. What was behind you?

14 A.  The fence was behind me.

15 Q.  Towards the rear of your vehicle?

16 A.  Yes.

17 Q.  What were the other two people doing at that

18 time?

19 A.  The shooter, the defendant, he was trying to

20 get a clear shot. I had his partner like this, the

21 other one was trying to get me off his partner.

22 Q.  So you had one of them between yourself and

23 the gun?

26

1  A.  Yes.

2  Q.  What occurred next?

3  A.  I walked backwards and trying to get on the

4  other side of the car and I tripped and we both fell

5  back on the curb.

6  Q.  Ws anybody else saying anything?

7  A.  No. No one said anything at that time, no,

8  other than the guy, he was saying -- telling him to

9  shoot me. That's what had me walking backwards,

10 walking behind the car keeping him like this, telling

11 him to shoot me, so I was bobbing and weaving trying to

12 stay clear of the shot.

13 Q.  Was the guy saying shoot, the guy you had in

14 the hold or the other guy?

15 A.  The other guy.

16 Q.  The guy with the gun?

17 A.  No.

18 Q.  The other person?

19 A.  Yes.

20 Q.  Do you recall any of them touching your car?

21 A.  I don't recall. I'm not sure.

22 Q.  You indicated you fell back against the curb

23 or fell in the curb?

27

1  A.  Yes.

2  Q.  Can you tell the jury what happened next?

3  A.  Fell back against the curb, both fell down.

4  The guy that was telling the other guy to shoot me,

5  they tried to kick me and he was pulling his friend up

6  at the same time, so when he got up that's when he shot

7  at me.

8  Q.  The person who said shoot me was trying to

9  pull the guy on top of you off?

10 A.  Yes.

11 Q.  Then the other person fired the weapon?

12 A.  Yes.

13 Q.  What direction was that fired at?

14 A.  On the ground, towards me on the ground.

15 Q.  How long would you estimate this struggle

16 occurred with these guys?

17 A.  Two minutes.

18 Q.  What happened after that shot was fired?

19 A.  Took off running and I got up and started

20 chasing after them.

21 Q.  What direction did they run?

22 A.  Towards Fifth Street.

23 Q.  So south on Willing away from you?

28

1  A.  Yes.

2  Q.  And away from the direction they came?

3  A.  Yes.

4  Q.  Why did you chase after them?

5  A.  Anger.

6  Q.  How did you feel at that time?

7  A.  Angry.

8  Q.  Why?

9  A.  You don't think to get robbed in your

10 neighborhood. You come home, you go to work, you just

11 don't think to get robbed in your own neighborhood.

12 One of them things.

13 Q.  After you started running after these people

14 what happened?

15 A.  He turned and fired at me again.

16 Q.  Who did?

17 A.  The shooter.

18 Q.  Akeem Coleman?

19 A.  Yes.

20 Q.  And where was he in relation to the end of

21 Willing Street? Can you give the jury some perspective

22 about how far he turned before he turned and fired?

23 A.  About three or four houses down. The houses

000161

29

1  are pretty close. But it was some far distance away.
2  Q. What happened after that shot was fired?
3  A. Felt the pain in my foot and started hobbling.
4  Q. Had you felt any pain in your foot before that
5  time?
6  A. No, I didn't.
7  Q. Did you stop chasing after them?
8  A. Yes.
9  Q. Where did the three individuals go?
10  A. Made a left on Fifth Street.
11  Q. Towards what street?
12  A. Towards West.
13  Q. And what do you do?
14  A. Hobble back, went to my house, tried to get my
15  mom's attention, called for my mom.
16  Q. How did you do that?
17  A. Get my mom's attention?
18  Q. Yeah?
19  A. I had change in my pocket so I threw it at the
20  door, at the window.
21  Q. How many shots were fired during the contact
22  with these people?
23  A. Two.

31

1  what they are and present them to the jury.
2      THE COURT: Very well.
3  BY MR. O'CONNOR: .
4  Q. I'm going to hand you State's Exhibit 22; what
5  does that depict?
6  A. That's my foot.
7  Q. At the hospital that night?
8  A. Yes.
9  Q. Next is State's Exhibit 23.
10  A. That's my foot.
11  Q. State's Exhibit 24.
12  A. That's me.
13  Q. All right. Was there a bullet lodged in your
14  foot?
15  A. No.
16  Q. Did you have an entrance and exit wound?
17  A. Yes.
18  Q. This is State's Exhibit 22.
19      What type of treatment did you receive at the
20  hospital?
21  A. They put a pin in my foot to hold the bone in
22  place.
23  Q. Were you operated on?

30

1  Q. What do you remember happening next?
2  A. My mom came down she said she heard shots
3  fired and I told her I was shot. And I hobbled up the
4  stairs to tell her and hobbled back down the stairs to
5  go to my car.
6  Q. How long was it before the police arrived?
7  A. Not long at all, five minutes maybe.
8  Q. Did an ambulance arrive also?
9  A. Yes. Shortly after.
10  Q. Did you get in the ambulance?
11  A. Yes.
12  Q. Where did it take you?
13  A. Christiana Hospital.
14  Q. What were the injuries when you got to the
15  hospital, what did you see?
16  A. My foot was broken, I had a hole in my foot.
17      THE COURT: I didn't hear you.
18      THE WITNESS: My foot was broken.
19      MR. O'CONNOR: I have photographs that were
20  pre-marked with no objection by the defendants.
21      THE COURT: Are you presenting them to the
22  witness or do you want to present them to the jury?
23      MR. O'CONNOR: I would like him to acknowledge

32

1  A. Yes.
2  Q. Do you recall if you were operated on that
3  day, couple days later?
4  A. Sometime that day, that evening, by that
5  morning, after midnight when I got to the hospital,
6  sometime that morning early hours of the morning.
7  Q. How long were you in the hospital?
8  A. Three days.
9  Q. Were you able to return back to being a valet?
10  A. No.
11  Q. How long did it take before you could work
12  again?
13  A. Three months.
14  Q. Do you have any affect of this incident on
15  your foot today?
16  A. Yes.
17  Q. Can you explain to the jury?
18  A. I still feel pain in my foot like when old
19  people get arthritis when it gets cold outside they
20  feel it in their joints, I feel it in my foot.
21      MR. O'CONNOR: State offers the next two
22  exhibits into evidence. I don't believe there is any
23  objection.

33

1    MR. O'CONNELL: There is not.

2    MR. BAYARD: No, your Honor.

3    MR. O'CONNOR: The first is the sneaker Mr.

4  Meeks was wearing on the night of the shooting and the

5  sock.

6    THE PROTHONOTARY: 24 and 25, your Honor.

7    THE COURT: Thank you.

8  BY MR. O'CONNOR:

9    Q.  I'm going to hand you State's Exhibit 24.

10  Take that out of the bag; do you recognize that?

11    A.  Yes.

12    Q.  Is that the sneaker you were wearing that

13  night?

14    A.  Yes, it is.

15    Q.  Is it in a different condition than when you

16  left work that night?

17    A.  Yes.

18    Q.  Can you explain to the jury how it is

19  different?

20    A.  This right here, I didn't have a hole in my

21  shoe.

22    Q.  Can you show the jury where that would be?

23    A.  Right here.

34

1    Q.  Were you wearing socks that night?

2    A.  Yes.

3    Q.  I'm going to show you State's Exhibit 25, does

4  that appear to be the same sock you had on?

5    A.  Yes.

6    Q.  If I could draw your attention back to when

7  you were at the car that evening when the three people

8  approached you. Did you have any change or anything

9  else on your person that was left there that you are

10  aware of?

11    A.  Yes.

12    Q.  What do you remember about that?

13    A.  I had change and my badge, it was all in a

14  cup, that's where I keep my change at, and during the

15  struggle all that was on the ground somewhere.

16    Q.  Did you have an ID?

17    A.  Yes.

18    Q.  I'm going to show you State's Exhibit 13.

19    A.  My ID.

20    Q.  That's the ID you had that night?

21    A.  It is.

22    Q.  Did you have any change from Delaware Park?

23    A.  Yes.

35

1    Q.  I will show you State's Exhibit 16. Do you

2  recall having a 50 cent piece in your possession?

3    A.  Probably. Sometimes people to tip they give

4  you Delaware Park money.

5    MR. O'CONNOR: I have two other exhibits,

6  State's Exhibits 19 and 20. Without objection I would

7  like to move them into evidence.

8    THE COURT: Without objection?

9    MR. O'CONNELL: That's correct.

10    MR. BAYARD: That's correct.

11  BY MR. O'CONNOR:

12    Q.  I'm going to hand you State's Exhibit 19, if

13  you could hold them up to the jury, that's the driver's

14  side view of your vehicle?

15    A.  Yes.

16    Q.  Now State's Exhibit 20, what does that depict?

17    A.  A hole in my right -- behind the wheel of my

18  car.

19    Q.  So there is damage to the vehicle, a small

20  circular hole?

21    A.  Yes.

22    Q.  Was that there before the night of the 13th

23  into the 15th?

36

1    A.  No, it isn't.

2    Q.  Are you pretty good about keeping your car

3  clean?

4    A.  Yes, anal about that, actually.

5    Q.  I'm going to show you State's Exhibit 2 and

6  represent to you there is a white T-shirt found along

7  the curb line; do you know if that was there that

8  evening before this occurrence?

9    A.  No, that wasn't there.

10    Q.  Why do you say it wasn't there?

11    A.  Because I looked behind me when I got out of

12  the car, there was nothing there but the grass and the

13  bush and light pole and fence.

14    Q.  Was there any property of yours that was taken

15  from you that you didn't recover immediately or that

16  you didn't know where it was right away?

17    A.  Yes.

18    Q.  What was that?

19    A.  My car keys, house keys, and I had a like a

20  bottle opener, beer bottle opener on it. That was the

21  only three things and I didn't get that time back.

22    MR. O'CONNOR: Can I have two things marked

23  for identification?

37

1    THE PROTHONOTARY: Marked A and B.
2    MR. O'CONNOR: Can I have one second to speak
3  with counsel?
4    MR. O'CONNOR: I can make those exhibits.
5    THE PROTHONOTARY: State's Exhibit 26 and 27,
6  your Honor.
7    (State's Exhibits 26 and 27 were admitted into
8  evidence.)
9  BY MR. O'CONNOR:
10    Q.  I'm going to hand you State's Exhibit 26 and
11  take a look at that item in the envelope.
12    A.  **That's my bottle opener.**
13    Q.  You had that in your possession and hadn't
14  seen it until this week?
15    A.  **No, I haven't seen it.**
16    Q.  Until it was shown to you by myself?
17    A.  **Yes.**
18    Q.  I'm going to hand you State's Exhibit 27; does
19  that key look familiar?
20    A.  **Yes.**
21    Q.  What is it?
22    A.  **My house key.**
23    Q.  Did you receive some of your vehicle keys back

38

1  so you could drive your car?
2    A.  **Yes.**
3    Q.  Who did you get them from?
4    A.  **Detective Messetic.**
5    Q.  Did you speak to any of your neighbors or
6  anybody that evening just after this incident?
7    A.  **Yeah. There was one guy, never saw his face.**
8    Q.  What did you say?
9    A.  **He said to me I heard you got shot in the**
10  **foot.**
11    Q.  What did you say?
12    A.  **I said yes it does.**
13    Q.  If you can take a look at Mr. Coleman,
14  Whitfield or Robinson. I asked you about Mr. Coleman;
15  have you ever seen the other two?
16    A.  **No, I have never seen them.**
17    MR. O'CONNOR: I don't have any other
18  questions at this time.
19    THE COURT: Cross-examine.
20    CROSS-EXAMINATION
21  BY MR. O'CONNELL:
22    Q.  Good morning, Mr. Meeks, how are you today?
23    A.  **Fine. Yourself?**

39

1    A.  I'm doing well. Thank you for asking.
2    When you previously testified you pointed to
3  pictures where you were parked and you indicated there
4  was a pole right behind your vehicle, a Chevy Cavalier?
5    A.  **Not directly behind but behind.**
6    Q.  The one appears to the -- in the picture, to
7  the rear of your vehicle?
8    A.  **Yes.**
9    Q.  You indicated you believe it has a light on
10  it?
11    A.  **No. I said it is an electric pole, the whole**
12  **parking lot is lit.**
13    Q.  Okay. Is it your belief that there is
14  lighting coming from like a street light coming from
15  that pole?
16    A.  **No, it is a power pole.**
17    Q.  Do you know where the lighting is situated on
18  Willing Street or was at that time?
19    A.  **There is lights, not just one light, lights up**
20  **and down that street.**
21    MR. O'CONNELL: May I approach the witness,
22  your Honor?
23    THE COURT: Yes.

40

1    MR. O'CONNOR: No objection.
2    MR. O'CONNELL: May I have these marked as
3  first defense exhibits, two photographs.
4    THE COURT: I take it the other defendants
5  have no objection.
6    MR. BERNSTEIN: That's correct.
7    MR. BAYARD: No objection.
8    THE PROTHONOTARY: Defendant's Exhibits 1 and
9  2, your Honor.
10    (Defendant's Exhibits 1 and 2 were admitted
11  into evidence.)
12    MR. O'CONNELL: May I approach the witness,
13  your Honor?
14    THE COURT: Yes.
15  BY MR. O'CONNELL:
16    Q.  I'm going to show you two exhibits marked 1
17  and 2 and ask you to look at them and tell the jury
18  what they represent.
19    A.  **Same, Willing Street.**
20    Q.  From which direction is it looking?
21    A.  **South and north Fifth Street up.**
22    Q.  In other words, back from the perspective
23  where the pictures are taken your back would be to

000164

41

1 where you said the graveyard was?

2    **A. Yes.**

3    **Q.** And looking up towards Sixth Street would be

4 at the very end of the street or parking lot?

5    **A. Yes.**

6    **Q.** Now, your car on the evening of October 14th,

7 2002 would have been on which side of these two

8 pictures, the right or left?

9    **A. The right.**

10    **Q.** And is it fair to say that the pole, the power

11 pole that appears on the right is the pole that you

12 were generally backed up to?

13    **A. Yes.**

14    **Q.** And Mr. Meeks, I'm exhibiting for the jury

15 what has been marked Defendant's Exhibit 1. And can

16 you indicate -- perhaps it is easier for you to come

17 down.

18       MR. O'CONNELL: May the witness come down?

19       THE COURT: Yes.

20 BY MR. O'CONNELL:

21    **Q.** Thank you. Can you indicate to the jury the

22 pole? Using my pen point to the pole where you were

23 backed up to.

42

1    **A. Right here.**

2    **Q.** So where that white car appears is basically

3 about where you would have been?

4    **A. Basically.**

5    **Q.** But your car would have been in the opposite

6 direction, in other words facing the opposite direction

7 where the white car is?

8    **A. Yes.**

9    **Q.** It's fair to say this is the pole you referred

10 to earlier in the State's exhibit?

11    **A. Yes.**

12    **Q.** That would have been to the rear of your

13 vehicle?

14    **A. Yes.**

15    **Q.** Is it fair to say there is no light on that

16 pole?

17    **A. Yes.**

18    **Q.** There is a pole that appears across the

19 streets; is it not?

20    **A. Yes.**

21    **Q.** That pole does have a light on it; doesn't it.

22 I will let you look at a clearer version which is

23 Defendant's Exhibit 2. And if you could step over so

43

1 the jurors can all see. Are there any -- can you

2 indicate where on Willing Street there are lights --

3 street lights?

4    **A. Where?**

5    **Q.** Yes.

6    **A. I couldn't tell you a light except for this**

7 **picture there is one.**

8    **Q.** Did you see in that picture any other lights?

9    **A. No.**

10    **Q.** Okay. So it appears that there is one street

11 light that illuminates the area you were talking about,

12 but it is across the street, maybe two, three car

13 lengths away across the street?

14    **A. Yes. In my backyard actually.**

15    **Q.** So is it fair to say as you stood adjacent to

16 the driver's side of your car you faced the assailant;

17 is that correct?

18    **A. Yes.**

19    **Q.** Who would have been on the driver's side of

20 your car facing towards you?

21    **A. Yes.**

22    **Q.** Is it fair to say the lighting then would have

23 been to the rear of them?

44

1    **A. Yes.**

2    **Q.** Now, on the evening of October 14th in the

3 early morning hours of October 15, 2002, you were

4 interviewed by police officers who came to the scene;

5 were you not?

6    **A. You mean at the hospital?**

7    **Q.** Let's take the scene first. Did any police

8 officers come and talk to you at the scene and say can

9 you describe the people who did this do you?

10    **A. Yes, I was home on the step.**

11    **Q.** Do you remember if they were uniform or plain

12 clothes?

13    **A. Uniform.**

14    **Q.** Do you remember the officers' name by any

15 chance?

16    **A. No.**

17    **Q.** And did they ask you for a physical

18 description of the people who had perpetrated this

19 offense?

20    **A. Yes, they did.**

21    **Q.** And did you give them one?

22    **A. Yes.**

23    **Q.** Do you recall how you described the person who

000165

**45**

1  fired the shots, first of all, their height and weight
2  or build?
3  A.  I told them they didn't have a mask on. He
4  asked me what did he have on? I told him the other two
5  had something like T-shirts wrapped around their face.
6  Q.  Let's approach it this way. Do you recall
7  speaking with Detective Messetic at the hospital when
8  he came to visit you at the hospital?
9  A.  So many people there. No, I don't recall. I
10  talked to someone, I don't know who.
11  Q.  Was it a detective?
12  A.  I don't know. I don't know if it was a
13  detective.
14  Q.  Do you recall giving a physical description of
15  the people who perpetrated this offense at that time?
16  A.  I gave them a description as far as the
17  clothing.
18  Q.  Now let's focus on the person you said was the
19  person who shot the gun at you, who held the gun that
20  evening.
21  A.  Yes.
22  Q.  Did you tell them what kind of clothing they
23  were wearing -- that person was wearing?

**46**

1  A.  I don't remember telling him what kind of
2  clothing.
3  MR. O'CONNELL: May I confer with counsel for
4  a moment?
5  THE COURT: Yes.
6  BY MR. O'CONNELL:
7  Q.  Mr. Meeks, I will represent to you that in a
8  report prepared by Detective Messetic, who will testify
9  later, you represented you believed the shooter was
10  five-foot ten or a little bit shorter; does that
11  refresh your recollection?
12  A.  If that's what is on there, I guess.
13  Q.  That doesn't sound like you would say I never
14  said that I said he was six-ten; does that sound about
15  right?
16  A.  No.
17  Q.  You said average build? You need to respond
18  verbally?
19  A.  I'm thinking. Perhaps I did. If I said it I
20  said it.
21  Q.  You indicated that the person had a white
22  T-shirt on and dark pants?
23  A.  Yes.

**47**

1  Q.  Is that your recollection?
2  A.  If it was written I said it.
3  Q.  Okay. Let's talk about what you remember some
4  15 months later today. Do you recall that the person
5  was wearing a white T-shirt, the person holding the
6  gun?
7  A.  I recall the gun, the person's face, because
8  he had no mask on. The two accomplices, I guess, with
9  the mask on, that I do recall.
10  Q.  It is fair to say your memory was better back
11  on the early morning hours of October 15th than it is
12  now?
13  A.  Probably fresher then, yes.
14  Q.  As you sit here now you don't recall what the
15  person holding the gun was wearing in terms of
16  clothing?
17  A.  No.
18  Q.  And you don't recall the height or build?
19  A.  By average height, about my height, that I do
20  know. Because from here he wasn't that taller than me
21  if he was taller at all.
22  Q.  You indicated in your statement to Detective
23  Messetic you believe he was clean shaven; that is your

**48**

1  recollection now or you don't recall?
2  A.  I don't recall.
3  Q.  So you don't recall whether or not the person
4  had facial hair or?
5  A.  No. That's a fair statement.
6  Q.  You don't recall if the person was wearing a
7  light T-shirt, and I'm referring to the person holding
8  the gun?
9  A.  Yes.
10  Q.  You don't recall light T-shirt, dark T-shirt?
11  A.  No.
12  Q.  Long hair, short hair?
13  A.  Short hair.
14  Q.  You recall it was short hair? You don't
15  recall the color of the pants?
16  A.  They weren't white.
17  Q.  They weren't white?
18  A.  No.
19  Q.  Did you have an opportunity to look at some
20  photographic lineups?
21  A.  Yes.
22  MR. O'CONNELL: May I have these marked?
23  MR. O'CONNOR: No objection, your Honor.

000166

49

1    MR. O'CONNELL: With the Court's permission
2  could I have these marked as next sequential exhibits?
3    THE PROTHONOTARY: Three and four, your Honor.
4    (Defendant's Exhibits 3 and 4 were admitted
5  into evidence.)
6    MR. O'CONNELL: May I approach?
7    THE COURT: Yes.
8  BY MR. O'CONNELL:
9    Q. I'm going to show you Defendant's Exhibit 4.
10 Do you recall looking at that photographic lineup
11 previously?
12   A. Yes.
13   Q. Do you recall whether or not you pointed to
14 one of the pictures in that photographic lineup and
15 indicated that could be the person who fired the shot
16 at you?
17   A. Yes.
18   Q. And which person would that be in this lineup?
19   A. Right here.
20   Q. You are pointing to what is the lower
21 right-hand corner, and for the record that is serial
22 numbers 1036576, underneath of it, is that who you
23 pointed to you believe possibly could be the shooter?

50

1    A. Looks like it, yes.
2    Q. Later you were shown another photographic
3  lineup. Is that the photographic lineup you were shown
4  later?
5    A. Yes.
6    Q. Do you see a photograph you may have
7  identified in that lineup?
8    A. Yes.
9    Q. Which one that be?
10   A. Upper right hand corner.
11   Q. For the record, 1012584?
12   MR. O'CONNELL: Could I have a moment, your
13 Honor?
14   THE COURT: Yes.
15 BY MR. O'CONNELL:
16   Q. Just a couple more questions. I just have a
17 couple other questions. I noticed when you were
18 outside the courtroom you had glasses on. And you wear
19 glasses to correct a problem with your vision?
20   A. No, sometimes just reading.
21   Q. Let's explore that for a moment. You said no
22 you don't need them but you need them sometime for
23 reading?

51

1    A. Not at all, these are just glasses that go
2  with the suit.
3    Q. So they the don't magnify they just make you
4  look like a player?
5    A. Yes.
6    Q. So you don't have glasses to make you correct
7  your vision?
8    A. No.
9    Q. And didn't utilize glasses that night?
10   A. No.
11   THE COURT: Mr. Bayard.
12 BY MR. BAYARD:
13   Q. Did I understand correctly that you felt that
14 the gun you saw that evening was discharged two
15 different times?
16   A. Yes.
17   Q. Now, the first time it was discharged you were
18 still on the ground?
19   A. Yes.
20   Q. Did you see the person point the gun in any
21 particular direction when it was fired the first time?
22   A. Yes, pointed downward, this way.
23   Q. And did you get hit?

52

1    A. I don't know. I don't know if I got hit or
2  not the first time.
3    Q. Did you suffer more than one gunshot wound?
4    A. No.
5    Q. Did your clothing show any perforations that
6  you didn't have beforehand?
7    A. No.
8    Q. The second shot, how far away was the shooter
9  at the time of the second shot?
10   A. About three or four houses down.
11   Q. I'm looking at this room right now, would you
12 say it was longer than the length of this room?
13   A. No.
14   Q. Shorter than the length of this room?
15   A. Not that much shorter, probably from here
16 to --
17   Q. To the rail perhaps?
18   A. No, not to the rail, probably from --
19   Q. First guard here?
20   A. First and second guard.
21   Q. In this general area here?
22   A. Somewhere.
23   Q. That was the distance between you and the

000167

53

1  person firing this gun?
2      A.  I didn't have a ruler on it, but that is
3  pretty much accurate.
4      Q.  Now, you indicated you were upset about your
5  treatment that you were getting at the hands of these
6  people?
7      A.  Yes.
8      Q.  You said you started to run after them?
9      A.  Yes.
10     Q.  Had you had planned if you caught one of them,
11 sir?
12     A.  Did I have a plan if I caught one of them?
13     Q.  Yeah.
14     A.  Is that what you asked me?
15     Q.  Yes, sir.
16     A.  No, I didn't have a plan.
17     Q.  Can you help us understand why? You explained
18 you were mad?
19     A.  I have a six-year old daughter who depends on
20 me. I have bills to pay things to get done. You come
21 home from work you don't think about people robbing
22 you. And the fact we live in a violent society these
23 things happen. You don't want to think that they

54

1  happen, but they happen. So all that is planned in my
2  head is I might of got shot over a car.
3      Q.  Did you explain a few minutes ago the second
4  shot was made while these people were running away from
5  you?
6      A.  Yes, they turned around and shot.
7      Q.  Now, you made an inquiry identification as to
8  one individual. Were you ever able to make an
9  identification of the men you said had something
10 wrapped around their heads?
11     A.  No.
12         MR. BAYARD: Sir, thank you for your
13 cooperation.
14         THE COURT: Mr. Bernstein.
15 BY MR. BERNSTEIN:
16     Q.  I take it on October 14th -- was it
17 October 14th the first time you parked your car there?
18     A.  No.
19     Q.  You parked it there many many times?
20     A.  Yes.
21     Q.  You parked it there daylight hours, nighttime
22 hours?
23     A.  Yes.

55

1      Q.  Pretty much all the time?
2      A.  Not all the time, but when I can't park on the
3  front street I park on the back.
4      Q.  And you described that there were kind of two
5  street lights, correct, that illuminated that area?
6      A.  I remember seeing two.
7          MR. BERNSTEIN: Your Honor, without objection
8  I would like to have an additional photograph marked as
9  Defendant Whitfield's first exhibit.
10         THE COURT: No objection?
11         MR. O'CONNOR: No, your Honor.
12         THE PROTHONOTARY: Mark it for Whitfield.
13         (Defendant Whitfield's Exhibit 1 was admitted
14 into evidence.)
15 BY MR. BERNSTEIN:
16     Q.  Can you see a street light here in the upper
17 left-hand corner of this photo?
18     A.  Yes.
19     Q.  And do you see there is a street sign there,
20 this is Fifth Street; is that correct?
21     A.  Not Fifth, that is Willing.
22     Q.  Willing Street goes -- Fifth Street going
23 this way?

56

1      A.  This is Sixth going down.
2      Q.  And there is a street light on the corner of
3  Sixth and Willing; correct?
4      A.  Right there.
5      Q.  And there is another street light halfway down
6  if block; correct?
7      A.  Yes.
8      Q.  And see that one on Exhibit Number 2, Coleman
9  2?
10     A.  Yes.
11     Q.  Are you aware of any other street lights?
12     A.  No.
13     Q.  Fair enough. You can row assume your seat.
14         Regardless of how many street lights are out
15 there, I would like to ask you some questions about
16 your ability to perceive colors and distinguish between
17 colors. Okay?
18         What color is the suit I have on?
19     A.  Charcoal gray.
20     Q.  How about the suit that Mr. O'Connell has on,
21 how would you describe that in terms of color?
22     A.  It's not beige, brownish.
23     Q.  Fair enough. How about the suit that Mr.

000168

57

1  O'Connor is wearing?

2      A.  Gray, dark gray.

3      Q.  You are familiar with the lighting conditions

4  where you park your car at night on Willing Street?

5      A.  Pretty much.

6      Q.  Given those conditions, whether it is bright

7  as daylight or dark or whatever they are, under those

8  lighting conditions were you able to distinguish colors

9  or how well or how poorly were you able to distinguish

10  colors?

11      A.  At that time colors were not on my mind.

12      Q.  Were you asked to describe the color of the

13  gun?  What did you say?

14      A.  Told them it was black.

15      Q.  You remembered it was a gun?

16      A.  I remember the gun, yeah.

17      Q.  And you are sure it was black?

18      A.  Yes.

19      Q.  Not gray, not dark blue, black?

20      A.  It was black.

21      Q.  When you were asked at the hospital to

22  describe the clothing, do you remember what you said?

23      A.  No.  I don't remember what I said.

58

1      Q.  Would you like to look at something maybe to

2  refresh your memory?

3      A.  Sure.  Why not.

4      Q.  Do you remember telling the police officer who

5  interviewed you at the hospital that you described the

6  two other suspects as wearing matching dark clothing,

7  possibly a dark gray shirt with white scarves around

8  their faces; do you remember saying that?

9      A.  That's what I said then?

10      Q.  At the hospital.

11      A.  That's what I said, that's what was said.

12      Q.  You don't have a recollection sitting here

13  today that you said that?

14      A.  I remember saying that they looked like twins,

15  that I remember.

16      Q.  When you say twins in terms of the way they

17  were dressed?

18      A.  Dress and the build and the size of them in

19  the way they were dressed.

20      Q.  Kind of the same build and they were dressed

21  kind of the same?

22      A.  Yes.

23      Q.  You said they both had white scarves covering

59

1  their faces?

2      A.  T-shirts, scarves covering their face.

3      Q.  Clothing pants, light or dark?

4      A.  It wasn't white.

5      Q.  Dark, not khakis?

6      A.  No.

7      Q.  How about shirts?  Could you distinguish

8  colors?  Because apparently the person who recorded

9  your interview recorded that you said possibly a dark

10  gray shirt.

11      A.  That's what was written.

12      Q.  Let me ask you this, do you think if you were

13  standing on Willing Street at night right now you could

14  distinguish somebody wearing a dark gray shirt or a

15  black shirt?

16      A.  I don't know.  They would have to be out

17  there.

18      Q.  You have been out there many many times?

19      A.  When you're on Willing Street or any street

20  you don't think about person's colors, you think about

21  your position, who are they, where are they, if they

22  are trying to do something or not.  You are not

23  thinking about if the guy has rainbow socks on, that

60

1  doesn't come to mind.

2      Q.  I'm not asking that if you could distinguish

3  between colors?

4      A.  It is possible.

5      Q.  I'm not saying whether you did or didn't that

6  night, but if you were to go out there tonight and look

7  at people wearing clothing could you tell whether

8  someone was wearing a dark gray shirt or dark green

9  shirt?

10      A.  It is possible.

11      Q.  Or a dark gray shirt or black black shirt or

12  dark blue shirt?

13      A.  It is possible.

14      Q.  Do you think your vision is better today than

15  it was 18 months ago or about the same?

16      A.  About the same.  About the same.

17      Q.  Did you notice anything unusual about any of

18  the clothing worn by any of these three people that you

19  saw?

20      A.  Unusual as in what?

21      Q.  Say if one of them was wearing a top hat a

22  foot tall, would you have remembered that?

23      A.  Something abstract like that, yes.

61

1    Q.  Or if someone was wearing a kind of a, quote,
2  a distinctive design?
3    A.  If it was abstract, yes.
4    Q.  You think you would have remembered, hey, some
5  guy had some kind of crazy looking shirt on?
6    A.  It's possible.
7    Q.  With a picture on it?
8    A.  It is possible.
9    Q.  Okay.
10      MR. BERNSTEIN:  Excuse me a moment, your
11  Honor.
12      That's all I have.
13         REDIRECT EXAMINATION
14  BY MR. O'CONNOR: .
15    Q.  Mr. Meeks, recollecting that evening did you
16  have any problem seeing Akeem Coleman's face?
17    A.  None.
18    Q.  I'm going to show you again, Defendant's
19  Coleman's Exhibit 3.  That is the second lineup that
20  you were shown by the Wilmington Police and you
21  identified the individual on that lineup as the person
22  who shot at you?
23    A.  Yes.

62

1    Q.  On a scale of one to 10, 10 being the most
2  certain you could be and one being the least, what
3  number would you describe to the fact that the person
4  you pointed out was the person who shot you?
5    A.  Ten.
6    Q.  Pick up that lineup and point to the person?
7  Thank you.  So you looked at 12 pictures and you were
8  able to positively identify --
9      MR. O'CONNELL:  Objection.  Leading.
10  BY MR. O'CONNOR:
11    Q.  How many pictures did you see?
12    A.  Two pictures, two lineups.
13    Q.  Six on a page?
14    A.  Six on a page.
15    Q.  Were you able to positively identify anybody
16  as the shooter?
17    A.  Yes.
18    Q.  Who was that?
19    A.  Sitting right there.
20    Q.  This guy right here?
21    A.  Yes.
22    Q.  Akeem Coleman?
23    A.  Yes.

63

1    Q.  Mr. Bayard asked you a couple questions about
2  whether or not you got shot the first time or second
3  time.
4    A.  Yes.
5    Q.  Do you know today which time you were hit with
6  a bullet?
7    A.  Still unclear about that.  From the way the
8  bullet -- the entrance and the way the injury was to my
9  foot I want to say the second, that's when I felt it.
10  I'm still not certain if it was one or the two -- first
11  time or the second.  I don't know.
12    Q.  But you weren't hit twice?
13    A.  No.
14    Q.  Mr. Bernstein asked you questions about color
15  of suits and whether or not you could recognize colors
16  that night?
17    A.  Yes.
18    Q.  Were you focused on a gun or three people or
19  focused on what they were wearing?
20    A.  Gun and three people.
21      MR. O'CONNOR:  Nothing else.
22      MR. O'CONNELL:  Nothing.
23      MR. BERNSTEIN:  No further questions.

64

1      MR. BAYARD:  Nothing further.
2      THE COURT:  You may step down.
3      MR. DONAHUE:  State calls Officer Derbyshire.
4        MATTHEW DERBYSHIRE,
5      the witness herein, having first been duly
6  sworn on oath was examined and testified as follows:
7         DIRECT EXAMINATION
8  BY MR. DONAHUE:
9    Q.  Officer Derbyshire, how are you employed?
10    A.  City of Wilmington Police Department.
11    Q.  How long have you been so employed?
12    A.  Approximately three years.
13    Q.  Were you on duty the evening of October 14,
14  2002 into the morning hours of October 15, 2002?
15    A.  Yes, I was.
16    Q.  Were you working alone?
17    A.  No.  I had a partner David Prado.
18    Q.  On the late evening of October 14, 2002 were
19  you in the area of 4th and West Street?
20    A.  Yes, I was.
21    Q.  Approximately what time were you in that area?
22    A.  11:45, 11:50.
23      MR. DONAHUE:  If I may set up the easel to

65

1  display the map, very briefly?

2      THE COURT: Yes.

3      MR. DONAHUE: Thank you.

4  BY MR. DONAHUE:

5      Q.  Can you tell the Court -- sorry, what time of

6  day were you in the area of Fourth and West?

7      A.  It was approximately 11:45. Between 11:45 and

8  12 midnight.

9      Q.  And you were with Officer Prado?

10     A.  Correct.

11     Q.  Were you walking or were you in a police

12 vehicle?

13     A.  In a marked Wilmington Police vehicle.

14     Q.  What, if anything, did you observe while in

15 that vicinity?

16     A.  Well, we were sitting at the stop light at the

17 intersection of Fourth and West Streets waiting.

18     Q.  If I can have you step down.

19         MR. DONAHUE: With your Honor's permission?

20         THE COURT: Yes.

21 BY MR. DONAHUE:

22     Q.  Use the map and explain where you were?

23         THE COURT: Make sure all the jurors can see.

66

1      THE WITNESS: We were sitting at a stop light

2  traveling northbound on West Street at Fourth on the

3  opposite side of Fourth, a little south of Fourth

4  Street. As we were at the red light stopped for the

5  light we observe three black males running. They came

6  from either an alleyway of the 500 block of West and

7  started running and ran across the street to go -- and

8  began to run north on West Street in the 500 block

9  heading towards Sixth Street.

10     Q.  Did you see what street they came down before

11 they crossed onto West?

12     A.  I believe they came out of an alleyway. I

13 don't believe they were coming up Fourth Street. They

14 came out in the 500 block of West.

15     Q.  And how many individuals did you observe

16 running?

17     A.  Three.

18     Q.  And how close together were they?

19     A.  Very close. They could touch each other. One

20 was more in the front, two were in the back behind

21 them.

22     Q.  And what did you do, what did you and your

23 partner do when you observed the group, three

67

1  individuals running?

2      A.  We decided to stop them to see what they were

3  up to to ask them questions. So we accelerated up to

4  where we saw them running. At that point, as we were

5  getting out of the car two of them jumped over the

6  fence on the east side of the street, 500 block of

7  West.

8      Q.  If you can show the jury approximately where

9  the two individuals jumped the fence?

10     A.  This is the St. Peter's church and there is a

11 little courtyard here and a brick wall type of fence

12 probably six feet high, maybe a little less, right

13 there in the courtyard. Two of them, immediately upon

14 seeing the car pulling up getting close to them jumped

15 over and leaped over the fence.

16     Q.  What about the third?

17     A.  He, I guess, couldn't make it and he kept on

18 running or walking at a fast pace northbound in the

19 block there on West Street.

20     Q.  You can retake your seat. Thank you.

21         Were you able to get a description of the

22 three individuals before the two jumped the fence?

23     A.  Yes. Once we saw them jump the fence I

68

1  immediately followed out of the car and heard — I

2  could see motion lights go on in the courtyard and

3  heard some rattling and sounded like they jumped over

4  another fence, before I was able to get close enough.

5  I got on the radio and put out a description of two

6  black males running eastbound through the courtyards

7  from West Street, one wearing a gray sweatshirt, dark

8  pants and the other had dark clothing as well, tall,

9  skinny black males.

10     Q.  So, the physical description of both of them

11 was tall and skinny?

12     A.  Yes.

13     Q.  What about the third individual?

14     A.  Third, he was wearing a white T-shirt and dark

15 pants and he was not -- I don't recall if he actually

16 attempted to get over the fence. From what I remember

17 he was just running and kind of slowing down as we

18 pulled up heading northbound in the 500 block of West

19 and we actually stopped him.

20     Q.  Before you stopped him were you able to

21 observe his physical stature?

22     A.  Yes. He appeared heavy set, shorter than the

23 other two and like I say he was wearing a white T-shirt

000171

**69**

1  and dark pants.

2  MR. DONAHUE: May I have a moment?

3  THE COURT: Yes.

4  MR. DONAHUE: I would like to have these

5  marked as exhibits. I don't believe there is defense

6  objection.

7  MR. BAYARD: None, your Honor.

8  THE PROTHONOTARY: State's Exhibits 28 through

9  34, your Honor.

10  (State's Exhibits 28, 29, 30, 31, 32, 33 and

11  34 were admitted into evidence.)

12  MR. DONAHUE: Permission to approach the

13  witness, your Honor.

14  THE COURT: Sorry?

15  MR. DONAHUE: Permission to approach the

16  witness.

17  THE COURT: Yes.

18  BY MR. DONAHUE:

19  Q.   Sir, I'm handing you what has been marked

20  State's Exhibit 33; can you tell the jury what that is?

21  A.   A view looking northbound in the 500 block of

22  West, the eastern most sidewalk in the 500 block of

23  West.

**70**

1  Q.   Is that the sidewalk that you observed the

2  three individuals running down?

3  A.   Yes.

4  Q.   I would like to show you what has been marked

5  State's 29; can you please tell the jury what that is?

6  A.   That is the wall, brick wall on the east side

7  of that block, same sidewalk, the church -- that

8  separates the church from the street and the sidewalk

9  there. And the pictures taken from the west, the

10  opposite sidewalk, the west side of the street looking

11  at the east.

12  Q.   Is there any individuals in that picture?

13  A.   Yes, I am.

14  Q.   And what are you standing against?

15  A.   The brick wall that we saw the two defendants

16  jump over.

17  Q.   And how tall are you?

18  A.   Approximately 5-6.

19  Q.   Next I would like to show you State's

20  Exhibit 30; could you tell the jury what that is?

21  A.   Another picture of the sidewalk looking

22  northbound and it was a tree on the left-hand side and

23  the same fence that we had previously looked at.

**71**

1  THE COURT: Ladies and gentlemen, we are going

2  to recess. We will resume at 2:00. I remind you not

3  to discuss the case amongst yourselves. Leave the

4  courthouse directly -- you don't have to leave, there

5  is a cafeteria, but do not engage in a conversation

6  with anyone you don't know. You are excused and see

7  you at 2:00.

8  (The jury exited the courtroom at 1:45 p.m.)

9  (Following a luncheon recess:)

10  THE COURT: Jury, please.

11  (The jury entered the courtroom at 2:15 p.m.)

12  THE COURT: We have a witness on the stand.

13  MR. DONAHUE: Yes, your Honor. Officer

14  Derbyshire.

15  (Officer Derbyshire resumes.)

16  THE COURT: You are still under oath.

17  BY MR. DONAHUE:

18  Q.   I'm going to ask you some questions. We will

19  pick up from the recess.

20  Where were you when the two individuals jumped

21  over the fence?

22  A.   Still inside the marked patrol car.

23  Q.   On which block?

**72**

1  A.   On the 500 block of West, just in the middle

2  of the street.

3  Q.   So how far were you or how close were you to

4  the location where the two individuals jumped the

5  fence?

6  A.   I would say 15, 20 feet, maybe.

7  Q.   What did you and Officer Prado do after the

8  two individuals jumped the fence?

9  A.   After I got out of the car, I saw the two

10  gentlemen jump over the fence. I saw there was a

11  floodlight in the little park there, in the church.

12  And I heard another fence being jumped, so I realized

13  at that point they were already too far gone for me to

14  get, so I put a description over the radio.

15  At that time, I returned, I started walking

16  towards Officer Prado who had Mr. Coleman stopped up

17  the street a bit and that's when I saw a gun on the

18  ground.

19  Q.   Let's go back over that a bit. Where did you

20  get out of the patrol car?

21  A.   Middle of the block, I would say.

22  Q.   I'm going to put up on the screen State's

23  Exhibit 31. Where about -- actually, why don't you

73

1 tell the jury what that is a picture of?

2     A.   **That's the 500 block of West Street, east side**

3 **of the block looking south where our vehicle, the**

4 **vehicles you can see the headlights of the vehicles,**

5 **our car was coming up the road same way our vehicles**

6 **were.**

7     MR. DONAHUE:  Permission to approach.

8     THE COURT:  Yes.  I take it these are recent

9 photos.

10     MR. DONAHUE:  Yes, your Honor.

11 BY MR. DONAHUE:

12     Q.   Which way were the individuals running on this

13 street?

14     A.   **Northbound.**

15     Q.   And if you can show us with what I just handed

16 you, there is a button on that remote that says laser,

17 if you can use that to mark on the screen where the

18 area is that they jumped over the fence?

19     A.   **I would say right in that section right there.**

20     Q.   And where did your patrol car stop?

21     A.   **Right about there in the street.**

22     Q.   And that's where you exited?

23     A.   **Yes.**

74

1     Q.   What did Officer Prado do?

2     A.   **I believe when Mr. Coleman kept going**

3 **northbound on West, he drove up, followed him up the**

4 **street and got out of the car and stopped it around, I**

5 **think it might have been Fifth and West or a little**

6 **before the Fifth Street light, maybe.**

7     Q.   And if you could tell the jury, is this a

8 one-way or two-way street?

9     A.   **It is a one-way street that runs north.**

10     Q.   Is there parking on both sides or just one?

11     A.   **Parking on both sides of the street.**

12     Q.   Do you recall on the evening of October 14,

13 2002 whether there were any cars parked on the

14 right-hand side of the lane?

15     A.   **I believe there were, yes.**

16     Q.   And that would be the side that's depicted in

17 this picture?

18     A.   **Yes.**

19     Q.   You said Officer Prado continued onto the end

20 of the block?

21     A.   **Yes.**

22     Q.   Did he take someone into custody?

23     A.   **Yes.**

000173

75

1     Q.   Do you see that person today?

2     A.   **Yes.**

3     Q.   Identify that person?

4     A.   **Seated right there in the white Department of**

5 **Corrections suit.**

6     Q.   Let the record reflect the witness has

7 identified the defendant Akeem Coleman.

8     Now, you got out at about the middle of the

9 block; correct?

10     A.   **Correct.**

11     Q.   What did you do then?

12     A.   **After they had already jumped the fence, I**

13 **just -- I was going to walk to assist my partner who**

14 **had him -- was speaking with him at the time, I don't**

15 **believe he was in custody yet.  As soon as I turned**

16 **around and began to walk I noticed a black handgun was**

17 **on the ground.**

18     MR. DONAHUE:  Permission to approach the

19 witness, your Honor.

20     THE COURT:  Yes.

21     MR. DONAHUE:  I would like to have this marked

22 for identification.

23 BY MR. DONAHUE:

76

1     Q.   I'm handing you State's A.  Could you please

2 open that and tell the jury what that is?

3     A.   **Smith and Wesson handgun, looks like a nine**

4 **millimeter.**

5     MR. DONAHUE:  I believe there is not going to

6 be a defense objection.  I would like to have marked

7 Defense Identification A moved into evidence.

8     THE COURT:  Very well.  I'm going to request a

9 key lock for the gun.

10     THE PROTHONOTARY:  State's Exhibit 35.

11     (State's Exhibit 35 was admitted into

12 evidence.)

13     MR. DONAHUE:  I will not use it until there is

14 a key lock, if that's okay with your Honor.

15 BY MR. DONAHUE:

16     Q.   Did you recognize that gun?

17     A.   **Yes.**

18     Q.   And where do you recognize it from?

19     A.   **It was the gun found on the ground on the**

20 **evening in question.**

21     Q.   What did you do when you observed the gun?

22     A.   **First I notified my partner to put him in**

23 **handcuffs -- put who you are talking to in handcuffs.**

77

1  Because obviously we found a gun on the ground he might

2  be armed.

3      Q.  I'm going to show you what has been marked

4  State's Exhibit 29.  Could you tell the jury what that

5  is?

6      A.  That's a picture of the brick wall in the 500

7  block of West where the two suspects jumped over the

8  fence and the tree is approximately on the ground.

9  Behind the tree is where the gun was on the sidewalk.

10     Q.  If you could use the laser and show the jury

11 the area where you located the gun?

12     A.  Right about there behind that tree on the

13 ground.

14     Q.  Was it on the sidewalk?

15     A.  Yes, it was on the sidewalk.

16     Q.  Now, is there anything significant about where

17 you are standing in this picture?

18     A.  That is the wall, the exact area of the two,

19 Mr. Robinson and Whitfield, jumped over the fence.

20     Q.  So where you are standing?

21     MR. BERNSTEIN:  Objection.  I don't think that

22 it has been established this witness has identified

23 anyone.  He just mentioned two people by name who

78

1  jumped over the fence and I don't think that is -- he

2  has never been asked to identify these people.  I don't

3  know where this is coming from.

4      THE COURT:  Can you rephrase your question?

5      MR. DONAHUE:  Yes, your Honor.

6  BY MR. DONAHUE: .

7      Q.  Where you are standing, that is where the two

8  individuals jumped over the fence?

9      A.  Correct.

10     Q.  And which direction in this picture were the

11 individuals that jumped the fence running?

12     A.  That would be eastbound.

13     Q.  So if you could use the laser and show the

14 direction the way they were running?

15     A.  Over that fence to the courtyard.

16     Q.  But from which direction would they enter this

17 picture?

18     A.  Right where I was standing.

19     Q.  So from right to left; is that fair to say?

20     A.  Yes.

21     THE COURT:  Are you saying they are going

22 behind you?

23     THE WITNESS:  Correct.  Over the fence is east

79

1  and they kept going eastbound through the courtyards.

2      Q.  Were you able to get a good look at the two

3  individuals that jumped over the wall?

4      A.  I got a look, not a great look, but good

5  enough at the clothing description.

6      Q.  You didn't see their faces?

7      A.  No.

8      Q.  Now, could you -- I'm going to show you what's

9  been marked as State's Exhibit 30.  Could you please

10 tell the jury what this is?

11     A.  Again, that's the eastern most sidewalk in the

12 500 block of West Street.

13     Q.  And --

14     A.  Looking north on west.

15     Q.  And can you depict the area where you located

16 the gun?

17     A.  Right there in that area right there.

18     Q.  And where did Officer Prado stop Akeem

19 Coleman?

20     A.  Probably up around there.

21     Q.  Now, when you located the gun, what did you

22 do?

23     A.  I picked it up to make the weapon safe, which

80

1  is to see if it was loaded and there is a magazine in

2  the clip -- or clip in the gun.  At that point I made

3  it safe by ejecting the one round out of the chamber

4  and removing the clip.

5      Q.  So was there a round in the chamber?

6      A.  Yes.

7      Q.  And was there a magazine?

8      A.  Yes.

9      Q.  Do you know if the magazine had any bullets in

10 it?

11     A.  It did.

12     Q.  Were you able to take a look at the bullets

13 that were in the magazine?

14     A.  Yes.

15     Q.  And were you able to identify those bullets?

16     A.  Hollow point nine-millimeter rounds.

17     THE COURT:  Do you have the trigger lock?

18     THE BAILIFF:  Yes, your Honor.

19     THE COURT:  Would you like to bring it up and

20 put it on, please?

21 BY MR. DONAHUE:

22     Q.  I'm handing you State's Exhibit 14.  Could you

23 please open that envelope.  Can you tell the jury what

000174

83

1  that is?

2      A.   Looks like a nine millimeter round with a

3  hollow tip bullet.

4      Q.   Are you able to say whether or not it is a

5  similar bullet as to what you observed in the magazine

6  in the .nine-millimeter that you found on the sidewalk?

7      A.   Yes, it is.

8      Q.   After you made the gun safe what did you do

9  with the gun?

10     A.   Put it in the trunk of the car of our vehicle.

11     Q.   When you first located the gun, did you show

12  it to your partner?

13     A.   I picked it up and started walking towards my

14  vehicle which was up the street a little bit.

15     Q.   What, if anything, happened next?

16     A.   At that point, Mr. Coleman, I guess, saw that

17  I had a gun in my hand and he said that's not my gun,

18  I'm afraid of guns, my brother was killed by a gun.  I

19  believe -- he just said that as I was walking

20  approaching him and Officer Prado.

21     Q.   At that point had you received any calls about

22  a robbery?

23     A.   Not at that point.

---

1      A.   When someone forcefully takes a vehicle from

2  someone, attempts to either harm them in some way or

3  attempts to harm them forcefully and takes their

4  vehicle from them or attempts to.

5          MR. DONAHUE:   Thank you.  No further

6  questions.

7          THE COURT:  Cross-examine.

8                  CROSS-EXAMINATION

9  BY MR. O'CONNELL:

10     Q.   Good afternoon, Officer Derbyshire.

11     A.   Good afternoon.

12     Q.   Before you testified did you have an

13  opportunity to review your report?

14     A.   Yes.

15     Q.   Did you have an opportunity to speak with some

16  of the other officers involved in this investigation

17  about what happened to kind of refresh your

18  recollection?

19     A.   I spoke to Officer Prado.

20     Q.   So the two of you had some discussions about

21  what happened before you came in here and testified?

22     A.   Yes.

23     Q.   And did you have any discussions with the

---

82

1      Q.   When, if at all, did you receive a call about

2  a robbery?

3      A.   I would say two, three minutes later, a

4  minute, to two minutes later after I had already found

5  the gun and began to walk up the street to assist my

6  partner with Mr. Coleman.

7      Q.   What was broadcasting?

8      A.   They broadcast a carjacking that just occurred

9  in the 500 -- Fifth and Willing, 500 block of Willing,

10  I believe.

11         MR. DONAHUE:  May I have a moment, your Honor?

12  BY MR. DONAHUE:

13     Q.   Did you receive that broadcast before or after

14  you had Coleman in custody?

15     A.   After.

16     Q.   Approximately how long after?

17     A.   Not long, a minute, minute to two minutes

18  tops.

19     Q.   And you testified that it was broadcast for a

20  carjacking?

21     A.   A carjacking, shots fired, something to that

22  effect, robbery.

23     Q.   What is a carjacking?

---

84

1  prosecutors before you came in to testify?

2      A.   Yes.

3      Q.   You indicated where on the block you located

4  the weapon?

5          Did there come a time weeks after the initial

6  arrest when you went back out there with detectives and

7  sketched where on the block you found the weapon?

8      A.   Sketched?  No.

9      Q.   Made a diagram so you would know where it was?

10     A.   No.

11     Q.   I will represent to you that Detective

12  Messetic represents that on November 9th 2002, 12:30 at

13  night he went to the 500 block of West Street meeting

14  with you and Patrolman Prado to complete the sketch;

15  you don't recall that as you sit here?

16     A.   What was the date?

17     Q.   November 9, 2002?

18     A.   No.

19     Q.   You don't recall that?

20     A.   No.

21     Q.   You indicated you first saw these individuals

22  when you and your partner were at the light at Fourth

23  and West Street?

000175

1  A.  Correct.

2  Q.  You were in your marked vehicle facing north?

3  A.  Correct.

4  Q.  You would have been traveling on West Street?

5  A.  Correct.

6  Q.  So what you are looking at up ahead of you,

7  you got the light hanging over Fourth Street, four

8  lanes; correct?

9  A.  Yeah.

10  Q.  And you got Friends Meeting House and

11  cemetery -- fenced in cemetery in the 400 block of West

12  and Washington; is that correct?

13  A.  Correct.

14  Q.  And then the next block up is Fifth and then

15  you have got between Fifth and Sixth on West you have

16  St. Peter's?

17  A.  Correct.

18  Q.  Where is it you first saw these individuals

19  emerging from?

20  A.  **Appeared to me in the 500 block of West. They**

21  **did not come up Fourth Street, it was after Fourth**

22  **Street, so it was in the 500 block.**

23  Q.  Between Fourth and Fifth is the 400 block of

---

86

1  West Street; correct?

2  A.  **Correct.**

3  Q.  So it was somewhere in the 400 block or 500

4  block that you initially saw them?

5  A.  **500 block, yes.**

6  Q.  Was it Fifth Street they were coming out of?

7  A.  **If there is no alleyway in that block it would**

8  **have to be Fifth Street, yes.**

9  Q.  And so the fact they were running, you

10  indicated that's what drew your attention to them?

11  A.  **Yes.**

12  Q.  Were you driving or was your partner driving?

13  A.  **To the best of my recollection he was driving.**

14  Q.  So you would have been in the front passenger

15  seat?

16  A.  **Correct.**

17  Q.  Did you ever lose site of the individuals as

18  they made their way north on West Street?

19  A.  **No, they jumped over the fence.**

20  Q.  So you had continuous sight of them from the

21  point that you are beginning to move up West Street

22  towards them while they are going up West Street;

23  correct?

---

87

1  A.  **Correct.**

2  Q.  Did you go at a high rate of speed?

3  A.  **No, we sped up to about 20 or 30.**

4  Q.  So you have got to go that full block between

5  Fourth and Fifth because they are up at Fifth and going

6  up to Sixth?

7  A.  **Yes.**

8  Q.  And you weren't speeding?

9  A.  **No.**

10  Q.  Did you feel as if or did you observe that

11  they looked back and saw you?

12  A.  **Yes.**

13  Q.  When did you see that?

14  A.  **When we were pulling up we crossed Fourth**

15  **Street into the 400 block. At that point they heard**

16  **our vehicle or saw something, turned around, and at**

17  **that point we started getting close two of those males**

18  **jumped the fence.**

19  Q.  Was it the two who jumped the fence who turned

20  around?

21  A.  **Yes.**

22  Q.  Wasn't the other fellow?

23  A.  **Not to the best of my recollection, no.**

---

88

1  Q.  What is the lighting like on West Street?

2  A.  **Dimly lit. Dimly.**

3  Q.  But you never lost sight of the individuals as

4  they were making their way up West Street?

5  A.  **Not until like I said they jumped over the**

6  **fence.**

7  Q.  So you pull halfway up West Street when you

8  reached the two individuals who jumped the fence?

9  A.  **I would say in the middle of the block, yes.**

10  Q.  When you pull up there do you have your window

11  down?

12  A.  **I was preparing to get out of the car, open**

13  **the door and get out and talk to them or try to stop**

14  **them just to talk to them.**

15  Q.  They went over the fence; correct?

16  A.  **Correct.**

17  Q.  In your testimony you said, I guess the other

18  guy couldn't get over the fence, did you see him try?

19  A.  **I don't remember seeing him try to get over**

20  **the fence.**

21  Q.  So that was an assumption?

22  A.  **Yes.  That he didn't try because the fence was**

23  **too high.**

000176

89

1   Q.   Could it be he wasn't with the two people and

2   just moving up the block?

3   A.   No, they were running together.

4   Q.   When you testified on direct you indicated as

5   your partner approached Mr. Coleman or the person you

6   stopped in the 500 block of West Street that he was

7   walking?

8   A.   They were running together until the two

9   jumped the fence and that's when I focused my attention

10  on them and that's when he kept going north on west.

11  Q.   Was he walking at that time?

12  A.   Walking fast, I believe, running, slowing down

13  from a run, perhaps.

14  Q.   Did you see him drop the weapon?

15  A.   No, I didn't.

16  Q.   You said you never lost sight of him?

17  A.   Correct.

18  Q.   The weapon was dropped approximately at the

19  spot where the individuals went over the fence;

20  correct?

21  A.   Yes, very close.

22  Q.   Who took custody of the weapon?

23  A.   I did.

90

1   Q.   How did you take custody of the weapon?

2   A.   Picked it up off the ground.

3   Q.   With your bare hand or use a pen to help and

4   pick it up so you don't disturb fingerprints?

5   A.   I believe I picked it up with my hand.

6   Q.   Do you have training to how you pick up a gun?

7   A.   If people could be in danger with a loaded

8   weapon on the ground you pick it up.

9   Q.   Aren't there ways you can pick it up?

10  A.   If you have gloves, I didn't have gloves.

11  Q.   Can you use a pencil?

12  A.   Can't carry it with a pen or pencil.

13  Q.   Nevertheless you picked it up with your hand?

14  A.   Yes.

15  Q.   So it was your partner Officer Prado who went

16  after Mr. Coleman; is that correct?

17  A.   Yes.

18  Q.   And was there any effort to get away or did

19  Mr. Coleman run or take evasive action or did he stop

20  when he was told to stop?

21  A.   He stopped.

22  Q.   Did you observe what he was wearing?

23  A.   White T-shirt and dark colored pants. I don't

91

1   know if they were blue, black, but dark pants.

2   Q.   Was he wearing anything else?

3   A.   Not to the best of my recollection, no.

4   Q.   When you get the call over the radio about a

5   carjacking or attempted carjacking in the 500 block of

6   Willing Street that's when you told your partner to

7   take him into custody or when you observed the gun?

8   A.   When I observed the gun.

9   Q.   And told him take him into custody and he did?

10  A.   Yes.

11  Q.   And did you transport him back to Wilmington

12  Police station?

13  A.   Yes, we did.

14  Q.   The two of you did?

15  A.   I believe we transported Mr. Coleman and

16  another unit transported the other two suspects.

17  Q.   When you got him back to the station, who took

18  custody of him there?

19  A.   Officer Prado.

20  Q.   At some point do you take photographs of the

21  people you take into custody?

22  A.   It depends.

23  Q.   Can I have a moment your Honor?

92

1   THE COURT:  Yes.

2   MR. O'CONNELL:  May I have these three marked?

3   THE PROTHONOTARY:  A, B and C for the Defense,

4   your Honor.

5   (Defendant's A, B and C were marked for

6   Identification.)

7   BY MR. O'CONNELL:

8   Q.   I'm going to show you A, B, C Defense; do you

9   recognize these photos?

10  A.   Yes.

11  Q.   Are they the photos taken of Akeem Coleman at

12  the time of his arrest?

13  A.   I believe so, yes.

14  MR. O'CONNELL:  I have no further questions of

15  this witness.  Thank you.

16  THE COURT:  Mr. Bayard.

17  BY MR. BAYARD:

18  Q.   Officer, good afternoon.

19  A.   Good afternoon.

20  Q.   You say you saw these fellows hike over the

21  stone wall; correct?

22  A.   Brick wall.

23  Q.   Brick wall.  Did they do it simultaneously or

000177

1  delay between them; how did they do it?

2      A.  One was first was already over and second was

3  right behind him, I would say.  But one was already

4  over fence as we pulled up and one was on his way up

5  and over.

6      Q.  And just for the sake of us, how did they

7  affect this maneuver of getting over the wall?

8      A.  Jumped up with the hands, pulled themselves up

9  and pulled them over.

10      Q.  So it did take a little time to clear the wall

11  each individually?

12      A.  Not much, but yes, a little bit of time.

13      Q.  And it is your testimony, at the time you

14  actually saw him jump over the wall, you couldn't tell

15  who was who?

16      A.  Just the clothing and approximate height was

17  all I could really tell.

18      Q.  That was about it at that point?

19      A.  Yes.

20      Q.  And then you are focused on Mr. Coleman to let

21  your friend Officer Prado effect an arrest of Mr.

22  Coleman; is that correct?

23      A.  Yes.

1      Q.  You next saw -- so these fellows that went

2  over the brick wall, how long do you think they were

3  out of your sight?

4      A.  Once they got over the fence?  Once they got

5  over the brick wall?

6      Q.  Yes, sir.

7      A.  Well I tried to look over the wall because I

8  saw the flood lights activated and heard another chain

9  link type fence.  It sounded like somebody was jumping

10  over the fence, but I couldn't see that.  As soon as I

11  got over the one fence that's all I saw.

12      Q.  And then your focus went to Mr. Coleman and

13  the remainder of your involvement in this event was

14  with Mr. Coleman?

15      A.  Yes.

16      Q.  And you did not focus on the man who got shot?

17      A.  I believe there was another unit that had

18  already been there and they spoke with him.

19      Q.  And you didn't focus on the two fellows that

20  went over the wall, you just focused on --

21      A.  What do you mean by focus?

22      Q.  Did you deal with them?  Arrest them?

23      A.  One of the other units who made the arrest.

1      Q.  But you personally did not?

2      A.  No.  No personally, no.

3      Q.  All right.

4          Your Honor, if I could confer briefly.

5          MR. BAYARD:  Thank you for your help.

6          THE COURT:  Mr. Bernstein.

7          MR. BERNSTEIN:  I would like to have a

8  photograph marked as Defense Whitfield's next exhibit.

9          THE PROTHONOTARY:  Two, your Honor.

10          (Defendant Whitfield's Exhibit Number 2 was

11  admitted into evidence.)

12  BY MR. BERNSTEIN:

13      Q.  I'm going to put a photo up on the Elmo; can

14  you see that?

15      A.  Yes.

16      Q.  Do you still have the laser pointer there?

17      A.  Yes, I do.

18      Q.  As I understand it, you are in the -- you are

19  a block-and-a-half away from what is depicted in that

20  picture when you first see three individuals running up

21  West Street; correct?

22      A.  Correct.

23      Q.  Now, the first time you see these individuals,

1  they are already -- I think you described it as midway

2  up the block?

3      A.  I don't know exactly how far, but --

4      Q.  Can you point approximately with the laser

5  where these individuals might have been when you first

6  saw them sitting, when you were sitting at Fourth and

7  West, could you do that?

8      A.  You mean this area here?

9      Q.  When you first see them that's where they are?

10      A.  Correct.

11      Q.  Then you are driving up West Street; correct

12  and they are still moving?

13      A.  Yes, still running.

14      Q.  And what I'm going to do is I'm going to start

15  in the back of the -- start back maybe back here and

16  I'm going to walk towards you, and tell me when to stop

17  when I get to the closest point that you ever got to

18  them.

19      A.  Back there.  Back whether you first started.

20      Q.  Back here?

21      A.  About that.

22      Q.  That's the closest you ever got to them?

23      A.  Maybe a little closer but not up to the table

97

1 where you were in between there and there.

2    Q. That's far away and I'm going to guesstimate

3 that's maybe 30 feet?

4    A. I guess so.

5    Q. And at that distance are these people going

6 over the wall?

7    A. Yes.

8    Q. And you are still in your car?

9    A. Getting ready to get out, yes.

10    Q. Getting ready to get out?

11    A. Yes.

12    Q. You get out of your car and you go up -- are

13 you running up the street by now?

14    A. Yeah. I ran towards where I saw them jump

15 over.

16    Q. You are running on the east side of West

17 Street along that wall; correct?

18    A. Right where I saw they jumped I went to that

19 spot and --

20    Q. When you saw these two people go over the wall

21 how far away from them were you? Back here or closer?

22    A. About that distance.

23    Q. Okay.

98

1    A. I can't be sure, they were moving.

2    Q. You weren't five feet away, were you?

3    A. No.

4    Q. You weren't here, were you?

5    A. No.

6    Q. No way. And from where you were you were

7 able to see they were black males?

8    A. Yes.

9    Q. Correct?

10    A. Yes.

11    Q. And they were wearing dark clothing?

12    A. Dark. I think one had a gray sweatshirt on.

13    Q. You could tell it was gray?

14    A. Uh-huh.

15    Q. Not black?

16    A. No. Looked like a gray in color shirt.

17    Q. Not dark green?

18    A. No.

19    Q. You are positive it was gray?

20    A. Yes.

21    Q. Were they wearing any head gear, caps, hats,

22 anything like that?

23    A. I don't recall. I don't think they were

99

1 wearing head gear.

2    Q. Could you see their faces?

3    A. No, I saw them more from the back.

4    Q. Their backs were towards you, right? They are

5 not running towards you running away from you; correct?

6    A. Yes.

7    Q. So you get a good look at their backs, don't

8 you?

9    A. Yes.

10    Q. I noticed in one of the earlier pictures there

11 was a figure standing up against the wall; was that

12 you?

13    A. Yes.

14    Q. You don't quite come over the wall?

15    A. No.

16    Q. You got to jump over to see the -- jump up to

17 see over the wall?

18    A. Yes.

19    Q. Did do you that?

20    A. Yes.

21    Q. You didn't go over the wall; what did you do?

22    A. I looked to see if I was close enough to see

23 if I could pursue them on foot to catch them.

100

1    Q. Did you have to jump up?

2    A. Pull myself up.

3    Q. So you are hanging?

4    A. Looking enough to see over the fence and --

5    Q. What do you see?

6    A. Nothing. They were gone.

7    Q. They are gone. Okay. Now did you call this

8 incident in to Recom?

9    A. Wilcom, yes.

10    Q. Wilcom, okay. And those calls are all

11 recorded; correct?

12    A. Yes.

13    Q. Does the identification 17C mean anything to

14 you?

15    A. Yes.

16    Q. What was that?

17    A. The call sign 17 District, Car C, Platoon

18 Charles.

19    Q. So if it is recorded that 17 C did something,

20 that's you?

21    A. Yes.

22    Q. I want to show you a document that's been

23 represented to me to be a Wilcom dispatch entry; do you

000179



101

1  see that? Do you recognize that document?

2     A.  Yes.

3     Q.  Look at the bottom three lines where it says

4  17C, do you see that?

5     A.  Yes.

6     Q.  What does it say?

7     A.  17C had one stopped, two fled, jumped over the

8  fence by church, suspect male, gray black sweatshirt

9  jumped over the fence towards Orange Street.

10    Q.  Is there a time recorded there?

11    A.  23:59.

12    Q.  What is the time next to the 17C?

13    A.  00:06.

14    Q.  What time would that be?

15    A.  12:06.

16    Q.  Six minutes after midnight?

17    A.  Correct.

18    Q.  Earlier you mentioned two individuals, Mr.

19  Whitfield and Rob --

20    A.  Robinson.

21    Q.  -- Robinson by name?

22    A.  Correct.

23    Q.  You didn't know anybody's name at three

102

1  minutes after 12?

2     A.  At that time?

3     Q.  You didn't know anybody's name except that

4  they were black males?

5     A.  Yes.

6     Q.  Were you personally involved in the

7  apprehension of Robinson and Coleman?

8     A.  No.

9     Q.  You were not?

10    A.  No.

11    Q.  Did you ever see those two people again that

12  night?

13    A.  No.

14    Q.  Did you ever see them the next day?

15    A.  Next day, no.

16    Q.  Do you know who was involved in arresting

17  those two people and apprehending them?

18    A.  I believe Officer Prado and Officer Draper.

19    Q.  Okay. But you were not?

20    A.  No.

21    Q.  Did you have any involvement with this

22  incident after you apprehended Mr. Coleman and picked

23  up this weapon?

103

1     A.  Other than that, I went back to -- transported

2  them back to Central for booking purposes.

3     Q.  You mean you transported Coleman?

4     A.  Coleman. Coleman, correct. Then I wrote the

5  incident, whatever we had done that night and our

6  actions.

7     Q.  That was it?

8     A.  Yes.

9     Q.  Other than going back a couple months later

10  taking some photos or you don't remember that?

11    A.  I remember taking a photo yesterday.

12    Q.  All right.

13        MR. BERNSTEIN:  Excuse me for a minute.

14        That's all, your Honor. Thank you.

15        THE COURT:  Anything further?

16        MR. DONAHUE:  Very brief.

17  BY MR. DONAHUE:

18    Q.  Officer, is it possible that Akeem Coleman

19  dropped the gun and you didn't see it?

20        MR. O'CONNELL:  Objection. Calls for

21  speculation. The question is phrased is it possible.

22        MR. DONAHUE:  I will rephrase.

23  BY MR. DONAHUE:

104

1     Q.  From your position would you have been able to

2  see Akeem Coleman drop a gun?

3     A.  No.

4     Q.  I didn't say that.

5     A.  If he had it down by his side cars would be

6  blocking my view, trees there.

7     Q.  Which cars?

8     A.  The ones parked on the -- like in the picture

9  east side of the block.

10        MR. DONAHUE:  No further questions.

11        MR. O'CONNELL:  Nothing further.

12        MR. BAYARD:  Nothing further.

13        MR. BERNSTEIN:  Nothing further, your Honor.

14        THE COURT:  Very well. You may step down.

15        State's next witness please.

16        MR. O'CONNOR:  State calls Francisco Failey,

17  somewhat out of order. But Francisco Failey.

18        FRANCISCO FAILEY,

19        the witness herein, having first been duly

20  sworn on oath, was examined and testified as follows:

21  BY MR. O'CONNOR:

22    Q.  Mr. Failey, where do you live?

23    A.  515 West Street, Wilmington.

000180

000181

105

1    Q.   Where are you from?

2    A.   Panama.

3    Q.   Where were you living October 2002?

4    A.   515 West Street.

5    Q.   Do you recall an incident which occurred

6    around midnight October 14th into the 15th, 2002?

7    A.   Yes, sir I do.

8    Q.   Could you describe to the jury what caught

9    your attention and what you observed?

10   A.   Well, that night I was preparing to go to bed

11   and I look out, noise out in the back of the house,

12   people arguing. And I hear a guy say, why, why? So

13   when I look I see four people was in the back of the

14   house. Was a heavyset guy and two little small body

15   guys on the guy harassing a guy saying, no, no, why? I

16   said, they were going to rob this guy. And next that I

17   think shot went off and they started to back off. And

18   then the guy, the big guy, had a gun in him hand and

19   shot off and took off running.

20   Q.   Your residence on West Street, what is in back

21   of the residence?

22   A.   Parking lot.

23   Q.   Facing Willing Street where people park back

106

1    there?

2    A.   Yes, sir.

3    Q.   And heard a commotion and saw some people out

4    there?

5    A.   Uh-huh.

6    Q.   And I believe you saw four people?

7    A.   Uh-huh.

8    Q.   Big guy, two small guys?

9    A.   Little smaller.

10   Q.   And you said you saw a gun; who had the gun?

11   A.   The big guy.

12   Q.   Who was he pointing it at?

13   A.   At the guy was trying to rob. I think

14   they was trying to rob him.

15   Q.   You said something about a struggle; did you

16   see a struggle?

17   A.   Yeah. They started like harass him and stuff.

18   But the big guy was standing back and the other two

19   guys was trying to do something. I don't know if they

20   were trying to rob him or pleading, but I hear this gun

21   went off.

22   Q.   The big guy is standing back? When the

23   wrestling starts had the shot been fired?

107

1    A.   No.

2    Q.   When is it you remember a shot being fired?

3    A.   When the other two guys separate from the guy

4    the gun went off. The other two guy was kind of

5    stunned that the gun, and they started running then the

6    guy start to go after them and the gun went off again

7    then the guy jumped and that's all I see.

8    Q.   So the gun is fired once and the three guys

9    run?

10   A.   Uh-huh.

11   Q.   Which direction do they run?

12   A.   Run to the cemetery direction.

13   Q.   Towards Fifth Street?

14   A.   Yes.

15   Q.   The fourth guy, what did he do when the other

16   guys ran?

17   A.   He was trying to go after them and the big guy

18   turned around and fired another shot and I think he got

19   hit as he jumped. And I said you got hit, but he

20   walked away and started limping so I came down and

21   that's where I ran into the officers.

22   Q.   So you heard a shot and saw him startled or

23   jumped?

108

1    A.   Yes.

2    Q.   Then limping?

3    A.   Yes.

4    Q.   You asked if he was shot and he said he didn't

5    know and you came downstairs?

6    A.   Right.

7    Q.   Did you have a problem seeing the three --

8    four people and the gun that night?

9    A.   Only could see the gun, but I couldn't

10   recognize the face, but I knew what was taking place in

11   the alley.

12   Q.   How was the lighting?

13   A.   The light was across the street and I could

14   see the top of the car it was right in front of me.

15   Q.   Was your bedroom facing that parking lot?

16   A.   Yes.

17   Q.   Is that a pretty bright light?

18   A.   Yes. Across the street. Across the street,

19   because you can park that across the street where the

20   light is across shining over.

21   Q.   Would you keep a shade over your window so you

22   could sleep?

23   A.   Yes, sir.

109

1  Q. Would you be able to sleep at night if the
2  shade wasn't there?
3      A. No.
4      Q. Is it bright in your room.
5      A. Yeah, pretty bright, got the glare.
6      Q. The glare?
7      A. That's the lights from the other side of
8  Willing Street.
9          MR. O'CONNOR: Nothing further, your Honor.
10         THE COURT: Mr. O'Connell.
11         MR. O'CONNELL: No questions, your Honor.
12             CROSS-EXAMINATION
13 BY MR. BAYARD:
14     Q. Good afternoon. Sir, you are saying then that
15 you saw these three fellows and you didn't really see
16 their faces you just saw the activity?
17     A. Yes, sir.
18     Q. The fellow that got shot, did you know him
19 before this event?
20     A. No. No.
21     Q. And you lived in that area about how long
22 before this event?
23     A. Almost two years.

110

1      Q. About two years?
2      A. Before that.
3          MR. BAYARD: Thank you for your help.
4          THE COURT: Mr. Bernstein.
5          MR. BERNSTEIN: Yes. Thank your Honor.
6          May I approach the witness?
7          THE COURT: Yes.
8          MR. BERNSTEIN: Can I have two photographs
9  marked for identification?
10         MR. O'CONNOR: . No objection.
11 BY MR. BERNSTEIN:
12     Q. Mr. Failey I'm going to show you two
13 photographs that show opposite sides of the Willing
14 Street alley. Do you recognize what is depicted in
15 those photographs? Do you see the back of your house
16 in any of those photographs?
17     A. No, sir.
18     Q. Where in relation to those photographs is your
19 house?
20     A. On the opposite side of the street.
21     Q. Are these the photos of the same side of the
22 street?
23     A. No. This was is on the opposite side where I

111

1  am and this is across the other side of the street.
2      Q. Where is your house?
3      A. My house is right in front of this one, across
4  the street. This one.
5      Q. The parking lot -- does the back of your house
6  back up to Willing Street?
7      A. Yes.
8      Q. Do you see the back of your house?
9      A. Yes.
10     Q. Where would your house be?
11     A. Across the side. Can't see my picture here
12 because it was taken in front of my house.
13     Q. So these two photos are both the same side of
14 the street; is that what you are saying?
15     A. No. They are not the same.
16     Q. They are on either side of the alley?
17     A. My house is on this side.
18     Q. Your house is on this side?
19     A. Yes. You can't see my house.
20     Q. Your house isn't in the picture?
21     A. No.
22     Q. It is closer to one of the pictures?
23     A. Yes.

112

1      Q. And your house is 550.
2      A. 515.
3      Q. So that's closer up the block closer to Sixth
4  Street?
5      A. Yes.
6      Q. From where you were looking outside of your
7  window, with the lighting conditions that you saw, can
8  you distinguish colors, could you see whether someone
9  was wearing a light outfit or dark outfit or blue
10 outfit or green outfit?
11     A. I didn't pay attention to the colors.
12     Q. You weren't paying -- if you are looking out
13 your window could you distinguish colors?
14     A. Yes. But I wasn't conscious of the colors he
15 was wearing or whatever.
16     Q. Were the lighting conditions good enough that
17 if you were looking for colors you could have seen
18 them?
19     A. Yeah. They was close, right up to my window.
20     Q. It was bright out as well?
21     A. The lights were brighter across the street.
22 It was close, right up to my window and the car was
23 parked right there.

000182

113

1    Q.    So if you were looking for colors you could

2    have seen it, but you didn't pay attention?

3    A.    Right.

4    Q.    And the individuals that you saw arguing,

5    could you tell what race they were?

6    A.    No.

7    Q.    White or black?

8    A.    No, wasn't white. Black.

9    Q.    All four?

10    A.    All four.

11    Q.    And you weren't paying attention to clothing

12    at all; correct?

13    A.    Correct.

14    Q.    And you did see one of the people had a gun?

15    A.    Right.

16    Q.    Did you see any physical altercation between

17    these people? Did you see somebody grabbing anybody

18    else or anything like that?

19    A.    Yeah. Now the other two guys was robbing him

20    or trying to rob him but the big guy was just standing

21    back.

22    Q.    Big guy standing by himself?

23    A.    Yes. And the other three were tussling.

114

1    Q.    And then the other three ran away?

2    A.    Yes. When the gun went off they took off.

3    When they were running the big guy turned around and

4    fired a shot again and the guy jumped.

5    Q.    Three guys running away and one person is

6    going after them?

7    A.    Right. The guy that was trying to probably

8    rob him.

9    Q.    And you hear two different shots?

10    A.    Yes.

11        MR. BERNSTEIN: That's all, your Honor.

12        MR. O'CONNOR: Nothing further.

13        THE COURT: You may step down.

14        MR. O'CONNOR: May we approach as to

15    scheduling?

16        THE COURT: Yes.

17        (A side-bar discussion was held off the

18    record.)

19        MR. DONAHUE: State calls Officer Prado.

20            DAVID PRADO,

21        the witness herein, having first been duly

22    sworn on oath, was examined and testified as follows:

23            DIRECT EXAMINATION

115

1    BY MR. DONAHUE:

2    Q.    How are you employed?

3    A.    I'm a Safe Streets Detective. Officer for the

4    Wilmington Police Department.

5    Q.    How long have you been employed by the

6    Wilmington Police Department?

7    A.    I'm going in my fifth year.

8    Q.    What duties did you carry out in October of

9    2002 with the Wilmington Police Department?

10    A.    I was patrol at that time.

11    Q.    Specifically on October 14th, evening hours

12    into the early morning hours of October 15, 2002 were

13    you working that day?

14    A.    Yes, I was.

15    Q.    Did you have a partner?

16    A.    Yes, I did.

17    Q.    What was your partner's name?

18    A.    Matthew Derbyshire.

19    Q.    Were you in the area of 4th and West Street on

20    the late evening hours of October 14, 2002?

21    A.    Yes.

22    Q.    And were you in a patrol car or on foot?

23    A.    Marked patrol vehicle.

116

1    Q.    Could you tell the jury what you observed

2    while at a red light at Fourth and West?

3    A.    Myself and my partner were both in our

4    vehicle. They were at Fourth and West Streets. We

5    were sitting there when we observed three subjects runs

6    down Fifth Street, eastbound on Fifth Street. They all

7    attempted to jump over a brick wall, which is St.

8    Peter's Cathedral Church. Two of them made it over the

9    wall, one could not because of his size. Seeing that

10    was suspicious we proceeded to go through the light and

11    proceeded to go to the location that we observed these

12    individuals.

13    Q.    What about their activity made you think it

14    was suspicious?

15    A.    Well, it is private property belonging to the

16    Cathedral -- St. Peter's Cathedral. They were running

17    pretty fast and jumping over a brick -- a barrier wall

18    which, you know, closes out any trespassers from going

19    into the property of St. Peter's Cathedral.

20    Q.    When you observed three individuals running

21    how close together were they?

22    A.    Bunched together. I couldn't tell you exact

23    distances, they were pretty close.

000183

117

1    Q.   Were they close enough to touch each other?

2    A.   It is hard to say. Distance wise you can't --

3    perception wise you can't tell if they were that close

4    to touch each other, but they were in a group.

5    Q.   Now, you testified that two of the

6    individuals --

7    A.   -- made it over the wall, correct.

8    Q.   And one didn't?

9    A.   Correct.

10   Q.   Did you see the one who didn't make it over

11   attempt to get over the wall?

12   A.   Yes. Yes.

13   Q.   And he could not get over?

14   A.   Correct.

15   Q.   Were you able to get a description of the two

16   individuals who went over the wall?

17   A.   Being that that area is not well lit, I mean,

18   it is dimly lit, dark clothing, they were thinner, you

19   could tell they were a lot smaller than the one

20   individual. But they were thin in stature and they

21   were able to jump over this wall pretty easily without

22   any problems.

23   Q.   Could you tell what race they were?

118

1    A.   No.

2    Q.   Now, upon seeing the individuals running, what

3    did you and your partner do?

4    A.   As soon as we saw them running and that occur,

5    we had already started through the light going into the

6    middle of the block, 400 block of West Fourth Street.

7    The larger individual who didn't make it over the wall

8    proceeded to walk northbound on the 500 block of West

9    Fifth. We exited our patrol vehicle, stopped him and

10   asked to speak with him.

11   Q.   The individual you stopped in that area do you

12   see that individual in court today?

13   A.   Yes. It is Mr. Coleman.

14   MR. DONAHUE: Let the record reflect the

15   witness has identified Defendant Akeem Coleman.

16   BY MR. DONAHUE:

17   Q.   Who took the Defendant Coleman into custody?

18   A.   We had both got out of the vehicle. I was a

19   passenger, I believe, that night, so I had first

20   hands-on with him because Officer Derbyshire walked

21   towards the direction of where the other two were spied

22   jumping over the wall.

23   Q.   And what did you do when you contacted

119

1    Coleman?

2    A.   Usually it is our normal protocol, we will

3    bring them over to the vehicle, place hands on vehicle,

4    just a normal stop and proceeded to ask questions.

5    Q.   What, if anything, did Officer Derbyshire?

6    A.   As he was walking down towards the last

7    location we had seen the subjects together, he

8    immediately found a weapon, a handgun.

9    Q.   And what, if you know, what did he do with

10   that weapon?

11   A.   He immediately told me that he found a weapon,

12   and as soon as we called in the stop we were advised by

13   Wilcom, our radio room, they had just received a call

14   for shots fired and that's -- you know, that's when

15   Officer Derbyshire had located the weapon.

16   Q.   Did they broadcast the shots were fired?

17   A.   They were given the -- I can't recall exactly

18   if it was -- it was the 500 Block of Willing Street,

19   but I don't exactly recall.

20   Q.   Is the 500 block of Willing in New Castle

21   County State of Delaware?

22   A.   Yes.

23   Q.   Now, after -- strike that.

120

1    What did you and Derbyshire do with Defendant

2    Coleman?

3    A.   We detained him immediately. Placed handcuffs

4    on him immediately and placed him in the patrol

5    vehicle. And I think at that time that's when we made

6    the weapon safe. And from that point that's where I

7    went to backtrack to see if we could locate the two

8    other individuals.

9    Q.   Where did you backtrack?

10   A.   Went back to the same location that Derbyshire

11   had found the weapon. I jumped over the brick wall

12   to -- about six feet, jumped over that, went in the

13   courtyard of St. Peter's cathedral.

14   Q.   What did you do then?

15   A.   Went through the courtyard of St. Peter's

16   Cathedral and checked some of the darker areas. There

17   is a chain link fence in the back of St. Peter's

18   Cathedral, a six-foot tall chain link fence went

19   throughout the courtyard, was in between the school and

20   church, went through that courtyard and then came out

21   on Sixth Street, jumped over a smaller brick wall onto

22   Sixth Street between the church and school.

23   Q.   And once you were onto Sixth Street which

121

1  direction did you go?

2  A.  I traveled eastbound on Sixth Street and then

3  went south on Tatnal.

4  MR. DONAHUE: If I could use the easel very

5  briefly with the diagram, please.

6  BY MR. DONAHUE:

7  Q.  If I could have you step down and show the

8  jury -- first of all, show the jury where you and your

9  partner apprehended Akeem Coleman.

10  A.  Approximately right about in the middle of the

11  block, right here is where we stopped.

12  Q.  You want to put an X on that?

13  Show the jury which direction you traveled

14  then.

15  A.  Okay. After stopping him and recovering the

16  weapon that was located by Officer Derbyshire I went

17  back to the location where the weapon was found,

18  climbed over the brick wall, which is about six feet

19  high, went out throughout this courtyard, looked all

20  through here, and it is real dark in this area, for

21  evidence. There is a chain link fence right here, went

22  through this courtyard again, looked around, it is

23  pretty deep in this area, there is a large about a

122

1  20 feet drop, like a large alleyway, looked down in

2  there, nothing down in there, continued, and then came

3  out over a small brick wall that separates a courtyard

4  and a church, went over that, and proceeded eastbound

5  on Sixth Street and south on Tatnal.

6  Q.  So you went down and made a right onto Tatnal?

7  A.  Correct.

8  Q.  What did you observe when you made a right on

9  Tatnal?

10  A.  As I'm walking southbound on Tatnal, two

11  individuals are crossing over Fifth Street, crossing

12  over on Tatnal, going towards an apartment complex

13  which is right here on the corner of Fifth and Tatnal.

14  Q.  And did you eventually catch up with those two

15  individuals?

16  A.  Yeah, with another officer. We stopped the

17  individual inside the apartment complex right about in

18  there.

19  Q.  Thank you. You can return to your seat.

20  What, if anything, drew your attention to the

21  individuals walking on Fifth?

22  A.  They were walking at a steady pace, not a

23  normal walk. One of the individuals was bare chested

123

1  and it was 40 degrees that night, and that immediately

2  drew my attention to both of them. And knowing there

3  was only three individuals seen and two were able to

4  jump over a wall of St. Peter's Cathedral we

5  immediately stopped them, me and another officer who

6  assisted me. They were both sweating. And a lot of

7  times what I will do if we are looking for somebody if

8  it was a foot pursuit or if somebody is running from

9  officers I will place my hand on the chest and I can

10  tell by the beating of their heart, when you do an

11  exercise of any kind exerting yourself, you are going

12  to have an increased heart rate, and a lot of times I

13  will do that and they did. And they are sweating. One

14  of them had their shirts off in 40 degree weather.

15  Q.  Both of the individuals had accelerated

16  heartbeats?

17  A.  Correct.

18  Q.  Do you see them in the courtroom?

19  A.  Yeah, they are sitting. One is behind Coleman

20  and the other one is in the maroon.

21  Q.  If you could describe what they are wearing.

22  A.  One with the maroon sweatshirt and the other

23  with the DOC.

124

1  Q.  Second table?

2  A.  Robinson and Mustafa Whitfield.

3  MR. DONAHUE:  Let the record reflect the

4  witness has identified defendants Whitfield and

5  Robinson.

6  May I have a moment to confer with defense

7  counsel, briefly?

8  BY MR. DONAHUE:

9  Q.  Officer, how much time elapsed between the

10  time -- from the time you saw the two individuals go

11  over the wall until you stopped defendants Whitfield

12  and Robinson?

13  A.  When we got the call for the shots fired.

14  Q.  No --

15  A.  For the --

16  Q.  Let me rephrase so we are clear. How much

17  time elapsed from when you saw the two individuals go

18  over the wall until you stopped the defendants

19  Whitfield and Robinson?

20  A.  I would say between five and ten minutes.

21  Q.  And when you stopped defendants Whitfield and

22  Robinson, what did you do next?

23  A.  I think -- there was the unit that was there,

000185

125

1   there was a transport unit van, so we immediately took
2   them down to the police station for questioning so we
3   could detain them, and sent them down with the van,
4   down to the police station.
5      Q.   Did you have any further contact with
6   Whitfield or Robinson?
7      A.   At that location or later?
8      Q.   Later.
9      A.   When we got to the police station.
10     Q.   Was anyone else with you or were you alone?
11     A.   In the police station or --
12     Q.   Yes.
13     A.   I can't recall if there was any other
14  officers.
15     Q.   And what did you do while at the police
16  station?
17     A.   After we cleared the scene, because again the
18  evidence units were there and other officers were there
19  doing interviews. When we got back to the police
20  station, Mirandized all of the suspects that we had
21  then began to interview the suspects.
22     MR. BAYARD:   Could we approach the bench
23  please?

126

1      THE COURT:   Yes.
2      (The following side-bar discussion was had:)
3      MR. BAYARD:   My concern is, I think a taped
4   statement was done of my client. However, that taped
5   statement turned out to be defective and as a
6   consequence we never had a copy of the transcript,
7   notes, or any indication as to what really went on
8   during that, quote, statement. And I have no questions
9   elicited.
10     THE COURT:   Let me give the jury a break. It
11  is time for a recess any way. Excuse me.
12     Ladies and gentlemen, rather than keep you
13  sitting there while we are having this conversation, it
14  is time for our afternoon break so I will let you go.
15     Take the jury, please.
16     (The jury exited the courtroom at 3:30.)
17     (Following a side-bar discussion:)
18     THE COURT:   How do you want to proceed?
19     MR. DONAHUE:   Your Honor, what we are going to
20  do is I have okayed with Mr. Bayard that we are going
21  to elicit statements from this witness. And Mr. Bayard
22  is okay with the State requesting that the witness
23  limit his answer to only one defendant. And we are

127

1   going to do the same thing with the other defendant.
2      THE COURT:   All right. I need a little more
3   detail.
4      MR. O'CONNOR:   Maybe I can help. The officer
5   spoke to Mr. Whitfield and Robinson about why they were
6   at the apartment complex that he stopped them at. Each
7   gave different statements about why they were at the
8   apartment complex, which are not consistent. Beyond
9   that -- strike that.
10     The only testimony Mr. Donahue was going to
11  elicit was about those two statements, not any other
12  statements made by this defendant to this officer or
13  any other officer. But the problem was this officer
14  was not directed to limit his testimony to those
15  incidents. With defense counsels permission at the
16  break if we can do that there should not be a problem.
17     THE COURT:   Is it a fact that there were more
18  extensive statements, but the problem is that the video
19  mechanism didn't work properly or the taping mechanism,
20  is that what happened here?
21     MR. O'CONNOR:   I don't know the answer to
22  that. I thought -- I know that a summary of the
23  statement given to Detective Messetic was provided to

128

1   Mr. Bayard. I was personally unaware there was a
2   problem with the tape. And I may have been notified of
3   that and I don't have an answer for that.
4      THE COURT:   In any event, there is nothing
5   going to come in beyond what was said, as to each of
6   the defendants who was there in that apartment complex,
7   you are going to limit your testimony to that.
8      THE WITNESS:   Correct.
9      THE COURT:   Is that --
10     MR. BAYARD:   That would not cause any problem
11  in the recitation of what my client said.
12     THE COURT:   Mr. Bernstein.
13     MR. BERNSTEIN:   As long as the witness talks
14  about what a particular defendant said about that
15  defendant and not some other defendant it is okay.
16     THE COURT:   Well, okay. In other words,
17  you -- was it you personally who spoke to each of these
18  defendants.
19     THE WITNESS:   I spoke to all three when we
20  were down at the police station, it is in my
21  supplement.
22     THE COURT:   But the testimony with regard to
23  why Robinson and Whitfield were at the apartment is

000186

129

1 what you are going to testify about and it was
2 inconsistent.
3        THE WITNESS: Correct.
4        THE COURT: That's the extent of what you are
5 going to say?
6        THE WITNESS: Correct, ma'am.
7        MR. BERNSTEIN: To make it clear, the report
8 that I have says after they came back to the police
9 station Mustafa Whitfield did not want to speak to this
10 writer. That's first thing in the report.
11        Next thing it says, Mustafa only stated he was
12 going to the apartment complex to meet a girl who he
13 did not have a name for. Mustafa stated he met the
14 female on the internet an older female, no further
15 descriptions.
16        I have no problem with that as long as he
17 limits his testimony to what Mr. Whitfield said about
18 Mr. Whitfield. It is okay likewise --
19        THE COURT: Let's have a preview. What are
20 you going to say? You have told us about what you are
21 going to say with regard to Whitfield. What are you
22 going to say with regard to the other defendant?
23        MR. BERNSTEIN: Is what I recited; correct?

130

1        THE WITNESS: That was it. That was all that
2 was said. That was pretty much it with Whitfield.
3        THE COURT: All right. What is the proffer as
4 to the other defendant?
5        THE WITNESS: The other defendant stated that
6 he was there also, because they had both met a female
7 that day who when they were together walking around he
8 didn't know what her name was, younger girl between
9 ages of 16 and 18, not this older woman he met on the
10 internet. So it was an inconsistent story how they met
11 this female, supposedly who lives in this apartment
12 that they have no name for.
13        MR. BERNSTEIN: The problem I have with
14 respect to Mr. Whitfield is that Mr. Robinson said some
15 things about Mr. Whitfield that in my opinion can't be
16 redacted without directly implicating Mr. Whitfield and
17 we have a Bruton problem. And the solution to the
18 Bruton problem where there are codefendants, if you
19 can't redact a statement to eliminate all reference to
20 the non-testifying defendant or to the codefendant
21 rather, you can't use it.
22        THE COURT: Anyone want to be heard?
23        MR. O'CONNOR: I think the officer needs to

131

1 clarify if Mr. Robinson said they did something or he
2 did something. I think Mr. Bernstein could be legally
3 correct as far as Bruton. Did Mr. Robinson say they
4 met this girl? Did he say he didn't know where she
5 lived? Did he say he believed she was younger? I
6 don't know the answer.
7        The statements he made about what they were
8 doing are originally Bruton, but if he made statements
9 about personal knowledge only then those are arguments.
10        MR. BERNSTEIN: The summary I have of Mr.
11 Robinson's statement is they, they, they.
12        MR. O'CONNOR: Because it is a summary I asked
13 what the officer's recollection, whether it is they,
14 they, they or Robinson told me X.
15        THE COURT: Do you have no notes? Are you
16 relying on memory?
17        THE WITNESS: I couldn't locate any notes
18 whatever was written in the report is what I have.
19        THE COURT: Any notes other than what was
20 written in the report and the report was prepared by
21 somebody other than you?
22        THE WITNESS: No. I wrote that report, but
23 they didn't want to discuss anything else. That was it

132

1 the story about why they were there. That was the only
2 thing we had written down.
3        MR. BERNSTEIN: The distinction is Mr.
4 Whitfield explained why he was there. Mr. Robinson
5 explained why they were there.
6        THE COURT: Do you have any independent
7 recollection or are you relying on your report?
8        THE WITNESS: I'm just recollecting -- I'm
9 going by what I had written in the report. I don't
10 have any notes and just remembering.
11        THE COURT: But you used the notes in your
12 report to refresh your recollection testimony so you
13 are depending upon your notes.
14        THE WITNESS: Well the notes that are in the
15 report; correct?
16        THE COURT: Yeah. Okay. So, you are
17 objecting to this testimony on the grounds that it
18 violates Bruton?
19        MR. BERNSTEIN: I'm objecting to Mr.
20 Robinson -- testimony of what Mr. Robinson said because
21 Mr. Robinson kept saying they did this, they did that.
22 It is impossible to redact that type of statement
23 without directly implicating Mr. Whitfield. What

000187

133

1   Whitfield said about Whitfield is fine but not what
2   Robinson said about Whitfield. When you use the they,
3   even if he used he for they the context makes it clear
4   there were two participants. He was wrestling with --
5       THE COURT: I haven't seen the notes so I
6   don't know.
7       MR. BERNSTEIN: I can hand them up.
8       THE COURT: I see the part about wrestling.
9   According to this report, Emmanuel Robinson stopped at
10  the 200 block of West Fourth Street -- apartments on
11  the Fifth Street side, had his shirt off. Robinson was
12  ask why he was bare chested, stated he and Whitfield
13  were wrestling and pulled the shirt off and stated
14  that's why he was winded and sweating. After being
15  transported to Central stated he was wrestling and
16  Whitfield kept telling Robinson he was skinny --
17      MR. DONAHUE: State is intending to produce
18  the fourth paragraph only. The four paragraph only,
19  and the State has made redactions to that fourth
20  paragraph which the State believes it would now satisfy
21  any problems or satisfy Bruton.
22      The State would ask the Court to have it read:
23  "This writer asked Robinson why he entered this

134

1   apartment complex. He states he had went there to meet
2   a female subject. Asked who the female was, Robinson
3   stated didn't know, met the female earlier this date
4   walking around the city. When asked how old she was
5   stated 16 to 18 years old."
6       So the State is essentially striking and
7   Whitfield three times and they were, and it seems to
8   still read logically.
9       THE COURT: Mr. Bernstein, does that solve it?
10      MR. BERNSTEIN: If it is limited to that and
11  nothing else, I will withdraw my objection.
12      MR. DONAHUE: That's it. And the witness will
13  be instructed, with defendant's permission, that is it.
14      THE COURT: Everybody content? You
15  understand?
16      We will recess for about ten minutes and
17  reconvene.
18      (Following a brief recess:)
19      THE COURT: Jury please.
20      (The jury entered the courtroom at 4:00 p.m.)
21      THE COURT: You may continue.
22  BY MR. DONAHUE:
23      Q.  Did you ask Mr. Whitfield why he was at the

000188

135

1   apartment complex?
2       A.  Yes, I did.
3       Q.  What did he say?
4       A.  He said he was there to meet a female that he
5   had met over the internet, older female that he met
6   over the internet.
7       Q.  Did you ask Robinson why he was at the
8   apartment complex?
9       A.  Yes. He also stated he was there to meet a
10  female, that he had met earlier during the day, didn't
11  know her name, but she lived in an apartment complex
12  and she was 16 or 18 years of age.
13      MR. DONAHUE: I have no further questions.
14      THE COURT: Cross-examine.
15          CROSS-EXAMINATION
16  BY MR. O'CONNELL:
17      Q.  Good afternoon, Officer. How are you today?
18      A.  Good.
19      Q.  Prior to coming in did you have an opportunity
20  to review the reports you prepared?
21      A.  Yes.
22      Q.  And did you have an opportunity to speak with
23  Officer Derbyshire your partner that evening?

136

1       A.  Today?
2       Q.  Prior to testifying.
3       A.  Yes.
4       Q.  And you discussed your collective recollection
5   of the events?
6       A.  We spoke briefly about it but we didn't really
7   get into it, most about who was driving that night.
8       Q.  Do you recall a few weeks after this initial
9   arrest, that would be on the evening of October 14,
10  2002, going back to the scene with Detective Messetic
11  and doing a rough sketch of where the weapon was?
12      A.  Yes.
13      Q.  You do recall doing that?
14      A.  Yes. I remember meeting up with Detective
15  Messetic and maybe another Detective.
16      Q.  Did Officer Derbyshire go with you?
17      A.  I don't recall if he did or not.
18      Q.  Let's go back to October 14th that evening
19  when you first observed the individuals making the way
20  up north on West Street. What first drew your
21  attention to them?
22      A.  The speed of the running is what we call it.
23      Q.  Where were you located when you first saw

137

1    them?

2    A.    Fourth and West which is about a block and a

3    half.

4    Q.    Were you on Fourth Street or facing north on

5    West?

6    A.    North on West facing Fourth Street.

7    Q.    Waiting for the light to change?

8    A.    Yes.

9    Q.    So did you see these guys where they came out

10    of?

11    A.    They were coming east on Fifth Street so you

12    can't tell where they are coming from because there is

13    a church there and fence but they were coming.

14    Q.    Did it appear they observed you?

15    A.    No. I don't think they observed us it didn't

16    seem like they saw us.

17    Q.    Who was driving that night?

18    A.    I'm sure I was a passenger that night because

19    when we got out of the vehicle I was the first one that

20    approached Mr. Robinson -- Mr. Coleman.

21    Q.    So you believe you were the passenger that

22    night?

23    A.    Correct.

138

1    Q.    And Derbyshire would have been driving?

2    A.    Correct.

3    Q.    When you saw these guys running did they mash

4    down and accelerate?

5    A.    No. Because when we saw them running that's

6    when we went through the light. They were at high

7    speed, high tailing it, and it was around the middle of

8    the block was when they were already jumping over the

9    wall. So we didn't speed up or anything because

10    Coleman began to walk, so we were just going to stop

11    them so there was no need to really high tail it.

12    Q.    Let me see if I can follow this then. You are

13    at Fourth and West?

14    A.    Correct.

15    Q.    And so you have got the light in front of you

16    and four lane Fourth Street ahead of you; correct?

17    A.    Correct.

18    Q.    You have to go in the 400 block of West Street

19    and you have Friends Meeting House and a little

20    cemetery there on the your left?

21    A.    Yes.

22    Q.    And go across Fifth Street and 500 block of

23    West Street now and it is about halfway up between

139

1    Fifth and Six that the two individuals who went over

2    the wall went over the wall; is that correct?

3    A.    No. They -- where they jumped over the wall,

4    it is I would say maybe 15 feet away from the front

5    door of the rectory. St. Peter's Cathedral rectory is

6    where they jumped over the wall.

7    Q.    For purposes is that fully up the block,

8    halfway, three quarters?

9    A.    No. The rectory is at the corner of Fifth and

10    West.

11    Q.    So it is closer to Fifth Street than Sixth

12    Street where they went over the wall?

13    A.    Correct.

14    Q.    And when they are going over the wall,

15    approximately where is your vehicle?

16    A.    We are already into the intersection going in

17    to the 400 block of West is when they are jumping over

18    the wall.

19    Q.    Going 20 to 25 miles per hour?

20    A.    I can't tell. Normal speed. Again, we

21    weren't speeding to the location.

22    Q.    So you are better than a block away and they

23    are already going over the wall?

140

1    A.    Correct.

2    Q.    Could you see them clearly from that distance?

3    A.    Only thing you could see was they were taller,

4    one was larger than the other two, but it was dark

5    clothing so you couldn't tell facial wise or who it

6    was, it was dark clothing.

7    Q.    You indicated two of them got over and the

8    larger one tried to get over but couldn't get over?

9    A.    Correct.

10    Q.    Are you sure about that?

11    A.    Yes.

12    Q.    Because your partner testified that you didn't

13    necessarily see anybody try -- the third person try to

14    go over the wall?

15    A.    That's what I saw. I was on the passenger

16    seat so I have the better view of what was going on.

17    We both saw them running, but I had the better view of

18    what they were doing because he was of course driving.

19    But that's --

20    Q.    Then that individual just continued walking up

21    the block?

22    A.    Yes. Started walking north on West Street.

23    Q.    When he is walking north on West Street did

000189

141

1  you get the sense he was aware of your presence?

2  A.  I'm not sure, I can't recall if he was aware

3  of our presence, but he was walking, just didn't pay

4  attention to what was going on or even us.

5  Q.  Were you in a marked vehicle?

6  A.  Yes, marked patrol.

7  Q.  Did you have emergency equipment on?

8  A.  No.

9  Q.  When you pulled up was there any attempt or

10 inclination on Mr. Coleman's part to try to evade you.

11 A.  No.  Didn't try to run.  Wasn't really

12 evasive with us, no.

13 Q.  Was he -- I don't want to get into anything he

14 said or you said -- was he in an overall cooperative

15 mood?

16 A.  Yes, he was.  There was no problem.

17 Q.  Do you recall what he was wearing that night?

18 A.  He had dark clothing on, that's all I can --

19 Q.  Mr. Coleman did?

20 A.  That's all I can remember.  I think he may

21 have had, you know, I think sweat gear, but I can't

22 recall exactly what it was.

23 Q.  Okay.  As you are sitting here do you have a

142

1  recollection of what Coleman was wearing?

2  A.  I can't recall exactly but it was -- honestly,

3  no, I can't tell you exactly what he was wearing.

4  MR. O'CONNELL:  May I have a moment?

5  THE COURT:  Yes.

6  MR. O'CONNELL:  No further questions.

7  Thank you, Officer.

8  BY MR. BAYARD:

9  Q.  Officer, good afternoon.  Sir, you spoke as to

10 Mr. Robinson, when you first saw these people going

11 over the wall you indicated they -- you did not

12 indicate that anybody was bare chested; is that a fair

13 statement?

14 A.  You couldn't tell if anybody was bare chested.

15 Q.  But eventually when you met Mr. Robinson, he

16 was bare chested?

17 A.  Correct.

18 Q.  And did he have a shirt with him or.  Nothing

19 on, just his trousers and shoes?

20 A.  I can't recall if he had any -- if he was

21 carrying any shirt with him, he was bare chested.  I

22 don't know if he was carrying anything with him.

23 Q.  Is it possible he was carrying a shirt with

143

1  him?

2  A.  Could have been, I can't recall.

3  Q.  Were you the officer that actually arrested

4  Mr. Robinson, sir?

5  A.  When we took them down to the police station,

6  yes, because when we got there I was the one that

7  Mirandized him -- I Mirandized him, yes.

8  Q.  Now, I'm talking now about what he had on his

9  person at the time he took him down to the police

10 station.  Do you recall at that point whether he had a

11 shirt on and shirt on and shoes on?

12 A.  He had the rest of his clothing on, pants

13 shoes, then he was wearing a top but I can't recall

14 what type of top he was wearing.

15 Q.  That's when he went down to the police station

16 he did have a top and bottom on?

17 A.  He may have been carrying it with him, yeah.

18 Q.  Do you recall whether the color of his top was

19 it like a T-shirt, button down, was it a pull over like

20 yourself?  Do you remember anything about the top that

21 he was wearing when he was there at the police station?

22 A.  I can't recall exactly what it was.

23 Q.  Can you remember whether it was any particular

144

1  color, please?

2  A.  No.

3  MR. BAYARD:  Your Honor if I could confer

4  briefly.

5  Thank you, sir.  No further questions.

6  THE COURT:  Mr. Bernstein.

7  BY MR. BERNSTEIN:

8  Q.  Afternoon Officer Prado.

9  A.  Good afternoon.

10 Q.  You are setting in your patrol car down at the

11 intersection of Fourth and West?

12 A.  Yes.

13 Q.  And you see these individuals.  Did you see

14 them turn the corner?  You said they were coming --

15 looked like they were running east on Fifth?

16 A.  Correct.

17 Q.  And you actually saw them turn the corner?

18 A.  Turning the corner; correct.

19 Q.  Then going up on the east side of West Street?

20 A.  Correct.

21 Q.  Along the wall.  And then you saw two

22 individuals go over the wall and as you see them kind

23 of scaling the wall that's when you start up through

000190

145

1   the intersection at a normal rate of speed?

2   A.   Well, I think we had already started through

3   the intersection when we saw the individuals running.

4   Q.   Would it be fair to say from that distance

5   everything looks kind of dark at that time of night?

6   A.   Yes.

7   Q.   You couldn't tell what race these people were?

8   A.   No, not from this distance.

9   Q.   You saw two figures; correct?

10  A.   Three figures.

11  Q.   Two go over a wall, one continued walking up

12  the street?

13  A.   Correct.

14  Q.   Now, earlier, if we could maybe get some

15  assistance and get this map back up on the easel.

16      What I would like you to do is start with the

17  point on Fifth Street where you saw these individuals

18  go over the wall, just to orient you, here is Willing

19  Street.

20  A.   Right about this wall right here.

21  Q.   And you approximately, if you know -- let me

22  ask you this, after you got out of your car did you go

23  over to the person who was still walking up Fifth

146

1   Street?  You both did?

2   A.   We stopped the vehicle and exited the vehicle

3   and approached.

4   Q.   Were you the one who approached Coleman?

5   A.   I was a passenger in the vehicle, told him

6   stop, come here we need to speak to you.

7   Q.   You spent time with Coleman?

8   A.   Yeah.

9   Q.   Couple minutes at least?

10  A.   Probably.

11  Q.   Then you go back to the wall and go over the

12  wall?

13  A.   After we located the weapon.

14  Q.   So, you speak to Coleman, locate the weapon,

15  then go over the wall and then you are walking around

16  inside this courtyard; correct?

17  A.   Correct.

18  Q.   Five minutes, looking around?

19  A.   Five, ten minutes, approximately.

20  Q.   Then where do you go?  Use the pointer and

21  just describe your path of travel.

22  A.   After going over this three-foot wall --

23  Q.   And there you are coming out?

147

1   A.   Onto Sixth Street.

2   Q.   And then you go back to Tatnal -- south on

3   Tatnal?

4   A.   South on Tatnal.

5   Q.   Are you walking or running?

6   A.   Walking.

7   Q.   Stop the pointer where you were when you saw

8   these two individuals that you ultimately apprehended

9   down by the apartment complex.

10  A.   I was probably about the middle of the block.

11  Q.   Where were the individuals when you saw them?

12  A.   Right here.

13  Q.   Right in the intersection?

14  A.   Crossing the intersection at Fifth and Tatnal.

15  Q.   Walking or running?

16  A.   Walking.  At a faster pace, but they were

17  walking.

18  Q.   Where did they go?  Use the pointer.

19  A.   There is two entrances to the apartment

20  complex, they go into the first gated entrance of

21  the --

22  Q.   Is that something open to the public, you can

23  just walk through?

148

1   A.   Yes.

2   Q.   Is there a courtyard there?

3   A.   In the back, in the rear on the Sixth Street

4   side or actually Fifth Street side there is a courtyard

5   and parking lot.

6   Q.   And can you use the laser to pinpoint the stop

7   point where you got right up in their face?

8   A.   We were in the corridor of the first apartment

9   complex.

10  Q.   Inside?

11  A.   Inside a corridor that leads into.

12  Q.   At an outer door?

13  A.   Open corridor.

14  Q.   And they appear to be together?

15  A.   Yes, they were together.

16  Q.   And the first time you saw them was at that

17  entrance?

18  A.   Correct.

19  Q.   Now, you can stand back at the witness stand.

20      MR. BERNSTEIN:  Can I have this next item

21  marked for identification?

22      THE COURT:  Yes.

23      THE PROTHONOTARY:  Defendant's Identification

149

1  F, your Honor.

2  (Defendant's F was marked for identification.)

3  MR. BERNSTEIN: May I approach the witness?

4  THE COURT: Yes.

5  BY MR. BERNSTEIN:

6  Q. I want to show you Defense Identification F

7  and ask if you recognize that.

8  A. **Yes. That's Mr. Whitfield.**

9  Q. What is he wearing?

10  A. **He is wearing dark blue jeans and a gray Pepe**

11  **Le Pew sweatshirt.**

12  Q. What is Pepe Le Pew?

13  A. **In my day I guess cartoons I used to like to**

14  **watch.**

15  Q. Is that what he was wearing when you arrested

16  him?

17  A. **Could have been.**

18  Q. Could have been?

19  A. **Can't recall.**

20  Q. Can't recall? Did he go home and change his

21  clothes?

22  A. **He wouldn't have been able to do that.**

23  Q. Not likely?

150

1  A. **Right.**

2  MR. BERNSTEIN: With the Court's permission

3  could I put that up there?

4  THE COURT: There is actually a zoom feature

5  on that.

6  MR. BERNSTEIN: I will try to do that.

7  BY MR. BERNSTEIN:

8  Q. That's him; right?

9  A. **Yes, sir.**

10  Q. Okay.

11  MR. BERNSTEIN: Could I have Exhibit F for

12  Identification marked as Defendant Whitfield's next

13  exhibit?

14  MR. DONAHUE: No objection.

15  THE PROTHONOTARY: Whitfield 3, your Honor.

16  MR. BERNSTEIN: That's all, your Honor. Thank

17  you.

18  REDIRECT EXAMINATION

19  BY MR. DONAHUE:

20  Q. Officer Prado, were there any other

21  individuals on West Street where you observed the three

22  individuals?

23  A. **No. Again, it was a cold night so there**

151

1  **wasn't that many people out on the street.**

2  Q. What about on Sixth Street was there anybody

3  on Sixth Street when you walked down Sixth?

4  A. **Nobody on Sixth.**

5  Q. When you went down Tatnal was there anyone on

6  Tatnal Street besides the two defendants?

7  A. **Nobody else.**

8  MR. DONAHUE: State has nothing further.

9  MR. O'CONNELL: Nothing else.

10  MR. BAYARD: Nothing.

11  MR. BERNSTEIN: Nothing.

12  THE COURT: You may step down.

13  Does the State have another witness available?

14  MR. O'CONNOR: If I can check the hallway I

15  will be able to let you know.

16  THE COURT: Very well.

17  MR. O'CONNOR: No, your Honor.

18  THE COURT: Shall we recess for the day?

19  MR. O'CONNOR: Yes, your Honor.

20  THE COURT: I told you we would resume on

21  Tuesday next week. We have calendar matters that take

22  everyone's time and therefore it is not possible to

23  have trial trials on Monday's. So we will resume at

152

1  10:00 a.m. I remind you you are not to discuss the

2  case among yourselves or anyone else. Don't do any

3  detective work on your own.

4  MR. BERNSTEIN: Excuse me. Tuesday is the day

5  that I have to be in Dover in the morning.

6  THE COURT: You did tell me that. Remind me.

7  MR. BERNSTEIN: We agreed to start at 2:00

8  rather than 10:00.

9  THE COURT: That's right. And the State has a

10  witness in from Texas?

11  MR. O'CONNOR: Yes, your Honor.

12  THE COURT: That is agreeable to the State?

13  MR. O'CONNOR: Yes, your Honor.

14  THE COURT: Thank you. You did tell me

15  before. We will start at 2:00 on Tuesday and it will

16  be just a half a day because of the other commitments

17  and traveling issues that have to be dealt with. So it

18  will be a short day on Tuesday. But we were aware of

19  that when I told you it was going to be Tuesday

20  Wednesday and Thursday I just forgot about it, but you

21  were aware when we did the scheduling. So don't be

22  concerned that the schedule overall will be affected by

23  that. See you Tuesday at 2:00.

153

 1    (The jury exited the courtroom at 4:35 p.m.)

 2    THE COURT: Is that it?

 3    It may be too soon for you to have thought

 4  this through but I will be preparing the drafts of jury

 5  instructions. I know there was mention of Accomplice

 6  Liability earlier. Are there any instructions that

 7  immediately come to mind?

 8    MR. BERNSTEIN: There are a number of legal

 9  issues that I don't know when the Court wants to take

10  them up.

11    Kevin what do you think?

12    THE COURT: Before the close of the State's

13  case.

14    MR. BERNSTEIN: They may be somewhat -- they

15  may not be premature at this point.

16    For tactical reasons I'm going to say we

17  prefer to deal with them after the State rests. We are

18  not trying to deliberately keep the Court in the dark

19  instead we are trying to keep the State in the dark.

20    THE COURT: My focus was slightly different.

21  And certainly there will be whatever opportunities is

22  required to give you the chance to present whatever

23  legal arguments you want to make, that is just of a

154

 1  different discussion. I just wanted a heads up. If

 2  you think it is premature that's fine.

 3    MR. BERNSTEIN: It dovetails into jury

 4  instructions. I am perfectly willing to disclose to

 5  the Court what those issues are.

 6    THE COURT: No. What happens with jury

 7  instructions, you are given a draft, it often contains

 8  things not pertinent. You can look at what we need,

 9  but if it is premature to have the conversation we will

10  stand in recess.

155

STATE OF DELAWARE:

NEW CASTLE COUNTY:

I, Christine Mason Baird, RPR, CRR and
Official Court Reporter of the Superior Court, State of
Delaware, do hereby certify that the foregoing is an
accurate transcript of the proceedings had, as reported
by me in the Superior Court of the State of Delaware,
in and for New Castle County, in the case therein
stated, as the same remains of record in the Office of
the Prothonotary at Wilmington, Delaware, and that I am
neither counsel nor kin to any party or participant in
said action nor interested in the outcome thereof.

WITNESS my hand this 22nd day of
July, 2004.

Christine Mason Baird, RPR, CRR
Certification #157-PS

000193

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MUSTAFA A. WHITFIELD,                :
                                         :
                Plaintiff,       :
                                         :
        v.                      :      C.A. No. 06-541 GMS
                                         :
WILMINGTON POLICE DEPARTMENT,  :
                                         :
                Defendant.    :

CERTIFICATE OF SERVICE

I, Andrea J. Faraone, Esquire, hereby certify that on this 8th day of January, 2007, I filed the Appendix to the Opening Brief In Support of Defendant Wilmington Police Department's Motion to Dismiss, or in the Alternative for Summary Judgment Vol. II with the Clerk of Court using CM/ECF which will send notification of such filing(s) that this document is available for viewing and downloading from CM/ECF, I also mailed via U.S. Mail, postage pre-paid one copy to the following:

Mustafa A. Whitfield
S.B.I. #317479
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

    /s/ Andrea J. Faraone
Andrea J. Faraone, Esquire (I.D. #3831)
City of Wilmington Law Department
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendant