IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MUSTAFA A. WHITFIELD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 06-541 GMS |
| | : | |
| WILMINGTON POLICE DEPARTMENT, | : | |
| | : | |
| Defendant. | : | |

APPENDIX TO DEFENDANT WILMINGTON POLICE DEPARTMENT'S
OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS OR, IN THE ALTERNATIVE,
MOTION FOR SUMMARY JUDGMENT

Vol. III

Andrea J. Faraone, Esquire (I.D. #3831)
Assistant City Solicitor
City of Wilmington Law Department
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendant Wilmington Police
Department

Dated:   January 8, 2007

## TABLE OF CONTENTS

<u>Vol. I</u>

Plaintiff's § 1983 Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Civil Docket Sheet for *Whitfield v. Wilmington Police Dep't and Delaware Attorney General's Office*, D. Del., C.A. No. 1:06-cv-00541-GMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Memorandum Opinion dated November 16, 2006 in *Whitfield v. Wilmington Police Dep't and Delaware Attorney General's Office*, D. Del., C.A. No. 06-541-GMS. . . . . . . . . . . . . . . . . . . . 10

Order dated November 16, 2006 in *Whitfield v. Wilmington Police Dep't and Delaware Attorney General's Office*, D. Del., C.A. No. 06-541-GMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Delaware Superior Court Criminal docket as of December 21, 2006 in *State of Delaware v. Whitfield*, I.D. No. 0210009174 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Order dated June 13, 2003 in *State of Delaware v. Whitfield*, I.D . No. 0210009174 (Del. Super. Ct.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Order dated July 7, 2003 in *State of Delaware v. Whitfield*, I.D . No. 0210009174 (Del. Super. Ct.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Deputy service sheet - subpoena return dated January 29, 2004 . . . . . . . . . . . . . . . . . . . . . . . . 31

Subpoena to Jamila J. Reed dated January 22, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Notice of Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Motion for Habeas Corpus filed by Mustafa Whitfield in the Delaware Superior Court on November 2, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Delaware Superior Court Order dated November 3, 2004, denying Mustafa Whitfield's Petition for a Writ of Habeas Corpus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Petition for a Writ of Habeas Corpus filed by Mustafa Whitfield in the Delaware Superior Court on October 19, 2004, with attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Delaware Superior Court's Order dated November 17, 2004, denying Mustafa Whitfield's petition for habeas corpus and pro se motion to compel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Motion for Post Conviction Relief filed by Mustafa Whitfield in the Delaware Superior Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Delaware Superior Court Order dated June 27, 2005 denying Mustafa Whitfield's Motion for Post Conviction Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Delaware Supreme Court dockets for appeals filed by Mustafa Whitfield . . . . . . . . . . . . . . . . 71

Delaware Supreme Court Opinion dated December 29, 2004, denying Mustafa Whitfield's direct appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Supreme Court Order dated December 13, 2005 denying Mustafa Whitfield's applications for post-conviction relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Docket Sheet for Whitfield's federal Petition for a Writ of Habeas Corpus, D. Del., C.A. No. 1:06-cv-00137-GMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Vol. II

Mustafa Whitfield's federal Petition for Writ of Habeas Corpus dated February 28, 2006 w/attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Initial Crime Report prepared by Patrolman Matthew Derbyshire . . . . . . . . . . . . . . . . . . . . . . 136

Supplemental Crime Report prepared by Patrolman David Prado . . . . . . . . . . . . . . . . . . . . . . 139

Delaware Superior Court Trial Transcript for *State v. Whitfield, et al.* - January 29, 2004 . . . . 141

Delaware Superior Court Trial Transcript for *State v. Whitfield, et al.* - January 30, 2004 . . . . 155

Vol. III

Delaware Superior Court Trial Transcript for *State v. Whitfield, et al.* - February 3, 2004 . . . . 194

Delaware Superior Court Trial Transcript for *State v. Whitfield, et al.* - February 6, 2004 . . . . 221

Delaware Superior Court Verdict Transcript for *State v. Whitfield, et al.* - February 6, 2004 . . 252

Delaware Superior Court Hearing Transcript in *State v. Whitfield*, et al. - March 5, 2004 . . . . 259

Affidavit of Stephen Misetic w/attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

Investigative Reports Prepared by Detective Stephen Misetic . . . . . . . . . . . . . . . . . . . . . . . . . 266

Detective Stephen Misetic's handwritten notes of his October 15, 2002 interview of the victim at Christiana Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 298

Arrest warrant application prepared by Detective Stephen Misetic for the arrest of Mustafa

Whitfield . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306

Transcript of Detective Misetic's October 18, 2002 interview of the victim  . . . . . . . . . . . . . 313



**Page 1**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,        ID#0210009174
          0210009188
          0210008663

v.

AKEEM S. COLEMAN, and
EMMANUEL M. ROBINSON and
MUSTAFA WHITFIELD,

          Defendants.

BEFORE:  HONORABLE SUSAN C. DEL PESCO, J.
  and jury

APPEARANCES:

  MARTIN B. O'CONNOR, ESQ.
  STEPHEN DONAHUE, ESQ.
  Deputy Attorney General
    for the State

  KEVIN J. O'CONNELL, ESQ.
    for Defendant Akeem Coleman

  JAMES A. BAYARD, ESQ.
    for Defendant Emmanuel Robinson

  JOSEPH M. BERNSTEIN, ESQ.
    for Defendant Mustafa Whitfield

**Page 2**

000194

ORIGINAL

- - - - - - - - - - - - - - -
TRIAL TRANSCRIPT
FEBRUARY 3, 2004
- - - - - - - - - - - - - - -

SUPERIOR COURT REPORTERS
500 North King Street, Suite 2609
Wilmington, Delaware 19801-3725
(302) 255-0570

**Page 3**

1      February 3, 2004
       Courtroom No. 4-A

2

       PRESENT:

3

         As noted.

4

5                - - - - -

6          THE COURT:  Ready to begin?
7          MR. BERNSTEIN:  One housekeeping matter, the
8  witness I had spoken about yesterday, Jamilla Reed, I
9  was able to speak with her last night.
10         When I spoke with her -- she's in Dover, and
11 she will not be returning to Wilmington until four
12 o'clock this afternoon.
13         THE COURT:  Does that mean she'll be here at
14 four o'clock?
15         MR. BERNSTEIN:  She'll be here at four,
16 that's what I told her.
17         THE COURT:  Hopefully, she'll be on time.
18         MR. BERNSTEIN:  The other matter is that I
19 left some additional -- more paper clips -- three
20 instructions, one is a revision of the multiple
21 offense instruction, is that -- I gave the Court it
22 yesterday.  It's just the sentence at the very end.
23         The other is an accomplice liability

**Page 4**

1  instruction and a revision to the robbery -- Attempted
2  Robbery.
3          THE COURT:  We'll take all of those up when
4  we need to confer about the instructions.
5          MR. O'CONNOR:  Your Honor, just for your
6  information, I have Mr. William Edelin in there, his
7  testimony should only take a couple minutes.  He's the
8  gentleman who found the bottle opener in the church,
9  and Detective Messic -- we have made transcripts of
10 the tape.  The tape is now a cassette, as it was
11 copied, and I have asked to have a tape player, which
12 we're working on.
13         THE COURT:  Oh, good.  When it works.
14         MR. O'CONNOR:  We may need to take a recess
15 after Mr. Edelin.
16         THE COURT:  So we can start with Mr. Edelin
17 now?
18         MR. O'CONNOR:  Yes, Your Honor.
19         THE COURT:  All right.  Jury, please.
20         (The jury entered the room at 10:15 a.m.)
21         THE COURT:  Good morning, ladies and
22 gentlemen.  Is the State ready to proceed?
23         MR. O'CONNOR:  Yes, Your Honor, the State

5

1  calls William Edelin.
2      WILLIAM C. EDELIN, having been called on the
3  part and behalf of the State as a witness, being first
4  duly sworn under oath, testified as follows:
5          DIRECT EXAMINATION
6  BY MR. O'CONNOR:
7      Q. Good morning, Mr. Edelin.
8      A. Good morning.
9      Q. Where do you live?
10     A. 1331 West 23rd Street.
11     Q. That's in Wilmington?
12     A. Yes.
13     Q. How long have you lived in Wilmington?
14     A. Since '47.
15     Q. Okay. What do you do for a living?
16     A. Right now? Crossing guard, St. Peter's.
17     Q. St. Peter's Church, where is that located?
18     A. 6th and West.
19     Q. Just up here in Wilmington?
20     A. Yes.
21     Q. Do you recall contacting or having contact
22  with Detective Messic, who is seated at counsel table,
23  here in 2002?

6

1      A. Yes.
2      Q. Why did you have contact with him?
3      A. He and Sister Barron, the principal, were in
4  the library studying some tapes of the surveillance
5  camera. They called me in and asked if I found some
6  keys.
7      Q. Had you found anything out in the yard?
8      A. They were in the street.
9      Q. Can you describe to the jury where the keys
10  were found?
11     A. The keys were found alongside of the curb,
12  across the street from 605 and 607 West Street
13  Apartments, across there.
14         They were just laying on the curb in the
15  street.
16     Q. What were you doing out there that you
17  located the keys?
18     A. Cleaning leaves. Sweeping leaves.
19         MR. O'CONNOR: May I approach the witness,
20  Your Honor?
21         THE COURT: Yes.
22  BY MR. O'CONNOR:
23     Q. Mr. Edelin, I'm going to hand you what's been

7

1  previously marked as State's Exhibit 7. Does that key
2  look familiar to you?
3      A. Looks more like a ring of keys.
4      Q. I'm also going to show you State's Exhibit
5  26.
6      A. I recognize that.
7      Q. And State's Exhibit 26 is a bottle opener?
8      A. Yes.
9      Q. Is that the item that you found on the
10  sidewalk property of St. Peter's Cathedral?
11     A. Laying in the street.
12     Q. Do you remember what day you found it?
13     A. No, I don't remember the day.
14     Q. What did you do with these items or at least
15  the bottle opener once you found it?
16     A. We have a poor box in the church, and I
17  thought the keys and stuff belonged to the church, so
18  I left it in the poor box -- not poor box, but
19  lost-and-found box.
20     Q. Okay. Do you remember speaking to Detective
21  Messic in October of 2002?
22     A. Yes.
23     Q. Did you speak to him voluntarily?

8

1      A. Yes.
2      Q. And did you talk to him about the items that
3  you found out on the street that day?
4      A. Yes.
5         MR. O'CONNOR: Nothing further at this time,
6  Your Honor.
7         THE COURT: Cross.
8         MR. O'CONNELL: May we approach, Your Honor,
9  with the court reporter, briefly?
10        THE COURT: Why don't we take the jury out,
11  please.
12        (The jury left the room.)
13        MR. O'CONNELL: Your Honor, my request would
14  be that Mr. Edelin step down and be out the courtroom,
15  and that we be allowed to examine the officer --
16  present testimony to this officer about the tape.
17        THE COURT: Mr. Edelin, would you step
18  outside for a few minutes? We'll be getting back to
19  you.
20        DETECTIVE MESSIC, having been previously
21  sworn under oath as a witness for the State, was
22  recalled to the stand and testified further as
23  follows:

9

1    FURTHER DIRECT EXAMINATION
2    BY MR. O'CONNOR:
3        Q. Detective Messic, as part of the
4    investigation in this case, did you respond to
5    St. Peter's Cathedral to see if there were any
6    surveillance tapes available?
7        A. Yes, I did.
8        Q. Can -- could you please explain to the Judge
9    and the other people in the courtroom, what you did
10   when you got there, what you found out?
11       A. When I got there, I believe it was on the
12   18th of October. I just went there by chance to see
13   if they did have any. I wasn't aware that they did.
14       When I went there, I was surprised that they
15   did have surveillance tapes there.
16       They have a view of the courtyard in back
17   and, I think, what happens is, you know, they keep it
18   running during the nighttime, and I don't think they
19   do it during the day.
20       I spoke with Sister Barron, who was able to
21   show me where the cameras were. We looked at the
22   video, they didn't have the dates on the video.
23       The one she thought recorded that night, we

10

1    looked through it and it wasn't -- it was from like
2    2001. It wasn't that day. I don't know if it was
3    erased or what happened to it. So the video we looked
4    at erased the one she thought it was, it wasn't there.
5    It was the day before or the day after, the 15th.
6        So I don't know what happened to the video
7    they had. It looked like it was erased by the time I
8    got there.
9        Q. You're not aware of any video tape that
10   exists from that night?
11       A. No, I was -- I wish I was able to locate it,
12   to be honest with you.
13       THE COURT: Cross.
14       MR. O'CONNELL: None, Your Honor.
15       MR. BERNSTEIN: No, Your Honor.
16       MR. BAYARD: None, Your Honor. Thank you.
17       THE COURT: Should we ask Mr. Edelin to come
18   back in?
19       MR. O'CONNELL: I have no application to make
20   to the Court.
21       MR. BERNSTEIN: Nor do I.
22       MR. BAYARD: No.
23       THE COURT: Okay. We'll get the bailiff back

11

1    and get the jury back.
2        In the meantime, Mr. Edelin can be asked to
3    return to the stand.
4        (The jury entered the room.)
5        MR. O'CONNELL: Thank you, Your Honor.
6        CROSS-EXAMINATION
7    BY MR. O'CONNELL:
8        Q. Good morning, Mr. Edelin. Thank you. You
9    described where you found the keys and the bottle
10   opener, were they together?
11       A. I think there was a ring of keys, I'm not
12   sure. I thought there was a ring of keys and they
13   were laying side-by-side, the bottle opener and the
14   keys.
15       Q. And it is your recollection that they were in
16   the street?
17       A. They were in the street, alongside the
18   sidewalk.
19       Q. Okay. And you described a location by
20   referencing certain apartments, did you say the
21   apartment numbers?
22       A. 605 and 607, across the street from
23   St. Peter's Rectory, St. Peter's Church Rectory.

12

1        Q. Isn't St. Peter's in the 500 block of West
2    Street? In other words, between 5th and 6th?
3        A. Well, 505 and 507.
4        Q. Okay. All right.
5        A. St. Peter's is 500.
6        Q. I see. So it would have been closer to 5th
7    Street than 6th Street where you found these items?
8        A. Yes.
9        Q. And was it on the St. Peter's side of the
10   street or the opposite side?
11       A. St. Peter's side.
12       Q. Okay. Did you assist any of the police
13   officers in preparing a sketch or anything to show
14   where you found these items or did you just simply
15   point it out to them?
16       A. We were in the school library and I told them
17   where I found the stuff.
18       Q. That was the extent of your contact with the
19   Detective?
20       A. Yes.
21       MR. O'CONNELL: Thank you, Mr. Edelin. I
22   appreciate you coming in.
23       THE COURT: Sir, just a moment, sir. Maybe

13

1  others will have questions. Mr. Bayard?
2          MR. BAYARD: Thank you, Your Honor. Sir, we
3  don't have any questions, thank you.
4          MR. BERNSTEIN: Your Honor, we have no
5  questions.
6          THE COURT: Any redirect?
7          MR. O'CONNOR: No, Your Honor.
8          THE COURT: Okay. Thank you, Mr. Edelin.
9          THE COURT: Is the State ready to proceed?
10         MR. O'CONNOR: Your Honor, I think we may
11  need a short recess to set up the machine.
12         THE COURT: All right. We'll take a short
13  recess. Take the jury, please.
14         (The jury left the room at 10:30 p.m.)
15         THE COURT: Now, is this tape just what's on
16  this page.
17         MR. O'CONNOR: According to Mr. Donahue it
18  is.
19         THE COURT: Mr. Donahue, you have a lot at
20  stake here.
21         MR. DONOHUE: I understand, Your Honor.
22         THE COURT: All right. Okay.
23         MR. O'CONNELL: I believe that was my trial,

14

1  was it not?
2          MR. DONOHUE: Actually, Your Honor, the only
3  thing that's on the tape, that's not on the
4  transcript, is Detective Messic cueing up the tape and
5  saying when he copied it.
6          Everything that's spoken in this is in
7  reference to the officer and WILCOM is on this
8  transcript.
9          THE COURT: Okay. How long does it take?
10         MR. DONOHUE: Five, six minutes.
11         MR. O'CONNOR: Your Honor, I also marked one
12  as the next State's Exhibit.
13         THE COURT: Yes. Is there an objection?
14         MR. O'CONNELL: No.
15         MR. BAYARD: No, Your Honor.
16         MR. O'CONNELL: There's a standard
17  instruction that the Court gives, I don't know if the
18  Court wants to give it contemporaneous or it wants to
19  give it at the end. I don't have a position.
20         THE COURT: I'll give it before the tape.
21         THE CLERK: So marked as State's Exhibit 43.
22         (State's Exhibit 43 was marked into
23  evidence.)

15

1          THE COURT: Do you have copies for all the
2  jurors?
3          MR. O'CONNOR: Yes, Your Honor.
4          THE COURT: All right.
5          MR. O'CONNOR: I'll test it.
6          THE COURT: Yes. Okay. Jury, please.
7          (The jury entered the room.)
8          THE COURT: Is this called the RECOM tape?
9          THE WITNESS: WILCOM.
10         THE COURT: WILCOM?
11         MR. O'CONNOR: The State will move this into
12  evidence.
13         THE CLERK: State's Exhibit 44.
14         MR. O'CONNELL: No objection.
15         MR. O'CONNOR: Your Honor, for the record,
16  the State has the full tape here.
17         THE COURT: Okay. All right. MR. O'CONNOR.
18         MR. O'CONNOR: Thank you, Your Honor. The
19  State recalls Detective Messic.
20         DETECTIVE MESSIC, having been previously
21  sworn under oath as a witness for the State, was
22  recalled to the stand and testified further as
23  follows:

16

1          FURTHER DIRECT EXAMINATION
2          THE COURT: Ladies and gentlemen, you're
3  going to hear a tape recording, that was the WILCOM
4  tape for the evening in question. The bailiff will
5  distribute to you, now, a transcript that has been
6  prepared by the State to assist you in listening to
7  the tape.
8          But it is important to remember that it is
9  the tape that matters. It is what you hear on the
10  tape. I'm sure the State has tried to be accurate in
11  its transcription, but if there's anything that's
12  inconsistent, there's a discrepancy between what you
13  hear and what is stated on the transcript, then rely
14  on what you hear and that will be the best evidence of
15  what was said, okay?
16         You may proceed.
17  BY MR. O'CONNOR:
18         Q. Detective Messic, did you obtain from the
19  Wilmington Police Department the WILCOM dispatch for
20  the evening of October 14th, into the early morning
21  hours into the 15th?
22         A. Yes, I did.
23         Q. What is WILCOM dispatch?

17

1        A. WILCOM dispatch -- specifically, we're
2    dealing with Channel A, it is the main dispatch
3    channel. It is a channel where officers are
4    dispatched to complaints or officers will respond back
5    on what's going on.
6        If they are chasing anyone, that goes over
7    Channel A. A discussion will go over Channel A and
8    WILCOM will get general information. It is an
9    exchange of WILCOM and the street.
10        Q. It is not a 911 tape?
11        A. No, it is not.
12        MR. O'CONNOR: Your Honor, this State's
13    Exhibit 44 and the transcript State's Exhibit 43.
14        THE COURT: Any objections?
15        MR. O'CONNELL: No, objections.
16        MR. BERNSTEIN: No objection.
17        MR. BAYARD: No objection.
18    BY MR. O'CONNOR:
19        Q. Officer, before -- Detective, before we play
20    the tape, I just like to go over a couple of things on
21    the transcript --
22        THE COURT: Mr. O'Connor, for the record,
23    what was the exhibit number on the tape?

18

1        MR. O'CONNOR: 44, Your Honor.
2        THE COURT: 44, thank you.
3    BY MR. O'CONNOR:
4        Q. When someone responds 10/3, what does that
5    mean?
6        A. That means go ahead.
7        Q. 10/8?
8        A. Whatever complaint you're on or whatever
9    you're on that, means you're clear to answer call.
10        Q. There's a reference to Ida King, what does
11    Ida King mean?
12        A. Ida King means a shot.
13        Q. Why Ida King? What does the Ida and King
14    stand for?
15        A. Those are just -- just the prefixes, if you
16    will, certain codes instead of saying shooting,
17    stabbing, cutting, Ida King or IK, it cuts down on the
18    language on the airway to keep it clear.
19        You would say Ida King real quick for a
20    shooting and all the officers know what that means.
21        Q. So that's not a reference to a person?
22        A. No, it is not.
23        Q. On the tape there's a reference to the police

19

1    locating two defendants in the 200 block of Tatnall.
2    Do you recall that?
3        A. Can I refer to the transcript here?
4        Q. Sure. It is on the second page, the first
5    entry -- second entry by Prada?
6        A. Okay.
7        Q. Okay. You heard Officer Prada's description
8    of where the defendant's -- where he stopped Whitfield
9    and Emmanuel Robinson. Correct?
10        A. Yes.
11        Q. Is that the 200 block of Tatnall?
12        A. No, it is not.
13        Q. Is it the 200 block of anything?
14        A. It would be the 200 block of west 5th Street.
15        Q. Okay. What is at the 200 block of Tatnall?
16        A. 200 block of Tatnall, it is right at Del-Tech
17    campus, I think you have Del-Tech on the other side.
18    I believe there's another building, it is kind of a
19    pipe fitting building or something like that, but
20    that's what's in that block.
21        Q. Is there an apartment building of the 200
22    block of Tatnall?
23        A. No, there is not.

20

1        Q. Is there an apartment building at the 200
2    block of 5th?
3        A. Yes, it is.
4        Q. What does 10/2 mean?
5        A. 10/2 means you arrived at the scene.
6        MR. O'CONNOR: Your Honor, at this time I
7    would like to play the tape.
8        THE COURT: All right.
9        (A tape is being played for the jury.)
10    BY MR. O'CONNOR:
11        Q. Just a few follow-up questions. Detective,
12    did you recognize the voices on the tape?
13        A. Yes, I did.
14        Q. And were the voices you recognized identified
15    as Patrolman Derbyshire and Patrolman Prada?
16        A. Yes, they were.
17        Q. The times that were listed on the tape, for
18    example, 2350, 2353, did you hear those on the tape?
19        A. Yes, I did.
20        Q. When does the WILCOM dispatcher announce
21    those times? At the beginning of a transmission or at
22    the end?
23        A. It is usually at the end of a transmission.

21

1    Q. Okay. Why is Officer Derbyshire giving a
2    direction of eastbound towards Orange Street in
3    relationship to West Street?
4    A. In relationship to West Street, Orange Street
5    is East of West Street.
6    Q. And how -- does it go West toward Tatnall?
7    A. Yes, that's how the streets would go from
8    West Street, West Tatnall and then West Orange.
9    Q. Okay. And on the tape it indicates that the
10   first contact of having one stopped in the 500 block
11   of West is 2353?
12   A. Yes.
13   Q. And then the other two are stopped in the 200
14   block of Tatnall, which is really the 200 block of 5th
15   at 2358 or by 2358?
16   A. That's what it indicates here, yes.
17   Q. So within five minutes?
18   A. Correct.
19       MR. O'CONNOR: Nothing further, Your Honor.
20       MR. O'CONNELL: I have no cross-examination,
21   thank you.
22       THE COURT: Mr. Bayard?
23   BY MR. BAYARD:

22

1    Q. Officer, just real brief. Down at the bottom
2    of the transcript where it says Derbyshire, do I
3    understand correctly he described one of the males
4    that he saw jump over the fence wearing an all-gray
5    sweatsuit?
6    A. Yes, that's what it says here, correct.
7    Q. And did I recall the other day that when --
8    you showed us photos through your testimony of the
9    three men shortly after their arrest there at the
10   Wilmington Police Station?
11   A. Did I -- I'm sorry, I missed the question.
12   Did I --
13   Q. You took photos of all three men at
14   Wilmington Police Station shortly after their arrest?
15   A. I took it later on in the morning hours.
16   Q. Did any of those three photos show them
17   wearing an all-gray sweatsuit?
18   A. No.
19       MR. BAYARD: Nothing further. Thank you,
20   sir.
21       THE COURT: I've got a question.
22   BY THE COURT:
23   Q. It seems like the WILCOM person is receiving

23

1    information that she is sharing. For example,
2    somebody shot. Somebody shot in the foot. How would
3    that information come to WILCOM?
4    A. Most likely through the 911 or 911 phone
5    system.
6    Q. So the 911 information would be shared with
7    the WILCOM dispatcher?
8    A. Correct. Calls come into 911, the 911
9    operator will then relay the information to the
10   dispatcher, and then the dispatcher relays the
11   information to the officers in the street.
12   Q. Are they all in one place?
13   A. Yes. The dispatcher and the 911 operators
14   are all located in one room.
15   Q. Okay. And this 17/Charles is that related to
16   a district -- did you explain that earlier?
17   A. I didn't, but I can if you want me to.
18   Q. Would you, please.
19   A. The Charles and the David, which are on the
20   transcripts here, this is the platoons in the
21   district. The Charles units and the David units. 11,
22   13, 16, those are the numbers you see before those,
23   those are David and Charles districts. So there are

24

1    certain districts, 11 David is their cost sign and
2    they work in the 11th district, and they are part of
3    the David platoon.
4    Q. That's a similar way of letting them know who
5    you talk to?
6    A. You don't say Derbyshire or Prada, you just
7    say 11 Charles and 17 Charles, just to cut back on the
8    names and stuff on the air.
9        THE COURT: Did my questions prompt any --
10       MR. BERNSTEIN: I did have a few questions.
11       THE COURT: Sorry.
12       MR. BERNSTEIN: That's all right.
13       CROSS-EXAMINATION
14   BY MR. BERNSTEIN:
15   Q. Good morning, Detective. When you made this
16   tape that we just heard, can you describe how you did
17   that, physically? What did you do?
18   A. I went to our communications department and I
19   took it off a CD. I guess it is received on a CD and
20   I would go through the CD and put it all on the tape,
21   play it put a microcassette recorder and let it play.
22   Q. Whatever it is was on the CD, let it play?
23   A. Correct.

25

1    Q. Is there another method of accessing call
2  information traveling through WILCOM or a computer?
3    A. I'm not -- I don't know if you can or not.
The way I did it is the only way I'm aware of.
5    Q. Okay. I understand that. Okay.
6        Let me show you a document that was provided
7  to us and see if you can identify this.
8        THE COURT: While he's giving that, can you
9  tell me again what a 10/8 means.
10       THE WITNESS: That means they are clear on
11  that assignment. They are ready to call.
12       THE COURT: What does "unfounded" mean?
13       THE WITNESS: Unfounded would mean a certain
14  complaint. We clear it up a certain way, either
15  arrest, unable to locate -- it means victim or --
16  unfounded means they talked to someone, they cleared
17  up unfounded. There was no complaint. There was
18  miscommunication, something like that.
19       THE COURT: What's the first entry on this
20  tape that seems to have to do with the crimes alleged
21  here, would it be Derbyshire about eight down?
22       THE WITNESS: The first one would probably --
23       THE COURT: About ten. Do you know what he's

26

saying, We have one stopped?
2        THE WITNESS: Correct. We have one stopped
3  at the 500 block of West.
4        THE COURT: Everything else is routine.
5        THE WITNESS: Let me back up, Derbyshire
6  comes -- it says 17 Charles and WILCOM responds back
7  17 Charles, and then that's the beginning and then he
8  says, We have one stopped.
9        THE COURT: Oh, when he says 17 Charles that
10  informs WILCOM that he's about to report something.
11       THE WITNESS: He's going to say something to
12  them, so that would actually be the beginning part of
13  it.
14  BY MR. BERNSTEIN:
15    Q. One other question about the CD that you
16  recorded, what you recorded is real-time. Is that
17  correct?
18    A. Again, I don't work up there, but from my
19  understanding -- I don't know how that exactly works.
20  I don't think it is, from what I have been told, but I
21  can't -- I'm not sure.
22    Q. Meaning it stops if there's dead air?
23    A. No, that stays the same, but there's

27

1  something -- if there's no speaking in ten seconds --
2  they stay on the same order, but if there's no
3  speaking, I think it won't record anything if there's
4  no talk for a while, and then it will pick up if
5  someone starts talking again.
6    Q. So what you're saying is you don't think it
7  is real-time?
8    A. I don't think it is real-time, correct.
9    Q. Okay. But you don't -- you don't know?
10    A. I can't say for sure, correct.
11    Q. All right. Well, do you know -- do you know
12  how these CDs are made? Where are they made from? Do
13  they actually -- is a recording device running as
14  these calls are coming in?
15    A. I think so. I think that's how it works,
16  that once the calls come in automatically puts in that
17  CD and that CD is preserved after a certain amount of
18  time. It only contains a certain amount of
19  information, and after a certain amount of time they
20  will get rid of these CDs, and add some time if you
21  want to hold onto it.
22    Q. I want to show you what's Defense
23  Identification G, and ask you if you know what this

28

document is a representation of?
2    A. This looks like a dispatch entry.
3    Q. Okay. Does that look like a print out from a
4  computer screen?
5    A. Yes.
6    Q. Okay. Have you ever seen print outs like
7  that before?
8    A. I have, but I don't understand them to a
9  great real detail.
10    Q. Okay. There are entries on there. Right?
11    A. Yes.
12    Q. And next to the entry there are times.
13  Correct?
14    A. Yes.
15    Q. Okay. Do you know how those times are
16  generated? Are they some kind of automatic clock that
17  puts -- prints out time as you print out entries?
18    A. I can't answer that question, I don't know.
19    Q. But there are times in chronological order.
20  Correct?
21    A. According to the sheet.
22    Q. On that print out?
23    A. Yes.

29

1    Q. Could you read the last entry and the time?
2    A. On this sheet its 0741, I guess -- I would
3    presume that would mean --
4    Q. Seven minutes after midnight?
5    A. Seven minutes and 41 seconds after midnight.
6    Q. Okay. What's the entry?
7    A. It just says on the left-hand side -- it says
8    Orange Street.
9    Q. It just says Orange Street?
10   A. Well, going -- if you're --
11   Q. Okay. The three or four lines that have the
12   07 time, is that standard on there?
13   A. The only one, 0741, stamped on it is Orange
14   Street.
15   Q. Okay. Let's start where it says 17-C.
16   A. Okay. It says 17-C.
17   Q. And that's Derbyshire, correct?
18   A. It is Derbyshire and Prada, they work the
19   same car.
20   Q. Okay. What's it say?
21   A. You want me to read that whole line?
22   Q. Yes.
23   A. 17 Charles had one stop, two fled and jumped

30

1    over the fence by the Church, suspects are black male,
2    on had a gray sweatshirt and went over the fence onto
3    the street.
4    Q. What are the times listed by all of them?
5    A. All three of them are six minutes after
6    midnight, 51 seconds 7 minutes after midnight, 38
7    seconds and 7 minutes after midnight 41 seconds.
8    Q. Okay, thank you.
9    MR. BERNSTEIN: Your Honor, with the Court's
10   permission we would move this Defense Exhibit G as
11   Defendant Whitfield's exhibit without objection.
12   THE COURT: Is it previously marked?
13   MR. BERNSTEIN: I don't believe so.
14   THE CLERK: It will be Defense Exhibit 4.
15   THE COURT: All right.
16   Is there anything else of the officer?
17   MR. O'CONNELL: No, Your Honor.
18   MR. O'CONNOR: I have a couple of follow-up
19   questions.
20   THE COURT: Oh, you do?
21   MR. O'CONNOR: Yes.
22   THE COURT: All right, proceed.
23   THE COURT: Are you finished, Mr. Bernstein?

31

1    MR. BERNSTEIN: I believe so, yes.
2    MR. O'CONNOR: May I approach the clerk, Your
3    Honor?
4    THE COURT: Yes.
5    BY MR. O'CONNOR:
6    Q. Detective, looking at Defendant's Exhibit 4,
7    the first line, if I can just read it: It says before
8    another 31, state's four shoots occurred in parking
9    lot near 400 West 6th Street, the victim, black male,
10   burgundy jacket, brown paints, last seen in alleyway
11   limping. It later identifies him as Anthony Meek
12   correct?
13   A. Yes.
14   Q. What is a 31?
15   A. That's a caller, somebody calls in a
16   complaint. It is basically what we call a 31.
17   Q. It says before another 31?
18   A. Correct.
19   Q. It suggests another caller called before?
20   A. Yes.
21   Q. And the time of that call was what?
22   A. 2354 and 14 seconds, which in standard time
23   is 11:54 and 14 seconds.

32

1    Q. And on the tape that we heard the dispatcher
2    indicates that 2353, people are calling in reporting a
3    shooting in the 500 block of Wilmington?
4    A. Yes.
5    Q. Now, with respect to what you read, 17-C, had
6    one stopped and two jumped over the fence.
7    Can you tell from this that that was written
8    in the presentence or that's just a summary of what
9    had occurred?
10   A. This looks like a summary --
11   MR. BERNSTEIN: Your Honor, that is a leading
12   question.
13   THE COURT: Sustained.
14   BY MR. O'CONNOR:
15   Q. Reviewing the last entry, does it suggest
16   anything to you about when it was made?
17   A. It does look like it is just a summary. I
18   wouldn't -- I don't know if these times are even
19   associated with what's being put down here, in my
20   opinion.
21   Q. Okay. It does indicate a gray sweatsuit --
22   black male, gray sweatsuit, jumping over a fence?
23   A. Yes, it does.

**33**

1      Q. And let me show you Defendant's Exhibit 3,
2   which is the photograph of Mustafa Whitfield.
3      A. Yes.
4      Q. What's he wearing?
5      A. A gray sweatshirt, white T-shirt underneath
6   it and blue jeans.
7      Q. Anybody else wearing a gray sweatshirt or
8   sweatsuit?
9      A. No.
10      MR. O'CONNOR: Nothing further, Your Honor.
11      MR. O'CONNELL: I have no questions, Your
12   Honor.
13      MR. BAYARD: No further questions.
14      MR. BERNSTEIN: No further questions.
15      THE COURT: Very well, you may step down.
16      THE COURT: Does the State have any other
17   evidence to present?
18      MR. O'CONNOR: No, Your Honor, the State
19   rests.
20      MR. O'CONNELL: Your Honor, we have some
21   matters to take outside the jury's presence.
22      THE COURT: All right. Take the jury out,
23   please.

**34**

1      (The jury left the room for a short break.)
2      MR. BERNSTEIN: Your Honor, I guess I have
3   been elected.
4      MR. O'CONNELL: The reason I'd ask
5   Mr. Bernstein to do it is because the motion for
6   judgment of acquittal that was filed by Mr. Bernstein,
7   I'll have a similar motion to be filed.
8      It won't raise any different arguments than
9   Mr. Bernstein has raised, but on behalf of defendant,
10   Akeem Coleman, we move, likewise, for judgment of
11   acquittal on the Reckless Endangering -- Reckless
12   Endangering First, the Assault Second and the
13   Accompanying Firearm charges.
14      MR. BAYARD: Your Honor --
15      MR. BERNSTEIN: Your Honor, as an addendum --
16      MR. BAYARD: Your Honor, I would like to join
17   in on this motion for judgment of acquittal. Your
18   Honor as outlined or as set forth here by
19   Mr. Bernstein on behalf of defendant, Mr. Robinson.
20      MR. BERNSTEIN: Your Honor, actually my
21   motion asks for acquittal as to all three weapons
22   charges not withstanding La Compe.
23      THE COURT: Not withstanding the La Compe?

**35**

1      MR. BERNSTEIN: I just wanted to clarify
2   that.
3      THE COURT: Two of them, because you argue
4   you observed in the --
5      MR. BERNSTEIN: In the Attempted First -- all
6   of those charges.
7      THE COURT: Yeah. And the third one on the
8   ground breaking law.
9      MR. BERNSTEIN: Are included in those charges
10   as defined in the code.
11      THE COURT: Okay.
12      MR. BERNSTEIN: I'm not going to repeat those
13   arguments, I'll rest on the written arguments I
14   submitted. The case of State versus Washington very
15   clearly indicates that we would present this motion to
16   the Court at the close of the State's case and we're
17   going to ask for it to be ruled on.
18      We don't believe that these charges --
19   perhaps because of La Compe, with the exception of
20   weapons charges associated with the Attempted Robbery,
21   but we're not asking the Court to overrule La Compe,
22   but we want to preserve that issue.
23      That there is just insignificant evidence in

**36**

1   this case, if you look at the -- if you look at
2   Washington and if you look at the Poteat case.
3      Everything happened just too fast here. You
4   can't say, Well there was a distinct threat, there was
5   a distinct assault, there was a distinct attempted
6   robbery, it was all one thing and that's what -- and
7   the definition -- and if you look at what the Court in
8   Washington said in terms of an included -- the
9   definition of an included offense, now you have to
10   distinguish between something that's included offense,
11   because proof of one element of that offense is also
12   proof of a crime, and the right to have
13   lesser-included offenses instructed.
14      They are two different things. Something is
15   an included offense by definition because offenses can
16   include more than one offense.
17      In this case, you have Attempted Robbery
18   First Degree, which includes a threat to use force, it
19   includes a physical assault; and by definition of what
20   the term "included offense" means, some or less than
21   all of the elements of one offense are included in
22   another offense, that's an included offense.
23      And what the Supreme Court said was if it is

37

1  an included offense, then what you have to look at is
2  whether or not they really were separate offenses,
3  because if they really weren't separate offenses by
4  definition, the State can't separately prosecute the
5  separate crimes, each element of an offense. And
6  that's the argue in a nutshell.
7       We would ask the Court not to send those --
8  the Reckless Endangering charge, the Assault Second
9  charge and the Accompanying Weapons charges to the
10  jury.
11       THE COURT: Okay. Anyone else want to add
12  anything on the defense side before the State has an
13  opportunity to respond?
14       MR. O'CONNELL: No, Your Honor.
15       MR. BAYARD: No, Your Honor.
16       THE COURT: Okay. Mr. O'Connor.
17       MR. O'CONNOR: Your Honor, as I understand
18  Mr. Bernstein's position, it is essentially that the
19  Assault Second Degree charge and the Reckless
20  Endangering Charge are lesser-included offenses of the
21  Attempted Robbery.
22       I did research last night and I found
23  actually a 1987 case by Judge Balick where

38

1  Mr. Bernstein was actually the attorney. And it's a
2  case which essentially stands for the proposition --
3       THE COURT: How about you give us the name of
4  it.
5       MR. O'CONNOR: I will, Your Honor, I'm going
6  to give you a copy of it. It is State v. David
7  Andrews. And I would be a little more prepared, Your
8  Honor, but it was my understanding that this wouldn't
9  be argued until after the verdict, that was the
10  discussion.
11       Your Honor, I have some case law, I'll try to
12  go through it.
13       THE COURT: Go ahead, take your time.
14       I have a couple of questions for you that
15  might frame the issue a little bit, too.
16       I'm looking at the indictment, the Attempted
17  Robbery First Degree, I assume that the Attempted
18  Robbery First Degree and the associated weapons charge
19  are related to crimes that took place by the car.
20       MR. O'CONNOR: Yes, Your Honor.
21       THE COURT: Okay. I'm trying to distinguish
22  geographically --
23       MR. O'CONNELL: I have been focusing on the

39

1  same thing. The Court -- is it is not indicted that
2  way, it can be flight therefrom, that's included in
3  the language. It is not just conduct associated that
4  happened right by the car. It includes or during
5  flight therefrom.
6       THE COURT: Yeah, it does, and it says that
7  in the indictment. But let's answer my question and
8  then we'll talk about whether or not you intended it
9  be reflected in the indictment.
10       Is it correct that the Attempted Robbery
11  First Degree, Count 1, and Possession of a Firearm,
12  Count 2, are related to the behavior by the car.
13       MR. O'CONNOR: Yes, Your Honor. The
14  defendant's attempted to take the victim's vehicle.
15       THE COURT: Okay. And then the Count 3, the
16  felony, which is Assault Second Degree, where do you
17  contend that took place? What does the evidence show?
18       MR. O'CONNOR: The evidence shows that that
19  incident took place a short time later in the 500
20  block of Willing Street, where Akeem Coleman was to
21  the south end of the block, near 5th Street, turned
22  and fired in the direction of Anthony Meek, and hit
23  him in the foot in the middle of the block.

40

1       Q. So the first discharge of the weapon
2  referred -- the first discharge is associated with the
3  Attempted Robbery?
4       MR. O'CONNOR: The first discharge occurs at
5  the car.
6       THE COURT: Yeah, associated with what you
7  call the Attempted Robbery sequence.
8       MR. O'CONNOR: Arguably yes and arguably no.
9       THE COURT: What is it that the State is
10  alleging?
11       MR. O'CONNOR: The defendant's go to rob a
12  victim, a struggle ensues, Defendant Coleman fires the
13  gun. When he fires the gun, he doesn't do that to
14  facilitate the robbery. He doesn't fire the gun and
15  says, Okay, now give me the keys. I'm serious.
16       He fires the gun, which ends that
17  confrontation, so it facilitates their flight from the
18  crime.
19       It is not that -- firing that gun was not
20  intended, the State submits, to facilitate the robbery
21  because they didn't continue with the robbery. They
22  immediately fled.
23       THE COURT: So it is essentially to end the

41

1 confrontation.
2     MR. O'CONNOR: Yes, Your Honor, and that's
3 the effect it had.
4     THE COURT: Okay. Just trying to understand.
5     All right. Let's talk about Count 3, the
6 assault is -- is the -- is the firing of the gun the
7 second time, is Assault Second Degree associated with
8 the firing of the gun the second time?
9     MR. O'CONNOR: That is correct, Your Honor.
10     THE COURT: And the weapons charge is
11 associated with that assault?
12     MR. O'CONNOR: Yes, Your Honor.
13     THE COURT: Okay. So this is the second
14 firing and what's the Reckless Endangering associated
15 with?
16     MR. O'CONNOR: Sorry, Your Honor, I may have
17 misunderstand your question before the --
18     THE COURT: We have the Attempted Robbery
19 First Degree that -- and your associating weapons
20 charge and you're telling me are related to the car.
21     MR. O'CONNOR: Right. When he pointed the
22 gun to him and said, Give me your keys.
23     THE COURT: So that's Counts 1 and 2?

42

1     MR. O'CONNOR: Right.
2     THE COURT: And then you look at Count 3,
3 which is Assault Second Degree, and you told me that
4 that's related to the firing the second time. The
5 weapons charge is Count 4. And then we get to Count
6 5, Reckless Endangering First Degree, what behavior is
7 associated with that?
8     MR. O'CONNOR: That is when the defendant was
9 at the car and fired the gun in the direction of
10 Anthony Meek, which facilitated the end of the
11 robbery; that's what I was speaking about earlier,
12 maybe I wasn't clear. He fires the gun in his
13 direction, but he doesn't hit him.
14     THE COURT: Yeah, I understand the facts. So
15 you're indictment is jumping around chronologically
16 then?
17     MR. O'CONNOR: Yes, Your Honor.
18     THE COURT: All right, so -- okay. Then the
19 weapons charges, which is Count 6, is associated with
20 that number five?
21     MR. O'CONNOR: Yes.
22     THE COURT: And then Count 7 is the Disguise,
23 Count 8 is Conspiracy and Count 9 is Person's

43

1 Prohibited, okay. All right.
2     I think I understand your position.
3     MR. O'CONNELL: May I respond briefly,
4 factually, to that?
5     THE COURT: Yes.
6     MR. O'CONNELL: First of all, the way the
7 indictment is programmed as to Attempted Robbery First
8 Degree, it is rather all-inclusive.
9     I mean, it is as narrow as Mr. O'Conner is
10 now arguing. He is saying in his indictment that the
11 robbery is a Robbery First Degree because physical
12 injury was caused to Mr. Meek during the course of the
13 robbery, as you can see by the line first up from the
14 bottom of the first page of the indictment.
15     THE COURT: Yes.
16     MR. O'CONNELL: And by virtue of the fact
17 that he displayed a firearm --
18     THE COURT: Are you looking at the
19 indictment, I'm looking at the jury instructions.
20     MR. O'CONNELL: I'm sorry, I'm looking at the
21 indictment. It just says, When in the course of
22 attempting to commit theft, did intentionally use to
23 threaten the immediate use of force upon Anthony Meek

44

1 with intent to prevent -- I'll get to the important
2 language in just a moment.
3     And in the course of the commission of the
4 crime or immediate flight therefrom, the defendant or
5 another participant in the crime caused physical
6 injury to Anthony Meek.
7     So the way they have indicted this is that
8 they are including the flight therefrom under what I'm
9 hearing now and the shot that causes injury, the
10 second shot they are saying. You follow what I'm
11 saying?
12     THE COURT: Yeah.
13     MR. O'CONNELL: And to parenthetically note,
14 Mr. Meek doesn't say the second shot injured my foot.
15 Mr. Meek testified, I don't know which shot injured my
16 foot. I don't know if it was the first one or the
17 second one.
18     THE COURT: Is that the only evidence of
19 injury?
20     MR. O'CONNELL: Yes, it is.
21     THE COURT: There was no evidence of injury
22 when he fell, didn't he disconnect from his allegation
23 -- didn't he say that he put his arm around one of the

45

1    defendant's, one of the perpetrators, maybe -- the
2    State charges that it was one of your defendants, and
3    that he stepped back and he tripped and fell in some
4    fashion.
5         MR. O'CONNELL: No -- yes, that is correct,
6    but he does not allege physical injury at that point.
7    It is as a result and they presented evidence with his
8    foot with the gunshot wounds. And he does not know --
9    and he states that quite clearly whether that occurred
10   when the first shot happened, because it all happened
11   so quickly, as he testified; or the second shot he
12   doesn't know. That's consistent with his testimony in
13   court.
14        It was consistent with his statement given to
15   the police that he doesn't know. So you have one
16   event as it were constituting the way they indicted,
17   Attempted Robbery in the First Degree.
18        In other words, the robbery doesn't
19   discreetly happened at the car, it happens throughout
20   the entire encounter, as it were according to the
21   indictment and according to the proof.
22        And that's why we're saying the Assault
23   Second, which is use of a deadly weapon recklessly

46

1    causing physical injury, certainly is an element of
2    Attempted Robbery First. And firing and discharging
3    the weapon in his direction is certainly an element of
4    Attempted Robbery First.
5         MR. O'CONNOR: Your Honor, if I could address
6    for a second. The elements of Assault in the Second
7    Degree as charged is recklessly or intentionally
8    causing physical injury by means of a firearm. So you
9    need that mental state and physical injury --
10        THE COURT: Okay. Assault in the Second
11   Degree, is that what your talking about?
12        MR. O'CONNOR: Yes.
13        THE COURT: Okay. Recklessly or
14   intentionally causes physical injury by means of a
15   firearm, right. Those elements are in the indictment.
16        MR. O'CONNOR: Those are not elements of
17   Attempted Robbery First Degree. First of all, there's
18   not reckless element of Attempted Robbery First
19   Degree. Second, to convict somebody of Attempted
20   Robbery First Degree, you don't need physical injury.
21   It could be physical injury, but you don't need it.
22        Third, there is a weapon involved, it just
23   needs to be displayed, not discharged, causing

47

1    physical injury, so they are distinct offenses. They
2    require different elements of proof.
3         THE COURT: I think this all comes down to
4    this occurring problem with the way the State indicts.
5    And somebody just through in the kitchen sink when
6    they indicted on the Attempted Robbery First Degree,
7    and the defendant's are saying that you indicted so
8    broadly that it approves the whole event, because you
9    have also alleged the injury, let me see.
10        I'll bet you this is almost directly quoted
11   from all the possible scenarios from an Attempted
12   Robbery First Degree, because you have alleged the
13   element of injury, you alleged your weapon.
14        MR. O'CONNOR: But both are not
15   necessarily -- both are not necessarily together to
16   convict somebody of robbery.
17        THE COURT: I understand the argument.
18        MR. O'CONNOR: Just so Your Honor -- I did
19   indict this, essentially, using all the elements of
20   the Attempted Robbery charge consciously, because in
21   my experience some times you go to court and you find
22   out that someone -- you could prove one set but you
23   can't prove the other ones. And until the evidence

48

1    comes out, you can't make a termination as to when
2    things happened or what people are going to say.
3         Now, Mr. Meek did say that he wasn't sure
4    when he was shot, but the evidence also is that he
5    didn't have any problem running after these guys and
6    when the second shots happened he felt pain in his
7    foot and he stopped; that would lead a person to
8    conclude that's when he was shot, because he's able to
9    run and he can't run any more because of a gunshot.
10        MR. BERNSTEIN: Your Honor --
11        THE COURT: Mr. Bernstein.
12        MR. BERNSTEIN: I think MR. O'CONNOR is
13   correct in saying the State can allege as many crimes
14   as they think they can prove. But what Washington
15   says, Once all the proof is in, you have to look and
16   see whether some of these crimes that they alleged in
17   the indictment are included crimes, and if they are,
18   206(a) says, You can't have multiple prosecutions.
19        Certainly they can indict ten -- what might
20   arguably be multiple prosecution crimes, maybe as it
21   turns out they couldn't prove Attempted Robbery and,
22   therefore, the Attempted Robbery might be dismissed,
23   but they could prove the shooting.

49

1    But here when we have all the evidence, this
2 is a classic 206 case, because one of the elements of
3 Attempted Robbery is physical injury, that's the
4 assault. Another of the elements of Attempted Robbery
5 is this Reckless Endangering, pointing a gun, firing
6 at somebody.
7    206(a) says that an offense is included, and
8 I'm not talking about the lesser-included offenses,
9 but included offenses, if it is established by proof
10 of the same or less than all of the facts required to
11 establish a commission of the offense charged.
12    These two offenses, Reckless Endangering and
13 Assault, are included offenses both in the language of
14 206(a) and as the case has delivered.
15    THE COURT: All right. I'm going to reserve
16 on this and I'd like to proceed with the defense case,
17 unless you can persuade me that there's some reason
18 that you have to have a ruling before you proceed.
19    MR. O'CONNOR: Your Honor, if I could just
20 provide the Court with some other cases, Hackett v.
21 State, 569 A.2d 79, actually argued by Mr. Bayard,
22 where the Supreme Court held that Robbery First Degree
23 and Assault First Degree were not the same or similar

50

1 offenses; and that they have different elements under
2 Blockberger, and under 11 Delaware Code Section 206,
3 neither offense is a lesser-included offense of the
4 other, that's what the Supreme Court says.
5    I guess at the break I have a couple more
6 cases that I'll sift through. I would like to bring
7 them before the break.
8    THE COURT: Mr. O'Connell, are you able to
9 proceed?
10    MR. O'CONNELL: Your Honor, the defendant,
11 Akeem Coleman, elects not to testify. The only
12 evidence we intended to present was via the witness
13 Jamilla Reed, who the Court has heard from
14 Mr. Bernstein will not be present until four o'clock.
15    Other than her testimony, that's all the
16 evidence we intended to present. I don't know if the
17 Court wants to go into a colloquy with Mr. Coleman
18 about his rights.
19    THE COURT: Yes, I do.
20    Mr. Coleman, this is the stage in the trial
21 where you have a choice, and it is your choice to
22 remain silent because the State has got the burden of
23 proof or you may choose to testify. Your attorney has

51

1 told me that you choose not to testify. Is that
2 correct?
3    DEFENDANT COLEMAN: Yes, ma'am.
4    THE COURT: Have you got any questions about
5 this decision? Do you understand that you don't get
6 to change your mind at another time, it is now or
7 never?
8    DEFENDANT COLEMAN: Yes, ma'am.
9    THE COURT: All right. Are you satisfied
10 that that's how you want to proceed?
11    THE DEFENDANT: Yes, ma'am.
12    THE COURT: Okay. You may be seated.
13    MR. O'CONNELL: Thank you, Your Honor.
14    THE COURT: Mr. Bayard, are you prepared to
15 present your defense?
16    MR. BAYARD: Your Honor, it is my
17 understanding, in speaking to Mr. Robinson this
18 morning, he does not wish to testify. I would ask the
19 Court to make inquiry of him to see if that's his
20 voluntary decision.
21    THE COURT: Okay. Mr. Robinson, this is the
22 point in time where you have a choice to make as well.
23 And you have a choice to testify or not to testify as

52

1 you wish. Your attorney has informed me that you
2 prefer not to testify on your own behalf. Is that
3 correct?
4    DEFENDANT ROBINSON: Yes, ma'am.
5    THE COURT: Have you had adequate amount of
6 time to consider this choice?
7    DEFENDANT ROBINSON: Yes, Your Honor.
8    THE COURT: You understand you don't get to
9 change your mind, it is now or never?
10    DEFENDANT ROBINSON: Yes, Your Honor.
11    THE COURT: Do you have any questions?
12    DEFENDANT ROBINSON: No, ma'am.
13    THE COURT: Okay. You may be seated.
14    MR. BERNSTEIN: Your Honor, I have spoken to
15 Mr. Whitfield several times about his choice to
16 testify or not testify. I explained to Mr. Whitfield
17 that it is his choice. He has indicated to me that he
18 does wish to testify, and I'll be calling
19 Mr. Whitfield as a witness, whenever the Court
20 resumes.
21    As I indicated, our other witness is not
22 available until four o'clock. We ask to take a lunch
23 break, perhaps go over the jury instructions between

53

1  then, and whenever we finish this morning, at four
2  o'clock perhaps we can tell the jury we'll be ready
3  for closings tomorrow.
4         THE COURT: I would like to get
5  Mr. Whitfield's testimony in.
6         MR. BERNSTEIN: We can do that right now or
7  whenever.
8         THE COURT: I would like to call the jury
9  back, unless you prefer to have a brief recess?
10        MR. BERNSTEIN: Okay, that's fine.
11        THE COURT: Is anybody requesting a recess?
12        MR. O'CONNOR: I would like five minute to
13  use the bathroom.
14        THE COURT: All right. We'll recess for ten
15  and then we'll resume.
16        MR. DONOHUE: Your Honor, Mr. O'Connor he
17  wanted me to inform the Court to please start without
18  him.
19        MR. O'CONNOR: Since everyone is sharing,
20  Your Honor, I'm going to ask the Court to accept the
21  State's purposed jury instructions, it is similar to
22  what Mr. Bernstein did, but I'll just hand them up.
23        THE COURT: We're going to talk about jury

54

1  instructions later. I just want to get the evidence
2  in. Let's stay focused here.
3         Ready to begin, Mr. Bernstein?
4         MR. BERNSTEIN: Yes.
5         THE COURT: All right, jury, please.
6         THE COURT: I'm going to give each of the
7  attorneys an opportunity to rest in the presence of
8  the jury before we get to Mr. Bernstein.
9         MR. O'CONNELL: Technically, I'm piggy
10  backing Jamilla Reed in my case, perhaps we wait until
11  the end of the day to do that.
12        THE COURT: All right. I do want to make it
13  clear, however, Mr. O'Connor, that as far as I'm
14  concerned that you and your client, and Mr. Bayard and
15  Mr. Bayard's client there's no going back.
16        MR. O'CONNELL: Understood. Thank you.
17        THE COURT: Mr. Bernstein?
18        MR. BERNSTEIN: Yes, Your Honor, ready to
19  proceed. The defense calls Mustafa Whitfield.
20        MUSTAFA WHITFIELD, having been called on the
21  part and behalf of the Defendant as a witness, being
22  first duly sworn under oath, testified as follows:
23        DIRECT EXAMINATION

55

1  BY MR. BERNSTEIN:
2         Q. Mr. Whitfield, how old are you?
3         A. 18.
4         Q. You're 18 now?
5         A. Yes, sir.
6         Q. Okay. What's your birth date?
7         A. 5/10/85.
8         Q. So you were under 18 when you got arrested
9  and charged with the offenses you're on trial here
10  today for?
11        A. Yes, sir.
12        Q. Okay. Now, prior to the time that you were
13  arrested, where were you living?
14        A. 622 West 6th Street.
15        MR. BERNSTEIN: Your Honor, can I ask the
16  witness to stand down and approach the map here.
17        THE COURT: Yes. Is that okay?
18        We're probably going to need to turn that a
19  bit so the jury can see it. Are you able to see it?
20        MR. BERNSTEIN: I don't know if we have a
21  pointer here.
22        THE COURT: Move it back about two feet, I
23  think that everyone can see it.

56

1  BY MR. BERNSTEIN:
2         Q. Take a second to familiarize yourself.
3  Here's Del-Tech. Here's Friends Meeting House.
4  There's Willing Street. Do you see your house on this
5  map?
6         MR. O'CONNELL: Your Honor, I think the
7  jurors are having trouble seeing it now.
8         THE COURT: Well, that's because people are
9  standing in front of it. Stand -- Mr. Bernstein,
10  you're in the line of sight, you're going to have to
11  get yourself back further. Excellent.
12        Is it possible to do this on the ELMO? I
13  guess not.
14  BY MR. BERNSTEIN:
15        Q. 6th Street, 8th Street, 5th Street, Orange
16  Street, Tatnell Street, West Washington, Jefferson.
17  Can I stand over this side? What is your address?
18        A. 622 West 6th Street.
19        Q. Do you see 6th Street on the map here?
20        A. I'm sure it is like down here.
21        Q. Here's 6th Street?
22        A. Right here. My house is right here.
23        Q. Okay. And can you point out on this map

57

1  where you were when you got arrested?  Right here
2  between Fifth Street and Fourth Street?
3      A. Yes.
4      Q. Correct?
5      A. Yes, sir.
6      Q. Okay.  Now, you can stand back on the witness
7  stand, okay.
8      Okay.  Going backwards in time, before you
9  got -- before you were arrested on Tatnell Street
10  between 4th and 5th street, where were you?  Where
11  were you going?
12     A. Like --
13     Q. Where were you?
14     A. Oh, I was home playing Play Station II.
15     Q. How long had you been home?
16     A. I don't know, probably, like, a couple hours,
17  because I had just came from my sister's house, so
18  like 8:30.
19     Q. Try to speak up a little bit, speak right in
20  the microphone.
21     A. Like, I got home at 8:30.
22     Q. Okay.  Where were you before you got home?
23     A. I was at my sister's house, I had to go -- I

58

1  had to go Solid Gold, you know, where Solid Gold is?
2  My nieces little dolphin, I had to go down to her
3  house and give it to her.
4      Q. You got home around 8:30?
5      A. Yeah.
6      Q. After 8:30 were you home after that?
7      A. Yes, sir.
8      Q. Okay.  What did -- did there come a time when
9  you decided to go back out?
10     A. I got a phone call from a female friend --
11  Well, I didn't know her like that, but I was talking
12  to her for a while, because it is like -- it is like a
13  chat-line for young adults.  You get on and you meet
14  different people off of it, so she just called me up.
15  So she was, like, can I meet her somewhere?  And I
16  said, Yeah.
17     Q. What did you do?
18     A. I had -- what did I do, like -- I mean, she
19  called me probably like 10:30.
20     Q. Okay.  Do you recall what time it was when
21  you left your house?
22     A. It was like 11:50.
23     Q. What makes you think it was 11:50?

59

1      A. Because I got like -- on my TV I have, like,
2  a sleeper thing, right, my TV automatically cut off a
3  certain time.  And I put it on at 12 o'clock because I
4  always go to sleep around 12 o'clock.  I had reset it
5  because I knew I was going to be back, so I set it at
6  1:30.
7      Q. So you think it was 11:50 when you went out?
8      A. Yes, sir.
9      Q. Where did you go?  You say you got this call
10  from this girl, is there some place you were going to
11  meet up?
12     A. Yeah, she said her cousin lived in an
13  apartment building on 5th and Tatnell.
14     Q. Did she give you an address?
15     A. She said, Meet her out back because her
16  cousin had kids and she don't like older people around
17  her kids.
18     Q. Was anybody with you when you left your
19  house?
20     A. No, sir.
21     Q. When you left your house, if I could have the
22  witness stand down again, indicate, point your
23  direction of travel from your house.  Where you

60

1  went -- the pointer is still --
2      THE COURT:  The pointer is right here.
3  BY MR. BERNSTEIN:
4      Q. Start at your house on 6th street, where did
5  you go?
6      A. I went to Jefferson, then I went to
7  Washington, then I went up to West and I turned on
8  West Street and I headed down to 5th and West, and I
9  turned down 5th Street and walked to Tatnell.
10     Q. Okay.  While you were walking that route, did
11  you see anything unusual?
12     A. Cops.  I seen cops right around here.
13     Q. Okay.
14     A. That's it.
15     Q. More than one cop?
16     A. A lot -- that's why -- that's why I took this
17  route.  I saw these lights up here, that's why I took
18  it.  I wanted to see what was going on, plus it was,
19  like -- it was, like, on the way, like, to Tatnell.
20     Q. So you walked up -- all the way up 6th Street
21  because you saw police officers?
22     A. I wanted to see what was going on, plus it
23  was on the way anyway.

61

1    Q. It was what?
2    A. It was on my way to 5th and Tatnell anyway.
     Q. On your way to 5th and Tatnell. Did you
3    encounter anyone else? You said you saw police
5    officers, did you see anybody else? Was anybody else
6    out there?
7    A. Like around this area, yeah. I saw somebody
8    else, I ran into, like, three people.
9    Q. You ran into three people?
10   A. Yeah.
11   Q. Did you know those people?
12   A. One was Emmanuel. One was somebody named
13   Domna (sic), I lived by him. I don't know his last
14   name. And a girl named Sadday.
15   Q. One of the individuals, who's on trial, here
16   with you today is Emmanuel Robinson. Did you see
17   Emmanuel Robinson that night? Did you see that person
18   who's sitting in the back row?
19   A. I saw him -- I saw him at 5th Street.
20   Q. Now, according to Officer Derbyshire --
21   Officer Prada, he was with you, standing right next to
22   you, when you got arrest. Is that correct?
23   A. Yes, sir.

62

1    Q. What?
2    A. Yes, sir.
3    Q. He was with you or he was next to you?
4    A. Yeah.
5    Q. Was he with you?
6    A. Well, when we got arrested, yeah.
7    Q. Yeah?
8    A. Yeah.
9    Q. Had you ever seen that individual before that
10   evening?
11   A. Emmanuel?
12   Q. Yes.
13   A. I saw him, yeah. I saw him, like, two weeks
14   before, I don't see him every day.
15   Q. Had you seen him that evening before you
16   encountered him just before you got arrested?
17   A. No, sir.
18   Q. You can step back. When you got arrested out
19   on the street, on Tatnell Street between 4th and 5th
20   Street, what were you wearing?
21   A. I had a gray sweater on, it was -- it is
22   called Iceberg. It was a gray Iceberg sweater --
23   Q. What's an Iceberg sweater?

63

1    A. That's the name of it. It got different
2    Looney Toon characters on it.
3    Q. Okay. Was there some Looney Toon characters
4    on your shirt?
5    A. Yeah.
6    Q. What was it?
7    A. It was Pepe Le Pew and, like, -- I don't know
8    he's a certain cat. He's always trying to chase
9    somebody and kiss them.
10   Q. Do you recall what kind of pants you were
11   wearing?
12   A. I had on blue Dickie pants.
13   Q. Blue what?
14   A. They call it Dickie pants, it is, like,
15   construction pants.
16   Q. Okay. Did you have a hat on?
17   A. No, sir.
18   Q. Did you have -- did you have a white T-shirt?
19   A. I had a white T-shirt on, yes.
20   Q. Where was that?
21   A. It was under my shirt.
22   Q. Under the --
23   A. Under my sweater.

64

1    Q. Under your sweater, okay.
2        MR. BERNSTEIN: That's all I have, Your
3    Honor. Thank you.
4        THE COURT: Cross examination.
5            CROSS-EXAMINATION
6        MR. DONOHUE: Thank you, Your Honor.
7    BY MR. DONOHUE:
8    Q. Mr. Whitfield, you were at your residence at
9    10:30 on October 14th?
10   A. Yes, sir.
11   Q. And at 10:30 you received a phone call from a
12   female friend?
13   A. Yes, sir.
14   Q. And you said it is kind of, like, a
15   chat-line?
16   A. Yes, sir.
17   Q. All right. What's the female's name that
18   called you?
19   A. All I know -- her name was Cathy or something
20   like that, but I don't know for sure.
21   Q. But you think it is Cathy?
22   A. I thought it was Cathy because she always --
23   it sounded like Cathy anyway.

65

1    Q. You spoke to her before?
2    A. I spoke to her for like three weeks.
3    Q. So after three weeks of speaking to her you
4    think her name is Cathy. Why aren't you sure?
5    A. Excuse me? .
6    Q. After speaking to her for a period of three
7    weeks --
8    A. No, people don't give their real names.
9    Q. She gave you her name, but you weren't sure
10   if it was her real name?
11   A. Yeah.
12   Q. And how long did you speak to her on the
13   phone for?
14   A. About an hour -- probably about an hour.
15   Q. So you spoke to her until about 11:30?
16   A. Yes, sir.
17   Q. And she told you to come to where she lived
18   at that apartment complex at 5th and Tatnell?
19   A. No, she lived out in Newark, that's where she
20   said she lived at.
21   Q. She asked you to come to her cousin's
22   residence, which is at the apartment complex at 5th
23   and Tatnell?

66

1    A. Yes, sir.
2    Q. Now, in speaking to Cathy for three weeks,
3    I'm sure that she called you and you called her?
4    A. No, sir.
5    Q. She never called you?
6    A. She called me. I never called her.
7    Q. And this is a chat-line, so there's other
8    people on the line, also?
9    A. Yes, sir.
10   Q. I'm sorry. Who else was on the line?
11   A. What do you mean? Like, she called my phone,
12   like -- you meet them on the chat-line, so she called
13   my house, so it was just her and me on the phone.
14   Q. So you met her on a chat-line?
15   A. Yes, sir.
16   Q. And that chat-line is by phone?
17   A. Yes, sir.
18   Q. So the first time you met her was by
19   telephone?
20   A. Yes, sir.
21   Q. So you didn't meet her over the Internet?
22   A. No, sir.
23   Q. And she wanted you to come down to her

67

1    cousin's residence at 5th and Tatnell?
2    A. Yes, sir.
3    Q. And you -- after hanging up the phone with
4    her, you didn't leave your house until 11:50?
5    A. Yes, sir.
6    Q. And you know that because your TV is on a
7    sleeper?
8    A. Yes, sir.
9    Q. So when you left your house, you were alone.
10   Correct?
11   A. Yes.
12   Q. When you left the house was anyone else in
13   the house?
14   A. No. No.
15   Q. When you left your house were you alone?
16   A. Yes, sir.
17   Q. When you were home, was there anyone else
18   there?
19   A. My mom and my step dad.
20   Q. Your mom and who?
21   A. My step dad.
22   Q. Nobody else?
23   A. No, sir.

68

1    Q. So they saw you leave at about 11:50?
2    A. I don't know.
3    Q. But they were home?
4    A. Yes.
5    Q. And I don't want to confuse you, but I just
6    want you to read this map because this is what we have
7    been using it for, for most of the proceedings. Can
8    you see it to okay from up there?
9         THE COURT: I think you ought to turn it back
10   to the way he was oriented to the map.
11        MR. DONOHUE: Okay. Can you see it okay?
12        THE COURT: Mr. Donahue be mindful of the
13   jurors.
14        MR. DONOHUE: Yes, Your Honor.
15   BY MR. DONOHUE:
16   Q. Now, you live at about 626 --
17   A. 622.
18   Q. 622, 5th Street?
19   A. West 5th Street, correct.
20   Q. And that's in this area here?
21   A. Go down -- it is like on a -- it is like
22   where the other big block is, go down one other block
23   right there. No back your stick up a little bit,

69

1  right there.
2      Q. Right there. This is where your live and
3  when you left to go to 5th and Tatnell, you walked
4  down 6th Street. Correct?
5      A. Up 6th Street.
6      Q. And you continued to walk down 6th Street
7  because you saw police activity on 6th Street?
8      A. Yes, sir.
9      Q. And you wanted to see what was going on?
10     A. Yes, sir.
11     Q. And then you go all the way down 6th and you
12  make a right-hand turn on West Street?
13     A. Yes, sir.
14     Q. Okay. And you walk down West Street past
15  St. Peter's Cathedral?
16     A. Yes, sir.
17     Q. Correct. And that's when you walked down
18  West Street to 5th Street. Correct?
19         Now some time on 5th Street you testified
20  that you ran into three other people?
21     A. Yes, sir.
22     Q. And those people's names were I believe
23  Donald?

70

1      A. Domna (sic).
2      Q. What is that? Can you spell that? Do you
3  know how to spell that?
4      A. I don't know how to spell his name.
5      Q. Is that a male or female?
6      A. Male.
7      Q. And you ran into them on 5th Street.
8  Correct?
9      A. Yes, sir.
10     Q. So you -- so you come down 6th, make a right
11  on West and then you make a left on 5th and run into
12  them right on 5th before Tatnell Street?
13     A. Yes, sir.
14     Q. And you know Emmanuel. Correct?
15     A. I don't hang with Emmanuel, but I know him.
16     Q. You have seen him before?
17     A. Yeah.
18     Q. You have talked to him before?
19     A. Yes.
20     Q. And you know Sadday, you have talked to her
21  before, and you do know or at least you know their
22  names, right? You have talked to these people before?
23     A. Yeah.

71

1      Q. So when you ran into them at midnight, around
2  or about midnight on October 14th, you talked to them.
3  Right? You said hi to them?
4      A. Yes.
5      Q. And you walked with them. Correct?
6      A. What you mean? I didn't walk with Dom and
7  Sadday.
8      Q. You just walked with Emmanuel?
9      A. Yes, sir.
10     Q. So you stop -- do you actually stop and have
11  a conservation or do you walk and talk?
12     A. We stopped.
13     Q. So you stop and you talked to Sadday, Dom and
14  Emmanuel?
15     A. Yes, sir.
16     Q. And you exchange pleasantries, talk to them
17  for a couple of minutes; is that fair to say?
18     A. Yes, sir.
19     Q. And Dom and Sadday go in a different
20  direction than you?
21     A. Yes, sir. They go up like towards the cops.
22     Q. Okay. So, if -- if you're on 5th Street
23  here, they go which way towards 6th street?

72

1      A. They go up towards, like, West Street and
2  then turn on 6th Street. I mean turn on West Street
3  make a right on West Street.
4      Q. So they were walking toward you, in other
5  words -- all right, I'll frame the question better.
6      A. They weren't walking towards me, we were
7  standing there and they left, like, from me.
8      Q. Let me ask you the question then: You're
9  walking down 5th Street toward Tatnell. Correct?
10     A. Yeah, I turned off West Street.
11     Q. Right. You're walking towards Tatnell?
12     A. Yes, sir.
13     Q. That's when you see Dom, Emmanuel and Sadday?
14     A. Yes, sir.
15     Q. And they were walking toward you. Correct?
16  They were walking toward 5th Street towards where you
17  were?
18     A. I don't know because when I turned they were
19  already there, so I don't know.
20     Q. When you turned onto 5th Street they were all
21  just there?
22     A. Excuse me?
23     Q. They were all just right there?

73

1    A. Yeah.
2    Q. They weren't walking, they were standing?
     A. They were walking towards me.
     Q. So they were walking on 5th toward your
5    direction? In other words, you're walking toward each
6    other?
7    A. Yes, sir.
8    Q. Is that fair to say?
9    A. Yes, sir.
10   Q. And you probably saw them before Tatnell,.
11   they were probably on 5th heading toward Tatnell as
12   you were heading toward Tatnell?
13   A. No, sir.
14   Q. Where were they heading toward you?
15   A. They were probably in -- they were past
16   Tatnell in, like, the middle of the block between
17   Tatnell and West.
18   Q. So they were right here in the middle of the
19   block -- in the middle of West and Tatnell when you
20   ran into Emmanuel, Sadday and Dom?
21   A. Yes, sir.
22   Q. And you stopped, you talked to them for a
23   couple of minutes, and then you and Emmanuel went in a

74

1    different direction than Sadday and Dom?
2    A. Yes, sir.
3    Q. Sadday and Dom, which direction did they go?
4    A. They went up towards West and made a right.
5    Q. Okay. So they went up West Street towards
6    6th?
7    A. Yes, sir.
8    Q. And you and Emmanuel kept walking on 5th
9    towards Tatnell?
10   A. Yes, sir.
11   Q. And you're just walking, you're not running.
12   Right?
13   A. No, sir.
14   Q. And you would agree with me that you were
15   just walking casually?
16   A. Yes, sir.
17   Q. You get to -- let me make sure I'm correct
18   here -- you cross over Tatnell Street to the corner of
19   5th and Tatnell where the apartment complex is?
20   A. No, see, we were already across the street.
     I didn't have to cross the street to go to the corner
     and cross, because I already crossed the street
23   because they were across the street.

75

1    Q. Let's figure this out. You're walking on
2    5th and you meet up with Emmanuel, Dom and Sadday on
3    5th Street before you get to Tatnell?
4    A. Yes, sir.
5    Q. So when you meet up with them, you and
6    Emmanuel keep walking toward Tatnell?
7    A. After we talked.
8    Q. Right, after you guys talked?
9    A. Yes, sir.
10   Q. So then you two walk towards Tatnell and you
11   have to cross over Tatnell to get into that apartment
12   complex. Right?
13   A. Yes, sir, but we were already across the
14   street, so we didn't go to the corner of Tatnell and ·
15   5th and Tatnell, we walked across the apartment
16   building. We just walked across the street, like,
17   straight across instead of a diagonal.
18   Q. You and Emmanuel had to cross over Tatnell
19   Street?
20   A. Yes, sir.
21   Q. When you crossed other to Tatnell Street, you
22   went into the apartment complex?
23   A. Yes, sir.

76

1    Q. And you're in the apartment complex not very
2    long before you were contacted by the police.
3    Correct?
4    A. It had to be not too long, not too long.
5    Q. Would you say maybe less than a minute?
6    A. Yes, sir.
7    Q. Less than thirty seconds?
8    A. No.
9    Q. More than thirty second, but less than a
10   minute?
11   A. Yes, sir.
12   Q. And your purpose of entering this apartment
13   complex is to find Cathy's cousin?
14   A. No, she told me to meet her around back.
15   Q. She -- Cathy told you to meet her around
16   back?
17   A. Yes, sir.
18   Q. Now, if -- if this is Tatnell and 5th here,
19   and that is the apartment complex, around back would
20   be toward Orange?
21   A. Around back would be like -- like, a little
22   parking lot, like, a little parking section.
23   Q. Right. It would be back here?

**77**

1  A. Yeah.

2  Q. And I'm indicating about the center of the

3  block. Right?

4  A. No. It would be directly behind it. So it

5  is more like towards, like, 5th Street, not the center

6  of the block, the center of the block would be -- it

7  would be like a big parking lot, like, where the

8  Salvation Army buses would be at.

9  Q. So you took it to meet on 5th Street, closer

10  to 5th Street, that's what you considered to be the

11  back of the apartment complex; is that fair to say?

12  A. Closer to Tatnell Street, yeah.

13  Q. Okay. But closer to 5th?

14  A. Closer to Tatnell, 5th and Tatnell.

15  Q. Okay. All right. So you get to the

16  apartment complex and you're with Emmanuel, you're in

17  the apartment complex for maybe thirty seconds and

18  that's when the police come up to you?

19  A. A little over thirty seconds.

20  Q. I'm sorry, less than a minute and the police

21  contact you?

22  A. Yes, sir.

23  Q. And they ask you what you were doing there?

**78**

1  A. At the time?

2  Q. They didn't ask you why you were there?

3  A. No, sir.

4  Q. When you were walking with Emmanuel, did you

5  find it odd that he didn't have a T-shirt on?

6  A. He had a shirt on.

7  Q. So he wasn't bare-chested?

8  A. No, sir.

9  Q. And while he was with you, he always had a

10  shirt on?

11  A. I didn't hang with him like that, some times

12  he played a lot of basketball, you don't have a shirt

13  on when you play basketball.

14  Q. From the time that you met up with Emmanuel

15  till the time that you were stopped by the police, he

16  had a shirt on?

17  A. Oh, yes, sir.

18  Q. And you never observed Emmanuel running

19  anywhere?

20  A. No, sir.

21  Q. And you didn't run anywhere?

22  A. No, sir.

23  Q. So you weren't sweating?

**79**

1  A. No, sir.

2  Q. And you weren't breathing heavy?

3  A. No, sir.

4  Q. And your heart wasn't racing?

5  A. Yeah, my heart as racing.

6  Q. Your heart was racing because you were going

7  to meet a girl?

8  A. Because I had like six cops out with their

9  guns on me.

10  Q. So once the police officers stopped you,

11  that's when your heart started racing?

12  A. When they pulled their guns out.

13  Q. Okay. And you told the police officer,

14  Officer Prada, that the reason that you were in that

15  apartment complex was to meet a girl?

16  A. Yes, sir.

17  Q. Did Cathy ever tell you how old she was?

18  A. She said she was a little older than me

19  because I told her I was 17. She kept calling me a

20  baby, so she said, Yeah I'm older than you.

21  Q. You told Officer Prada that you were

22  specifically there to meet an older girl?

23  A. Yeah, she said she was older than me. I

**80**

1  don't know how old she was.

2  Q. But you told Officer Prada that you didn't

3  know her name?

4  A. Excuse me, I said I think her name was Cathy,

5  something like that. You don't give real names so she

6  was like -- so you assume you don't really know her

7  name. Then I was, like, yeah, I don't know her real

8  name that's her chat-line name.

9  Q. But your testimony is that you told Officer

10  Prada that you were there to see Cathy?

11  A. I said, I didn't know her name really, I

12  didn't know her. I didn't say Cathy. I said I really

13  don't know her name, but it might be Cathy or

14  something like that.

15  Q. So you suggested to Officer Prada that you

16  don't know her name, but it might be Cathy?

17  A. Yeah, I said I know her chat-line name and

18  it -- I said -- excuse me, I'm a little nervous right

19  now. But it was like when I was talking, when I first

20  talked to him he was like -- he read me my rights and

21  all that stuff. And he said, What were you doing at

22  the apartment building?

23  I said, I was there to meet a female.

81

1  He was, like, What's her name?
2  I said, It might be Cathy.
3  So he was like, I guess you don't know her
4  real name.
5  And I was, like, No.
6  And he was, like, how old is?
7  I said, I don't know, she might be a little
8  older than me, so I don't know her real name or real
9  age.
10  Q. Did you tell Officer Prada that you were
11  there to meet a girl whose name you thought was Cathy?
12  A. Yes, sir.
13  Q. Okay. And this women, Cathy, who you have
14  been on a chat-line with her before, what is her
15  chat-line name?
16  A. Excuse me?
17  Q. You said chat-line name?
18  A. That's her chat-line name, Cathy. You don't
19  use your real name on it.
20  Q. So that's the name you always go by, Cathy?
21  A. Yes.
22  Q. Now, when the police stopped you, you're
23  standing with Emmanuel. Correct?

82

1  A. I wasn't standing with him, I was walking
2  inside.
3  Q. You were walking with each other, you were
4  standing next to him or walking next to him?
5  A. Yes, sir.
6  Q. And you would agree with me that on this
7  night other than Sadday and Dom, you didn't see anyone
8  else on the streets?
9  A. Yes, sir. I seen people on 6th Street.
10  Q. So there were people up on 6th?
11  A. Like 6th and Jefferson.
12  Q. 6th and Jefferson, and when did you see them?
13  A. When I went outside.
14  Q. So when you came out of your house here,
15  there were people in this general vicinity, 6th and
16  Jefferson?
17  A. Yes, sir.
18  Q. But you would agree with me that when you got
19  down to 5th and West, you didn't see anyone other than
20  Sadday and Dom and Emmanuel?
21  A. And the police.
22  Q. Other than the police, there were no other
23  people out walking the streets?

83

1  A. No, sir.
2  Q. What did you tell -- what did you tell
3  Emmanuel -- where did you tell Emmanuel you were
4  going?
5  A. I told him I was going to meet somebody out
6  off the chat-line.
7  MR. DONOHUE: May I have one moment, Your
8  Honor?
9  THE COURT: Yes.
10  BY MR. DONOHUE:
11  Q. How long have you known Emmanuel Robinson?
12  A. I don't know, probably since we were babies.
13  Q. You guys have been good friends for a long
14  period of time, haven't you?
15  A. No, sir, because after I was, like, seven, he
16  disappeared. I didn't know where he went.
17  Q. So since you were 7 year's old, you haven't
18  been good friends with Emmanuel Robinson?
19  A. No, sir.
20  Q. Just casual acquaintances?
21  A. Yes, sir.
22  Q. You see him, you say hi to him, that's it?
23  A. You know what I mean, sometimes we try to get

84

1  together, sometimes, but not a lot.
2  Q. Now, if -- if the police officer said that
3  you told him you met this women over the Internet that
4  would be incorrect?
5  A. Yes, sir.
6  Q. And if the officer said that you told him
7  that you didn't have a name of the person that you
8  were going to meet, that would also be incorrect?
9  A. Yes, sir.
10  Q. And if the officer said that you were
11  sweating and out of breath, that would be incorrect?
12  A. Yes, sir.
13  Q. And if the officer said that Emmanuel
14  Robinson didn't have a shirt on, that would also be
15  incorrect?
16  A. Yes, sir.
17  MR. DONOHUE: May I have one more moment,
18  Your Honor?
19  THE COURT: Yes.
20  BY MR. DONOHUE:
21  Q. And you have been present throughout the
22  entire trial. Correct?
23  A. Yes, sir.

85

1    Q. And you have heard every witness that's
2    testified?
3        A. Yes, sir.
4        Q. And you have seen just about every piece of
5    evidence that's been admitted. Correct?
6        A. Yes, sir.
7        MR. DONOHUE: I have no further questions.
8        THE COURT: Mr. O'Connell?
9        MR. O'CONNELL: I have no questions of this
10   witness.
11       THE COURT: Mr. Bernstein --
12       MR. BAYARD: I have no questions for him,
13   thank you, Your Honor.
14       MR. BERNSTEIN: Just a couple on recross.
15       THE COURT: Okay.
16       REDIRECT EXAMINATION
17   BY MR. BERNSTEIN:
18       Q. Mr. Whitfield, do you have a computer at
19   home?
20       A. No, sir.
21       Q. Do you know what the Internet is?
22       A. I know what it is, but I don't know how to
23   get on it.

86

1    Q. Did you ever hear the term "chat room"?
2        A. On the computer?
3        Q. Yeah.
4        A. Yes, sir.
5        Q. Do you know what that is?
6        A. It is like, I don't -- I don't know what it
7    is, but I -- it is like when you meet somebody or
8    something. I don't know.
9        Q. Okay. And you told Detective Prada you met
10   this girl on a chat-line?
11       A. Yes, sir.
12       Q. Okay. Thank you.
13       THE COURT: Is that all?
14       MR. BERNSTEIN: Yes, that's all.
15       THE COURT: Anything further from the State?
16       MR. DONOHUE: Yes, Your Honor.
17   BY MR. DONOHUE:
18       Q. So it's just a coincidence that you were with
19   Emmanuel Robinson five minutes after Anthony Meek was
20   shot?
21       MR. BERNSTEIN: Your Honor, objection, how is
22   this witness possibly going to know it was
23   coincidentally.

87

1        THE COURT: Sustained.
2        MR. DONOHUE: I have nothing further.
3        THE COURT: Anything further from any of the
4    other defendant's?
5        MR. O'CONNELL: No, Your Honor.
6        MR. BAYARD: No.
7        THE COURT: Okay. You may step down.
8        Ladies and gentlemen the next available
9    witness can't be here until four o'clock. I don't
10   think the testimony is going to be very lengthy, but
11   we can't proceed until four o'clock. So you are
12   excused until four o'clock and our expectation, I
13   believe, last I heard, is that that witness will
14   complete Mr. Bernstein's case. Is that correct?
15       MR. BERNSTEIN: That's correct, Your Honor.
16       THE COURT: Okay.
17       MR. BERNSTEIN: As we indicated, we should be
18   ready for closing arguments first thing Thursday
19   morning.
20       THE COURT: Okay. All right, so you're
21   excused until four o'clock. Have a real nice long
22   lunch hour.
23       (The jury left the room at 12:20 p.m.)

88

1        THE COURT: Counsel, why don't we meet in
2    chambers at three. Does that sound right?
3        MR. BERNSTEIN: That's fine.
4        MR. O'CONNOR: Yes, Your Honor.
5        MR. O'CONNELL: Yes.
6        MR. BAYARD: Yes, Your Honor.
7        THE COURT: That gives us enough time to talk
8    about the legal issue you raised earlier and to talk
9    about the jury instructions. And I'd like a proffer
10   as to what this last witness will say, just so I have
11   a sense of what the totality of the evidence will be.
12       MR. BERNSTEIN: Basically this witness gives
13   a somewhat different account of the timing of the
14   Attempted Robbery that Mr. Meek says. Essentially,
15   this witness also lived facing this alleyway, this
16   witness had given a statement to police that night or
17   the next day, indicated that she heard shots then --
18   she looked out her window and saw an occupant of a
19   vehicle get out of that vehicle and walk up the
20   alleyway after the shots were fired.
21       THE COURT: Okay. So she's unrelated to any
22   of the parties just another --
23       MR. BERNSTEIN: That is correct. She

**89**

1  lives --
2       THE COURT: Okay. All right.
3       MR. BERNSTEIN: At least at that time lived
4  facing this alley --
5       THE COURT: Okay. Please come with your
6  draft jury instructions and we'll try to resolve this
7  as we can today at three o'clock.
8       MR. O'CONNELL: Would you like us -- I have
9  this additional -- you may recall I have an additional
10  identification instruction.
11       THE COURT: Yes, if you want to hand it up,
12  whatever you have.
13       MR. O'CONNELL: I apologize. I just printed
14  it off from the previous trial and I just handed it
15  out. I have changed the pronouns.
16       (Whereupon, Court is in recess until 3:00).
17       (3:00 office conference in Judge Del Pesco's
18  chambers.)
19       THE COURT: Is there anything you want to
20  bring to my attention?
21       MR. O'CONNOR: The State doesn't have
22  anything additional that we want to discuss.
23       THE COURT: You guys have read these.

**90**

1       MR. BERNSTEIN: Yes.
2       THE COURT: Okay. We have the -- the issues
3  that were on the table yesterday, is there anything
4  else anybody wants to add to the arguments?
5       MR. O'CONNOR: I would like to address the
6  request by Mr. Bernstein for the
7  Fedmine/Washington-type instruction.
8       THE COURT: Okay. Go ahead.
9       MR. O'CONNOR: It is the State's position
10  that that instruction is not necessary or warranted in
11  this case. Fedmine and Washington are cases which
12  dealt with crimes, and crimes that were -- for
13  example, in Washington a defendant charged with two
14  Robbery First Degrees and two weapons offenses both
15  arising out of the same course of conduct. The one
16  robbery points to a robbery --
17       THE COURT: I read the case.
18       MR. O'CONNOR: The other was factually
19  different, but the jury had to decide were there two
20  robberies or was it just one. Similar issue in
21  Fedmine, was it really -- was this one sexual act or
22  was this a series of rapes. This case is different.
23       This case -- the question is not did the

**91**

1  State charge two or three robberies and whether
2  there's individual robberies, it is: Is there a
3  Robbery? Is there an Assault Second Degree? Is there
4  Reckless Endangering charge? The Supreme -- the
5  Delaware Superior Court and the Delaware Supreme Court
6  have both previously held that Robbery and Assault are
7  distinct independent offenses. They are not included
8  in one another. They are independent offenses which
9  require proof of different facts.
10       Looking at Hackett v. State, 569 A.2d 79
11  applying Blockberger to the case and 11 Delaware Code
12  Section 206, the Court said neither of these offenses,
13  meaning Assault First Degree or Robbery First Degree,
14  is a lesser offense of the other. And that they are
15  distinguished factually and, therefore, there is no
16  double jeopardy or other confer, whether or not a
17  person is convicted of both offenses through one
18  continuous act.
19       The same applies to the decision by Judge
20  Balick, which is State v. Andrews, 1987 Westlaw 828.
21       THE COURT: If you're going to cite cases,
22  tell the other parties in advance that you're going to
23  cite them, so they can respond under these

**92**

1  circumstances. I really do get the issue here.
2       MR. O'CONNOR: Okay.
3       THE COURT: I have a couple of questions for
4  you. Yesterday, when I reviewed the indictment with
5  you, you indicated to me that you were going to argue
6  that the Attempted Robbery and the Reckless
7  Endangering were focused around the car, the initial
8  contact with Mr. Meek; and that the Assault Second was
9  related to the period of time when he was chasing the
10  three, after he had got up from ground and chased the
11  three people who had stopped him.
12       Now, it appears to me that in order to prove
13  an Assault Second -- and the way that you got it
14  indicted, you've got to argue that the second
15  discharge of the weapon caused the injury. Is that
16  what you intend to do?
17       MR. O'CONNOR: Yes, Your Honor.
18       THE COURT: So that's a factual basis for
19  these separate charges.
20       MR. O'CONNOR: Yes, Your Honor.
21       THE COURT: Okay. All right. I have already
22  heard arguments from the defendant's, is there
23  anything you feel the need to respond to?

93

1    MR. BERNSTEIN: Let me see if I can kind of
2  encapsulate our position.
3    MR. O'CONNOR: Your Honor, if I can just say
4  one thing, just to get on the record. In addition to
5  being independent offenses, Mr. Bernstein cited Poteat
6  for the proposition that Menacing is an included
7  offense of Robbery First Degree. What really Poteat
8  said was Menancing was a lesser-included offense of
9  Robbery First Degree, because it has the same element
10  and that's not the case here.
11    For that reason, it is the State's position
12  that Poteat doesn't apply either. I guess my point is
13  the State would object to any jury instruction
14  regarding Washington and/or Fedmine; however, if the
15  Court is inclined, the State's purposed instruction,
16  which I submitted yesterday, which was what the Court
17  gave in Fedmine, I just amended it to these offense.
18    THE COURT: Okay. I'm not sure I know which
19  form it is, I have got so many papers.
20    THE COURT: Mr. Bernstein, please don't
21  repeat what you said before.
22    MR. BERNSTEIN: I'm going to try not to. I'm
23  going to keep it to, like, two minutes, all right.

94

1    I think the starting point is you have to
2  look at Section 206 and say, what is an included
3  offense? And the definition of an included offense
4  and offenses included in another offenses, if it can
5  be proved by some or less than the same elements of
6  another offense. And our position is, if you read
7  Poteat and Washington together and apply that
8  definition, that Reckless Endangering is an included
9  offense to Robbery Second Degree -- Attempted Robbery,
10  the way it is indicted and so is assault.
11    Washington says that the Court has to make an
12  initial determination of this. And if the Court
13  decides to send it to the jury, then the Court also
14  has to instruct the jury on this factual issue. If
15  the Court says -- if there's insignificant evidence,
16  then the Court should not even send it to the jury on
17  the multiple offenses issue.
18    If the Court thinks there is significant
19  evidence, if the jury could either find there were
20  multiple offenses or the same offense, the Court has
21  to submit that factual issue to the jury. That's what
22  Washington says, and that's what we're asking the
23  Court to do.

95

1    The Court has already denied our motion,
2  that's okay. But when the Court does that, I think
3  Washington is pretty clear, and I don't know how --
4  you know, I don't know how you get around that.
5    THE COURT: Do you want to join in,
6  Mr. O'Connell and Mr. Bayard?
7    MR. O'CONNELL: I agree.
8    MR. BAYARD: Point well made, Your Honor.
9    MR. O'CONNELL: To supplement in submitting
10  the matter to the jury, I believe the instruction I'd
11  go with either instructions; although, I prefer
12  Mr. Bernstein's instruction on the factual issue of
13  whether or not this is continuous course of conduct.
14  And I drafted an interrogatory to the jury that would
15  answer that question as well, I can suggest that to
16  the Court.
17    THE COURT: Yeah, tell me what it is?
18    MR. O'CONNELL: If you look at your verdict
19  sheet as it now stands, you have the first three
20  counts -- the two -- first two counts and you get to
21  question three, Assault Second Degree, before that I
22  would insert the question: Do you find the conduct in
23  this case to be one continuous course or not? If yes,

96

1  go under question seven.
2    In other words, skipping addressing the
3  Assault and Reckless Endangering counts and their
4  accompanying firearm charges; that's not part of the
5  interrogatory, the part I just said. And if no,
6  answer questions four through six. They would be
7  renumbered. Four would now be the Assault Second
8  interrogatory.
9    THE COURT: Okay. All right. And the other
10  issue that we had was amending the indictment. Did
11  you want to be heard on that?
12    MR. O'CONNOR: I have decided not to attempt
13  that. Under Rule 7 I don't know that amending the
14  indictment by striking language would ultimately fly,
15  because it could effect the substantial rights of the
16  defendants, which is what the test is. So I don't
17  have any application with respect to amending the
18  indictment.
19    THE COURT: Okay. And the last issue was the
20  Lolly issue.
21    MR. O'CONNOR: The State's position is still
22  the same that the instruction should not be given,
23  because there is no convincing evidence that that

97

1  evidence was ever created in the first place or
2  existed at any time.
3          And -- as Mr. O'Connell said yesterday, what
4  is the remedy? If such evidence existed, what should
5  the Court do in that circumstance? And to then
6  suggest that it was this potential evidence that if it
7  was ever made was lost, and that should exculpate his
8  client, is well beyond any type of fair resolution, in
9  the State's mind.
10         THE COURT: Anybody else want to add
11  anything?
12         MR. BERNSTEIN: Your Honor, just one point,
13  maybe I'm not sure. When we talked yesterday about
14  the sentence, the Court had included that on page 20?
15         THE COURT: Yeah.
16         MR. BERNSTEIN: Is that in or out?
17         THE COURT: Well --
18         MR. BERNSTEIN: There -- and there's another
19  place.
20         THE COURT: You asked me a question: Do you
21  want me to answer it or not?
22         MR. BERNSTEIN: Yes.
23         THE COURT: Based on what the State has just

98

1  confirmed that they are going to argue it, which is a
2  repeat of what they said yesterday, I will take it out
3  and let them argue and let you argue.
4          I do think that if -- it would be helpful to
5  have a specific statement by the jury as to when they
6  found the injury to the foot to have occurred. Just
7  because I think it will make it clearer, but I'm not
8  going to insist on it. If you don't want it, I'm not
9  going to put it in, so just keep it simple.
10         MR. BERNSTEIN: I'm trying to remember where
11  the --
12         MR. O'CONNELL: 25. Page 25.
13         THE COURT: Both of them are coming out.
14  That's why I asked you about the jury instructions to
15  begin the conversation here, Gentleman. Okay. Is
16  there anything else?
17         MR. O'CONNELL: We kind of cut off the Lolly
18  discussion. Not to rehash, but there are three points
19  here that demonstrate that there was, in fact,
20  fingerprinting done. It is good police practice to
21  fingerprint the weapon in a case. The Chief
22  Investigating Officer asked that the fingerprinting
23  occur, and there's physical evidence to substantiate

99

1  the fingerprinting occurred in this case, according to
2  the police officer.
3          There's nothing to say they didn't occur
4  except for a Lolly situation, the absence of a report.
5  And so what, you know, it could be exculpatory to my
6  client. And if the fingerprinting was done and they
7  have his fingerprints that evidence would be favorable
8  to him.
9          Under Lolly, the instruction the Supreme
10  Court has suggested, I have provided the Court, I
11  think that's an appropriate remedy in this case.
12         THE COURT: Anybody else to be heard?
13         MR. O'CONNOR: Just because he asked that it
14  be heard, doesn't mean it -- that it should be done.
15  I don't think that's a fair assessment of reasons why
16  the test was necessarily done. The officer said he
17  didn't know if it was done at all.
18         THE COURT: Okay. Well, let me just address
19  these things in reverse order.
20         As to the Lolly instruction, I'm not going to
21  give it, and the reason is that the negligence
22  considerations are important of the evidence and the
23  sufficiency of other evidence in this instance. We

100

1  have the WILCOM print out. We have the testimony of
2  the arrest -- Officer Derbyshire testified that he saw
3  these three men coming around the corner running, and
4  they made a decision to find out why, and they stopped
5  them, and it is clear from the WILCOM sheet and from
6  his testimony that they weren't aware that there was a
7  crime.
8          At this point, they just wondered why these
9  guys were running. And two of the people fled, they
10  detained one and there was a gun in the vicinity and
11  he picked up the gun. And he wanted to make sure that
12  it was safe, so he did what it took to unload it. And
13  I don't find any negligence in that conduct under
14  those circumstances.
15         The importance of the missing evidence,
16  the -- it would be beneficial to Mr. Coleman, if there
17  were no fingerprints found on the gun. I suppose
18  beneficial to all defendants if fingerprints weren't
19  found on the gun, but there were no prints. And I
20  suppose the defense will argue that there is no
21  evidence of any fingerprints.
22         But I don't find that that is -- it couldn't
23  be exculpatory. It could only be incriminating

101

1  because clearly we all know there may or may not be
2  fingerprints on any object that's been touched or not
3  touched.
4      And the other thing is the significance of
5  the other evidence. We're dealing here with
6  identification of the Defendant Coleman, whose face
7  was not covered according to the victim. And we have
8  got incredibly close time proximity. We have got
9  things happening within a minute or less maybe. A
10  very short period of time, and time -- and on the
11  basis of that, I'm not going to give a Lolly
12  instruction.
13      With regard to this motion for judgment of
14  acquittal, I think that the defendant's misread
15  Washington. The judgment of acquittal on Assault
16  Second and Reckless Endangering on the grounds that
17  the crimes were a single course of conduct, not
18  distinct acts, which permitted multiple counts. The
19  testimony of the victim provides separate convictions
20  of Robbery First and Assault Second. The Robbery
21  First allegedly occurred near the victim's car. When
22  he was told to give up his keys, he resisted, a
23  scuffle ensued and a firearm discharged. The three

102

1  perpetrators could not have foreseen the victim would
2  chase them.
3      Consequently, no perpetrator formed the state
4  of mind a second time until the situation arose. When
5  the victim gave chase -- the victim gave chase and one
6  of the perpetrators turned and fired a second time.
7      It is the second firing which forms the basis
8  for the charge of Assault in the Second Degree.
9      There's a factual issue as to whether the
10  victim was injured at that final time or at the time
11  of the first shot or at the time of the second shot.
12      He said he didn't feel any pain in his foot
13  until the second shot was fired, but he had been able
14  to run until that point.
15      And as you know the police officers came on
16  the scene inadvertently. They weren't aware of the
17  crime. The two of the men fled over a fence, the
18  third man was detained; and the gun that was linked by
19  the ATF testimony to the cartridge was found in the
20  vicinity where the earlier shooting was located on the
21  ground near where one of the defendant's was
22  apprehended.
23      There was a separation of the two incidents

103

1  between time and some place. There's also a factual
2  basis for a separate intent for the intent to shoot a
3  second time, which could not have been formed until
4  the victim undertook to pursue the perpetrators.
5      I'm not going to give any instruction that's
6  related to the Washington case.
7      As to the Reckless Endangering, the State
8  contends that when the defendant fired the gun in
9  connection with the Attempted Robbery that constituted
10  Reckless Endangering. The elements of Reckless
11  Endangering are that reckless conduct that created a
12  substantial risk of death.
13      The victim testified that he grabbed one of
14  the perpetrators, held him between himself and the
15  perpetrator with the gun, who was trying to get a
16  clear shot.
17      Now, I wrote those words in my notes "trying
18  to get a clear shot," I think that that's a quote from
19  the testimony of the victim.
20      The gun was fired at or about the time the
21  victim fell. I don't remember if he said he had
22  already fallen when the gun was fired or he fell after
23  the gun was fired. What's your recollection?

104

1      MR. BAYARD: After he fell.
2      MR. O'CONNOR: That he was already on the
3  ground.
4      THE COURT: He was already on the ground when
5  the gun twice fired.
6      MR. BAYARD: That is correct.
7      THE COURT: And then the gun was fired and
8  the three perpetrators ran away and the guy had to get
9  up; and then he started pursuing them and the victim
10  testified that the second shot was fired from a
11  distance away.
12      So I think that there's a perfectly logical
13  basis, in fact, for the three separate charges.
14      There's reason here. There's no double
15  jeopardy issues. And really the simplest explanation
16  that the State argued is this isn't multiple counts of
17  the same crime. These are three different crimes. It
18  is not this scenario where there are multiple acts of
19  rape or multiple acts of robbery, such as the
20  Washington case was.
21      I think I got that right. Was Washington the
22  guy who kept taking things? So, anyway, the
23  application is denied and I think that takes care of

105

1    the issues.

2        MR. BERNSTEIN: I would just ask the court

3    reporter to transcribe the purposed instruction to

4    make it part of the record in some way.

5        THE COURT: We can mark it as an exhibit.

6        MR. BERNSTEIN: Mark it as a Court Exhibit.

7    We can do it.

8        THE COURT: All right. Going back to the

9    instructions then, everything is good to go, are there

10   any --

11       MR. O'CONNOR: I think you were going to add

12   a Reckless Endangering.

13       MR. O'CONNELL: As a lesser-included as

14   Reckless Endangering First.

15       THE COURT: I understand, but I -- I guess

16   the issue I have or thought that I have is that when

17   the victim testified -- and I didn't remember this

18   when you were in here yesterday, I didn't remember it

19   until I did my notes last night that he was trying to

20   get a clear shot.

21       You know, I don't know that -- that's a

22   pretty strong indication of at least injury, I suppose

23   that's your argument, you know, if he was trying to

106

1    get a clear shot at his head or a clear shot of his

2    foot.

3        MR. O'CONNELL: I think under the State's

4    version of the Reckless Endangering, the shot was

5    fired more to break this up not to hurt somebody, but

6    to scare -- and to -- let's get out of here. It had

7    that effect at least so the jury could find that that

8    was the way the gun was fired, not with intent to

9    cause death.

10       The reason why it's charged, why it is

11   Reckless First, the victim did also testify that he

12   believed that shot was fired at him or in his

13   immediate direction.

14       THE COURT: Yeah, that's right.

15       MR. O'CONNELL: It is a fact, yes.

16       MR. O'CONNOR: But argued under Reckless

17   Endangering Second Degree, substantial risk of death

18   or seriously bodily harm.

19       MR. O'CONNELL: Or just physical injury is

20   all right.

21       THE COURT: All right. I'll give the lesser

22   included.

23       MR. O'CONNELL: And change the verdict sheet

107

1    so that would be a different sub part.

2        THE COURT: Okay. Anything else?

3        MR. BERNSTEIN: No.

4        MR. O'CONNOR: No, Your Honor.

5        (Whereupon, the office conference ended.)

108

1    STATE OF DELAWARE:
2
3    NEW CASTLE COUNTY:
4
5        I, Michele R. Honaker, Official Court
6    Reporter of the Superior Court, State of Delaware, do
     hereby certify that the foregoing is an accurate
7    transcript of the proceedings had, as reported by me
     in the Superior Court of the State of Delaware, and
8    supervised by Kathleen D. Feldman, Chief Court
     Reporter, RPR, in and for New Castle County, in the
9    case therein stated, as the same remains of record in
     the Office of the Prothonotary at Wilmington,
10   Delaware, and that I am neither counsel nor kin to any
     party or participant in said action nor interested in
11   the outcome thereof.
12       WITNESS my hand this _____ day of
13       _____, 2004.
14       _____
         MICHELE R. HONAKER
15       SUPERIOR COURT REPORTER
         Cert#156-PS
16
17
18
19
20
21
22
23

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,    ID#0210009172
0210009188
0210008663

v.

AKEEM S. COLEMAN and,
EMMANUEL M. ROBINSON and
MUSTAFA WHITFIELD
Defendants.

BEFORE:  HONORABLE SUSAN C. DEL PESCO, J.
and jury

APPEARANCES:

MARTIN B. O'CONNOR, ESQ.
STEPHEN DONAHUE, ESQ.
Deputy Attorney General
for the State

KEVIN J. O'CONNELL, ESQ.
for Defendant Akeem Coleman

JAMES A. BAYARD, ESQ.
for Defendant Emmanuel Robinson

JOSEPH M. BERNSTEIN, ESQ.
for Defendant Mustafa Whitfield

---

000221

**ORIGINAL**

- - - - - - - - - - - -
TRIAL TRANSCRIPT
FEBRUARY 6, 2004
- - - - - - - - - - - -

SUPERIOR COURT REPORTERS
500 North King Street, Suite 2609
Wilmington, Delaware 19801-3725
(302) 255-0570

---

1  February 6, 2004
Courtroom No. 4-A

3  PRESENT:

4      As noted.

5      - - - - -

6      THE COURT: Looks like everybody is here,
7  ready to begin?
8      Mr. Bernstein, did you get your document
9  marked as a court exhibit?
10      MR. BERNSTEIN: Your Honor, my request would
11  be that, just for appeal purposes, it would be easier
12  if the requested instruction were transcribed as part
13  of the record rather than some exhibit.
14      THE COURT: I'm not going to take the time to
15  do that now.
16      MR. BERNSTEIN: I can do that later, if
17  that's okay, or with the court reporter's permission,
18  the court reporter could simply transcribe the writing
19  and make it part of the record.
20      THE COURT: Okay. It is denied. We'll --
21  we're not going to impose it on the court reporter.
22  It is marked. We're good to go.
23      I also would like all of you, after

---

1  summations, we'll probably break before I charge to
2  review with the clerk all of the exhibits so that we
3  make sure everything is going back is what's supposed
4  to go back in. No there's no suppressed evidence here
5  in the mix, so we're not at risk for that, but I think
6  it is important that you double check with everything,
7  with the clerk, when you have an opportunity to do so.
8      MR. DONAHUE: Your Honor I only have one
9  question, can we set up the easel really quickly, is
10  there a location that Your Honor would like to easel
11  to be?
12      THE COURT: That's fine. I don't mind that I
13  can't see.
14      MR. DONAHUE: Okay.
15      THE COURT: Okay, jury, please.
16      (The jury enter the room at 11:08 p.m.)
17      THE COURT: Good morning, ladies and
18  gentlemen. The State -- Mr. Donahue, would you like
19  to sum up.
20      MR. DONAHUE: Yes, Your Honor, thank you.
21  Ladies and gentlemen, this case is about a young man
22  named Anthony Meeks, who is victimized in his own
23  backyard. In the neighborhood he grew up in, behind

---

**5**

the house that he called his home for most of his life. A place he decided to return after living in Atlanta for almost ten years.

And Anthony Meeks is a hard working, young man trying to make a living for himself and his six-year-old daughter.

In fact, on October 14, 2002, Anthony worked a double shift that day. He got off late at night. And when he returned home, he was unable to find a parking spot on Washington Street so, as was his normal practice when there are no spots available on Washington, he parked behind his house on Willing.

When Anthony gets out of his car that evening, he's approached by three black males, two of which tried to hide their identity by wearing white T-shirts around their faces. Akeem Coleman has a loaded nine millimeter handgun. This handgun. The handgun was operational and it is a weapon with one design and one purpose, Akeem Coleman didn't hide his face that night. In fact, when he was standing with Whitfield and Robinson in front of Anthony Meek, approximately two feet from Anthony Meek, Akeem Coleman took that gun in his right hand and he raised

**6**

it head level, pointing it directly at Anthony Meek. And he demanded, Give up the keys. Give up the keys.

The three defendants were attempting to take something from Anthony Meek that Anthony had worked hard to get, and that was his car. But Anthony refused to be a victim. He said to them, How are you going to rob me in my own neighborhood? Anthony refused to hand over his keys. With Anthony holding his keys in his right hand and he would not released his grip, that is when Emmanuel Robinson jumped in the action. He went over to Anthony and went to grab his hand to get the keys out of Anthony's hand, but unrelenting Anthony Meek would not give in, and a struggle ensued.

And you heard Anthony Meek testify that when the individual, who grabbed his hand -- when the individual grabbed his hand, he struggled with that person and actually was able to pull that person close to his body.

And he was keeping that person between him and Akeem Coleman, the person with the gun.

Anthony Meek testified that Akeem -- it seemed to Anthony Meek that Akeem Coleman was trying

**7**

to get a clear shot and that's when Mustafa Whitfield chimed in.

What did he say? He demanded to Akeem Coleman, Shoot him. Shoot him. Anthony Meek feared for his life, but he would not be victimized. Anthony and Emmanuel Robinson are struggling. Anthony Meek is trying desperately to keep Robinson's body in front of his, and that's when they fall back over the curb.

When they fell back over that curb, Mustafa Whitfield was trying to get Emmanuel Robinson out of there. He was over with the other two, with Anthony Meek and Emmanuel Robinson, trying to get Emmanuel Robinson away from Anthony Meek.

And you heard Anthony Meek testify that in doing so Mustafa Whitfield kicked Anthony Meek. Finally, Emmanuel Robinson broke free; that's when Akeem Coleman discharged the firearm for the first time. He discharged the firearm directly in Anthony Meek's direction. Nothing more was said and the three defendants ran away. But Anthony Meek was angry and his anger that night caused him to do something that not many other people would do, and, that is, he chased after those three defendants.

**8**

And that's when Akeem Coleman observed this, he turned and fired a shot again. Now, prior to the shot, Anthony Meek was running. He was chasing them. But after Akeem Coleman turned and fired that second shot, he was unable to run and felt substantial pain in his foot.

This, ladies and gentlemen, is presented in the evidence, was Anthony Meek's shoe the night of October 14th. That was Anthony Meek's foot.

Now, during the struggle between Emmanuel Robinson and Anthony Meek, Emmanuel Robinson was able to get away. But Emmanuel Robinson left something there, he left that white T-shirt at the scene. And that white T-shirt, ladies and gentlemen, had a small piece of Emmanuel Robinson in the collar, and it was his DNA.

Now, when Anthony Meek was in the hospital -- excuse me, Anthony Meek was taken to the hospital and while at the hospital his foot was operated on. He was unable to work for three months. He still has pain and discomfort today, 15 months after he was shot.

Much of what happened to Anthony Meek is

9

1  uncontroverted. It was undisputed that he was shot in
2  the foot and no one disputes that three males did this
3  to him.
4         Anthony Meek saw three males, Francis Crow
5  saw three males, and the police find three males
6  fleeing the area.
7         The question at the beginning of this case
8  was: Who were the three men who accosted and shot
9  Anthony Meek the late evening hours of October 14,
10  2002? That question has been answered through all the
11  evidence presented at trial. That question has been
12  put to rest. It is not an issue any longer. The
13  evidence in this case speaks volumes to identity.
14         Anthony Meek told you that Akeem Coleman was
15  the one who held the black gun at him and demanded his
16  keys.
17         Anthony Meek told you it was Akeem Coleman
18  who shot at him twice. He told you that it was Akeem
19  Coleman, because he saw his face that night. Anthony
20  Meek said the visibly was good.
21         In fact, every witness testified that the
22  lighting at Willing Street, the visibility was good.
23  Detective Messic, Francis Crow, and Corporal Rhoades,

10

1  all testified that the visibility on Willing Street
2  was good.
3         Anthony Meeks attention was focused on the
4  three men and the gun. In fact, he was able to tell
5  the police what color the gun was.
6         And if you think about it, the gun that Akeem
7  Coleman was holding and the manner in which he held
8  it, head level, pointing at Anthony Meek, it is not a
9  surprise that Anthony Meek was able to see who was
10  holding that gun.
11         This is the photo array that is in evidence.
12  This is the same photo array that Detective Messic
13  showed Anthony Meek within an hour or so after the
14  shooting. And when he did so, when Detective Messic
15  showed this photo array to Anthony Meek, Anthony Meek
16  said that -- this individual, that's the guy; that's
17  the guy who shot him. The bigger of the three. The
18  guy with the gun.
19         He had not seen Akeem Coleman before the
20  incident and he testified that he had not seen him
21  again until last Friday.
22         Now, where is Akeem Coleman moments after the
23  shooting? Anthony Meek observes Akeem Coleman,

11

1  Robinson and Whitfield running South on Willing. When
2  they run south on Willing, he watches them make a left
3  onto 5th and disappear out of sight.
4         Just at that time, Officers Derbyshire and
5  Prada are at the intersection of 4th and West. And
6  they observe three individuals running down 5th cross
7  over West -- excuse me, cross onto West and make a
8  left running North on West Street.
9         They cross over West and run along the
10  eastbound side. When officers Prada and Derbyshire
11  observe this activity, it draws their attention and
12  they continue down West. Both officers observe two of
13  the three individuals climb over a fence.
14         Officer Prada testify that he observed the
15  third individual, Akeem Coleman, make an attempt to
16  get over that fence, but was unable to do so, which
17  makes sense given his size. By Akeem Coleman's own
18  account he's 5'10 220 pounds.
19         So when Coleman can't make it over this wall,
20  he continues on West and that's where Officers Prada
21  and Derbyshire obtain Coleman. Derbyshire then
22  locates a gun on the sidewalk next to St. Peter's
23  Cathedral; that handgun is in plain view on the

12

1  sidewalk.
2         What's significant about where that gun was
3  found is this: The testimony by Officer Derbyshire
4  and Officer Prada is the two individuals went over the
5  fence where Officer Derbyshire is standing. Officer
6  Derbyshire testified that the two individuals went
7  over the fence and the third kept going. Well, where
8  was the gun found? Right by that tree. Beyond the
9  area when the two individuals jumped the fence, but
10  right where Akeem Coleman had just passed.
11         And it just so happens that that gun matches
12  the physical and color description of the weapon
13  described by Anthony Meek to the police that night and
14  to you in court.
15         Within one minute of detaining Coleman, you
16  heard the dispatch reports. The report of the
17  shooting of Anthony Meek in the 500 block of Willing
18  was broadcasted. You heard the police transmissions.
19  Shots fired, 500 block of Willing, calls are coming
20  in.
21         They already have Akeem Coleman in custody.
22  Aside from Robinson and Whitfield, there's no one else
23  in the streets in that area of Wilmington that night.

13

1     That black nine millimeter hand gun, that was
2   recovered by Officer Derbyshire, is then placed into
3   evidence. Before it is placed into evidence by
4   Officer Derbyshire, the gun is made safe. And Officer
5   Derbyshire testified that the bullets in the magazine
6   were nine millimeter Lugar hollow point bullets.
7     As you heard the testimony, placard number
8   one -- excuse me, placards number two, which is back
9   here, was a nine millimeter hollow point bullet, a
10  nine millimeter Lugar hollow point bullet. The same
11  bullet that in the magazine that was in the area that
12  it was recovered in the area where Akeem Coleman had
13  just passed.
14    This handgun was sent to the Alcohol Tobacco
15  and Firearms to be processed. It was sent along with
16  a nine millimeter shell casing, which was found by
17  Corporal Rhoades in the 500 block of Willing, that's
18  placard number one where that shell casing was found.
19    And what did the ATF conclude? Well, Martin
20  Oales, from the ATF, told you most importantly that
21  this handgun, the one recovered by Officer Derbyshire,
22  on the eastern sidewalk of West Street, right where
23  Akeem Coleman was observed passing, was the same gun

14

1   that fired that shell casing, placards number one, the
2   same gun.
3     He also told you that this gun, when fired,
4   would eject a casing, and he told you that the gun was
5   operational when he test fired it.
6     Is this at all coincidental? No. The
7   evidence in this case is clear and speaks volumes.
8     Now, what about Emmanuel Robinson? What do
9   you know about him? Well, one thing that you know as
10  a result of the evidence presented is that there is a
11  one in 4.4 billion chances that another individual was
12  there with his DNA on October 14th at the Attempted
13  Robbery. To put this into context there are six billion
14  people on Earth. Just to give you some more
15  perspective, the odds of winning Powerball are 1
16  and 8 million.
17    Robinson had that shirt on that night.
18  People we know observed the area behind his car prior
19  to parking it that evening and he testified there was
20  no white T-shirt behind his car. Anthony Meek
21  described the two young -- excuse me, described the
22  two black males with Akeem Coleman as being more his
23  size, more Anthony Meek's size, that is smaller in

15

1   stature than Akeem Coleman. He described them as
2   twins in size.
3     Emmanuel Robinson places his height at 5'9,
4   155 pounds. Mustafa Whitfield places his height at
5   5'9, 162 pounds, seven pounds difference exact same
6   height.
7     Less than five minutes after detaining
8   Coleman, and you heard the police dispatch, it was
9   called in 2353, which is 11:53. The police had
10  Coleman in custody. 2358 is when you heard Officer
11  Prada come across that they had two additional
12  individuals stopped. Less than five minutes later,
13  Emmanuel Robinson and Mustafa Whitfield are stopped in
14  the 400 block of Tatnell, which is also the 2000 block
15  of 5th Street, right here, two blocks from the
16  shooting. One block from St. Peter's Cathedral.
17    Robinson is stopped and he's walking with
18  Whitfield. According to Officer Prada, there's no one
19  else on the street except Robinson, Whitfield and
20  Officer Prada. And what physical condition did
21  Officer Prada find Robinson? Well, he found him with
22  no shirt on. He's bare-chested. He's sweating and
23  his heart is racing.

16

1     Officer Prada told you it was approximately
2   40 degrees that night. It was less than 50 degrees.
3     Robinson tells Officer Prada that he's in the
4   apartment complex to meet a girl. A girl he met
5   earlier that day, a young girl, but he doesn't know
6   her name and he doesn't know where she lives. It is
7   midnight and there's no one else out. Does this make
8   any sense? When taken to the police station, Emmanuel
9   Robinson is the only one who does not have a white
10  T-shirt. Why? Because he left his at the scene.
11    That same T-shirt, as Amber Moss told you,
12  that was collected from the 500 block of Willing,
13  where the Attempted Robbery occurred, contained the
14  exact same alleles as Robinson's DNA. His DNA type is
15  the major contributor to that shirt. One in 4.4
16  billion.
17    Given this statistical probability, what are
18  the odds that another individual with the exact same
19  DNA as Robinson would be within two blocks of the
20  shooting, five minutes after it occurred? And at the
21  same time, lacks the general size and physical shape
22  of the person that Anthony Meek describes to be with
23  another person, who is his exact same height and seven

17

1  pounds heavier? And he's found sweating, heart
2  racing, no clothes on his upper body.
3      The evidence establishes that Emmanuel
4  Robinson was the defendant who approached Anthony Meek
5  with Akeem Coleman and Mustafa Whitfield. Emmanuel
6  Robinson had a T-shirt wrapped around his face to hide
7  his identity. When Anthony Meek would not hand over
8  the keys, that's when Emmanuel Robinson sprung into
9  action. He struggled with Anthony Meek to get his
10 keys and ultimately to get his car. But as a result
11 of that struggle, he left a shirt behind and also his
12 DNA.
13     That leaves the third defendant, Mustafa
14 Whitfield. Whitfield is the third disguised defendant
15 at the scene with Coleman and Robinson. Whitfield,
16 like Robinson, had a white T-shirt wrapped around his
17 head to conseal his identity. He approached Meek with
18 the other two. And when Robinson struggled with Meek,
19 that's when Whitfield commanded Coleman, Shoot him.
20 Shoot him. As I said before, Whitfield is the same
21 height, seven pounds heavier.
22     Mustafa Whitfield helped Emmanuel Robinson
23 off of Anthony Meek and according to Meek kicked him

18

1  in the process. Whitfield's apprehended less than
2  five minutes after Coleman and he's with Robinson.
3      Again, the two share similar physical
4  characteristics, and he's wearing a gray sweatshirt.
5      As reported on the dispatch tape, Officer
6  Derbyshire reported that he observed two black
7  males -- three, two went over the fence, one of which
8  was wearing a gray sweatshirt. As you heard the
9  officer's testimony, the two scaled the wall and
10 disappeared quickly. They were in -- they were within
11 the officer's sight for a very short period of time,
12 but Officer Derbyshire was able to determine that they
13 were two black males and he saw a gray sweatsuit.
14 Gray sweatsuit, gray sweatshirt.
15     Remember Mr. Bernstein asked Officer
16 Derbyshire that would he have -- which view would he
17 have gotten, given the defendant's scaled the fence?
18 And the answer was, It would have been a view of the
19 rear of the defendants.
20     So Officer Derbyshire would have -- would
21 have seen the back of this gray sweatshirt so the
22 decal on the front would not have been conspicuous to
23 Officer Derbyshire or Officer Prada.

19

1      Now, Whitfield and Robinson are seen by
2  Officer Prada walking at a fast pace down 5th Street
3  toward Tatnell. And if you remember Officer Prada's
4  testimony was after they found Coleman, he went over
5  the fence into St. Peter's Cathedral looking for the
6  two individuals. He came out on 6th Street, went down
7  around to Tatnell, and while he was walking down this
8  block that is where he observed Robinson and
9  Whitfield. And as he testified, he was about half
10 way, as you can see, from his markings in red, about
11 half way down when he observed the two coming down
12 toward Tatnell. He observed them walking at a steady
13 pace, a way from the Peter's Cathedral and away from
14 Willing Street.
15     The two are apprehended in the apartment
16 complex within five minutes. Whitfield, like
17 Robinson, is sweating and his heart is racing as if he
18 had been running or excited. Think of the adrenaline
19 that must have been running through his veins minutes
20 after the robbery or shooting. This is not
21 coincidental, this is evident.
22     Whitfield has a white T-shirt in his
23 possession and he's seen with Robinson. To explain

20

1  his presence at the apartment complex, you heard
2  Officer Prada testify that Whitfield told him that he
3  was there to meet a girl that he met over the
4  Internet. She was an older girl, and he said he did
5  not know her name.
6      More importantly, he didn't know where she
7  lived; however, in court, 15 months after the
8  incident, when he testified before you, he testified
9  that he knows the name, he thinks it is Cathy. At
10 least that's what he thinks her name is. And he told
11 Officer Prada -- he testified that he told Officer
12 Prada that her name was Cathy. And he testified that
13 he didn't meet her on the Internet, he met her on a
14 telephone chat room, and that the two had been
15 speaking for approximately three weeks prior to
16 this -- prior to the night of October 14th, but still
17 wasn't really sure of her name and that he never
18 called her, she only called him.
19     He also knew where she lived when he
20 testified -- he told you that she lives in Newark. He
21 told Officer Prada that night he didn't know where she
22 lived. He also made no mention of going to that
23 apartment complex, because that's where this mystery

21

1   women's cousin lived, but that's what he told you 15
2   months after the incident.
3       But the inconsistencies don't end there.
4   Whitfield testified that he left his house at 11:50
5   and he was specific, he knew, 11:50. And that he
6   walked on 6th Street because he wanted to observe
7   police activity that was going on down 6th Street.
8   But now remember, Officers Prada and Derbyshire were
9   the first officers on the scene, and they were in the
10  500 block of West where they stopped Coleman.
11      Add to that, the fact that the police
12  dispatch did not have the officers stopping Coleman
13  until 11:53. It wasn't until after 11:53 that the
14  report of shots fired in the 500 block of Willing came
15  over the dispatch. So what would have been even after
16  that point that officers would have responded to the
17  area of 6th for the report of the shooting at Willing.
18      Whitfield testified that he met up, while
19  walking to the apartment complex, with two
20  individuals, a female and a male.
21      According to Whitfield, he was walking on 5th
22  Street, down 5th Street toward Tatnell, that is where
23  he encountered Robinson. And where did he say

22

1   Robinson was coming from? Well, he said Robinson was
2   walking in his direction with the other two
3   individuals heading towards St. Peter's Cathedral
4   heading toward Willing Street.
5       Whitfield testified that he stopped and spoke
6   to the three individuals and then continued on 5th
7   toward Tatnell, except now Robinson, for whatever
8   reason, decides to turn around and head towards the
9   apartment complex.
10      After Whitfield observed him walking away
11  from that same apartment complex -- and keep in mind
12  what Robinson told the police that night, he was going
13  there to meet a young girl. Whitfield testified that
14  he never saw Robinson run. Whitfield testified that
15  he, himself, never ran. Whitfield further testified
16  that Robinson had clothes on his upper body; however,
17  you heard Officer Prada's testimony when he contacted
18  Robinson, he had no clothes on his upper body. He was
19  bare-chested.
20      But according to Whitfield, during the entire
21  time that they were together, and when Officer Prada
22  contacted them in the apartment complex, Robinson
23  always had a shirt or something covering his upper

23

1   body.
2       But not only that, Whitfield said that
3   neither he nor Robinson were sweating. Is this all
4   coincidental? No, this is all circumstantial
5   evidence.
6       As Judge Del Pesco will tell you, the State
7   has to prove its case using circumstantial and direct
8   evidence and we can use circumstantial evidence alone,
9   and you can use that circumstantial evidence to reach
10  a guilty verdict.
11      Whitfield was less than three blocks from the
12  scene, scene of the crime with Robinson, Robinson, who
13  is the same person whose DNA was on the shirt that's
14  left at the scene.
15      Those same alleles, which create a 4.4
16  billion chance that some other individual has the same
17  DNA as Robinson, no one else was out on the street
18  that night according to Officer Prada.
19      And Officer Prada was out on foot actually
20  looking for people. Keep in mind that when Officer
21  Prada saw these two individuals he was half way down
22  the block and these two were coming toward Tatnell.
23  He saw no one else.

24

1       Now, how does what happened to Anthony Meek
2   apply to the elements of the offenses and the law that
3   will be provide to you by Judge Del Pesco? First, is
4   Attempted Robbery First Degree. Attempted Robbery
5   First Degree were the facts that the State submits you
6   should use to apply to Attempted Robbery First Degree
7   is that these three individuals attempted to compel
8   Anthony Meek to give up his property by force of
9   threat. And while doing so, Akeem Coleman displayed a
10  handgun.
11      The State submits those are the facts that
12  you need to consider for Attempted Robbery First
13  Degree. Remember, Akeem Coleman with a gun raised at
14  his head said, Give me the keys. Give me the keys.
15  When that didn't work, that's when Robinson jumped in
16  trying to take the keys, and when that didn't work
17  that's when Whitfield tried to get in and tried to get
18  Robinson away from Meek; and it's at that point where
19  Robinson is away from Meek is when Akeem Coleman
20  discharges the weapon.
21      And that discharge of the weapon leads me to
22  the second crime, Reckless Endangering First Degree.
23  Likely to cause serious bodily injury -- excuse me,

25

1   likely to cause death or serious bodily injury, he
2   engaged in reckless conduct. Akeem Coleman
3   disregarded a risk when he turned and discharged a
4   firearm in the direction of Anthony Meek.
5          By discharging that firearm, he placed
6   Anthony Meek in a position where he could sustain
7   serious physical injury or even death.
8          At that point, the three run, nothing is said
9   but they flee; that's when Anthony Meek chases after
10  them. But what happens then? Akeem Coleman turns
11  around and fires his weapon. That gives rise to the
12  next crime, Assault in the Second Degree.
13         Akeem Coleman, Mustafa Whitfield and Emmanuel
14  Robinson caused physical injury to Anthony Meek by the
15  use of the handgun. Handgun, as you will find out, is
16  considered a deadly weapon.
17         Now, the physical injury you heard that he
18  was laid up for months. He was in pain. He had to
19  have an operation. Those are all facts that the State
20  submits satisfies physical injury.
21         And when they -- when the three defendants
22  commit the Attempted Robbery First Degree, the
23  Reckless Endangering First Degree, and the Assault in

26

1   the Second Degree, at each time they committed those
2   offenses, they were in possession of a firearm.
3          Therefore, the charge of Possession of a
4   Deadly Weapon During the Commission of a Felony
5   attaches to each and every one of those charges. It
6   attaches to the Attempted Robbery First Degree. It
7   attaches to the Reckless Endangering First Degree, and
8   it attaches to the Assault Second.
9          The next offense, Mustafa Whitfield and
10  Emmanuel Robinson were wearing disguises during the
11  commission of a felony. They tried to hide their
12  faces with the white T-shirts. They hid their faces
13  because they didn't want Anthony Meek to know who they
14  were. They intentionally hid their faces from Anthony
15  Meek.
16         The next crime is Conspiracy in the Second
17  Degree, and that is that it was the three defendant's
18  conscience object or purpose to facilitate a crime.
19  And if you think about it, the three, two with white
20  T-shirts wrapped around their faces, the other with a
21  gun, intended to promote or commit the offenses of
22  Attempted Robbery First Degree, Assault in the Second
23  Degree, and Reckless Endangering in the First Degree.

27

1          And finally, the last charge is Possession of
2   a Deadly Weapon by a Person Prohibited. The reason
3   that charge gives rise -- excuse me, that charge is
4   based on the fact that these individuals were under
5   the age of 18 and cannot possess firearms, a handgun,
6   and that's what they were in possession of.
7          Now, you may be asking yourself there was
8   only one gun, why are all three individuals charged
9   with possessing the one gun? Why are all three
10  individuals charged for each and every crime? That is
11  because of a provisions called accomplish liability.
12         Accomplish liability states that any person
13  who intends to facilitate the commission of a crime,
14  aids, agrees, attempts to aid another person in
15  committing that offense -- in other words, that person
16  helps another person commit a crime, and if you think
17  about the facts: Akeem Coleman had a gun. Emmanuel
18  Robinson tried to get the keys. Mustafa Whitfield
19  said, Shoot him. Shoot him. He jumped in to try to
20  help out. Each and every defendant participated in
21  each of these crimes.
22         The three defendants had a common intent and
23  purpose, and that was to rob Anthony Meek, to take his

28

1   property. They approached Anthony Meek together.
2   They all stood within two feet of him. Obviously,
3   Whitfield and Robinson knew something was going to
4   happen, because they chose to hide their faces. And
5   when they fled, they all fled together in the same
6   direction. So Officer Prada testified when he
7   observed them running, they were in a group, close
8   enough to touch other each other. They fled together
9   until they got to that wall, the wall that Akeem
10  Coleman couldn't get over. They all knew Akeem had
11  the gun. He held it high. He held it head level
12  demanding the keys. And then Whitfield told Coleman,
13  Shoot him. Shoot him.
14         Robinson jumps in to try to get the keys
15  while Coleman has the gun held high. They know --
16  they knew, what was happening. They knew that Akeem
17  Coleman had a gun.
18         Ladies and gentlemen, you were selected as
19  jurors to perform a very special role. You are
20  directed by the Court to do as best you can to
21  determine what happened to Anthony Meek in the late
22  hours of 2002. You are the sole judges of credibility
23  of each witness. When assessing credibility of the

29

1   witnesses, you should consider each witnesses means of
2   knowledge. Their ability to remember. The time
3   period they had to observe. The reasonableness of
4   their testimony. Their motivation or their reason for
5   testifying. Any bias they may have or any prejudice
6   or interest they may have in the matter.
7          You can also judge the credibility by the
8   demeanor of the witness on the witness stand. If you
9   find evidence that is conflicting, due to any
10  inconsistencies in testimony, you have the duty to
11  reconcile it. You must reconcile it to make one
12  harmonious story.
13         And if you cannot make one harmonious story
14  of everything, then you must give credit to the
15  portion of the testimony, which in your own judgment,
16  is most worthy of credit and disregard any portion of
17  testimony which in your judgment is unworthy of
18  credit.
19         Now, how do you do that? The State asks you
20  that when you judging the credibility of a witness,
21  when you look at all the evidence in the case, apply
22  your God-given common sense. Decide what happened,
23  apply it to the law as given to you by Judge Del

30

1   Pesco, but it is your common sense that is the most
2   important tool.
3          And when you apply the facts, using your
4   common sense to the law, as given to you by Judge Del
5   Pesco, you will all be firmly convinced or in other
6   words convinced beyond a reasonable doubt that
7   Defendants Coleman, Whitfield and Robinson are all
8   guilty of the charges in the indictment. Thank you.
9          THE COURT: Mr. O'Connell.
10         MR. O'CONNELL: Could we just briefly
11  approach the Court without the court reporter for
12  scheduling purposes.
13         THE COURT: Yes.
14         (A side-bar was not reported.)
15         THE COURT: Ladies and gentlemen, we'll take
16  a brief recess. As you know, the other attorneys get
17  a chance to speak to you as well, but we'll give you a
18  chance for a little break before we continue. Take
19  the jury, please.
20         (The jury left the room.)
21         (Back from break.)
22         THE COURT: Jury, please. Mr. O'Connell, are
23  you ready to begin?

31

1          MR. O'CONNELL: Yes, Your Honor.
2          THE COURT: Mr. O'Connell.
3          MR. O'CONNELL: Thank you, very much, Your
4   Honor. Good afternoon, ladies and gentlemen. I know
5   I speak on behalf of the State and the Court and all
6   the defendants and defense counsel, but we want to
7   thank you for your attention throughout this trial.
8          There really wasn't a whole lot of evidence
9   here, there was about eleven witnesses, none of which
10  were on for any real length of time, but we somehow
11  managed to stretch it out over seven days. And we
12  brought you in and we took you out, and we said come
13  back in three hours for a ten minute witness and you
14  didn't get mad once and we appreciate that.
15         It is a great thing that you do. It helps
16  the system work. And the toughest part is ahead of
17  you, and what I want to ask you to do is -- it is
18  difficult when you have to listen to this many
19  arguments, this many lawyers droning on and on and on
20  about the same thing over and over again to stay
21  focussed. But it is very important to the State and
22  it is very important to each of the defendants and it
23  is very important to the Court that your really focus

32

1   on what you have to say. And I thank you in advance
2   for doing that.
3          At the beginning of the trial, I talked to
4   you about reasonable doubt. And that's the most
5   important principle, ladies and gentlemen, that I'll
6   argue to you is at stake in this case, what reasonable
7   doubt is in this case, and to understand reasonable
8   doubt is, in this case, it helps if you understand a
9   little bit more about reasonable doubt as a concept.
10         Judge Del Pesco will spend some time with you
11  in about 45 minutes, probably, explaining to you the
12  law that applies to this case. In fact, she probably
13  will send back with you a list of the instructions
14  that she reads. And one of them will be about
15  reasonable doubt and the presumption of innocence.
16         But it is -- it is one of those terms of art
17  that keeps lawyers like us employed. We'll argue and
18  argue and argue about what it means and, ultimately,
19  what it comes down to with you folks is putting your
20  own life to spare and trying to determine whether or
21  not there are some cracks in the State's case.
22  Whether or not there are some holes, whether or not
23  there are some questions that you still have about

33

1   matters of substance to this case.
2          And the defense is going to suggest to you
3   and I'm going to suggest to you on behalf of Akeem
4   Coleman that there are substantial areas of doubt in
5   this case. I want to give you an illustration to
6   begin that I think will help you perhaps understand
7   the concept of reasonable doubt and how you should
8   look at the evidence in this case.
9          I have got two daughters, they are about
10  three years apart. And the house that we lived in
11  several years ago was near a park, and in that park
12  there was a rather large pond. And during the
13  wintertime it was open to the public for skating. And
14  my oldest of the two daughters enjoys skating or did
15  enjoy skating at least back then. And on a typical
16  Saturday morning, during the wintertime, she would --
17  when I was just settling in the newspaper, grab me by
18  the sleeve and say, Daddy, can I go skating? And
19  being the indulgent father, I say, Okay. Honey, but
20  before I do that, like any parent, what I'm doing to
21  do is I'm going to check out the conditions. I look
22  out the kitchen window.
23          Think of hypothetical situation of some

34

1   morning she comes to me and says, Let's go skating, on
2   one typical morning I might go and look out the
3   window, like it has been lately, it has been a long
4   stretch of cold, where it has been no higher then 25
5   degrees in the daytime, single digits at night; that's
6   pretty good evidence that pond is fairly solid. We
7   grab on our skates and head off ti the woods and as we
8   come to the pond, the pond off in the distance, you
9   can see that there is a lot of people on that pond,
10  there's a lot of people skating. It seems to be
11  supporting their weight quite well. There's even more
12  evidence that probably this is a safe pond to let her
13  skate on.
14          As we get closer, you can see the park
15  actually posts a sign saying, Pond open for skating
16  today. But still that's not enough, I'm a parent and
17  I need to really scrutinize. This is my flesh and
18  blood. As I get close, I walk out on the ice and I
19  can feel that it is solid like pavement, and it has
20  got that dull light gray look to it, where you know it
21  is thick. So at this point there can be no doubt it
22  is safe. It is beyond a reasonable doubt at least and
23  it is time to go skating.

35

1          Lets's think of another day. She says,
2   Daddy, can we go skating? It is a sunny morning. I
3   look at the kitchen window it is 40 degrees out. It
4   hasn't been freezing much, mostly during the daytimes.
5   It has been well above freezing, maybe a little below
6   it at night. It is probably not solid ice. She's a
7   bit of a nag so we head off through the woods and
8   we're carrying our skates. I can see in the distance,
9   in the pond, of ice shooting down in the water. As we
10  walk closer there's a sign that even says, Pond closed
11  to skating today. And as we walk up to the pond, you
12  can just see it is nearly a liquid, so there can be no
13  doubt I'm not going to let my daughter skating on that
14  mess and risk our life.
15          Well, let's think of a different scenario. I
16  go to the kitchen window one morning and I look out
17  and it is about 32 degrees out. And over the past
18  several weeks it has been going up above freezing some
19  during the day and down below freezing at night. And
20  we put on our coats and grab our skates and we head
21  off to the wood. As we come out of the woods, I see
22  off in the distance there's a few small children out
23  on that ice. As we walk closer, there's no sign up

36

1   today. It doesn't indicate whether or not it's safe
2   to skate, but from a distance my daughter is convinced
3   that is going to be a day we're going to be able to
4   skate. And from the distance the lake looks solid
5   with ice and it looks safe to skate on, but as I said
6   I'm a parent I need to get close. I need to inspect
7   these things closely more myself. As I get up close,
8   I – there's a gap between the ice and the shore and
9   out in the middle there's a hole forming in the water,
10  and over where the little children have been skating
11  there's some cracks in the ice. If you put your foot
12  out on it, it give as little bit. Well, there can be
13  no doubt that there's reasonable doubt about the
14  safety of this ice.
15          Ladies and gentlemen, what Akeem Coleman
16  wants you to do with the evidence that's been
17  presented to you is not stand back at the edge of the
18  woods and sort of say, It is a safe day to go skating.
19  He wants you to be a parent and get up close to the
20  evidence and look at it hard, because when you do,
21  ladies and gentlemen, you're going to see those gaps.
22  You're going to see those holes. And you're going to
23  see those gaps. And that, ladies and gentlemen, will

37

1    be reasonable doubt.
2        The State's case, as you heard it,
3    essentially came down to two things with respect to
4    Akeem -- Akeem Coleman. It came down to Anthony
5    Meeks' identification of him in the photo line-up, and
6    it comes down to some circumstantial evidence; that
7    is, his proximity to the crime, his being near a gun,
8    being near some other people who appeared to be
9    perpetrators of the crime; that's circumstantial
10   evidence.
11       I should briefly explain that the State
12   hasn't proved his case by direct evidence, eyewitness
13   and fingerprint evidence, or of somebody who sees the
14   crime happen, but by circumstantial evidence.
15       And what we're taught in law school is
16   footprints in the snow. You go to bed in the night
17   there's snow on the ground and a newspaper lies there,
18   the circumstantial proof is your paper boy came some
19   time after it snowed and dropped the paper there;
20   that's the kind of evidence called circumstantial
21   evidence.
22       In this case, some circumstantial evidence
23   that the State has presented to you that would suggest

38

1    that Akeem Coleman is guilty of the attempted robbery
2    of Anthony Meeks, what's missing in this case? The
3    case comes down to, as I said, Anthony Meeks'
4    identification and the circumstantial evidence. But
5    what you don't have is you don't have any physical
6    evidence linking Akeem Coleman to the crime scene.
7        You don't have any of the proceeds from the
8    robbery on his person. You don't have a gun on his
9    person. You don't have a confession from him or a
10   statement from the codefendant's implicating him. You
11   have no prints on the weapon that was used and found
12   near the scene.
13       All of these things, ladies and gentlemen,
14   when taken in the context of all of the evidence, will
15   lead you to one conclusion: There's reasonable doubt
16   as to Akeem Coleman's guilt in this case.
17       Let's look closely at the evidence by walking
18   through some of the witnesses. And I'm going to
19   divide them into two categories: I'm not going to
20   bamboozle you. I'm going to do what lawyers do, that
21   is, highlight what I think is important for you to
22   focus on when you go back in that room and discuss
23   this matter.

39

1        There are two types of witnesses: One is
2    what I'll call a professional witness and the other
3    I'll call a civilian witness. Professional witness
4    are not people who necessarily saw the crime that
5    happened, they are reporters who bring their
6    professional skills to bear that try to help you tell
7    them things, report to them or facts in running tests.
8        In this case, evidence detection unit Officer
9    Rhoades -- Corporal Rhoades, I don't want to slight
10   him, Officers Prada and Derbyshire and Detective
11   Messic. And it would also include the DNA lady, Amber
12   Moss, and the ballistics person Martin Oles -- William
13   Oles, and the civilian witnesses would include Anthony
14   Meeks Francis Crow, William Edelman, Jamilla Reed, and
15   Mustafa Whitfield. Let's look at the -- of the
16   professional witnesses, the first one you heard from
17   Corporal Rhoades from the evidence detention unit he
18   processed the scene on Willing Street; that is, he
19   goes about the scene taking pictures, doing
20   measurements, dusting for fingerprints and all sorts
21   of things. He collects evidence that connect,
22   ultimately, people that they arrest as perpetrators of
23   this crime.

40

1        Now, what you have to ask yourself in the
2    context of all of this is: If he dust that car for
3    prints, thinking possibly the perpetrators have
4    touched the car, because we know that there's no
5    evidence that the perpetrators were wearing gloves,
6    they had bare hands, and it is a nervous situation, so
7    -- so there's a good chance of the perpetrators
8    sweating and producing oils and doing things that
9    might create fingerprints. He does the right thing.
10   He dusts the car and he finds prints they are prints
11   of Anthony Meeks, himself. Mr. Meeks owns the car,
12   obviously, so puts his prints on the car. No prints
13   from Akeem Coleman, though.
14       But what do we also know might bear prints in
15   this case, and this is important, and I'm going to
16   belabor this point to death, because it is very
17   important: We have a weapon. We have a weapon that's
18   found a block away. A weapon that we now know from
19   ballistics testing is likely the weapon that is used
20   in this Attempted Robbery.
21       Okay. And we also know that officers are on
22   the scene within moments finding that weapon and
23   hearing from WILCOM that there's been a shooting

41

1  nearby. So what makes sense? What's the right thing
2  to do? Print the weapon.
3        How do we know that's the right thing to do?
4  Well, your common sense tells you that that officer,
5  Detective Messic told you that, that he ask that it be
6  printed, but we don't know from Corporal Rhoades
7  whether or not he did that. In fact, he said he
8  didn't do that, somebody else did that, if it was
9  done.
10       Corporal Rhoades also presented for you
11 pictures of the scene, and there were several of them
12 that they showed, and they do depict the scene
13 somewhat as it looked the night of the shooting or the
14 attempted robbery. But what they don't really show
15 accurately is the lighting in that area, and that's
16 important in this case. He indicated that a lot of
17 what you see, the lighting you see in these
18 photographs, is created artificially by the camera
19 he's using, which had a flash on it.
20       But what we do know when we look at the
21 defense picture from different angle, is there is
22 really only one light source. I'm not going to use
23 this thing because I'm horrible at it. There's only

42

1  one light source and that's across the parking lot,
2  and that's significant, ladies and gentlemen, because
3  of one thing this overhead light illuminate everything
4  that's pretty bright out; that's important. Use your
5  common sense, and draw from your own experience.
6        The crime scene is across the parking lot.
7  The perpetrators are facing in this direction, away
8  from the light, and Mr. Meeks is looking toward the
9  light. Use your own common sense and draw in your own
10 experience, when you're in the dark and you have got a
11 bright light behind a person, and they are looking at
12 you, do you have a good view of their face? Or do you
13 have a better view of the face when the situation is
14 reversed and they are looking into the light?
15       So, obviously, in this case Mr. Meek, did not
16 have good lighting to see the perpetrators of this
17 offense. He was up pretty close to him, but he only
18 could see him based on the lights behind the
19 perpetrators and it was nighttime.
20       The next professional witnesses you heard
21 from were Officers Derbyshire and Prada -- and I'll
22 deal with them together because they were together,
23 pretty much. Now, the State didn't focus on this too

43

1  much because the State won't focus on this. There
2  were several conflicts in what they had to say
3  already, they are little details but they are
4  important details. When you start focusing – first
5  of all neither knew who was the driver and who was the
6  passenger. Neither could remember -- well they were
7  differences between them as to whether or not the
8  third person in the group actually tried to go over
9  the wall. Derbyshire said he didn't see that. Prada
10 said he did see that, and you have to reconcile
11 whether or not that's the truth.
12       Prada -- Derbyshire says Prada goes up ahead
13 and detains the individual who turns out to be Akeem
14 Coleman, where Derbyshire gets out and does the bunny
15 hop over the wall to look and see the people who are
16 going.
17       Prada says we pull up next to him and we both
18 get out and detain that person. Are these important
19 details? Well, when you start determining a lot of
20 the facts of this case, based upon what they said,
21 they do become important details.
22       Another thing is important is where they
23 first saw these people. Now, I asked them: Did you

44

1  ever see Akeem Coleman drop the gun? And then the
2  State followed up with, Well, you probably wouldn't
3  see them because there's cars blocking where you're
4  going to see him drop the gun. You have to understand
5  where did they first see him? They are sitting at the
6  light facing North on West Street at 4th Street. They
7  see the individuals emerge from the 5th Street area,
8  including Akeem Coleman. They say the three of them
9  are running together, okay.
10       They also have -- you have also heard
11 testimony from -- I hate handling these things --
12 Anthony Meek that the perpetrator used his right hand,
13 is carrying the gun in his right hand, so which side
14 of Akeem Coleman is facing them as he's going across
15 the street? His right-hand side. Does anybody ever
16 say they see him carrying a weapon? No.
17       Officer Derbyshire says we pull up alongside
18 him and I say to him, How far are you from him? He
19 says, 15 to 20 feet. That means if they pulled up in
20 the street, are you going to see Akeem Coleman discard
21 a weapon if he's alongside those other guys? You are
22 not. Nobody testified to ever seeing him drop this
23 weapon.

45

1    They also don't testify to him dropping the
2  keys and bottle opener and anything else. And, again,
3  there's no printing done with those items either.
4    The other professional witnesses that you
5  heard from included Amber Moss and Martin Nolls.
6  Amber Moss didn't have anything to bring to the table
7  as far as Akeem Coleman is concerned. And the only
8  reason I'll note her testimony is that she said
9  specifically the DNA excluded Akeem Coleman from being
10 contributor from the DNA on that shirt. Obviously,
11 that shirt had nothing to do with him.
12   Martin Nolls say's there's a firearm, tool
13 marks examination indicates the firearm found on West
14 Street is likely to be the firearm that fired the
15 shell casings or struck the shell casing that fired
16 the bullets over on Willing Street.
17   And, okay, that's significant, but he also
18 told you, But I can't tell you who fired that weapon
19 and who possessed it.
20   And I asked him, How could you tell?
21   And he said, Fingerprints, things like that.
22   I asked him, Do we have fingerprints?
23   No.

46

1    Were they taken?
2    Probably.
3    Have you heard about it?
4    No.
5    He also told you, interestingly enough, that
6  the ATF has an ability -- has a thing to do a firearm
7  trace. All the firearms that are bought, you have to
8  fill out a transfer slip for a firearm to buy one.
9  They can trace where that weapon came from.
10   And in this case, the State hasn't presented
11 any evidence as to what turned up in that trace. It
12 was performed in this case, but they didn't tell you
13 anything about it.
14   Is that something you might want to know?
15   The last professional witness you heard from
16 was Detective Messic. He was the chief investigating
17 officer this case and he didn't testify as to many
18 things. He kind of just cleaned up some details, but
19 some of them are important. What you have to
20 understand is that nobody is lying about anything.
21 He's a reporter, ladies and gentlemen. He's come in
22 here reporting what he's discovered. He's a fine
23 person. He's a good Detective. We all sleep well

47

1    because people like him are working at night while
2  we're in our homes, but what he didn't tell you in
3  this case is what's important. What he didn't tell
4  you is if all the people who saw the perpetrator who
5  attempted to rob Anthony Meeks said he's wearing a
6  white T-shirt, and dark pants and Akeem Coleman was
7  arrested and brought to the Wilmington police station,
8  where he's put in lock up until booking, photographs
9  are taken at 5:00 a.m., then why, ladies and
10 gentlemen, is he wearing a black or dark blue gap
11 sweatshirt? Where was that? Nobody said anything is
12 tied around his waist, or he's carrying it under his
13 arm or anything like that. Where did that sweatshirt
14 come from, ladies and gentlemen?
15   If he's wearing that at the time that he's
16 arrested, then he's not the perpetrator who's just
17 fired the weapon a block away described as a person in
18 a white T-shirt.
19   He also testified quite clearly about
20 fingerprint evidence from that weapon. I asked him,
21 Would it have been important? And he said, I asked
22 for it to be done. And based upon any review of the
23 weapon it looks like superglue was utilized on the

48

1    handle to determine whether or not there were
2  fingerprints. And then I asked him, Was a report
3  generated? I don't know, there's not one in the file.
4    Well, would one be generated if you found
5  fingerprints or didn't find fingerprints? Yes. Could
6  it have been misfiled or misplaced? Yes.
7    Ladies and gentlemen, don't you think that's
8  some of the most important evidence in this case? But
9  we don't hear about it and there's no explanation.
10   The next group of people I'll deal with are
11 the civilian witnesses and, obviously, the most
12 important of the civilian witnesses is Anthony Meeks.
13   Like Detective Messic, he's a nice person.
14 He's not here to mislead anyone. What we're
15 suggesting to you is he's mistaken. He's not going to
16 tell you any lies other than having glasses on that
17 aren't really glasses, because they look good with his
18 suit, but what you have to do is really focus on his
19 whole function when he's up there. And you have to
20 assess his identification of Akeem Coleman while he's
21 sitting in the courtroom, based upon all the
22 circumstances surrounding it.
23   You know that in court we tested him with on

49

1   a lot of different things and you're thinking to
2   yourself, why are you testing him on these things?
3   I'll explain it to you.  His recollection and
4   perception in court were not that good.  In court, he
5   couldn't remember what perpetrator who held the gun
6   was wearing, okay.  In court, he couldn't remember
7   whether or not the perpetrator who held the gun had
8   any facial hair.  In court, he wasn't very good with
9   colors.
10          Ladies and gentleman, if this is anything but
11  a green suit, then I don't know what it is.  But he
12  didn't know this was a green suit that I'm wearing.
13          And why is that important?  Because his
14  powers of observation are not necessarily that great.
15  And his powers of recollection are not necessarily
16  that great.
17          How do we know that his powers of
18  recollection are not necessarily that great?  Because
19  he indicated that prior to picking Akeem Coleman out
20  of this line-up, he looked at this line-up, we called
21  it the Emmanuel Robinson line-up because it has got
22  Emmanuel Robinson lined up.
23          Now, Detective Messic testified that he

50

1   showed this line-up, he pointed to position number
2   three, that individual right there and said that looks
3   like the shooter, okay.
4           When I got here in court, he said, No, I
5   pointed to position number six that fellow, and that
6   that looks like the shooter, okay.
7           Now, Mr. O'Connor or whoever does rebuttals
8   will probably stand up and say, So what, he made a
9   mistake in court about the guy who wasn't the shooter.
10  Well, that is a big deal.  He can't remember who he
11  pointed to previously.  He doesn't know what he did
12  previously.  What he did do previously is pick this
13  individual out, Akeem Coleman, as the person who shot
14  at him, okay.
15          Now, one of the things you're going to be
16  told by Judge Del Pesco to look at in determining the
17  strength of the identification is the circumstances
18  under which the identification is made.  And I'm going
19  to suggest to you that this individual so stands out
20  from the other individuals that it is almost
21  suggestive of who the person to pick out is.
22          He's so different.  These aren't similar
23  looking African American looking males.  This

51

1   individual looks very different than the rest of them.
2   So you have to wonder about his in-court
3   identification.
4           His in-court identification he clearly said,
5   That man over there is the one that shot me.  What
6   else is he going to do?  There's three African
7   American males in here with prison gashes.  The one is
8   very big.  He knows the big one shot at him.  He
9   didn't remember whether or not he had facial hair.  He
10  didn't remember what he was wearing.  He didn't
11  remember a lot of things, which photograph he picked
12  out, so his in-court identification is not okay
13  because he remembers a year and a half later who shot
14  him and that's the person.  It is because we're
15  sitting in a courtroom and he's not going to point at
16  one of these three guys.  He's not going to point at
17  me or Mr. Bernstein or Mr. Bayard.  He's going to
18  point at one of these three guys, the two are little
19  not the one who held the weapon, its the big guy, any
20  big guy.
21          So you have to determine whether or not his
22  identification of Akeem Coleman is credible when he
23  looks at this photo line-up, and you have to assess a

52

1   lot of different things.  And Judge Del Pesco will
2   tell you what those things are.  Did he have a long
3   time to look at them or was it a short time?  Were the
4   lighting conditions very good?  What were the
5   circumstances under which he saw them?
6           In this case, the lighting conditions were
7   not good, despite the fact the State is going to say
8   it is a bright parking lot.  When you really look at
9   it, it is not – it is a bright parking lot behind
10  him, but he's looking from the light into the perp –
11  into the victim's face, so these are not good lighting
12  conditions.
13          It is a highly emotional scene.  You have got
14  a gun being pointed at you.  It lasts all of five to
15  ten seconds, that's all the time you have to assess
16  who this person is, while you're trying to defend
17  yourself, while you're trying to get away.
18          Is this identification credible?  Perhaps.
19  Does it convince you beyond a reasonable doubt that
20  the right person has been chosen?  No.  There is
21  reasonable doubt, ladies and gentlemen.
22          The other civilian witnesses you heard from
23  were Francis Edelman and Jamilla Reed.  Francis Crow

53

1   was important for a couple of reasons: First of all,
2   the point was made that he said my apartment is on the
3   west street side, so he has a clear view there of
4   what's going on beneath him, while this attempted
5   robbery is happening. And he looks out there and he
6   says it is bright. It is so bright that Detective
7   Messic said that he had to close the blinds because he
8   can't sleep because he has those blind closed. It is
9   so bright. Well, if it is so bright and so close,
10  why, if he's shown a photographic array, he's unable
11  to pick out Akeem Coleman. If he has such a great
12  view, why didn't he pick out Akeem Coleman.
13          Same for Jamilla Reed who lives in the corner
14  apartment far away from that seat to just past the
15  railing. The best estimate maybe that's 30 feet at
16  the most into this brightly light parking lot. She's
17  not even shown a photographic line-up, why is that?
18  She also was presented -- you're probably scratching
19  your head, why did we wait three hours for that?
20  There's an important reason why Jamilla Reed is
21  brought into the courtroom, and that's because you
22  have to understand that Mr. Crow and Mr. Meeks weren't
23  the only people who saw something that night. And

54

1   that when people see things some times they see
2   different things. And in this case Jamilla Reed hears
3   shots, that's what draws her to look out the window,
4   because, I mean, you hear people outside all the time,
5   but she hears shots and that causes her to look out
6   back. And it is then, only then, that she sees a
7   person emerge from the car. Okay that's substantially
8   different than what Anthony Meeks described and
9   somewhat different than what Francis Crow described.
10          Ladies and gentlemen that's the nature of the
11  situation. You can't always have a different picture
12  presented to you. You get a lot of different angles
13  and you get a lot of different versions. You try to
14  put it together and it is difficult some times, you
15  have to ask yourself a lady that's close by, why isn't
16  she shown a photograph of Akeem Coleman and an
17  opportunity to say, is this one of the people who's
18  involved in the shooting?
19          The last person you heard from in the
20  civilian witness department is Mustafa Whitfield and
21  I'm not going to dwell on his testimony except to say
22  one thing: There's no indication on his direct or
23  cross-examination that he has any familiarity on Akeem

55

1   Coleman. A lot of it was: How long have you known
2   Emmanuel Robinson? Where do you two meet? Do you
3   know each other? Like, all that sort of thing to link
4   those two people together? How about, Hey do you know
5   Akeem Coleman? So ladies and gentlemen you have to
6   presume he doesn't know Akeem Coleman and wasn't with
7   him that night.
8           So ladies and gentlemen the State's case
9   comes down to one piece of direct evidence, Anthony
10  Meeks' identification and the failure of witnesses to
11  identify -- eyewitnesses to the offense identify
12  that's circumstantial evidence. The proximity of
13  Akeem Coleman to the crime and possibly the other
14  perpetrators who went over the wall and his proximity
15  to the weapon that was used in the crime.
16          If, ladies and gentlemen, you think that
17  Anthony Meeks is probably not mistaken in his
18  identification of Akeem Coleman, that's reasonable
19  doubt. It probably doesn't cut it. It is not enough.
20          If you think he possibly could be mistaken,
21  that's reasonable doubt. So when you go back there
22  and you go, you know, I think he probably is
23  identifying the right person. If somebody hears

56

1   somebody say that raise your hand and go that's not
2   enough. All 12 of us have to be convinced beyond a
3   reasonable doubt he's got the right person.
4           And if he doesn't have the right person,
5   ladies and gentlemen, it comes down to a
6   circumstantial case. And in circumstantial cases, the
7   circumstances that the State is presenting to you must
8   suggest one logical conclusion and one logical
9   conclusion only. Because if it could suggest other
10  conclusions, like, Akeem Coleman happens to be an
11  African American male in the wrong place at the wrong
12  time, then there -- that's reasonable doubt.
13          Circumstantial evidence no doubt can be very
14  powerful, that's for sure, but like the direct
15  evidence you have got to look at it closely and think
16  to yourselves, Are there other possible conclusions I
17  could draw from this? And, again, the only way I can
18  illustrate that to you is by my own experience and
19  you're going to have to draw on your own experience
20  the circumstances in this case, and whether or not
21  they suggest only one conclusion.
22          I'll illustrate this by telling you there's a
23  time about ten years ago when I'm sitting in my house

57

1  and my wife had gone to the mall, and it was a Sunday
2  afternoon. And I was going to get to do one of the
3  things I love to do most, and that is to watch a
4  Phillies game. And back at that time the Phillies
5  were pretty good, I'm sitting down in my living room,
6  the TV is on, and suddenly from my back room I hear my
7  five-year-old. She's carries her Barbie and is crying
8  uncontrollably and Barbie's head is missing.
9       And so I go, What's the matter? Lauren took
10 Barbie's head off and she's screaming. And I go to
11 the back room and there's her older sister sitting
12 there, very calmly, with a Barbie head in her hand,
13 and she's combing the head.
14      I said to her, You know -- if your bored
15 there's nothing more fun than picking on your little
16 brother or sister -- Lauren, if you can't play nice
17 and continue to play at all, why don't you just go
18 outside? Why don't you find a neighborhood friends if
19 you can't be nice to Kathleen and deal with her dolls
20 nicely, don't play with her. I don't want to have to
21 go back again. Do we understand each other? Yes,
22 sir.
23      So back I go, no sooner has my rear end hits

58

1  the chair, my youngest comes back and says, She called
2  me a baby. She called me a rat.
3       All right, honey. So I walk her back and
4  there's Lauren, like nothing happened, combing
5  Barbie's hair again. I said, Lauren, look, I told you
6  once I'm going to tell you again if you can't deal
7  with your sister a nice fashion go outside, go
8  somewhere else, before I make you go somewhere else.
9  Do we understand one another? Yes, sir.
10      So I head back out the room, but I do what we
11 all do as parents, I stand right around the corner all
12 the way back to the room and have Kathleen run and I
13 wait and I listen. Lauren says, Baby rat. I am not.
14 Are too. Then pushing and shoving and I can tell --
15 and then I hear the sound of smack. And I know Lauren
16 hit her and I go marching in and we're going upstairs
17 right now and she's all upset and I take her to the
18 base of the steps and I grab her by her shoulders and
19 I say, You sit on your bed. You don't read any books.
20 You don't play with your dolls. You sit there for an
21 hour and you think about what we talked about and how
22 you didn't obey me. And I'll be back in an hour and
23 we'll talk about it. She's going to get in that last

59

1  word, one way or another, and when you get to your
2  room don't slam that door up the steps. She goes,
3  disgusted with her sister. Right as I'm getting back
4  to my chair, the door slams. Well, I am furious. I
5  run up the stairs, I go into the room. I go in and
6  there sits Lauren on her bed quivering and crying,
7  because she knows she's in big trouble. And she looks
8  at me and says, I didn't slam the door, the wind blew
9  it closed. I swear.
10      I'm furious. I turn her over my knee for
11 disregarding me not once, not twice, she's going to
12 bear the brunt on it. Now, right as I lift my hand to
13 strike her on the rear, a breeze hits me in the cheek
14 and it stops me for a moment. And on that day my
15 daughter won her first trial.
16      So ladies and gentlemen, Akeem Coleman wants
17 you to go back in that room and talk to each other.
18 And when you talk to each other about all this
19 evidence and when you really scrutinize it, your going
20 to start to see the cracks. You're going to start to
21 see the holes and you'll see the gaps and you're going
22 to feel that breeze come across that case and you'll
23 realize it is reasonable doubt. Thank you, very much

60

1  for your time and attention.
2       THE COURT: Mr. Bayard.
3       MR. BAYARD: Thank you, Your Honor. Ladies
4  and gentlemen, good afternoon. The case has been
5  belabored, unfortunately, the facts are fairly simple
6  and fairly straightforward. And really I think what
7  I'd like to do is to briefly talk to you about
8  reasonable doubt from another perspective and then
9  review the case as it regards my client, Mr. Robinson.
10      As noted, reasonable doubt is not a guess.
11 It is not a hunch. It is not a feeling, but it is a
12 firm belief that an act alleged was actually done by a
13 particular individual.
14      Now, that is in a way echoing what you just
15 heard a few moments ago: Guesses, hunches, gut
16 feelings, that's not the point. Reasonable doubt is
17 something you have, beyond any of that, a firm
18 conviction that this event happened and this person
19 did it.
20      But then it gets even a little more
21 complicated because we have to start looking at the
22 some of the atoms that make up the larger mass, and
23 that's the elements to each charge. Each charge has

61

1   parts like a chain, which has links, and if each link
2   is of equal strength that chain is worthy of standing.
3           But if one link in that chain is defective,
4   then the chain falls apart and it can't do its
5   function.
6           To complicate things even a little further,
7   there are three human beings over here that are on
8   trial for the same charges. So they have to be broken
9   out individually. How about this guy, what did he do?
10  How about that guy, what did he do? What is the
11  connection, if there is a connection, between these
12  two fellows?
13          The job is not an easy one, as I said at the
14  beginning. There's really 26, I said 27, but it is
15  really 26 different verdicts here, because there's
16  three men. And then you have got all of these charges
17  that have been placed before you.
18          Now, as to Mr. Robinson, was he a participant
19  in the events alleged in the indictment beyond a
20  reasonable doubt? We don't have Mr. Meeks saying,
21  Yup, I recognized him. We know that Mr. Meeks was
22  given a photo line-up with Mr. Coleman's picture in
23  it, he didn't pick him out, so that doesn't help.

62

1           We have an identification by the older
2   gentleman and the lady yesterday afternoon looking out
3   the window, they can't identify Emmanuel Robinson.
4   We know that Officers Prada and Derbyshire, when they
5   first pulled up on the scene, saw two males go over a
6   brick wall, but they can't identify them.
7           We know that when Mr. Robinson is stopped by
8   the police, you hear nothing about him having anything
9   on his person that links him to this crime.
10          Now, we do hear about this T-shirt. We hear
11  about a T-shirt that has DNA in it, and it has
12  Emmanuel Robinson's DNA on it, but it also has an
13  overlay of somebody else's; there's a mix.
14          The question was asked: What about the first
15  DNA on this shirt and who put it on second? The lady
16  didn't know. She couldn't tell us. The science is
17  not that sophisticated.
18          So we know there's a T-shirt found at the
19  scene, its got DNA from two different human beings.
20          What's interesting is she took her DNA from
21  the collar. Now that would make sense if somebody had
22  been wearing that shirt and had taken it off. But
23  when we hear that two fellows had masks wrapped around

63

1   their faces, now, think about a shirt being wrapped
2   around a person's face. Is it going to rub their
3   face? Is it going to rub their nose? Is it going to
4   rub the follicles of their hair? Is something going
5   to come off as they wrap this thing so tightly around
6   their face so they can't be recognized? Why the lady
7   said that there wasn't anything adequate on the rest
8   of the body of that T-shirt to corroborate
9   identification.
10          Reasonable doubt. This is what we're --
11  what's being preached here this afternoon, reasonable
12  doubt. Yes, Robinson's DNA is there, but where is it?
13  It is a ring around the collar. It is not on the body
14  of the T-shirt and the body of the T shirt is what we
15  were told was wrapped around the fellows face; they
16  got into the tussle with him when they were fighting
17  about the keys. And the lady said it was
18  insignificant DNA there, couldn't find anything.
19          There's much to do about Mr. Robinson being
20  out in the evening around midnight. Call upon
21  collective common experience, a 17-year-old male at
22  night out looking to chat with a girl. Is that
23  something that's bizarre, strange, unusual? Where did

64

1   he live? Look at his address sheet when you get back
2   there, look at where these events took place.
3           He lives on 4th, these things happen on 5th.
4   That it's not like he came out in the -- out in the
5   suburbs. He's a local kid looking for a girl.
6           The fact that its midnight, he's 17, he's a
7   male, is that shocking?
8           There's much to do about this gun. We know
9   what it is. We know that there's shell casings that
10  seem to match the gun that's been presented with shell
11  casings that were found at the scene. But what don't
12  we have? We have no medical statement that the wound
13  suffered was from a nine millimeter as oppose to a
14  .45, a .38, a .357, who knows. We just know that
15  we're told that it is a gunshot wound.
16          We have no scientific test to show that in
17  fact a .38 was what penetrated this man's foot. There
18  was no slug, no projectile, that was pulled out of any
19  surrounding area where the first or second shot was
20  fired.
21          We have no fingerprints on the gun and that's
22  been well pointed out.
23          But the other thing we don't seem to have

65

1   here is if Mr. Coleman is supposed to have been the
2   gunman here, how come he wasn't tested to see if in
3   fact he really fired that gun? You haven't heard
4   about that either. You have heard about no tests to
5   see if Coleman was the shooter of the gun. He's
6   alleged to have shot it twice. He's allege to have
7   been stopped within moments after it happened in a
8   span of less than ten minutes.
9        No effort was made, why? Because everybody's
10  so cocky that what Mr. Meeks said is gospel. Or
11  perhaps just proficiency in investigation procedures,
12  who knows.
13       But let's look at Mr. Meeks en -- allegation.
14  Was he totally credible? How many people have been
15  shot at once with three people accosting him, take off
16  after the first shot and he doesn't have anything with
17  him, he doesn't have any weapons or anything like
18  that, he chases the guy? Is this a clear thinking
19  individual? Or a person whose mind is clouded with
20  anger?
21       And I think he suggested that he was angry,
22  he was insulted that this was happening in his
23  neighborhood.

66

1        How rational was his observations when he
2   made them? Ladies and gentlemen, again, the facts
3   here are pretty straightforward. But like so many
4   things that are so simple, sometimes they are the
5   easiest to get suckered in with. By suckered in with,
6   I mean, grabbed onto. It's easy, let's go home. We
7   have done our job, but what's being suggested to you
8   is it is not that easy, and you start getting behind
9   the details. And in this case the details as to
10  Mr. Robinson in particular are fairly slim.
11       No identification. No confession. The only
12  thing they have is DNA, but it is DNA in the collar,
13  which would show the man wore the T-shirt, not wrapped
14  it around his face, and when the man was stopped, yes,
15  he was bare-chested, okay. But when you see the
16  pictures when he was down at the police station he had
17  something with him because he had his shirt on. And
18  he wasn't bare-chested when the officers saw the two
19  males hop over the fence. If in fact that was
20  Mr. Robinson himself.
21       Unless there is clear convincing evidence,
22  either direct or circumstantial or a combination of
23  the two, to convince you beyond a reasonable doubt,

67

1   even though there's a hunch, even there's a guess,
2   even though the best efforts of the police to try to
3   present some people for your consideration, guilt
4   beyond a reasonable doubt hasn't been established.
5   The argument is it has not, thank you.
6        THE COURT: Mr. Bernstein?
7        MR. BERNSTEIN: Yes, thank you. Just trying
8   to find some props here, so just bear with me.
9        Well, we're almost at the end. After I sit
10  down, the State gets what's called rebuttal. The
11  State gets rebuttal, they get the last word. We don't
12  get the last word, so I'm going to try and cover
13  everything in one fall swoop. They get the rebuttal
14  because they have the burden of proof. They have to
15  convince you beyond a reasonable doubt that these
16  defendants are guilty of the crimes that they have
17  been charged with.
18       So some of you might be thinking, you know,
19  well, we have heard from three lawyers already, now a
20  fourth lawyer is getting up here, what could he
21  possibly have to say.
22       Well, bear with me. Pay attention for just a
23  few more minutes. And then you'll probably be

68

1   wondering what could the Judge possibly have to say?
2   Well, the Judge is going to tell you about the law in
3   this case. She's going to define the crimes for you.
4        She's going to tell you things about
5   credibility of witnesses. She's going to tell you
6   about what proof beyond a reasonable doubt means.
7   She's basically going to give you kind of a framework
8   so that you can take the facts of this case and decide
9   whether or not it as up to guilty or not guilty.
10       Guilty means that you have satisfied beyond a
11  reasonable doubt that certain crimes were committed,
12  and that the people who were on trial committed those
13  crimes.
14       Not guilty, basically, means you have a
15  reasonable doubt as to one or both of these things.
16  We hear that certain crimes were not committed or that
17  even if the crime was committed, it wasn't committed
18  by one or more of these victims who's on trial.
19       Now, this is what's called a joint trial, and
20  is this is very important because there are three
21  individuals here on trial. You have to weigh the
22  evidence against each one separately, that is very
23  very important. If you go through all of the Court's

69

1  instructions and we're talking about accomplish
2  liability, you have to participate, you have got to do
3  something. It means more than just guilt by
4  association, just because you find one person may have
5  done something, doesn't mean that another person did
6  something, so you can't just rely on the fact that,
7  well, three people were arrested, three people were
8  charged, three people were in the courtroom. If one
9  of them is guilty, they all must be guilty. No,
10  that's not the way it works.
11       So with that little, kind of, overview or
12  background, I'd like to talk to you about the State's
13  case against my client, Mustafa Whitfield.
14       Now, in a criminal case, as you probably
15  could guess and I just mentioned it very briefly, one
16  of the things that the State has to prove is that
17  Mustafa Whitfield was one of the people who committed
18  these crimes. The State can prove -- and I'm not
19  going to talk to you about what happened to Mr. Meeks,
20  Mr. Meeks says it is very clear, it was clear that he
21  was assaulted and people attempted -- they took his
22  keys. He was shot in the foot. There's -- no one is
23  disputing that these things did not happen to

70

1  Mr. Meeks. They happened to him. That's one of these
2  things the State has to prove.
3       What -- what happened to Mr. Meeks were
4  crimes, one or more crimes. Another thing the State
5  has to prove is the who did it question. Who
6  committed the crimes? And that is just as important
7  and the State's burden of proof on the who did it
8  question, is the same as proof of the crimes question,
9  it's proof beyond a reasonable doubt.
10       So what I'd like to talk to you right now
11  about is this who did it question. Was Mustafa
12  Whitfield one of the people who was a participant in
13  these activities in these crimes?
14       If he wasn't, or you have a reasonable doubt
15  that he was, you have to find him not guilty. No
16  matter what you may have thought might have happened
17  out there on Willing Street that night. If Mustafa
18  Whitfield was not one of the people who was involved
19  in that, he's not guilty.
20       Now, what's the best case -- what's the
21  State's best case -- and I'm sitting here listening to
22  everybody else here and I'm going through my mind
23  here, you know, and I'm thinking what's the State's

71

1  best case against Mustafa Whitfield? Well, there were
2  three people. Two of them had their faces covered
3  with T-shirts. All three of these people, according
4  to Mr. Meek, were fairly close to him, two or three
5  feet away, gun pointed at his head. The man who had
6  the gun, his face wasn't concealed. According to
7  Mr. Meek, he got a pretty good look at this guy.
8       According to Mr. Meek the area was well lit.
9  In fact, all of the people who had an opportunity to
10  either look out their windows or be there that night
11  or go back a little bit later, they all agree it was a
12  pretty well-lit area. You heard Detective Messic say,
13  you know, I was standing there and I could see 30, 40
14  feet away, it was a well-lit area.
15       There was a struggle between Meek and one of
16  the people who had their faces covered. There was a
17  white T-shirt found at the scene. There was DNA
18  collected from the T-shirt and it comes back to
19  Emmanuel Robinson. Three men are seen running towards
20  5th Street going east. Coleman is apprehended right
21  around the corner and the other two are seen going
22  over a wall at the Church across the street. And
23  there's some controversy about how long it took to

72

1  apprehend these other two people after they were first
2  spotted, whether it is three minutes, five minutes,
3  ten minutes. I'll get into that in a few minutes that
4  may be significant, may not. But I'll talk about
5  that, I'm just going to put that aside for a minute.
6       Robinson is stopped by the police and with
7  Robinson is Mustafa Whitfield. There's nobody else
8  around, and the State's -- you know, its -- he's got
9  to be the third guy. Nobody else around, he's with
10  Robinson, Robinson's DNA is on a T-shirt that's found
11  at the scene. So the argument goes, if the T-shirt
12  comes back to Robinson, and Robinson is with
13  Whitfield, therefore ,Robinson -- Whitfield must have
14  been with Robinson in the 500 block of Willing Street
15  and he's the third guy. That's the theory.
16       Now, there really isn't anything else.
17  There's no fingerprints. Nobody identifies Mustafa
18  Whitfield, nobody. There's no physical evidence
19  linking Mustafa Whitfield to this offense. There's
20  just the T-shirt at the scene. The T-shirt comes back
21  to Emmanuel Robinson, who is with Whitfield,
22  therefore, it must be Whitfield, who else could it
23  possibly be?

73

1    Well, on one level, it sounds pretty
2    convincing, but it is really not. It is not
3    convincing at all, and here's why: Let's go back to
4    the 500 block of Willing Street and let's look at
5    Mr. Meek for a few minutes. If you paid close
6    attention to Mr. Meek and his testimony, one of the
7    things I would suggest you may have gotten out of that
8    was Mr. Meek is a fairly alert, observant person.
9        Even when he's pulling into the ally, he sees
10   these people and he -- a little suspicious. His
11   antenna was up a little bit because he goes ahead and
12   parks his car and he is getting out. It is a well-lit
13   area, and, you know, what possibly could happen? It
14   is right behind my house.
15       Mr. Meek also tells you when he encounters
16   these three people, he gets a really good look with
17   the guy with the gun. And, in fact, the next day when
18   he's shown a photo line-up he picks out Akeem Coleman
19   as the person who was welding that gun and he
20   describes the gun to a tee, a black handgun.
21       He also identifies Akeem Coleman sitting here
22   in court. He says that's the guy, pointing right at
23   him, saying, I'm positive 100 percent positive, that's

74

1    the guy.
2        And if you recall when Mr. Meek was cross
3    examined, he was asked a few questions about the other
4    people, the people who supposedly had these white
5    T-shirts covering their faces.
6        Well, Mr. Meek, do you remember anything
7    about the clothing, anything unusual at all about the .
8    clothing? I mean, you got a pretty good look at these
9    people. And he told you, you know, I really wasn't
10   paying real close attention.
11       You know, did any have puffy jackets or crazy
12   shirts, anything? Big shoes? Gold chains? Anything?
13   Anything that might, you know, when you see somebody
14   say, you know, I can't remember what his face looks
15   like, but that guy was wearing a jacket with a picture
16   of Elvis on it.
17       And Mr. Meeks said, No, nothing unusual.
18   Well, we know that within ten minutes after this
19   offense occurred Mustafa Whitfield is stopped by the
20   police and several hours later Mustafa Whitfield's
21   photo is taken, that's Mustafa Whitfield. Gray
22   sweatshirt, but ask yourself this question: If
23   Anthony Meek had such a good look at Akeem Coleman and

75

1    the gun and considering the lighting conditions and
2    how close he was, if Mustafa Whitfield was really this
3    third guy who was there, don't you think he would have
4    noticed that skunk on his T-shirt -- on his shirt?
5        Don't you think he would have seen Pepe Le
6    Pew staring him right in the face? You know, even if
7    you're not paying close attention, how can you miss
8    it? Now, what does that tell you? If you think about
9    it, well, maybe it tells you that that guy with the
10   skunk on the shirt wasn't there. Because if he was,
11   isn't it just amazing that Anthony Meek didn't see it.
12       I mean, is that something you're going to
13   miss no matter how observant you might be and I would
14   suggest to you Anthony Meek is anything but observant.
15       Now, Mustafa Whitfield doesn't have to prove
16   that it was somebody else. The State has to prove it
17   was him. The State has to prove that beyond a
18   reasonable doubt. And if you can answer the question,
19   why didn't Anthony Meeks see that skunk, if you can
20   answer that, you should find Mustafa Whitfield guilty.
21       But if you can't, if you're sitting there and
22   you're thinking, you know, even if it was dark out and
23   the it wasn't, and even if I really wasn't paying

76

1    attention, which I was, how do you miss that? How
2    could you not say when you're talking to the police,
3    you know, these guys had T-shirts wrapped around their
4    faces. I really couldn't see their faces, but one of
5    them was wearing a shirt with a skunk on it.
6        That's what you would expect to have heard
7    from somebody who had a good look at these three
8    people, under the conditions that was prevailed that
9    night, under the circumstances who could identify by
10   face one of these people, who identified the gun, very
11   accurately. And as I said before, I mean, even if
12   you're not paying attention to clothing or appearances
13   or hair styles or puffy jackets or big shoes or
14   whatever, you got to see that. You just can't miss
15   it. It is not some little monogram here. It is just
16   too big. It is just too -- it's too much out there. .
17   You got to see it.
18       And if you didn't, maybe that wasn't the
19   person who was there. That -- and I'm not going to
20   repeat all these definitions of reasonable doubt.
21   What's reasonable doubt? There's stories about
22   reasonable doubt, that is reasonable doubt. That is.
23   It is staring you right in the face. Take a look at

**77**

1  it.
2      And if you have a reasonable doubt that the
3  guy with the skunk on the shirt was out there, you
4  have to find Mustafa Whitfield not guilty. No matter
5  what happened to Mr. Meek because Mustafa Whitfield
6  just wasn't involved in that.
7      Now, you're probably asking yourself at this
8  point, well, what about the fact that, you know, well
9  he was with Robinson. And you heard Mustafa Whitfield
10 testify and he told you where he was before, and how
11 he went out of his house, and how he ended up where he
12 was. And you're going to have to evaluate that. But
13 remember this, the defendant doesn't have the burden
14 of proof in a criminal case, the State does.
15     The State has to prove he is one of the
16 people who did this. And I would suggest to you that
17 the -- the strongest evidence against that is that
18 picture right there.
19     If it was him, how could Anthony Meeks
20 possibly miss him?
21     And if you can't answer that, that's
22 reasonable doubt, that's not guilty. Thank you, very
23 much.

**78**

1      THE COURT: The State.
2      MR. O'CONNOR: Thank you, Your Honor. Ladies
3  and gentlemen, if it gets to be 1:30 on that clock I'm
4  sitting down, that gives me ten minutes, okay.
5      Thank you for your time. We all appreciate
6  it. As the other lawyers have told you this is the
7  State's opportunity and I apologize if I speak a
8  little fast, but I'm trying to get a lot in to address
9  in closing arguments. I'm going to take them in
10 reverse because that's the way my notes go.
11     First, Mr. Bernstein is right, the defendant
12 does not have the burden of proof in a criminal case,
13 except Mustafa Whitfield took the stand. He put his
14 hand on the bible. He gave you a story. Does his
15 story make sense? Do you believe his explanation? Do
16 you believe that he was walking with Emmanuel Robinson
17 in the opposite direction within five minutes of this
18 crime, when Emmanuel Robinson's DNA is at the scene, 1
19 in 4.4 billion, that would mean there's one and a half
20 Emmanuel's Robinson on the either statistically that
21 it had to have been that guy; that's what it means.
22     Could he have been seen Emmanuel Robinson
23 walking with two other people when the crime occurred?

**79**

1      Because he obviously -- Emmanuel Robinson obviously
2  wasn't at the scene when Anthony Meek got shot. Does
3  that make any sense? You have got to ask yourself
4  that, does that make any sense that Emmanuel Robinson
5  is down in the direction of Orange and Tatnell walking
6  up towards the crime scene, based on what Mustafa
7  Whitfield told you, does that make sense with his DNA
8  at the scene? Does it make sense that Mustafa
9  Whitfield and Emmanuel Robinson are almost identically
10 build, 5'9 150 pounds, 5'9 160 pounds, wearing similar
11 clothing. What does that indicate?
12     Mr. Meeks said the other two guys looked like
13 twins. Looked like twins with a 7 pounds difference.
14 And who are they with? A big guy, 5'10, 220 pounds.
15 The big guy had the gun. The big guy who's caught by
16 the police half a block away before the cops even get
17 a phone call or a notice that a shooting occurred, and
18 what's at his feet? The gun. Not the gun that
19 probably fired that casing, the gun that fired that
20 casing.
21     Because as Martin Oales told you that gun was
22 fired and that casing was fire to the exclusion of all
23 other weapons. Not just that same kind of gun, all

**80**

1  other weapons.
2      Mr. O'Connell's representation to you was it
3  probably fired that casing. No, the testimony is that
4  gun fired that casing. Is that a coincidence? Is
5  that a coincidence that a big guy, the size of him, is
6  seen running with two other guys, the size of Anthony
7  Meek, 5'9, 160 pounds right there and he's caught
8  before the cops even know about the shooting? Those
9  are all coincidences that lead up to guilty beyond a
10 reasonable doubt.
11     How does it make sense that Anthony Meek
12 doesn't see Pepe Le Pew in less than a minute's time?
13 Anthony Meek is approached by three guys, two with
14 things around their head and a third guy who's
15 pointing this at his head. Pointing it at his head,
16 what is he looking at? He's looking at the gun
17 because he's afraid that a bullet is going to come out
18 of this gun and pop him, and kill him; that's what
19 he's looking at. He's looking at the gun. He's
20 looking at the guy who's holding the gun, and who is
21 the guy he says holding the gun, that guy.
22     Mr. O'Connell suggests that this line-up is
23 suggestive. Well, in realty the police showed him two

81

1  -- they showed him 12 pictures, not six. They didn't
2  show him two pictures, they didn't show him three
3  pictures, they showed him 12 and he picked out that
4  guy.
5        The same guy who's a half a block away within
6  a minute of the shooting. Is that a coincidence? So
7  Anthony Meek is sitting there, he's got a gun to his
8  face, he's being told to give up the keys, give up the
9  keys and within that same minute what happens?
10 Emmanuel Robinson grabs at his keys, now he's watching
11 the gun and he's got this guy and he's fighting with
12 him. So, now he's wondering, Hey I wonder what
13 everybody is wearing today. He's not thinking that,
14 he's thinking I got to save myself because this guy
15 has a gun to my head.
16       The struggle ensues, a shot is fired. What's
17 he thinking then? He's getting angry. I don't know
18 why he chased the guy. I wouldn't do that, but he
19 gave you an explanation he was angry. So he chases
20 them down the street and then he says Emmanuel
21 Robinson turns and shoots at him again, hitting him in
22 the foot. Does it make sense? Yeah that's when he
23 started to feel pain.

82

1        Does it make sense that he didn't see Pepe Le
2  Pew, that silly cat? Of course it does, because he's
3  got a gun pointed at his face. What's he looking at?
4  The gun. He's looking at the gun. He's fighting with
5  another gun and he's got another guy yelling, Shoot
6  him. Shoot him. Shoot him.
7        And if you accept that explanation,
8  Mr. Bernstein told you, he's guilty. In addition to
9  the fact that he's caught within five minutes of the
10 crime, within a block and a half of the crime with
11 another guy, who's DNA is at the crime, who just
12 happens to be his twin.
13       He couldn't say it was him because he did
14 wrap the T-shirt around his face. Oh, but he didn't
15 have the T-shirt on, that picture was taken six hours
16 after they were taken to the police station. What did
17 they do with their clothes in that six hours? Who
18 knows. Nobody was watching them. There's no
19 testimony that what they were wearing at the time
20 except for Officer Derbyshire who said Akeem Coleman
21 was wearing a white T-shirt when he was stopped.
22       Is it unreasonable that Anthony Meek is not
23 paying attention to Pepe Le Pew in that circumstance?

83

1  Absolutely.
2        Mr. Bernstein says that Anthony Meek's
3  observations are very good. Mr. Bayard's says they
4  are not. You have to decide, you saw his testimony.
5        Do we know how these T-shirts were wrapped
6  around their faces? No, we don't. To the best of my
7  recollection, the shirt that was left at the scene had
8  DNA on it, and he's caught within a block of the scene
9  within minutes of the shooting.
10       Mr. Bayard, or somebody said, something about
11 if Akeem Coleman was tested whether he fired the gun
12 or not. There's no evidence whether that is even
13 possible before you. It is a red herring. Nobody
14 wants you to think about other things, they don't want
15 you to look for the truth. They want you to search
16 for doubt.
17       Mr. O'Connell's client, Mr. Coleman, if you
18 believe the victim, he's guilty. If you believe the
19 circumstantial evidence, he's guilty. But I want --
20 he wants you to look at it all separately and say if
21 you can't believe Anthony Meeks, you have got to find
22 him not guilty. Or if you can't believe the
23 circumstantial evidence, you have to find him not

84

1  guilty.
2        We're saying, look at it all. He says that's
3  the guy. That night, an hour from the shooting,
4  that's the guy; that same guy is caught half a block
5  away with the gun at his feet. Reasonable doubt? The
6  State submits it is based on the evidence.
7        Listen to the tape again. Listen to the
8  radio dispatch and put the time frame of all this
9  together. And remember, when you listen to the tape,
10 Anthony Meek has already been shot and then watch how
11 it comes out.
12       A lot of talk about fingerprints.
13 Mr. O'Connell said there's no fingerprints on the gun.
14 Can't say that he had it. There's no evidence that
15 the fingerprinting was actually done to the gun.
16 Detective Messic told you -- and you can assess his
17 credibility like everybody else that he asked for it
18 to be done. It looked like it was done, but he
19 doesn't work in the evidence detection unit so he
20 doesn't know.
21       What else do we know about the gun?
22 Patrolman Derbyshire handled the gun with his hands.
23       If there's fingerprint evidence, which

85

1  Corporal Rhoades is going to tell you, remember there
2  was a bottle sitting there. Sometimes fingerprints
3  depends on the sequence of a lot of things. It is a
4  misconception that fingerprints are left everywhere,
5  even if they were Derbyshire's prints should come up
6  on it.
7      Regardless of fingerprints -- fingerprints is
8  another way to say. They can't absolutely prove to
9  you, that he's the guy who had the gun. Despite the
10  fact the victim said it is him, within a minute he's
11  half way around the block. The gun's at his feet, but
12  didn't see him drop it, but there's cars there. We're
13  just going to ask you to look at all of the evidence
14  and when you look at it all together, when you apply
15  your common sense to all of the evidence in this case,
16  you're going to conclude that these three guy are the
17  guys that committed the crime.
18      I have five seconds left.
19      THE COURT: It is my understanding that lunch
20  has not yet arrive. Is that correct?
21      THE COURT: Ladies and gentlemen, I have jury
22  instruction that I need to look over. It looks like
23  your lunches are not here, so I think it might be

86

1  better to just go ahead and read the instructions to
2  you. So you can get started with your deliberations
3  but once I start I can't stop, so we're committed.
4      Ladies and gentlemen of the jury, you have
5  now heard all of the evidence that's going to be
6  presented in this case, and you have heard the
7  arguments of the attorneys for the State and for the
8  defendants. I shall now review the evidence that has
9  been presented, because you, the jury, are the sole
10  and exclusive Judges of the facts of the case; of the
11  credibility of the witnesses; and of the weight and
12  the value of their testimony.
13      I shall now instruct you as to the principles
14  of law governing this case. No single one of these
15  instructions states all of the law applicable to this
16  case; therefore, you should listen to and consider all
17  of the instructions together in reaching your verdict.
18      It is your duty as jurors to determine the
19  facts, and the determine them only from the evidence
20  in this case. You are to apply the law as I state it
21  to you to the facts as you find them to be, and in
22  this way decide the case.
23      Under our criminal law, crimes are defined by

87

1  statute and many other matters pertaining to the
2  criminal law are governed by statute as well. I shall
3  explain to you the law defining the offenses which
4  these defendants are charged with having committed,
5  and any other offenses of which they might be found
6  guilty under such a charge. I shall also explain to
7  you the burden of proof that's imposed on the State in
8  that case.
9      Counsel has sometimes presented objections to
10  some of the testimony or other evidence. It is the
11  duty of an attorney to object to evidence that may not
12  properly be offered, and you should not be prejudiced
13  in any way against an attorney to who makes objections
14  or against the party that this attorney represents.
15      At times I may have sustained objections.
16  You must not consider any evidence to which an
17  objection has been sustained. You are not to
18  speculate as to the nature or content of evidence I
19  have ruled inadmissible.
20      At other times, I have overruled objections,
21  in which case you are free to consider the evidence
22  that has been offered.
23      Often the attorney's have approached sidebar

88

1  to discuss evidentiary and other matters. You are not
2  to speculate on what may have been said at such
3  sidebar conferences. Please understand that when I
4  rule on objections, I'm making a legal decision. You
5  must not concern yourselves with the reasons behind
6  the rulings that I make.
7      The role of an attorney is to zealously and
8  effectively advance the claims of the party the
9  attorney represents within the bounds of the law. An
10  attorney may argue all reasonable inferences from
11  evidence in the record. However, it is not proper for
12  an attorney to state a personal opinion as to the
13  truth or falsity of any testimony or evidence or on
14  the guilt or innocence of an accused. What an
15  attorney personally thinks or believes about the
16  testimony or evidence in a case is simply not
17  relevant, and you are instructed to disregard any
18  personal opinion or belief concerning testimony or
19  evidence which is -- which an attorney offered.
20      While it is very important that you listen to
21  and consider what the attorneys say during the trial,
22  what they say is not evidence. Further, even though
23  you must follow what I say about the law, what I say

89

1  is not evidence. Evidence consisting of testimony
2  from witnesses testifying from the witness stand and
3  exhibits introduced through their testimony. It is
4  this evidence only which you may consider in reaching
5  your verdicts.
6       The law presumes every person charged with a
7  crime to be innocent. This presumption of innocence
8  requires a verdict of not guilty, unless you are
9  convinced by the evidence that the defendant is guilty
10  beyond a reasonable doubt.
11      I'm was going to ask the bailiff to move
12  that.
13      The burden of proof is upon the State to
14  prove beyond a reasonable doubt all of the facts
15  necessary to establish each of every element of the
16  crime charged.
17      Reasonable doubt is a practical standard.
18      On the one hand, the criminal cases the law
19  imposes a greater burden of proof than in civil cases.
20  Proof that a defendant is probably guilty is not
21  significant.
22      On the other hand, there are very few things
23  in this world that we know with absolute certainty.

90

1  Therefore, in criminal cases, the law does not require
2  proof that overcomes every possible doubt.
3      Proof beyond a reasonable doubt is proof that
4  leaves you firmly convinced of the defendant's guilt.
5  Therefore, if, based upon your conscientious
6  consideration of the evidence, you are firmly
7  convinced that the defendant is guilty of the crime
8  charged, you should find the defendant guilty.
9      If, on the other hand, you think there is a
10  real possibility, or, in other words, a reasonable
11  doubt, that the defendant is not guilty, you must give
12  the defendant the benefit of that doubt by finding the
13  defendant not guilty.
14      There are three individuals on trial. In
15  effect, there are three separate cases being tried
16  together. A criminal offense may be committed by one
17  person, or by two or more persons acting together. If
18  you are satisfied beyond a reasonable doubt that one
19  of the defendants is guilty, that does not necessarily
20  mean any other defendant is guilty. In other words,
21  just because you reach a conclusion with regard to one
22  defendant does not mean that that conclusion will
23  apply with regard to another defendant.

91

1      You must bear in mind at all times that the
2  defendants are charged as individuals. You must weigh
3  the evidence and apply the law individually and render
4  separate verdicts as to each defendant.
5      Each defendant is charged with separate
6  charges as contained in the indictment.
7      Each offense charged is a separate and
8  distinct offense and must, therefore, be independently
9  evaluated by you. Just because you reach a conclusion
10  with regard to one offense does not mean that the same
11  conclusion will apply with regard to any other
12  offense. Again, each charge is separate and distinct
13  and you must evaluate evidence as to one independently
14  from evidence as to the others.
15      The defendants are charged in this Court by
16  an indictment. The indictment is a mere accusation
17  against the defendants. It is not in itself any
18  evidence of the guilt of the defendants. You should
19  not allow yourselves to be influenced in anyway,
20  however slight, by the fact that an indictment has
21  been returned against these defendants.
22      Whether these defendants are guilty or not
23  guilty is for you to determine solely from the

92

1  testimony which has been presented during the trial.
2  If your recollection of that evidence disagrees with
3  anything said about it, either by counsel or by the
4  Court, you should be guided entirely by your own
5  recollection. The determination of the true facts,
6  and the drawing of any inferences from the proven
7  facts, are matters solely within your province.
8      Now, I'll review the counts in the
9  indictment. Count I, it is charged Attempted Robbery
10  First Degree, Akeem Coleman, Emmanuel Robinson and
11  Mustafa Whitfield, on or about the 14th day of
12  October, 2002, in the County of New Castle, State of
13  Delaware, when in the course of attempting to commit
14  theft, did intentionally use or threaten the immediate
15  use of force upon Anthony Meek with intent to prevent
16  or overcome resistance to the taking of property or to
17  the retention thereof immediately after the taking, or
18  with intent to compel said person to deliver up
19  property or the engage in other conduct in which aided
20  in the commission of theft, and in the course of the
21  commission of the crime or the immediate flight
22  therefrom, the defendant or another participant in the
23  crime caused physical injury to Anthony Meek, who was

93

1 not a participant in a crime or displayed what
2 appeared to be a firearm, a handgun, a deadly weapon
3 as defined in Title 11, Section 222 of the Delaware
4 code.
5 　　　Count II, Possession of a Firearm During the
6 Commission of a Felony, that is charged that Akeem
7 Coleman, Emmanuel Robinson and Mustafa Whitfield, on
8 or about the 14th day of October, 2002, in the County
9 of New Castle, State of Delaware, did possess a gun, a
10 firearm during the commission of an Attempted Robbery
11 First Degree as stated in Count I of this indictment
12 and incorporated herein by reference.
13 　　　Count III, Assault in the Second Degree, it
14 is charged that Akeem Coleman, Emmanuel Robinson and
15 Mustafa Whitfield, on or about the 14th day of
16 October, 2002, in the County of New Castle, State of
17 Delaware, did recklessly or intentionally cause
18 physical injury to Anthony Meek by means of a firearm,
19 a deadly weapon.
20 　　　Count IV, Possession of a Firearm During the
21 Commission of a Felony, it is charged that Akeem
22 Coleman, Emmanuel Robinson and Mustafa Whitfield, on
23 or about the 14th day of October, 2002, in the County

94

1 of New Castle, State of Delaware did possess a gun, a
2 firearm, during the commission of Assault Second
3 Degree as stated in Count III of this indictment and
4 incorporated herein by reference.
5 　　　Count V, Reckless Endangering in the First
6 Degree, it is charged that Akeem Coleman, Emmanuel
7 Robinson and Mustafa Whitfield, on or about the 14th
8 day of October, 2002, in the County of New Castle,
9 State of Delaware, did recklessly engage in conduct
10 which created a substantial risk of death to Anthony
11 Meek, by discharging a firearm at him or in his
12 direction.
13 　　　Count VI, Possession of a Firearm During the
14 Commission of a Felony. It is charged that Akeem
15 Coleman, Emmanuel Robinson and Mustafa Whitfield, on
16 or about the 14th day of October, 2002, in the County
17 of New Castle, State of Delaware, did posses a gun, a
18 firearm during the commission of Reckless Endangering
19 First Degree as stated in Count V of this indictment
20 and incorporated herein by reference.
21 　　　Count VII, Wearing a Disguise During the
22 Commission of a Felony, it is charged that Emmanuel
23 Robinson and Mustafa Whitfield on or about the 14th

95

1 day of October, 2002, in the County of New Castle,
2 State of Delaware, did wear a hood, mask or other
3 disguise during the commission of Attempted Robbery
4 First Degree, Assault Second Degree, and/or Reckless
5 Endangering First Degree, felonies set forth in Count
6 I, II, III and/or V of this indictment.
7 　　　Count VIII, Conspiracy Second Degree, it is
8 charged that Akeem Coleman, Emmanuel Robinson and
9 Mustafa Whitfield on or about the 14th day of October,
10 2002, in the County of New Castle, State of Delaware,
11 when intending to promote or facilitate commission of
12 the felony of Robbery First Degree, Assault Second
13 Degree, and/or Reckless Endangering First Degree, did
14 agree with each other that they or one or more of them
15 would engage in conduct constituting said felony or
16 felonies or an attempt or solicitation to commit same,
17 and the defendant or one of the co-conspirators did
18 commit an overt act in pursuance of said conspiracy by
19 committing said felony or felonies as set forth in
20 Counts I, III, and/or V of this indictment.
21 　　　Count IX, Possession Of a Deadly Weapon by a
22 Person Prohibited. It is charged that Akeem Coleman,
23 Emmanuel Robinson and Mustafa Whitfield on or about

96

1 the 14th day of October, 2002, in the County of New
2 Castle, State of Delaware, the defendants, juveniles,
3 did have in their possession a handgun, while not
4 engaged in lawful hunting, instruction, sporting or
5 recreational activity while under the supervision of
6 an adult, an act in violation of Title 11, Section
7 1448 of the Delaware code.
8 　　　Now I'm going to read you an instruction
9 about accomplish liability. A person charged with
10 committing one or more offenses may be convicted
11 either as a principle for acts committed by himself or
12 as an accomplice for acts committed by another person.
13 Delaware law provides:
14 　　　"A person is guilty of an offense committed
15 by another person when intending to promote or
16 facilitate the commission of the offense, the person
17 ... aids, counsels, or agrees, or attempt to aide the
18 other person in planning or committing it."
19 　　　In other words, the person directly
20 committing the offense is the principle; the person
21 who assists the principal, in a matter defined above,
22 is the accomplice. A person may therefore be found
23 guilty as an accomplice for an offense committed by

97

1 another person if you are unanimously satisfied beyond
2 a reasonable doubt that the person alleged to be the
3 accomplice acted intentionally, that is, he intended
4 to promote or facilitate the commission of a crime.
5     It is the law that all persons who join
6 together with a common intent and purpose to commit an
7 unlawful act which, in itself, makes it foreseeable
8 that a crime not specifically agreed upon in advance
9 might be committed, are responsible equally as
10 principals for the commission of such an incidental or
11 consequential crime, whenever the second crime is one
12 in furtherance of or in aid to the originally
13 contemplated unlawful act.
14     If your determine, however, after considering
15 the evidence that a defendant was merely present at or
16 near the scene of the crime, without taking any
17 actions as described above that would make the
18 defendant liable as an accomplice, then it is your
19 duty to find the defendant not guilty.
20     This statute does not confer accomplice
21 liability if a defendant participated only after the
22 crimes committed. Additionally, you are further
23 instructed that your verdict need not be unanimous as

98

1 to whether a defendant acted as a principal or an as
2 an accomplish. However, your verdict must be
3 unanimous as to the defendant's guilt, whether as a
4 principle or as an accomplice.
5     Each defendant is charged as a principle or
6 accomplice in Counts I, II, III, IV, V, VI, VIII and
7 IX. As a matter of fact, all the counts in the
8 indictment are under all three defendants except the
9 wearing a disguise, which is Count VIII and that is a
10 charge only against Emmanuel Robinson and Mustafa
11 Whitfield.
12     The defendants are charged in Count I of the
13 indictment with Attempted Robbery First Degree. In
14 order to find the defendants guilty of Attempted
15 Robbery First Degree, you must find that all of the
16 following elements have been established beyond a
17 reasonable doubt, as to each defendant.
18     First, the defendant's conduct occurred in
19 the course of committing theft, or in the course of an
20 attempt to commit theft. The phrase "in the course of
21 committing theft" in addition to its ordinary meaning,
22 includes any act which occurs in an attempt to commit
23 theft or immediate flight after commission or attempt

99

1 to commit theft.
2     A person commits "theft" when he takes,
3 exercises control over or obtains property of another
4 person, intending to deprive him of it or appropriate
5 it. "Appropriate" means to exercise control over
6 property of another person permanently or for so
7 extended a period of time as to obtain the economic
8 benefit of it.
9     Second, the defendant threaten the immediate
10 use of force on another person, in this case, Anthony
11 Meek. The phrase "threatened the immediate use of
12 force on another person," refers to a show of power or
13 strength sufficient to compel another person to give
14 up property, such as the giving up of property through
15 intimidation, by not necessarily by means of physical
16 violence.
17     The third element, the defendant acts with
18 the intent to compel the owner of the property or
19 another person to give up the property.
20     And fourth, there's an alternative -- there's
21 an A or B part to number four. The defendant caused
22 physical injury to Anthony Meek, who was not a
23 participant in the crime. The term "physical injury"

100

1 means any impairment of physical condition or
2 substantial pain. Or the (b) part, the defendant
3 displayed what appeared to be a deadly weapon in the
4 course of committing the crime. The term "display"
5 includes not only the notion of spreading before you
6 or exhibiting to the sight, but also that which is
7 manifested to any of the victim's sentences. In other
8 words, a weapon may be manifested to a victim even
9 though the victim may not actually see the weapon. A
10 "deadly weapon" includes any weapon from which a shot
11 may be fired.
12     Fifth element is this: The defendant acted
13 intentionally as to all of the above elements. The
14 defendant acts "intentionally" when it is the
15 defendant's conscience object or purpose to do the
16 acts alleged.
17     If after considering all of the evidence, you
18 find that the State has established beyond a
19 reasonable doubt, as to each defendant, all of the
20 elements of this offense as I have defined them for
21 you, then you should find the defendant guilty of the
22 offense of attempted Robbery First Degree.
23     If you do not so find, or if you have a

101

1 reasonable doubt as to any elements of this offense,
2 you must find the defendant not guilty.
3          Delaware law defines the offense of
4 Possession of a Firearm During the Commission of a
5 Felony in pertinent part as follows: A person who is
6 in possession of a firearm during the commission of a
7 felony is guilty of Possession of a Firearm During the
8 Commission of a Felony.
9          Counts II, IV, and VI of the indictment
10 charge defendants Akeem Coleman, Emmanuel Robinson and
11 Mustafa Whitfield with Possession of a Firearm During
12 the Commission of a Felony. In order to find the
13 defendants guilty of Possession of a Firearm During
14 the Commission of a Felony, you must find that all of
15 the following elements have been established beyond a
16 reasonable doubt as to each defendant:
17          First, that the defendant committed a felony,
18 in this case the felony charged is: Count II
19 Attempted Robbery in the First Degree as set forth in
20 Count I; Count IV, Assault Second Degree as set forth
21 in Count III; and Count VI, Reckless Endangering in
22 the First Degree as set forth in Count V.
23          And during the commission of a felony, the

102

1 defendant possessed a firearm; and third the defendant
2 acted knowingly. A "firearm" means any weapon from
3 which a shot, projectile, or other object may be
4 discharged by force of combustion, explosive, gas
5 and/or mechanical means, whether the weapon is
6 operable or inoperable, loaded or unloaded. By
7 "possession" I do not mean merely that the weapon may
8 have been in the area or vicinity of the defendant so
9 that it might have been taken possession of if the
10 defendant wanted to do so. Rather, in order for the
11 defendant to be found in possession of a firearm, as
12 that word is used in this statute, you must find that
13 the weapon was in the immediate personal possession
14 of, or under the immediate control of the defendant so
15 that it was physically available or accessible during
16 the commission of the crime. The defendant acted
17 "knowingly" if he was aware that a firearm was in his
18 possession at the time and place of the alleged
19 offense.
20          If, after considering all of the evidence,
21 you find that the State has established beyond a
22 reasonable doubt as to each particular count as to
23 each defendant, that the defendant acted in such a

103

1 manner as to satisfy all of the elements that I have
2 just stated at or about the date and place stated in
3 the indictment, you should find the defendant guilty
4 of Possession of a Firearm During the Commission of a
5 Felony.
6          If you do not so find, or if you have a
7 reasonable doubt as to any element of this offense as
8 to each particular count and as to each defendant, you
9 must find the defendant not guilty of Possession of a
10 Firearm During the Commission of a Felony.
11          Delaware law defines the offense of Assault
12 Second Degree in pertinent part as follows: A person
13 is guilty of Assault Second Degree when the person
14 recklessly or intentionally causes physical injury to
15 another person by means of a deadly weapon. Count III
16 of the indictment charges the defendants, Akeem
17 Coleman and Emmanuel Robinson and Mustafa Whitfield
18 with Assault in the Second Degree. In order to find
19 the defendants guilty of Assault in the Second Degree,
20 you must find that the following elements have been
21 established beyond a reasonable doubt as to each
22 defendant:
23          First, the defendant caused physical injury

104

1 to the victim, in this case, Anthony Meek, by
2 allegedly shooting him with a firearm. And, second,
3 the defendant acted recklessly or the defendant acted
4 intentionally. And, third, the defendant used a
5 deadly weapon, in this case, a firearm.
6          "Physical injury" and "deadly weapon" have
7 previously been defined.
8          "Recklessly" means the defendant was aware
9 and consciously disregarded a substantial and
10 unjustifiable risk that physical injury of another
11 person would result in his conduct. The risk must be
12 of such a nature and degree disregard thereof
13 constitutes a gross deviations from the standard of
14 conduct that a reasonable person would observe in a
15 situation. "Intentionally" is that it was the
16 defendant's conscience object or purpose to cause
17 physical injury to another person.
18          If, after considering all of the evidence,
19 you find that the State has established beyond a
20 reasonable doubt as to each defendant that the
21 defendant acted in such a manner as to satisfy all of
22 the elements that I have just stated at or about the
23 date and place stated in the time, you should find the

105

1   defendant guilty of Assault Second Degree.
2       If you do not so find, or if you have a
3   reasonable doubt as to any element of the offense as
4   to each defendant, you must find the defendant not
5   guilty of Assault in the Second Degree.
6       Reckless Endangering in the First Degree.
7   Delaware law defines the offense of Reckless
8   Endangering in the First Degree in pertinent part as
9   follows: A person is guilty of reckless endangering
10  the first degree when a person recklessly engages in
11  conduct which creates a substantial risk of death to
12  another person.
13      Count V in the indictment charges all three
14  defendants with Reckless Endangering in the First
15  Degree. In order to find the defendant reckless --
16  guilty of Reckless Endangering First Degree, you must
17  find that the -- that both of the following elements
18  have been established beyond a reasonable doubt as to
19  each defendant: The defendant engaged in conduct
20  which created a substantial risk of death to another
21  person, in this case, Anthony Meek; and, second, the
22  defendant acted recklessly.
23      "And recklessly" has been previously defined.

106

1   If, after considering all of the evidence, you find
2   that the State has established beyond a reasonable
3   doubt that the defendant acted in such a manner as to
4   satisfy all of the elements that I have just stated,
5   as to each defendant, at or about the date and place
6   in the indictment, you should find the defendant
7   guilty of Reckless Endangering First Degree.
8       If you do not so find, or if you have a
9   reasonable doubt as to any element of this offense you
10  must find the defendant not guilty of Reckless
11  Endangering First Degree, and go on to consider the
12  lesser-included offense of Reckless Endangering Second
13  Degree.
14      Delaware law defines the offense of Reckless
15  Endangering in the Second Degree in pertinent part as
16  follows: A person is guilty of Reckless Endangering
17  in the Second Degree when a person recklessly engages
18  in conduct which creates a substantial risk of
19  physical injury to another person.
20      In order to find the defendant guilty of
21  Reckless Endangering in the Second Degree, you must
22  find that all of the following elements have been
23  established beyond a reasonable doubt:

107

1      First, the defendant engaged in conduct which
2   created a substantial risk of physical injury to
3   another person, in this case, Anthony Meek, by
4   allegedly shooting him with a gun; and, second, that
5   the defendant acted recklessly.
6      "Physical injury" means an impairment of
7   physical condition or subsequent pain. And
8   "recklessly" I have previously defined for you.
9      If, after considering all of the evidence,
10  you find that the State has established beyond a
11  reasonable doubt as to each defendant that the
12  defendant acted in such a manner as to satisfy all of
13  the elements that I have just stated at or about the
14  date and place stated in the indictment, you should
15  find the defendant guilty of Reckless Endangering
16  Second Degree.
17      If you do not so find, or if you have a
18  reasonable doubt as to any element of the offense, you
19  must find the defendant not guilty of Reckless
20  Endangering Second Degree.
21      Wearing A Disguise During the Commission Of a
22  Felony. The Delaware law defines the offense of
23  Wearing a Disguise during the Commission of the Felony

108

1   in pertinent part as follows: A person who wears a
2   hood, mask or other disguise during the commission of
3   a felony is guilty of wearing a disguise during the
4   commission of a felony.
5      Count VII of the indictment charges
6   defendants, Emmanuel Robinson and Mustafa Whitfield,
7   of wearing a disguise during the commission of a
8   felony.
9      In order to find the defendant guilty of
10  Wearing a Disguise During the Commission of a Felony,
11  you must find that all of the following elements have
12  been established beyond a reasonable doubt as to each
13  defendant:
14      First, that the defendant committed the
15  felony charged in this case: Count I, Attempted
16  Robbery First, Count II, Assault Second Degree or
17  Count V Reckless Endangering in the First Degree.
18      And secondly, during the commission of a
19  felony the defendant wore a hood, mask or other
20  disguise; and, thirdly, that the defendant acted
21  intentionally or knowingly.
22      A person acts "knowingly" when is aware that
23  he was wearing a hood or mask or disguise during the

109

1  commission of a felony. And "intentionally" has
2  previously before defined for you.
3      If, after considering all of the evidence,
4  you find that the State has established beyond a
5  reasonable doubt as to each defendant that the
6  defendant acted in such a manner as to satisfy all of
7  the elements stated at or about the date and place
8  stated in the indictment, you should find the
9  defendant guilty of Wearing Disguise During the
10  Commission of a Felony.
11      If you do not so find, or if you have a
12  reasonable doubt as to any element of this offense,
13  you must find the defendant not guilty of Wearing a
14  Disguise During the Commission of a Felony.
15      Delaware law defines the offense of
16  Conspiracy in the Second Degree in part as follows: A
17  person is guilty of Conspiracy in the Second Degree
18  when intending to promote or facilitate the commission
19  of a felony, the person: Agrees with another person
20  or persons that they or one or more of them will
21  engage in conduct constituting the felony or attempt
22  or solicitation to commit the felony; and the person
23  or another person with whom the person conspired

111

1      If, after considering all of the evidence,
2  you find that the State has established beyond a
3  reasonable doubt as to each defendant that the
4  defendant acted in such a manner as to satisfy all of
5  the elements, which I have just stated at or about the
6  date and place stated in the indictment, you should
7  find the defendant guilty of Conspiracy in the Second
8  Degree.
9      If you do not so find, or if you have a
10  reasonable doubt as to any element of this offense as
11  to each defendant, you must find the defendant not
12  guilty to Conspiracy in the Second Degree.
13      Delaware law defines the offense of
14  Possession of a Deadly Weapon by a Person Prohibited
15  in pertinent part as follows:
16      The following persons are prohibited from
17  purchasing, owning, possessing or controlling a deadly
18  weapon within the state: Any juvenile, if said deadly
19  weapon is a handgun, unless said juvenile possesses
20  that handgun for the purpose of engaging in lawful
21  hunting, instruction, sporting or recreational
22  activity while under the direct or indirect
23  supervision of an adult.

110

1  commits an overt act in pursuance of the conspiracy.
2      Count VIII of the indictment charges
3  defendants, Akeem Coleman, Emmanuel Robinson and
4  Mustafa Whitfield with Conspiracy in the Second
5  Degree.
6      In order to find the defendant guilty of
7  Conspiracy in the Second Degree, you must find that
8  all of the following elements have been established
9  beyond a reasonable doubt as to each defendant:
10      The defendant intended, that is, it was his
11  conscious object or purpose, to promote or facilitate
12  the commission of the felony: Count I, Attempted
13  Robbery First, Count III Assault Second or Count V
14  Reckless Endangering.
15      Second, the defendant agreed with another
16  person or persons, in this case, each other, to engage
17  in conduct which constitutes the felony or an attempt
18  or solicitation to commit the felony; and, third, the
19  defendant or another person with whom he conspired
20  committed an overt act in pursuant of the conspiracy.
21      An overt act is any act in pursuance of, or
22  in furtherance of, the accomplishment of the purpose
23  of the conspiracy.

112

1      Any prohibited person as set forth in the
2  above subsection, that I just read to you, who
3  knowingly possesses, purchases, owns or controls a
4  deadly weapon while so prohibited shall be guilty of
5  Possession Of a Deadly Weapon by a Person Prohibited.
6      Count IX of the defendant charges defendants,
7  Akeem Coleman, Emmanuel Robinson and Mustafa
8  Whitfield, with Possession of a Deadly Is Weapon by a
9  Person Prohibited.
10      In order to find the defendant guilty of that
11  crime, you must find that the following elements have
12  been established beyond a reasonable doubt as to each
13  defendant:
14      First the defendant knowingly possessed a
15  deadly weapon at the time of the charged offense.
16      Second, the defendant was prohibited from
17  possessing a deadly weapon because he was a juvenile
18  in possession of a handgun at the time of the charged
19  offense.
20      "Deadly weapon" has been previously defined
21  for you. A "juvenile" is a person who has not reached
22  the age of 18.
23      A person who knowingly has direct physical

113

1  control over a thing, at a given time, is regarded as
2  being an actual "possession" of it. Possession may be
3  sole or joint. If one person alone has actual or
4  constructive possession of a thing, possession is
5  sole. If two or more persons share actual or
6  constructive possession over a thing, possession is
7  joint. The element of possession is proven if you
8  find beyond a reasonable doubt that the defendant had
9  actual or constructive possession, either alone or
10  jointly with others.
11          The defendant acted "knowingly" if he was
12  aware that he was possessing a deadly weapon at the
13  time and placed alleged.
14          If, after considering all of the evidence,
15  you find that the State has established beyond a
16  reasonable doubt as to each defendant that the
17  defendant acted in such a manner as to satisfy all of
18  the elements I have just stated at or about the date
19  and place stated in the indictment, you should find
20  the defendant guilty of Possession of a Deadly Weapon
21  by a Person Prohibited.
22          If you do not so find, or if you have a
23  reasonable doubt as to any element of this offense as

114

1  to each defendant, you must find the defendant not
2  guilty of Possession of a Deadly Weapon by a Person
3  Prohibited.
4          An element of a criminal offense deals with
5  the state of mind of the defendant. It is, of course,
6  difficult to know what is going on in another person's
7  mind. Therefore, you are permitted to draw an
8  inference, or in other words to reach a conclusion
9  about a defendant's state of mind from the facts and
10  circumstances surrounding the act that the defendant
11  is alleged to have done.
12          In reaching this conclusion, you may consider
13  whether a reasonable person acting in the defendant's
14  circumstances would have had or would have lacked the
15  requisite intention, knowledge or belief.
16          You should, however, keep in mind at all
17  times that it is the defendant's state of mind which
18  is at issue, and in order to convict the defendant you
19  are required to find beyond a reasonable doubt that
20  the defendant in fact had the intention, knowledge or
21  belief required for a finding of guilt.
22          The fact that our law permits you to draw an
23  inference about the defendant's state of mind in no

115

1  way relieves the State of its burden of proving beyond
2  a reasonable doubt every element of an offense.
3          A matter that has been raised in this case is
4  the identification of Mr. Coleman by Anthony Meek.
5  Identification testimony is an expression of belief or
6  impression by a witness. Its value depends on the
7  opportunity the witness had to observe the offender at
8  the time of the offense and to make a reliable
9  identification later.
10          Are you convinced that the witness has the
11  capacity and an adequate opportunity to observe the
12  offender?
13          Whether the witness had an adequate
14  opportunity to observe the offender at the time if
15  offense will be effected by such manners as how long
16  or how short a time was available, how far or close
17  the witness was, how good were lighting conditions,
18  whether the witness had the occasion to see or know
19  the person in the past.
20          Are you satisfied that the identification
21  made by the witness subsequent to the offense was a
22  product of his own recollection?
23          You may take into account both the strength

116

1  of the identification, and the circumstances under
2  which the identification was made.
3          Finally, you must consider the credibility of
4  each identification witness in the same way as you
5  would any other witness. You must be satisfied beyond
6  a reasonable doubt that each defendant was indeed the
7  one who acted -- who did the act charged and that each
8  actually took place before you may find the defendant
9  guilty of any crime.
10          If there is any reasonable doubt about a
11  defendant's identification, you must give him the
12  benefit of such doubt and find him not guilty.
13          There are two potentially reliable types of
14  evidence from which a jury may properly find the facts
15  of a case. One, is direct evidence; such as the
16  testimony of an eyewitness. The other is indirect or
17  circumstantial evidence, that is, the proof of facts
18  or circumstances from which the existence or
19  non-existence of other facts may reasonably be
20  suggested.
21          In this case, the parties have relied in part
22  upon circumstantial evidence. It is not unusual in a
23  criminal case for either side to rely upon

117

1  circumstantial evidence and the law does not provide
2  that circumstantial evidence need be considered any
3  differently than direct evidence.
4       To warrant a conviction based, in part, on
5  circumstantial evidence, all of the evidence, both
6  direct and circumstantial, must lead you to conclude
7  beyond a reasonable doubt that the defendant committed
8  the offenses charged.
9       You are the sole judges of the credibility of
10  each witness and the weight to be given to the
11  testimony of each. In this connection, you should not
12  give more weight to the testimony of a police officer
13  merely because he is a police officer. You should
14  take into consideration each witness's means of
15  knowledge, strength of memory, and opportunity for
16  observation, the reasonable or unreasonableness of the
17  testimony, the consistency or inconsistency of the
18  testimony, the motivations of the witness, the fact,
19  if it is a fact, that the testimony has been
20  contradicted, the bias, prejudice or interest of the
21  witness, if any, the manner or demeanor of the witness
22  upon the witness stand, and all other facts and
23  circumstances shown by the evidence that affect the

118

1  credibility of the testimony.
2       If you find the testimony to be conflicting
3  by reason of inconsistencies, it is your duty to
4  reconcile it, if reasonably possible, so as to make
5  one harmonious story or it all. But if you cannot do
6  this, then it is your duty and privilege to give
7  portion and testimony which, in your judgment, is most
8  worthy of credit and disregard any portion in your
9  testimony which, in your judgment, is unworthy of
10  credit.
11       Akeem Coleman and Emmanuel Robinson have not
12  elected not to testify in this trial. The election of
13  a person accused of a crime not to testify must not be
14  considered as an indication of his guilt. The
15  defendant has a constitutional right to testify or not
16  to testify as he chooses. The fact that the defendant
17  did not testify must not be considered by you as an
18  indication that the defendant is guilty of the crimes
19  charged or for any other purpose, and you must not
20  discuss it or consider it during your deliberations.
21       Like every other person charged with an
22  offense, each defendant is presumed innocent until
23  proven guilty beyond a reasonable doubt.

119

1       Nothing that I have said since the trial
2  commenced should be taken as expressing an opinion as
3  to the outcome of the case. You are to understand
4  that I have meant no favoritism or partisan meaning in
5  any ruling that I have made in the trial or in these
6  instructions. Furthermore, you must not view these
7  instructions as an expression of opinion on the facts.
8  You, and only you, are the Judges of the facts.
9       How the jury conducts its deliberations is up
10  to the jury itself. It is required, however, that
11  your discussion and deliberations take place only when
12  all twelve jurors are present to participate.
13       I suggest that you discuss the issues fully,
14  giving all jurors a fair opportunity to express their
15  views, before committing yourself to a particular
16  position. Jurors have a duty to consult with one
17  another with an open mind and to deliberate with a
18  view to reaching a verdict.
19       Each of you should decide the case for
20  yourself, but only after impartially considering the
21  evidence with your fellow jurors. You should not
22  surrender your own opinion or defer to the opinions of
23  your fellow jurors for the mere purpose of returning a

120

1  verdict, but you should not hesitate to re-examine
2  your own view and change your opinion if you are
3  persuaded by another view.
4       You are officers of the Court, and must act
5  impartially. Throughout your deliberations, you may
6  not be influenced by passion, prejudice, sympathy the
7  consequences of a verdict, or any motive except a
8  desire to declare the proper verdict upon the evidence
9  and the law.
10       Your verdicts, whatever they are, must be
11  unanimous.
12       At the back of the jury instructions, you'll
13  receive several copies that you can refer to. I know
14  this is an overwhelming amount of material I read to
15  you. There is a verdict sheet that guides you through
16  the various counts and the possible verdicts.
17       At this time, I'll excuse the alternates.
18       THE COURT: All right. Swear the brief,
19  please.
20       (The bailiff is sworn.)
21       THE COURT: We'll send in the exhibits and
22  the instructions soon. Please take the jury.
23       (The jury left the room at 2:15 to

121

1    deliberate.)

2          THE COURT:  Counsel, anything you want to put

3    on the record before we go?

4          MR. O'CONNOR:  Not from the State.

5          MR. O'CONNELL:  None from Akeem Coleman.

6          MR. BERNSTEIN:  No, Your Honor, other than

7    the exceptions the Courts failure charge on the

8    multiple offense instruction, failure to give that.

9          THE COURT:  Very well.

10         THE COURT:  Mr. Bayard?

11         MR. BAYARD:  Your Honor, the Court read what

12   I take is the third and final version of the jury

13   instructions.  We were provided with the first and

14   second version, could we have a copy of the third

15   version that was actually read just now.

16         THE COURT:  Yes.

17         MR. O'CONNELL:  By my saying I don't have any

18   objections, I -- of course, everything I said

19   upstairs --

20         THE COURT:  It is reserved.

21         Now, with regard to the exhibits, bundled

22   them up here and take them to the jury.

23         (Court is in recess until the verdict.)

122

1    STATE OF DELAWARE:

2

3    NEW CASTLE COUNTY:

4

5

6          I, Michele R. Honaker, Official Court
     Reporter of the Superior Court, State of Delaware, do
     hereby certify that the foregoing is an accurate

7    transcript of the proceedings had, as reported by me
     in the Superior Court of the State of Delaware, and

8    supervised by Kathleen D. Feldman, Chief Court
     Reporter, RPR, in and for New Castle County, in the

9    case therein stated, as the same remains of record in
     the Office of the Prothonotary at Wilmington,

10   Delaware, and that I am neither counsel nor kin to any
     party or participant in said action nor interested in

11   the outcome thereof.

12         WITNESS my hand this ____ day of
     _____, 2004.

13

14         MICHELE R. HONAKER
           SUPERIOR COURT REPORTER

15         Cert#156-PS

16

17

18

19

20

1

2

23

000251

State v. Coleman, Robinson, Whitfield

```
                                                    1                                                    3
IN THE SUPERIOR COURT OF THE STATE OF DELAWARE      1        February 6, 2004
                                                             Courtroom No. 6-C
        IN AND FOR NEW CASTLE COUNTY                2

STATE OF DELAWARE,      ID#0210008663  (25)         3    PRESENT:
                        ID#0210009186  (31)
                        ID#0210009174               4        As noted.
v.                            (53)
                                                    5        - - - - -
AKEEM COLEMAN
EMMANUEL ROBINSON                                   6        THE COURT:  Take the verdict, please.
MUSTAFA WHITFIELD,                                  7        THE CLERK:  Madam Forelady, please rise.  Has
                                                    8    the jury agreed upon their verdicts?
        Defendant.                                  9        MADAM FORELADY:  Yes.
                                                    10       THE CLERK:  As to Count 1, how does the jury
                                                    11   find the defendant, Akeem Coleman, for Attempted
                                                    12   Robbery First Degree, guilty as charged or not guilty?
                                                    13       MADAM FORELADY:  Hung.
BEFORE:  HONORABLE SUSAN C. DEL PESCO, J.           14       THE CLERK:  As to Emmanuel --
         and jury                                   15       THE COURT:  Excuse me, I was told that you
                                                    16   had a verdict and if there is a verdict, it means you
APPEARANCES:                                        17   have agreed, all 12 of you, on one of these verdicts:
                                                    18   Guilty, not guilty or guilty of a lesser-included as
    MARTIN O'CONNOR, ESQ.                           19   necessary.
    JOHN DONOVAN, ESQ.                              20       I wasn't informed that there was a
    Deputy Attorney General                         21   nonunanimous verdict.  So I'm going to ask you to take
      for the State                                 22   your seat for a moment and take the jury out, please.
                                                    23       (The jury left the room.)
    KEVIN J. O'CONNELL, ESQ.
      for the Defendant, Akeem Coleman

    JAMES BAYARD, ESQ.
      for the Defendant, Emmanuel Robinson

    JOSEPH M. BERNSTEIN, ESQ.
      for the Defendant, Mustafa Whitfield
```

```
                                                    2                                                    4
                                                    1        MR. BERNSTEIN:  I couldn't quite hear what
        000252                                      2    the response to the question --
                                                    3        THE COURT:  Her response was hung.  And I
         ORIGINAL                                   4    don't know if there's any interest in giving an
                                                    5    Allen-type charge or anything else, but we generally
                                                    6    have that conversation before we take a verdict when
                                                    7    there is a less than unanimous decision as to any of
                                                    8    the counts.
                                                    9        I just didn't want to go any further until we
       VERDICT TRANSCRIPT                           10   had a conversation.
       FEBRUARY 6, 2004                             11       MR. O'CONNELL:  On behalf of Akeem Coleman,
                                                    12   my application would be not to give an Allen charge.
                                                    13       The only application I would have would be to
                                                    14   inquire of the jury whether or not they feel
                                                    15   additional deliberations might bear fruit.  If that
                                                    16   makes sense.
                                                    17       MR. BERNSTEIN:  I guess my observation --
                                                    18   First, I think because of the number of defendant's
                                                    19   and the number of charges, the Court probably should
    SUPERIOR COURT REPORTERS                        20   inquire whether there is a unanimous verdict as to any
    500 North King Street, Suite 2609              21   defendant or any charge as to any defendant.
    Wilmington, Delaware 19801-3725                22       And depending on the answer, then I would
         (302) 255-0570                             23   join in on Mr. O'Connell's request that an Allen
```

5

1  charge not be given; but that the Court inquire of the
2  jury, whether they feel that any additional time would
3  be productive in reaching a unanimous verdict.
4       Tell them, you know, they can take as much
5  time as they want, we're all here, and ask them to go
6  back and think about that and answer that question.
7       MR. BAYARD: Your Honor, as to Mr. Robinson,
8  I would ask to join in that application that the Court
9  do -- does not give the Allen charge, but makes
10  inquiry to see if any further deliberation would be
11  beneficial. If not -- I mean, they did try last
12  night, they have come back here today. Perhaps
13  they --
14       THE COURT: What's the State's position?
15       MR. O'CONNOR: Your Honor, the jury has only
16  deliberated, as far as I can figure, no more than
17  three hours. I think this is a multiple count,
18  multiple defendant case, and I would request that an
19  Allen charge be given.
20       The State, the Court and the Defense has
21  invested a great deal of time into this case and an
22  Allen charge would direct them, given they have only
23  been out less than three hours. The instruction that

6

1  they are -- they are expected to reach a verdict, if
2  they can at all, and I would ask the Court to give an
3  Allen charge at this time, given the amount of time
4  they have deliberated.
5       I don't -- I'm not aware of any basis to
6  object to the Allen charge at this point.
7       THE COURT: Okay. Anybody else want to be
8  heard?
9       MR. BERNSTEIN: I didn't bring my Allen
10  charge folder here.
11       THE COURT: I didn't either, none of us saw
12  this coming.
13       MR. BERNSTEIN: My direction that Allen
14  charges at one time they used to be favored. They
15  have fallen into great disfavor in favor of what's
16  called a modified Allen charge, which emphasizes you
17  ought to go back and try again, as opposed to the
18  dynamite language of, We're going to have to do this
19  again, and, you know, all that stuff.
20       So that prompted my request to simply ask the
21  jury, Do you think that more time would be productive,
22  which is kind of the modified Allen charge.
23       MR. O'CONNOR: Your Honor, I'm aware of what

7

1  Mr. Bernstein is talking about, and I guess what I'm
2  asking the Court is the most recently pronounced Allen
3  charge that the Supreme Court put out.
4       I don't remember the name of the case, they
5  did say the Allen charge, as what is written, is not
6  as favorable as to when they then offered.
7       THE COURT: Why don't we take a few minutes
8  and let's see if we find that decision and see if I
9  can find it.
10       I'm not interested in bringing them back and
11  forth multiple times. I would rather be prepared to
12  address them when they come back in again.
13       Should we let the wheels turn, do you think
14  you can come up with the name of the case?
15       MR. BERNSTEIN: I have my folder back at my
16  office from the last hung jury I had, which was the
17  Hassan L. Guy murder case. I have a whole bunch of
18  things on Allen charges.
19       THE COURT: We'll reconvene in 15 minutes and
20  we'll all see what I got.
21       MR. BERNSTEIN: I doubt if my secretary could
22  find it.
23       (Court was in recess for a short break.)

8

1       MR. BERNSTEIN: Your Honor, the case that I
2  am --
3       THE COURT: The defendant's -- please. I
4  don't have the case that you're referring to.
5       MR. BERNSTEIN: I'll hand it up to the Court.
6       Actually, it would be page -- the last page
7  that I have. Well -- it is actually page 193, the
8  opinion. The paragraph starts off, Although the
9  Supreme Court held in Allen the minority jury
10  charge -- basically, that paragraph -- it points to
11  certain aspects of an Allen charge of the Third
12  Circuit, and those aspects basically are telling the
13  jury that the burden -- about the burden and expense
14  to the Government of a new trial was unduly coercive.
15       And, also, telling the jury you have got to
16  reach a decision --
17       THE COURT: Have you reviewed the form of the
18  Allen charge that you have?
19       MR. BERNSTEIN: I have the Papantinas case,
20  which the Delaware Supreme Court approved an Allen
21  charge and that charge is reproduced in Papantinas.
22       THE COURT: I thought I had that case right
23  here.

9

1      MR. BERNSTEIN: It seems to be the last word
2   from the Delaware Supreme Court.
3      THE COURT: I don't have this case.
4      MR. BERNSTEIN: The language we object to is
5   actually the second paragraph.
6      THE COURT: Let me see, that case was decided
7   in 2002.
8      MR. BERNSTEIN: Yes.
9      THE COURT: No, April 2003.
10      MR. BERNSTEIN: April 2003.
11      THE COURT: And it quotes -- it quotes the
12   instruction that was actually given.
13      MR. BERNSTEIN: Yes.
14      THE COURT: Which is substantially the same
15   as the one we have in our standard instructions.
16      MR. BERNSTEIN: The part that I object to,
17   based on the Third Circuit case in Brennan, the second
18   paragraph of that instruction that deals both with,
19   We're going to have to do it again if you don't reach
20   a verdict and you have got to reach a verdict,
21   language.
22      THE COURT: Show me in this opinion that says
23   you can't say anything.

10

1      Let me tell you, first, that mine is a print
2   out of a Lexus-type so it is not easy --
3      MR. BERNSTEIN: Your Honor, can I hand it up?
4   It is marked with an X, very easy. It is hard for me
5   to walk around, my leg is bothering me.
6      THE COURT: It refers to a case called United
7   State's versus Burley, where it says that the Judge
8   instructed a dead-locked jury to consider it an
9   expense to the Government of a new trial, and it was
10   unduly coercive.
11      What -- the charge given in this case, I
12   assume it is quoted here somewhere, they did not find
13   the charge given to be under coercive.
14      MR. BERNSTEIN: My point is that there are
15   certain aspects.
16      THE COURT: Do you know whether they quoted
17   it here? I think it is a matter of degree. The exact
18   charge was as follows -- okay, I found it. Well, the
19   Delaware Supreme Courts spoke on this issue and --
20   interesting. It is unlikely that they are aware of
21   one another.
22      MR. BERNSTEIN: Well, it is a Federal
23   Constitutional issue, Your Honor. And as I said, we

11

1   don't -- I don't have a problem with the Papantinas
2   instruction, as long as the second paragraph is
3   eliminated, which is what the Third Circuit said is
4   coercive.
5      THE COURT: The State's position?
6      MR. O'CONNOR: Your Honor, I'm not familiar
7   with the exact language of the instruction that
8   Mr. Bernstein says the Third Circuit said was
9   coercive.
10      THE COURT: They didn't -- the point is that
11   the instruction that they reviewed, they found not to
12   be coercive. They simply cite the -- a case that
13   stands for the proposition saying that it is coercive
14   and talks about the burden and expense to the
15   Government of a new trial.
16      MR. O'CONNOR: I don't know what the language
17   was they found offensive in this case.
18      THE COURT: They didn't.
19      MR. O'CONNOR: The State would ask the
20   instruction from Papantinas. The Delaware Supreme
21   Court specifically held that that instruction was not
22   coercive.
23      It's the pattern jury instruction telling

12

1   them that this trial will have to be done again if
2   they can't reach a verdict. It is just a fact, that's
3   just a fact. It doesn't suggest to them that they
4   have to decide in this case. In fact, the next line
5   it says, It is your duty to come to a unanimous
6   verdict if you are able to do so. They are not
7   telling them you have to reach a verdict. They are
8   still telling them --
9      THE COURT: I'm going to give the instruction
10   that's based on that case. It is the same instruction
11   as the standard, so to speak.
12      MR. BERNSTEIN: Your Honor, just to make it
13   clear, we do object to any language that suggests that
14   they have to reach a unanimous verdict, and any
15   language that tells them if they don't this trial is
16   going to be done over.
17      THE COURT: Okay.
18      MR. O'CONNELL: Just so I can make the record
19   clear, as far as my client is concerned, I think it is
20   too early for an Allen charge. They have only
21   deliberated approximately three hours, and it was a
22   rather lengthy case; and that's one of the components
23   that the Supreme Court usually looks at, is the length

13

1  they have been deliberating since giving such a
2  charge. I think it is premature. It is my
3  application not to give the charge.
4       THE COURT: What do you suppose saying to
5  them?
6       MR. O'CONNELL: Inquiring whether or not
7  deliberating further would be more fruitful. If they
8  indicate then that further deliberation would be
9  fruitful, perhaps an Allen charge, a modified one,
10  would be appropriate.
11       Why -- I think at this point they have only
12  deliberated three hours, that's not very long at all.
13       THE COURT: I agree, but the point is that
14  they announced about forty minutes ago that they had a
15  verdict and the only verdict that was returned was the
16  first count. And they said they were hung, so I don't
17  know if they are deliberating now.
18       MR. O'CONNELL: We're operating in a vacuum
19  right now. We don't know if they have agreed on
20  everything expect for that first charge that was
21  asked. They may, in fact, be in agreement for
22  everything, there may only be one charge.
23       But, I guess, my application would be find

14

1  out from them if they reached an agreement on any
2  charges, and if further deliberations will be
3  appropriate. And the Court will do what it sees fit.
4       Obviously -- and I object to an Allen charge.
5       THE COURT: Okay. Well, I think asking them
6  whether or not they have reached a verdict on any
7  charge may be useful information without asking them
8  what they are. And then we can decide whether it is
9  necessary to give the charge. Bring the jury in.
10       MR. BERNSTEIN: Make sure you use the word
11  "unanimous".
12       (The jury entered the room.)
13       THE COURT: Madam Forelady, please rise. I
14  have a couple of questions for you.
15       MADAM FORELADY: Yes.
16       THE COURT: And I'm not going to be asking
17  you about what's on the paper.
18       MADAM FORELADY: Okay.
19       MADAM FORELADY: Have you reached a unanimous
20  verdict as to any of the counts as to any of the
21  defendants?
22       MADAM FORELADY: Yes.
23       THE COURT: Do you believe that further

15

1  deliberation would assist you in reaching a unanimous
2  verdict on additional counts?
3       MADAM FORELADY: No.
4       THE COURT: All right. Please take your
5  seat.
6       I'm going to read to you an instruction that
7  I would like you all to consider.
8       I'd like to suggest a few thoughts that you
9  may wish to consider in your deliberations, along with
10  the evidence in the instructions previously given to
11  you.
12       Every case is important to the parties
13  affected. The trial has been time-consuming and
14  expensive to all the parties. If you should fail to
15  agree upon the verdict, the case is left open and
16  undecided. Like all cases, it must be disposed of at
17  some point.
18       There appears to be no reason to believe that
19  another trial would not with equally time-consuming
20  and expensive to all persons involved, nor does there
21  appear to be any reason to believe the case can be
22  tried again better or more exhaustively than it has in
23  this trial.

16

1       Any future jury must be selected in the same
2  manner and from the same source as you have been
3  chosen. So there appears to be no reason to believe
4  that the case would ever been submitted to twelve men
5  or women more intelligent, or more partial or more
6  competent to decide it or that more or clearer
7  evidence could be produced on behalf of either side.
8       Of course, these matters suggest themselves,
9  upon brief reflection, to all of us who have sat
10  through the trial. The only reason they are mentioned
11  is because some of them have escaped your attention,
12  which must have been fully occupied up until this time
13  in reviewing the evidence of this case. They are
14  matters which, along with others and perhaps more
15  obvious ones, remind us how important and desirable it
16  is for you to unanimously agree upon a verdict, but
17  only if you can do so without violence to your
18  individual judgment and conscience.
19       You should not surrender your conscientious
20  convictions. It is your duty, as jurors, to consult
21  with one another and to deliberate with a view to
22  reaching an agreement, if you can do so without
23  violence to your individual judgment. Each of you

17

1 must decide the case for yourself, but you should do
2 so only after consideration of the evidence with your
3 fellow jurors. And in the course of your
4 deliberations, you should not hesitate to change your
5 opinion when convinced that it is erroneous.
6      In order to bring twelve minds to a unanimous
7 result, you must examine the questions submitted to
8 you with candor and frankness and with proper
9 deference to and with regard to the opinions of each
10 other. That is to say, in conferring together, each
11 of you should pay due attention and respect to the
12 views of the others and listen to each other's
13 arguments with the disposition to re-examine your own
14 view.
15      If much the greater number of you are for one
16 side, each dissenting juror ought to consider whether
17 his or her position is a reasonable one since it makes
18 no effective impression on the minds of so many
19 equally honest, intelligent fellow jurors who bear the
20 same responsibility, serve under the sanction of the
21 same oath, and have heard the same evidence with, you
22 may assume, the same attention and with equal desire
23 to arrive at the truth. In a like manner, the jurors

18

1 who constitute the greater number should consider the
2 reasons of those who take a different position to see
3 whether they may be persuasive merit in that position.
4      You are not partisans; you are judges of the
5 facts. Your sole purpose is to ascertain the truth
6 from the evidence before you. You are the sole and
7 exclusive judges of the credibility of all of the
8 witnesses and of the weight and effect of all of the
9 evidence. In the performance of this high duty, you
10 are at liberty to disregard any comments of both the
11 Court and of counsel, including, of course, the
12 remarks that I am now making.
13      Remember at all times no juror should yield
14 his or her conscientious belief as to the weight and
15 meaning of the evidence.
16      Remember, also, that after full deliberation
17 and consideration of all the evidence, it is your duty
18 to agree upon a verdict, if you can do so, without
19 violating your individual judgment and conscience.
20      You may conduct your deliberations as you
21 choose, but I suggest that you should now retire and
22 carefully reconsider all of the evidence bearing upon
23 the questions before you and see whether it is

19

1 possible to arrive at a unanimous verdict.
2      If, however, upon further deliberation, you
3 believe that a unanimous verdict is simply not
4 possible, please inform the bailiff. I do not suggest
5 in any way you must remain together until a verdict is
6 reached. Nor do I suggest that you must deliberate
7 for any particular length of time before being
8 discharged.
9      So I ask you to retire now. I believe a
10 lunch order has been placed for you and you can resume
11 your deliberations.
12      (The jury left the room to deliberate.)
13      THE COURT: Thank you. We stand in recess.
14      (We reconvene for the verdict.)
15      THE COURT: Verdict, please.
16      THE CLERK: Madam Forelady, please rise. Has
17 the jury agreed upon its verdict?
18      MADAM FORELADY: Yes.
19      THE CLERK: Okay. How does the jury find as
20 to Count 1, Attempted Robbery First Degree as to the
21 defendant, Akeem Coleman, guilty as charged or not
22 guilty?
23      MADAM FORELADY: Guilty as charged.

20

1      THE CLERK: As to defendant, Emmanuel
2 Robinson, guilty as charged or not guilty?
3      MADAM FORELADY: Guilty as charged.
4      THE CLERK: As to defendant, Mustafa
5 Whitfield, guilty as charged or not guilty?
6      MADAM FORELADY: Guilty as charged.
7      THE CLERK: As to Count 2, Possession of a
8 Firearm During the Commission of a Felony, as to
9 defendant, Akeem Coleman, guilty as charged or not
10 guilty?
11      MADAM FORELADY: Not guilty.
12      THE CLERK: As to defendant, Emmanuel
13 Robinson, guilty as charged or not guilty?
14      MADAM FORELADY: Not guilty.
15      THE CLERK: As to defendant, Mustafa
16 Whitfield, guilty as charged or not guilty?
17      MADAM FORELADY: Not guilty.
18      THE CLERK: Count 3, Assault Second Degree,
19 as to the defendant, Akeem Coleman, guilty as charged
20 or not guilty?
21      MADAM FORELADY: Guilty as charged.
22      THE CLERK: As to defendant, Emmanuel
23 Robinson, guilty as charged or not guilty?

**21**

1    MADAM FORELADY: Guilty as charged.
2    THE CLERK: As to defendant, Mustafa
Whitfield, guilty as charged or not guilty?
4    MADAM FORELADY: Guilty as charged.
5    THE CLERK: In Count 4, Possession of a
6    Firearm During the Commission of a Felony, as to
7    defendant, Akeem Coleman, guilty as charged or not
8    guilty?
9    MADAM FORELADY: Guilty as charged.
10    THE CLERK: As to defendant, Emmanuel
11    Robinson, guilty as charged or not guilty?
12    MADAM FORELADY: Guilty as charged.
13    THE CLERK: As to defendant, Mustafa
14    Whitfield, guilty as charged or not guilty?
15    MADAM FORELADY: Guilty as charged.
16    THE CLERK: On Count 5, Reckless Endangering
17    First Degree, as to defendant, Akeem Coleman, guilty
18    as charged or guilty of a lesser-included offense of
19    Reckless Endangering Second Degree or not guilty?
20    MADAM FORELADY: Guilty as charged.
21    THE CLERK: As to defendant, Emmanuel
22    Robinson, guilty as charged or guilty of the
23    lesser-included offense of Reckless Endangering Second

**22**

1    Degree or not guilty?
2    MADAM FORELADY: Guilty as charged.
3    THE CLERK: As to Mustafa Whitfield, guilty
4    as charged or guilty of the lesser-included offense of
5    Reckless Endangering Second Degree or not guilty?
6    MADAM FORELADY: Guilty as charged.
7    THE CLERK: Count 6, Possession of a Firearm
8    During the Commission of a Felony, as to defendant,
9    Akeem Coleman, guilty as charged or not guilty?
10    MADAM FORELADY: Guilty as charged.
11    THE CLERK: As to defendant, Emmanuel
12    Robinson, guilty as charged or not guilty?
13    MADAM FORELADY: Guilty as charged.
14    THE CLERK: As to defendant, Mustafa
15    Whitfield, guilty as charged or not guilty?
16    MADAM FORELADY: Guilty as charged.
17    THE CLERK: Count 7, Wearing a Disguise
18    During the Commission of a Felony, as the defendant,
19    Emmanuel Robinson, guilty as charged or not guilty?
20    MADAM FORELADY: Guilty as charged.
21    THE CLERK: As to defendant, Mustafa
22    Whitfield, guilty as charged or not guilty?
23    MADAM FORELADY: Guilty as charged.

**23**

1    THE CLERK: Count 8, Conspiracy Second
2    Degree, as to defendant, Akeem Coleman, guilty as
3    charged or not guilty?
4    MADAM FORELADY: Guilty as charged.
5    THE CLERK: As to defendant, Emmanuel
6    Robinson, guilty as charged or not guilty?
7    MADAM FORELADY: Guilty as charged.
8    THE CLERK: As to defendant, Mustafa
9    Whitfield, guilty as charged or not guilty?
10    MADAM FORELADY: Guilty as charged.
11    THE CLERK: As to Count 9, Possession of a
12    Deadly Weapon by a Person Prohibited, as to the
13    defendant, Akeem Coleman, guilty as charged or not
14    guilty?
15    MADAM FORELADY: Not guilty.
16    THE CLERK: As to defendant, Emmanuel
17    Robinson, guilty as charged or not guilty?
18    MADAM FORELADY: Not guilty.
19    THE CLERK: As to defendant, Mustafa
20    Whitfield, guilty a charged or not guilty?
21    MADAM FORELADY: Not guilty.
22    THE CLERK: Thank you, you may be seated.
23    Members of the jury, harken to the verdict as the

**24**

1    Court has recorded, your foreperson says that you find
2    the defendants at the bar guilty as to Count 1, all
3    three defendants. As to Count 2, not guilty, as to
4    all three defendants. As Count 3, guilty as to all
5    three defendants. As to Count 4, guilty as to all
6    three defendants. As to Count 5, guilty as to all
7    three defendants. As to Count 6, guilty as to all
8    three defendants. As to Count 7, guilty as to both
9    Mr. Akeem Coleman -- I'm sorry, Emmanuel Robinson and
10    Mustafa Whitfield.
11    And Count 8, Conspiracy, guilty as charged of
12    all three defendants. And Count 9, not guilty as to
13    all three defendants, so say you all?
14    THE JURORS: Yes.
15    THE CLERK: Your Honor.
16    THE COURT: I'd like the jury to retire to
17    the jury room for just a moment and then I'll excuse
18    them. Take them back to the jury, please.
19    (The jury left the room.)
20    THE COURT: I don't know why they would find
21    guilty on a weapons charge, on any of the weapons
22    charges, if not be found guilty as to person's
23    prohibited, unless they misinterpreted the instruction

25

1  at the time of the trial.

2      But, be that as it may, is there any

3  application?

4      MR. O'CONNOR: Not from the State, Your

5  Honor.

6      MR. O'CONNELL: Just for purposes of

7  preserving the argument on the Allen charge --

8      THE COURT: No, I have heard your arguments.

9      MR. O'CONNELL: I'm not going to make a new

10  one, I think the verdict sounds like a compromise

11  verdict, and it is as a result of the course of nature

12  of an Allen charge, just for the record.

13      MR. BERNSTEIN: I agree.

14      MR. BAYARD: Your Honor, I do agree with that

15  observations, please. Thank you.

16      THE COURT: Any other applications?

17      MR. O'CONNELL: No, Your Honor.

18      THE COURT: Let's ask the jury to come back

19  in, I'll excuse them.

20      MR. O'CONNOR: Your Honor, may I speak to

21  defense counsel for one moment?

22      (The jury entered the room.)

23      THE COURT: Ladies and gentlemen, thank you

26

1  very much for the time and attention you have given to

2  this case. We very much appreciate you being here and

3  your patience in listening to all this evidence and

4  going through this process and returning the verdict.

5  You're excused.

6      (The jury was excused.)

7      THE COURT: All right.

8      MR. O'CONNOR: The State would just ask that

9  bail be revoked pursuant to statute.

10      THE COURT: Yes, I think the bail has to be

11  revoked.

12      MR. BERNSTEIN: We're going to ask for a

13  presentence investigation.

14      THE COURT: Yes, I'll do a presentence

15  investigation and the sentencing date will be

16  announced.

17      MR. O'CONNELL: Thank you, Your Honor.

18      (Whereupon, court is in recess.)

19

20

23

27

1  STATE OF DELAWARE:

2

3  NEW CASTLE COUNTY:

4

5      I, Michele R. Honaker, Official Court

6  Reporter of the Superior Court, State of Delaware, do

   hereby certify that the foregoing is an accurate

7  transcript of the proceedings had, as reported by me

   in the Superior Court of the State of Delaware, and

8  supervised by Kathleen D. Feldman, Chief Court

   Reporter, RPR, in and for New Castle County, in the

9  case therein stated, as the same remains of record in

   the Office of the Prothonotary at Wilmington,

10  Delaware, and that I am neither counsel nor kin to any

   party or participant in said action nor interested in

11  the outcome thereof.

12      WITNESS my hand this 10th day of February,

   2004.

13

14  MICHELE R. HONAKER

   SUPERIOR COURT REPORTER

15  Cert#156-PS

16
17
18
19
20
21
22
23

000258

3

1  IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

2      IN AND FOR NEW CASTLE COUNTY

3  STATE OF DELAWARE,

4

5                            ID

6  v.              No. 0210008663

7  AKEEM S. COLEMAN,

8

9          Defendant.

10  BEFORE:    HON. SUSAN C. DELPESCO, J.

11

12

13

14

15          TRANSCRIPT OF HEARING

16

17

18         **ORIGINAL**

19

20

21

22          JOHN P. DONNELLY, RPR
            SUPERIOR COURT REPORTERS
        500 N. KING STREET   WILMINGTON, DELAWARE  19801
                 (302) 255-0563

---

2

1  March 5, 2004
   Courtroom No. 6C
2  1:00

3

4

5  MARTIN B. O'CONNOR, ESQUIRE
   DEPARTMENT OF JUSTICE
6     820 N. French Street
      Wilmington, Delaware  19801
7     for State of Delaware

8  KEVIN J. O'CONNELL, ESQUIRE
      831 Tatnall Street
9     Wilmington, Delaware  19801
      for Defendant
10

11  JOSEPH M. BERNSTEIN, ESQUIRE
       800 N. King Street
12     Wilmington, Delaware  19801
       for Defendant
13

14  JAMES BAYARD, ESQUIRE
    PUBLIC DEFENDER'S OFFICE
15     820 N. French Street
       Wilmington, Delaware  19801
16     for Defendant

000259

---

1          THE COURT:  Good afternoon.  Mr. Bayard, you

2  told me earlier you have another obligation.  What time

3  is your obligation.

4          MR. BAYARD:  2:30, Your Honor, in Dover.  If

5  all else fails, I can call and cancel.

6          THE COURT:  That won't be necessary.  I will

7  ask you not to repeat what is in your papers.  I will

8  give you a chance to supplement what you said.

9          Gentlemen, I have read your written

10  submissions and it is not necessary that you repeat.  I

11  will give you an opportunity to supplement your

12  comments if you would like to.

13          MR. BERNSTEIN:  I guess I just have two

14  comments.  Looking at the State's response it appears

15  that we may have two conflicting decisions from the

16  Delaware Supreme Court.  One, Wilson, that says

17  compromise verdicts are invalid.  The Tilden case that

18  said you can explain any inconsistency in terms of jury

19  linety or practically any inconsistency.  My

20  observation is this; that it is at least on the facts

21  of this case, and the way the verdicts were returned

22  virtually impossible to explain the verdict in terms of

23  jury linety.  I say that for two reasons; if it was

---

1  jury linety, why were the defendants convicted of two

2  weapons charges, but acquitted of the third?  If it was

3  jury linety, how could the jury possibly have

4  acquitted -- found the defendant guilty of assault

5  second without finding the defendants guilty of the

6  weapons charge, because one of the elements of the

7  robbery charge was the assault, either with a weapon or

8  inflicting serious physical injury.  So I think this is

9  a case where as much as a court would like to say it is

10  jury linety, it is impossible.  It just can't be

11  explained that way.

12          The only way it can really be explained is

13  that verdicts were traded.  Jurors decided to vote

14  guilty on some charges in exchange for not guilties on

15  other charges.  And as a final footnote, I discussed

16  with my client, I know that the cases always talks

17  about well, the defendant really gets a windfall by a

18  not guilty verdict.  If the Court began a new trial my

19  client, I have discussed this with him, is willing to

20  waive double jeopardy.  You can waive it.

21          THE COURT:  I am not sure he can waive it

22  after there is a decision.

23          MR. BERNSTEIN:  I am saying if the Court is

---

1  concerned about the windfall, what I am telling the
2  Court is that he will waive double jeopardy. Unless
3  the Court has any questions --
4       THE COURT: No, the State's response; anything
5  you would like to add -- sorry.
6       MR. BAYARD: I have nothing to add. I think
7  everything has been said appropriately, for me to say
8  thing any would probably muddy the waters. We would
9  join in the comments of Mr. Bernstein, please.
10      MR. O'CONNELL: Likewise as to Mr. Coleman.
11      MR. O'CONNOR: Good afternoon, Your Honor.
12  Your Honor, the just briefly Mr. Bernstein's comment is
13  a compromised verdict is speculation. We don't know
14  what happened back in the jury room. And we are really
15  not supposed to ever find out what happened back there.
16  I don't think the court can conclude this is
17  necessarily a compromised verdict. It could be they
18  decided to cut the defendants a break on a couple of
19  charges which is kind of what Tilden suggests is
20  possible that the jury can look at defense say we are
21  not going to find them guilty of every charge.
22  Mr. Bernstein's comment about why they were found
23  guilty of two weapons and not third, that seems to

6

1  play, at least to me the jury would have to know that
2  he gets three years mandatory time on each weapon.
3  They cut out one instead of two. They would have to be
4  aware of what the penalty is to decide what kind of a
5  break to give them. I am not certain that is
6  necessarily logically consistent.
7       The issue about the Assault II without a
8  weapon is kind of a flip of the coin of Tilden where
9  you had a Robbery II, with a weapon conviction. The
10  jury found Tilden guilty of the weapon, but then guilty
11  of a robbery without a weapon.
12      THE COURT: Instead of a Robbery.
13      MR. O'CONNOR: It is just kind of the reverse.
14  I don't know that anyone can conclude that votes were
15  traded. The jury deliberated for 90 minutes. I would
16  ask if the Court concludes that Tilden is the
17  appropriate standard here, that it does enter findings
18  of consistent with that opinion. As to the burden,
19  that is looking at the evidence in light most favorable
20  to the State, the evidence -- convictions for which the
21  defendant was found guilty were supported by
22  appropriate evidence.
23      THE COURT: Okay. Thank you. I think we were

1  all a little surprised when this verdict came back
2  because there is no way to logically reconcile the
3  verdicts. There were eight counts, the first count was
4  attempted robbery first degree, and the verdict as to
5  all three defendants was guilty. The associated weapon
6  charge was not guilty. The assault second was guilty,
7  and the associated weapons charge was guilty. Reckless
8  endangering was guilty and the associated weapons
9  charge was guilty. Conspiracy second was guilty, and
10  then the possession of a deadly weapon by a person
11  prohibited because of the age of two of the defendants
12  was not guilty.
13      And there is no way to completely match all
14  that up and, of course, the question is was there
15  evidence viewed in the light most favorable to the
16  State to establish the factual basis for each of the
17  convictions? The main issue in this case was
18  identification. It was very little about the story
19  that was provided by the victim and the other
20  witnesses. There was very little that was
21  significantly inconsistent. There was some
22  inconsistency or lack of clarity as to when the victim
23  was shot, when the injury to his foot occurred, but

8

1  that was the only thing factually that was disputed.
2  It was mostly disputed by common sense because it is
3  hard to imagine he took off running and already had
4  been shot in the foot. But he said he did not know for
5  sure when he was shot. The timing, the factor that is
6  one has to consider in determining -- before I get to
7  the question of the Allen Charge. I find that there
8  was jury linety, and that there is a factual basis for
9  all the convictions and, therefore, I will not grant a
10  new trial on that basis.
11      As to the Allen Charge, the charge that I gave
12  is a charge that has already been reviewed, at least
13  been considered in terms of its coercive affect in two
14  other Superior Court decisions. It is an instruction
15  that is given on a routine basis here in this Court. I
16  don't find because of the language that it is coercive
17  because there is reminders throughout the instruction
18  that each juror has to decide the case for himself or
19  herself.
20      The factors with regard to timing the jury
21  deliberated about three hours before they came in with
22  what I think all of us thought was a verdict when the
23  forelady stood up and said that they were hung as to

000260

**11**

1 the first count, I did not have any idea what she was
2 going to say as to the rest of the counts. We talked,
3 the jury was excused, we talked, then we asked the jury
4 back in, and I inquired the forelady whether or not
5 they felt they could reach a verdict. Based on her
6 responses I decided to give the Allen Charge. We had
7 talked about the Allen Charge. I had been provided
8 with some authority, Mr. Bernstein made a case that he
9 was interested in that raised some question as to the
10 coercive effect of an Allen Charge. In the case that
11 he gave me the Court had found that the instruction was
12 okay. So it raised the question of the potential for
13 coercive Allen Charge, but in that case the charge
14 given was not coercive, and the Delaware Supreme Court
15 had decided a case considering the Allen Charge just
16 about the same time as the Third Circuit case. I
17 assumed they were not aware of one, but in any event it
18 seemed to me there was enough language in our standard
19 instruction to safeguard against any coercive effect,
20 did not suggest to me there was any coercive effect or
21 vote trading when it took them another hour and a half
22 before they reached a verdict.
23     This case was relatively simple. The most

**10**

1 complicated thing about the case was there were three
2 defendants, but the evidence was very strong, the
3 State's evidence, because the individual, three
4 defendants were found in relatively close proximity to
5 the events, shortly after they occurred. And there was
6 certainly other factors that implicated each of them.
7 So I don't find the case was so complex as to suggest
8 it was beyond the ability of the jury to sort out
9 considerations that were aired to them. Motion for a
10 new trial is denied.
11     Let's talk about sentencing. There is no
12 mandatory time here. I don't know whether there is a
13 request or desire to have a presentence investigation.
14 Did anyone have any thoughts with regard to that?
15     MR. BERNSTEIN: I think the Court ordered one.
16 I think we have a sentencing date.
17     THE COURT: Do we already have a date?
18     MR. BERNSTEIN: I believe it is two weeks from
19 now; is that correct?
20     MR. O'CONNOR: I know Mr. Coleman's sentencing
21 is the Wednesday following the other two defendants,
22 for some reason, based on the computer system.
23     MR. BERNSTEIN: I remember seeing it.

**11**

1     THE COURT: If we have dates, we have dates
2 that is fine. I will sentence them at the times that
3 has been established. I think that I was thinking that
4 might not be scheduled until there was a resolution of
5 the motion, but apparently optimistic people.
6     THE CLERK: Your Honor, on Akeem Coleman ther
7 is sentencing date of April 16, at 9:30, also April 21
8 at 9:30. So I guess the second date is probably the
9 correct date.
10     MR. O'CONNOR: Other two should be on the
11 16th. That is my recollection.
12     THE COURT: So April 16 and April 22 for Mr.
13 Coleman.
14     THE CLERK: April 21.
15     THE COURT: Stand in recess.
16     (Whereupon the proceedings were concluded.)

**12**

CERTIFICATE OF COURT STENOGRAPHER

I, John P. Donnelly, RPR, Official Court
Stenographer of the Superior Court, State of Delaware,
do hereby certify that the foregoing is an accurate
transcript of the proceedings had, as reported by me, in
the Superior Court of the State of Delaware, in and for
New Castle County, in the case herein stated, as the
same remains of record in the Office of the Prothonotary
at Wilmington, Delaware.

WITNESS my hand this 15th day of JULY,
2004.
Cert. # 161-PS

John P. Donnelly, RPR
Official Court Stenographer

000261

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MUSTAFA A. WHITFIELD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 06-541 GMS |
| | : | |
| WILMINGTON POLICE DEPARTMENT, | : | |
| | : | |
| Defendant. | : | |

## AFFIDAVIT OF STEPHEN MISETIC

| | |
|---|---|
| STATE OF DELAWARE | : |
| | : S.S. |
| NEW CASTLE COUNTY | : |

I, STEPHEN MISETIC, being duly sworn according to law, depose and state that the information contained herein is based upon my personal knowledge and is true and accurate.

1.    I am submitting this affidavit in support of Defendant Wilmington Police Department's Motion to Dismiss, or in the Alternative, for Summary Judgment in the above-captioned case.

2.    I have been employed as a police officer with the City of Wilmington Police Department for approximately ten years, and I currently have the rank of Sergeant. At the time of Plaintiff Mustafa Whitfield's arrest in October 2002, I was working as a Detective in the Wilmington Police Department's Criminal Investigation Division.

3.    On October 15, 2002, at approximately 12:30 a.m., I was notified of a shooting that occurred in the 500 block of Willing Street in Wilmington, Delaware. I was assigned to investigate this incident and prepared several reports documenting the investigatory actions I undertook and setting forth the findings of my investigation. The documents attached hereto as Exhibit "A" are true

and correct copies of the investigatory reports that I prepared with respect to this incident.

4.      At approximately 2:30 a.m. on October 15, 2002, I conducted a preliminary interview of the victim at Christiana Hospital. This interview was not recorded or transcribed. However, I did take handwritten notes regarding this interview. Attached hereto as Exhibit "B" is a true and correct copy of the handwritten notes I took during my October 15, 2002 interview of the victim. During that interview, the victim described the two suspects other than the shooter as wearing matching dark clothing, possibly a dark gray shirt, with white scarves or t-shirts around their faces covering everything except for their eyes.

5.      On October 15, 2002, following my interview with the victim, I applied for and obtained a warrant to arrest Mustafa Whitfield. A true and correct copy of the arrest warrant application relating to Mr. Whitfield is attached hereto as Exhibit "C". The descriptions of the suspects I included in my arrest warrant affidavit were based on a combination of the descriptions given by the Wilmington police officers who stopped the shooter and witnessed the other two suspects flee over a fence, as well as the description given by the victim during his October 15, 2002 interview at the hospital.

6.      I indicated in the warrant affidavit that the "two subjects who had a white in color object covering their faces were positevely [sic] identified as Mustafa Whitfield BMN-17 D.O.B. of 5-10-1985 and Emmanuel Robinson BMN-17 D.O.B. of 3-12-1985." I obtained this information from one of the arresting officers, Patrolman David Prado, who orally informed me that when he stopped Whitfield and Robinson, he was able to identify them as the suspects he had previously seen fleeing over a wall because they were breathing heavily and were sweating even though it was only around 40 degrees outside, and they matched the description of the two suspects who had climbed over the wall.

000263

7.    A few hours after the incident, I took photographs of Whitfield and the other two suspects after they were taken into custody. At the time he was photographed, a large image of Pepe Le Pieu could be seen on the grey sweatshirt Mr. Whitfield was wearing. However, neither I nor the arresting officers saw this image of Pepe Le Pieu on the grey sweatshirt Whitfield had on when he was stopped and taken into custody.

8.    Mr. Whitfield was charged and subsequently arrested on October 16, 2002. A few days later, on October 18, 2002, at approximately 11:42 a.m., I conducted a formal interview of the victim at the Wilmington Police Department's Criminal Investigation Division. This interview was recorded by both audio and video tapes and was subsequently transcribed. The victim's description of the suspect that is quoted in the Plaintiff's Complaint in this action is taken from the transcript of the October 18, 2002 interview of the victim. Attached hereto as Exhibit "D" is a true and correct copy of the relevant pages of the transcript of the October 18, 2002 interview of the victim, in which the victim gave a description of the two suspects other than the gunman.

_Stephen Misetic_
Stephen Misetic

SWORN TO AND SUBSCRIBED before me this _5th_ day of _January_ , 2007.

_Donna L. Kellam_
Notary Public

DONNA L. KELLAM
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Sept.9, 2010

000264

# EXHIBIT A

000265

## WILMINGTON DEPARTMENT OF POLICE

### SUPPLEMENT REPORT

**CASE NUMBER:** 30-02-106294/106295
**RED NUMBER: 02-S-55/ 02-1383**

**VICTIM:** Anthony Meek BMN-29███████████

**ADDRESS:** ████████████████Wilmington, Delaware 19801

**INCIDENT:** Assault First Degree 11/613

**DATE OF INCIDENT:** 14 October 2002 at approximately 2352 hours

**LOCATION OF INCIDENT:** 500 Block of Willing Street Wilmington, Delaware 19801

**CASE NUMBER:** 30-02-108810/106295
**RED NUMBER:  02-1383**

**VICTIM:** Society

**INCIDENT:** Trafficking In Cocaine 16/4753

**DATE OF INCIDENT:** 15 October 2002 at approximately 1600 hours thru 1610 hours.

**LOCATION OF INCIDENT:** 622 West 6th Street Wilmington, Delaware 19801

**DATE OF REPORT:** 21 October 2002

**INVESTIGATOR:** Detective Stephen R. Misetic I/7056.

### CASE SUMMARY:

On 15 October 2002 at approximately 0030 hours this detective was notified by Detective Sergeant Robert Emory of a shooting that occurred in the 500 block of Willing Street Wilmington, Delaware 19801. During this investigation it was discovered that the victim, Anthony Meek had departed work and was parking his vehicle in the street behind his residence. This street that he parked his vehicle on is the 500 block of Willing Street, which is a one block street located directly behind his residence that runs north to

south. This street has parking available on both sides, east and west of it. The victim had just parked his vehicle when he noticed three subjects traveling in a southerly direction towards him on Willing Street. Two of the subjects, Emmanuel Robinson and Mustafa Whitfield placed white in colored t-shirts over their face in attempt to obscure their identity, by only allowing their eyes to be seen. The third suspect, Akeem Coleman pointed a black in color semi-automatic handgun to the head of the victim and stated, "Give it up". Either Emmanuel Robinson or Mustafa Whitfield stated, "Grab the Keys", while the other one grabbed the hand and some of the keys of the victim. A struggle then ensued, in which the victim wrapped his arms around the suspect who had a hold of his hand and keys. The victim used the suspect he had a hold of as shield from Akeem Coleman, who was moving the handgun around in an attempt to get a clear path to shoot him. The suspect who stated, "Grab the keys" told Akeem Coleman to, "Shoot him". While moving around with the suspect the victim and the suspect fell backwards over a curb. The suspect either Emmanuel Robinson or Mustafa Whitfield was able to free themselves. As the victim was attempting to get up off the ground, Akeem Coleman fired a shot at the victim. After firing this shot all three subjects, Akeem Coleman, Mustafa Whitfield and Emmanuel Robinson started to run together, south on Willing Street towards 5th Street. The victim was able to get up and began to run after the suspects. While running towards the suspects, Akeem Coleman turned around, stopped and fired another shot at the victim. The suspects then continued to run south on Willing Street then East on 5th Street towards West Street out of sight. The victim is unsure which shot struck his foot, but after the second shot he limped over to the alley way behind his residence and yelled for his mother. The victim eventually made it inside and told his mother that he had been shot and for her to call the police, which she did.

     The three suspects were seen running together away from the shooting scene by Patrolman Mathew Derbyshire and Patrolman David Prado. They were seen running together Eastbound on 5th Street then North in the 500 Block of West Street. Two of the suspects were observed attempting and eventually jumping over a fence onto the property of 500 West Street (Saint Peter's Cathedral). This raised the suspicion of the patrol officers as the subjects were running together and two of the suspects, Emmanuel Robinson and Mustafa Whitfield jumped over a fence onto private property (Trespassing). The patrol officers began to travel north on West Street towards the suspects. The third suspect, Akeem Coleman continued to run north on West Street until he was stopped by Patrolman Derbyshire and Prado. Akeem Coleman was wearing a white t-shirt and dark pants. While speaking to Akeem Coleman, Patrolman Derbyshire observed a black in color handgun lying on the eastern side of the street on the sidewalk in the 500 block of West Street, where the suspects were seen running and jumping over the fence. Akeem Coleman was placed into custody and transported to central for further investigation. During this stop a call came over main dispatch Channel 'A' stating that there was a shooting in the 500 Block of Willing Street. This location is less then half a block away from where the suspects were seen running from and the black in color handgun was located.

     Patrolman Prado hopped the wall where the other two suspects were last observed and headed east towards Tatnall Street. The other two subjects were located walking east bound on 5th Street from Tatnall Street, which is consistent with the direction they were last seen running from. Patrolman Prado and Patrolman William Draper observed the two

Page: 3
02-106294/106295
MISETIC

suspects walk into the apartment complex located in the 200 block of 4th and 5th Streets. These two suspects were stopped and positively identified as the two suspects who were seen running with Akeem Coleman and observed jumping over the fence. The suspects were identified as Emmanuel Robinson and Mustafa Whitfield. Although it was cold this night somewhere between 40 to 45 degrees, Emmanuel Robinson was bare-chested and was carrying his shirts. Both subjects were also noticeably sweating and had an accelerated heart rate for just walking. These suspects were taken into custody and transported to central for further investigation.

The victim was transported to Christiana Hospital for a single gunshot wound to his left foot. While at the hospital the victim was treated by Doctor Denise Dunlop for a possible fracture. Through the x-rays it showed the victim suffered a shattered 1st Metatarsal Bone and a shattered 1st Proximal Phalanx. It is unknown at this time if there will be any future problems with walking or running, although according to Doctor Dunlop the victim could have certain limitations from the injury. This detective along with Detective James Diana responded to the Christiana Hospital and conducted an initial interview of the victim. During this interview the victim was shown two separate photo lineups. One lineup contained a photo of suspect, Emmanuel Robinson and the other contained a photo of Akeem Coleman. The victim was unable to identify a photo of Emmanuel Robinson as one of the suspects involved in the incident as he was unable to see his face due to the white in color clothing around his face. When shown the second lineup, the victim positively identified Akeem Coleman as the person who displayed the black in color handgun and fired both shots at him. This detective along with Detective James Diana then responded to the crime scene, 500 block of Willing Street and noted the lighting conditions along with any vehicles in the block.

This detective along with Detective James Diana received permission from Eugene Robinson mother to interview her son. An interview was conducted. An attempt was made by Detective James Diana to contact the mother of Akeem Coleman with the number Mr. Coleman supplied. This attempt was met with negative results, so an interview was conducted with Mr. Coleman. Detective James Diana contacted the mother of Mustafa Whitfield, who stated that she did not want her son interviewed and no interview was conducted.

An area canvas search was conducted by patrol officers, who responded to the area. During this canvas search several individuals were located that heard shots fired in the area. One witness was located who heard a commotion in the 500 block of Willing Street. This witness looked out his window and observed a heavy set male holding a black in color handgun towards another male. He then observed this heavy set male fire a shot at the male. The male with the gun and two other subjects began to run towards 5th Street, while the victim ran after them. The heavy set male then turned around and fired two more shots at the victim, who then started limping.

The three suspects were booked on the below listed charges and arraigned at Justice of the Peace Court #20. They were all committed to New Castle County Detention Center. Due to several other robberies and carjackings in the surrounding area, search warrants for the addresses of the suspect's were executed for possible evidence related to these robberies and carjackings. During the search warrant at Mustafa Whitfield's residence, 622 West 6th Street Wilmington, Delaware, Detective Brian Ellis located crack/cocaine and heroin in Mustafa's jacket, which was located in his bedroom. This

Page: 4
02-106294/106295
MISETIC

contraband was photographed, tested, weighed and tagged as evidence. During the search warrant at Emanuel Robinson residence, 717 East 4th Street Detective Ellis located a cell phone in his room, which his mother stated was not his. This was seized as possible evidence in a past robbery and to locate the proper owner. Mustafa Whitfield was arrested and arraigned at Justice of the Peace Court #20 for the below listed drug charges.

## CRIME SCENE:

The crime scene is located in the 500 block of Willing Street Wilmington, Delaware 19801. The crime scene is located on the East side of the street in a parking area. This location is in the City of Wilmington, County of New Castle, State of Delaware. The sky was clear and the temperature was approximately 40 to 45 degrees. Evidence Detection Unit responded to the scene and photographed same. For further on their actions refer to the supplement report completed by Evidence Detection Unit Corporal David Rhoades. This detective responded to the scene at approximately 0330 hours and did a rough crime sketch of the scene. The streetlights and any spotlights that were on were noted in this rough sketch.

## PHYSICAL EVIDENCE:

### Located in the 500 Block of West Street:

1. One black in color Smith and Wesson 9mm semi-automatic handgun model #910 containing serial #VDM5793. This handgun was located in the 500 Block of West Street on the east side of the street. The item was collected by Patrolman Mathew Derbyshire and turned into records division on 15 October 2002. For further on this handgun refer to original report completed under case number #30-02-106295.

2. One silver in color house key located by William Edelin in the 500 Block of West Street on the eastern most sidewalk. This item was located by Mr. Edelin on Wednesday 16 October 2002. The item was picked up by Mr. Edelin on Thursday 17 October 2002 in the same location. This item was given to this investigator on 22 October 2002 at approximately 1730 hours. The item was then shown to the victim on 22 October 2002 at approximately 2150 hours, in which he positively identified the item as his house key that was on his key ring during the incident. The item was placed into temporary evidence.

3. One silver in color bottle opener with the words "CHIHUAHUA" and underneath that "Mexico" along with a picture of a female. This item was located by Mr. William Edelin in the 500 Block of West Street on the eastern most sidewalk on Wednesday 16 October 2002. This item was picked up by Mr. Edelin on Thursday 17 October 2002 in the same location. This item was given to this detective on 22 October 2002 at approximately 1730 hours. This item was then shown to the victim on 22 October 2002 at approximately 2150 hours, in which he positively identified the item has his bottle opener that was on his key ring during the incident. This item was placed into temporary evidence.

**Page: 5**
**02-106294/106295**
**MISETIC**

## Located in the 500 Block of Willing Street:

1. One 9mm luger Hollow Point live round located at the scene in the 500 Block of Willing Street. This round was collected by Evidence Detection Unit Corporal David Rhoades and tagged as evidence. For further on this item refer to supplement report completed by Corporal Rhoades.

2. One 9mm luger shell casing located at the scene in the 500 Block of Willing Street. This casing was collected by Evidence Detection Unit Corporal David Rhoades and tagged as evidence. For further on this item refer to supplement report completed by Corporal David Rhoades.

3. Two Id Badges in the name of the victim that was located in the 500 block of Willing Street. These items was collected by Evidence Detection Unit Corporal David Rhoades and tagged as evidence. For further on these items refer to supplement report completed by Corporal Rhoades.

4. Miscellaneous amount of United States change in the amount of $1.60 dollars. These items were located in the 500 block of Willing Street. These items were collected by Evidence Detection Unit Corporal David Rhoades and tagged as evidence. For further on these items refer to supplement report completed by Corporal Rhoades.

5. One key and key ring which was located at the scene in the 500 Block of Willing Street. These items were collected by Evidence Detection Officer, Corporal David Rhoades. These items were tagged as evidence. For further on this item refer to supplement report completed by Corporal David Rhoades. These items were removed from records division by this investigator on 18 October 2002 at approximately 1135 hours. These items were then shown to the victim in the Criminal Investigation Division on 18 October 2002 at approximately 1140 hours, at which time he positively identified these items as his vehicle keys. These items were given back to the victim as they were his only set for his vehicle.

6. One white in color t-shirt, which was located in the 500 Block of Willing Street. This item was collected by Evidence Detection Officer, Corporal David Rhoades. This item was tagged as evidence. For further on this item refer to supplement report completed by Corporal David Rhoades.

7. Twenty nine 35mm photographs taken of the scene, 500 Block of Willing Street by Evidence Detection Corporal David Rhoades. For further on these photographs refer to supplement report completed by Corporal David Rhoades and originals in evidence.

8. One gold color fifty cent piece from Delaware Park. This item was collected by Evidence Detection Officer David Rhoades. For further on this item refer to the supplement report completed by Corporal Rhoades.

9. One 3x5 print card with latent lifts. These lifts were collected by Corporal Rhoades. For further on these lifts refer to supplement report completed by Corporal Rhoades.

000270

Page: 6
02-106294/106295
MISETIC

### Located at 300 North Walnut Street:

1. One white in color t-shirt that was removed from Akeem Coleman while he was at the Police Station. This item was collected by this investigator on 15 October 2002 from Akeem Coleman and placed into temporary evidence until it was removed by this investigator and tagged as evidence and placed into evidence on 29 October 2002 under case number #30-02-106295.

2. One white in color t-shirt that was removed from Mustafa Whitfield while he was at the Police Station. This item was collected by this investigator on 15 October 2002 from Mustafa Whitfield and placed into temporary evidence until it was removed by this investigator and tagged as evidence and placed into evidence on 29 October 2002 under case number #30-02-106295.

3. One white in color t-shirt that was in the property bag of Akeem Coleman at the police station. This item was removed from the property of Akeem Coleman by this investigator on 15 October 2002 and placed into temporary evidence until it was removed, tagged and placed into evidence on 27 November 2002 at approximately 1602 hours.

4. One Cell Phone that was in the property of Akeem Coleman at the police station. This item was removed from the property of Akeem Coleman by this investigator on 15 October 2002 and placed into temporary evidence until it was removed, tagged and placed into evidence on 27 November 2002 at approximately 1602 hours. This item was removed to ascertain if it is property in another robbery, as there were several in the area recently.

5. One VHS and mini-cassette tapes containing the interview with Akeem Coleman conducted on 15 October 2002 at approximately 0608 hours by this investigator and Detective Wilfredo Campos. These tapes were copied and originals were placed into temporary evidence.

6. One VHS and mini-cassette tapes containing the interview with Emmanuel Robinson conducted on 15 October 2002 at approximately 0518 hours by this investigator and Detective James Diana. These tapes were copied and originals were placed into temporary evidence.

7. One VHS and mini-cassette tapes containing the interview of Anthony Meek conducted on 18 October 2002 at approximately 1142 hours by this investigator. This tape was copied and originals were placed into temporary evidence.

8. One mini-cassette tape containing the air traffic over the Wilmington Police Dispatch channel 'A' and 'C' on 14 October 2002 thru 15 October 2002. This tape was placed into temporary evidence.

### Located at 622 West 6th Street During Executed Search Warrant:

1. Three bundles of clear glassine bags containing blue in color wax paper with a stop sign green in color with the word, "STOP" written inside and the words, "UP TOP" underneath it, which contained an off white powdery substance, which tested positive for Heroin. There were a total of forty-five bags. These items weighed approximately .90 grams. They were located in the jacket in the room of Mustafa Whitfield by Detective Brian Ellis. They were placed in temporary

000271

evidence and then tagged and placed into records on 16 October 2002 at approximately 1406 hours under case number #30-02-106295. For further on the discovery of these drugs refer to supplement report completed by Detective Brian Ellis.

2. One clear plastic bag containing 199 smaller black-tinted ziplock baggies and one clear torn off piece of bag tied off. All of these bags contained an off white chunky substance, which tested positive for crack/cocaine. These items weighed approximately 18.2 grams. They were located in the jacket in the room of Mustafa Whitfield by Detective Brian Ellis. They were placed in temporary evidence and then tagged and placed into records on 16 October 2002 at approximately 1403 hours under case number #30-02-106295. For further on the discovery of these drugs refer to supplement report completed by Detective Brian Ellis.

3. Three Polaroid photographs were taken of where the above drugs were located. These photographs were taken by Detective Brian Ellis at 622 West 6th Street Wilmington, Delaware. These photographs were taken of Mustafa Whitfield's jacket in his closet. These photographs were taken on 15 October 2002. These photographs were placed into the case file.

**Located at 717 East 4th Street Apt. 2-C During Executed Search Warrant:**

1. One cell phone located in the room of Emmanuel Robinson at 717 East 4th Street Apt. 2-C. This phone was located by Detective Brian Ellis in the room of Emmanuel Robinson on 15 October 2002. This item was seized as to ascertain the rightful owner and see if it was taken in a robbery. The phone was placed into temporary evidence.

**Located at Christiana Hospital:**

1. One white in color tube sock removed from the victim's left foot. Evidence Detection Officer, Corporal Henry Law took this item into custody on 15 October 2002 at the Christiana Hospital and tagged as evidence. For further on this piece of evidence refer to supplement report completed by Corporal Law.

2. One Blue in color Nike sneaker removed from the victim's left foot. Evidence Detection Officer, Corporal Henry Law took this item into custody on 15 October 2002 at the Christiana Hospital and tagged as evidence. For further on this piece of evidence refer to supplement report completed by Corporal Law.

3. Six 35mm color photographs taken by Evidence Detection Officer, Corporal Law of the victim's left foot. These photographs were taken at the Christiana Hospital on 15 October 2002. The negatives were tagged as evidence. For further on these photographs refer to supplement report completed by Corporal Law.

Page: 8
02-106294/106295
MISETIC

## VICTIM INTERVIEW:

**Anthony Meek BMN-29** ████████████████████████████
**Wilmington, Delaware 19801** █████████████████
    This preliminary interview was conducted at the Christiana Hospital on 15 October 2002 at approximately 0230 hours. This interview was not recorded, but is memorialized by this investigator's notes. The following text is this investigators synopsis of the interview conducted with Mr. Meek.

    Mr. Meek stated that he got off work at 11:30pm from Delaware Park. He backed into a parking spot around 12:00am and turned his car off, when three guys came up to him. Two of the suspects were wearing white t-shits around their faces. One subject had a gun in his hand and stated to him, "Give it Up". Another subject stated, "Grab the Keys". Mr. Meek then grabbed one of the suspects and held him in front of him. He then fell down with the guy on top of him. The suspect that fell down with him got up. The suspect with the gun fired a shot at him and missed. One of the two other suspects snatched his keys and they all took off running. Mr. Meek stated he started to chase them, at which point the suspect with the gun took another shot and struck him in his foot. He then yelled through the alleyway for his mom. He then states he went upstairs and told his mom to call the police, which she did. Mr. Meek added that it seemed like they were waiting for him. The suspects ran south then made a left towards West Street.

    Mr. Meek described the shooter as average build approximately 5'10" or a little shorter wearing dark pants and a white t-shirt, he also described him as clean-shaven. At approximately 0235 hours Mr. Meek was shown two photo lineups, which contained photographs of the suspects. When shown the second photo lineup Mr. Meek positively identified Akeem Coleman as the subject with the gun, who shot at him twice. Mr. Meek added that he does not know Akeem Coleman. Mr. Meek described the other two suspects as wearing matching dark clothing, possibly a dark gray shirt with white scarves around their faces covering everything except their eyes. He was able to determine they were black males as they were brown skin. Mr. Meek stated that the subject he grabbed, when he went to grab his keys was about his height 5'10" and his build. The other suspect who didn't grab the keys stated, "Shoot Him, Shoot Him". He also added that these suspects tried to kick and punch him.

    Mr. Meek stated that the subjects came from a northerly direction, from 6th Street, as if they were waiting for him. Mr. Meek stated that gun used was a black in color semi-automatic handgun.

    For further on this interview refer to this investigator's notes.

    This investigator conducted a formal interview with Mr. Meek at the Criminal Investigation Division on 18 October 2002 at approximately 1142 hours. This interview was conducted in the victim interview room and was recorded both by audio and videotapes. The following text is this investigator's synopsis of the interview with Mr. Meek.

    Mr. Meek states that he works at the Delaware Park and left this place around 11:30pm to go home. Mr. Meek stated that he turned down Willing Street from 6th Street. He looked up at the corner and saw three guys coming down. Two guys were masked up

**Page: 9**
**02-106294/106295**
**MISETIC**

while the one in the middle had no mask. Mr. Meek added that these subjects came off of 6th Street and did not see them when he drove by. He first notice them while he was in the car. As they walked down the street one of the masked up suspects tried to duck and come from behind a couple of cars up, but stopped and continued with the other suspects, when Mr. Meek saw him. All three suspects approached Mr. Meek from the front of his car. The guy with the gun stated to Mr. Meek to, "Give up the Keys". This subject stated this a couple of times, while pointing the gun at his head. Mr. Meek stated that this subject said this in a way that made it seem like he had seen this on television. All three suspects surrounded Mr. Meek, with the guy with the gun in front of him. Mr. Meek stated something to the affect that he lived around the corner. At this point one of the other masked guys said, "Get his Keys", while the other masked suspect grabbed the keys while they were in Mr. Meek's hand. Mr. Meek then stated her grabbed this subject around the neck area and used him as a shield, as the guy with the gun was moving the gun around in a way to get a clear shot. The other masked suspect was saying, "Shoot". Mr. Meek and the masked suspect he grabbed a hold of fell backward over the curb. The one masked suspect got up, while the other masked suspect tried to kick Mr. Meek. Mr. Meek then stated as he was attempting to get up the suspect with the gun, who was approximately two feet away fired a shot at Mr. Meek. Mr. Meek is unsure if he was hit this time because he was able to get up and began to run after the three suspects as they all ran together south on to 5th Street. Mr. Meek stated that the suspect with the gun turned around like he was aiming and shot again at him, at which point Mr. Meek felt a pain in his foot. The suspects continued to run towards 5th Street then ran towards West Street. Mr. Meek then hobbled to the alleyway near his house. Mr. Meek added that a subject yelled out his window' "Looked like you were shot." Once at his house Mr. Meek stated that his mom stated that she heard gunshots. Mr. Meek then informed his mom that he was shot and to call the police.

Mr. Meek also stated that his house key and a bottle opener are still missing, as those items must have been pulled off by the suspect.

For further on this interview refer to this investigator's notes along with the video and audiotapes.

### WITNESS INTERVIEW:

**Fancisco A. Failey BMN-56**
**Wilmington, Delaware 19801**

Mr. Failey was originally interviewed by Patrolman Mathew Derbyshire on 15 October 2002. For further on this interview refer to the report completed by Patrolman Derbyshire under case number 30-02-106295.

This investigator along with Detective James Diana interviewed Mr. Failey on 15 October 2002 at approximately 0130 hours at his residence. This interview was not recorded, but is memorialized by this investigator's notes. The following text is this investigator's synopsis of the interview with Mr. Failey.

Mr. Failey stated that the lights were off in his bedroom and he was about ready to go to bed. He heard some yelling outside and peeked through his shades as his windows were closed. Mr. Failey stated that he observed a heavyset guy holding a gun towards another male. Mr. Failey described this gun as a police gun, dark in color.

Mr. Failey stated that he observed this suspect fire a shot. He described this heavyset suspect as having darker arms then the other part of his shirt, which he did not know the color to. Mr. Failey could not describe the other two subjects. Mr. Failey added that all three subjects ran to 5th Street after the shot and the victim ran after them. The heavy set guy then turned around an fired two more shots, at which point the victim started limping. The victim then came back to his car and then shut the door and walked westerly through an alley way and started yelling' "Dad". Mr. Failey stated that he came back and started to walk northerly, at which point Mr. Failey stated that he opened the window and asked the victim, "Did you get hit". Mr. Failey stated that the victim stated' "I don't know man". Mr. Failey stated he put his clothes on and went outside, but the victim was gone. Mr. Failey advised he could not identify anyone by their face.

For further on this interview with Mr. Failey refer to this investigator's notes.

## PERSON CONTACTED

**Alama Meek BFN-52[redacted] Wilmington, Delaware 19801[redacted]**

Ms. Meek was interviewed by Detective James Diana on 15 October 2002 at approximately 0238 hours. This interview was conducted at the Christiana Hospital. For further on this interview refer to supplement reported completed by Detective Diana under case number 30-02-106295.

On 18 October 2002 at approximately 1050 hours this investigator spoke to Ms. Meek in the Criminal Investigation Division Victim Interview Room. This interview was not recorded, but is memorialized by this investigator's notes. The following text is this investigator's synopsis of the interview with Ms. Meek.

Ms. Meek states that she heard the first shot at 11:52pm as she was in her bedroom and looked at a clock on the preview channel. A short time later Ms. Meek states she heard a second shot. A short time after that she heard her someone yell "Mom". When she went downstairs she saw her son. He stated to her, "Mom they tried to rob me and take my car and they got my keys", "They shot me in the foot". They both responded inside, where she called 911. Anthony went back outside and by the time she went outside the police were talking to her son.

For further on this interview with Ms. Meeks refer to this investigator's notes.

**William Edelin BMN-73 D.O.B. 2-7-1929 1331 East 23rd Street Wilmington, Delaware 19802 (302)767-5491.**

This investigator spoke to Mr. Edelin on 18 October 2002 at approximately 1435 hours. This interview was conducted in the 500 block of West Street. This interview was not recorded, but is memorialized by this investigator's notes. The following text is this investigator's synopsis of the interview with Mr. Edelin.

Mr. Edelin stated he is the maintenance man for the Saint Peter Cathedral. He stated that he found the key on Wednesday (16 October 2002) around 1:30pm. He found the key lying in the street close to the eastern side sidewalk, while he was sweeping. Mr. Edelin advised that he left it there that day, in case the owner came back. On Thursday (17 October 2002) around 1:30pm, Mr. Edelin advised that he picked the key up along

**Page: 11**
02-106294/106295
MISETIC

with a bottle opener that he located in the same area. Mr. Edelin advised that he washed the bottle opener off and has it at home.

     For further on the interview with Mr. Edelin refer to this investigator's notes.

**Yvonne Brown BFN-40 D.O.B. 10-18-1962 717 East 4th Street Apt. 2-C Wilmington, Delaware 19801 (302)654-9607.**

     Ms. Brown is the mother of Emmanuel Robinson. This investigator responded to her address and spoke to her on 22 October 2002 at approximately 1735 hours this interview was not recorded, but is memorialized by this investigator's notes. The following text is this investigator's synopsis of the interview with Ms. Brown.

     Ms. Brown states her son has been a friend with "Manny", who she stated is Mustafa Whitfield, since their childhood. Ms. Brown was shown a photo lineup and asked if she saw any friends of her sons. Ms. Brown pointed to photo #3 (Akeem Coleman) and stated that he was someone she has seen her son with before, but does not know his name. She added that she saw her son, Emmanuel, "Manny" (Mustafa Whitfield) and the subject she just pointed out, (Akeem Coleman), outside the house talking on Saturday around 2:30pm. She stated that she knew they were up to no good. That was the last time that she saw them, including her son. Ms. Brown also indicated that the cell phone located in her son's room during the search warrant did not belong to her son.

**Patrolman Mathew Derbyshire 300 North Walnut Street Wilmington, Delaware 19801 (302)576-3670.**

     For any actions or interviews completed by Patrolman Derbyshire refer to original report completed by Patrolman Derbyshire under case number #30-02-106295.

**Patrolman David Prado 300 North Walnut Street Wilmington, Delaware 19801 (302)576-3670.**

     For any actions or interviews completed by Patrolman Prado refer to supplement report completed by Patrolman Prado under case number #30-02-106295.

**Patrolman Stuart Walker 300 North Walnut Street Wilmington, Delaware 19801 (302)576-3670.**

     For any actions or interviews completed by Patrolman Walker refer to supplement report completed by Patrolman Walker under case number #30-02-106295.

**Patrolwoman Tracey Hammond 300 North Walnut Street Wilmington, Delaware 19801 (302)576-3670.**

     For any actions or interviews completed by Patrolwoman refer to supplement report completed by Patrolwoman Hammond under case number #30-02-106295.

**Detective Corporal David Rhoades 300 North Walnut Street Wilmington, Delaware 19801 (302)576-3670.**

     For any actions by Evidence Detection Corporal Rhoades refer to supplement report completed by Corporal Rhoades under case number #30-02-106295.

Page: 12
02-106294/106295
MISETIC

**Detective Henry Law 300 North Walnut Street Wilmington, Delaware 19801 (302)576-3670.**

For any actions completed by Evidence Detection Corporal Law refer to supplement report completed by Corporal Law under case number #30-02-106295.

**Detective James Diana 300 North Walnut Street Wilmington, Delaware 19801 (302)576-3670.**

For any actions or interviews completed by Detective Diana refer to supplement report completed by Detective Diana under case number #30-02-106295.

**Detective Brian Ellis 300 North Walnut Street Wilmington, Delaware 19801 (302)576-3670.**

For any actions or interviews completed by Detective Ellis refer to supplement report completed by Detective Ellis under case number #30-02-108810.

**Doctor Denise Dunlap Christiana Hospital Doctor**

This investigator spoke to Ms. Dunlap at the Christiana Hospital on 15 October 2002. She advised that Mr. Meeks has a possible fracture of the left foot from a gunshot wound.

For further on any treatments and the diagnosis of Mr. Meek's injuries refer to medical records.

## SUSPECT INTERVIEW:

**#1 Akeem Coleman BMN-16 D.O.B. 2-17-1986 1118 Rodman Road Wilmington, Delaware 19805 (302)658-4412.**

For any comments made by Mr. Coleman to Patrolman Prado and Derbyshire refer to their reports.

At approximately 0418 hours, with the number provided by Akeem Coleman Detective Diana attempted to contact Mr. Coleman's mother, Patricia Norton, by phone. A male answered the phone and stated that he had the wrong number. This detective along with the assistance of Detective Wilfredo Campos interviewed Mr. Coleman in the Criminal Investigation Division Interview Room #1. This interview was conducted on 15 October 2002 at approximately 0608 hours. This interview was recorded both by video and audiotapes. The following text is this investigator's synopsis of the interview with Mr. Coleman.

Mr. Coleman was informed of the phone call home and the results of same. Mr. Coleman was read his Miranda Rights by this investigator at 0609 hours and again at 0610 hours. He stated he wanted a lawyer, at which point this investigator stopped any further questioning and left the room. Mr. Coleman then called this investigator back in at 0612 hours and stated he did not want a lawyer as he did not do anything wrong. He was read his Miranda Rights a third time at 0612 hours, which he waived.

Mr. Coleman stated he was not with the other two guys. He stated that he was at his Aunt's house, Patricia Norton who lives near 22nd and Jessup Street. He could not provide an exact address and stated she has no phone. Mr. Coleman stated that he walked home from her house around 10:15pm. He stopped at another Aunt's house, Arlene

Page: 13
02-106294/106295
MISETIC

Coleman in the area of 9th and Pine Streets. Again Mr. Coleman was unable to provide an exact address for Ms. Coleman. He knocked on her door, but no one answered. He stated he knocked on her door around 11:30pm. Mr. Coleman then walked to the area of Bethel Villa, but there was no one out so he began to walk down 4th Street then went up West Street. When he got to the area of 7th and West Streets, Mr. Coleman states the cops stopped him. He stated he was walking in this area looking for a ride home. He thought four guys were chasing him so he started to walk faster.

Mr. Coleman stated he did not know the other two guys who jumped over the fence. He also added that he does not know Mustafa, he only knows his name because he told him his name when they were in the cell. Mr. Coleman later in the interview indicated that Patricia Norton would say he was at her house from 10:15pm to 11:00pm, which is different then his original statement of leaving her house at 10:15pm.
Mr. Coleman also indicated that his mother was Patricia Norton however it was later learned that it is Jackie Whittle.

For further on this interview refer to this investigator's notes along with the video and audiotapes.

**#2 Emmanuel Robinson BMN-17 D.O.B. 3-12-1985 717 East 4th Street Apt. 2-C Wilmington, Delaware 19801 (302)654-9087.**

For any comments made by Mr. Robinson to Patrolman Prado refer to supplement report completed by Patrolman Prado.

At approximately 0419 hours Detective Diana was able to contact Emmanuel Robinson's mother, Yvonne Brown, by phone, at which point she gave permission to interview her son. This investigator along with the assistance of Detective James Diana interviewed Mr. Robinson in the Criminal Investigation Division Interview Room #1. This interview was conducted on 15 October 2002 at approximately 0518 hours. This interview was recorded both by video and audiotapes. The following text is this investigator's synopsis of the interview with Mr. Robinson.

Mr. Robinson was notified that his mother gave permission for us to talk to him. Mr. Robinson was also read his Miranda Rights, which he waived at 0520 hours.
Mr. Robinson stated he was walking home with Mustafa Whitfield. He was over his house playing a video game. He added that the officers did see them all together. He states that Mustafa was going to walk him halfway home and that he does not know the other guy. He added that his heart was beating when the officer's stopped him because him an Mustafa were wrestling because he beat him in Knockout King and that he was not running. Mr. Robinson thinks that Mustafa's mother was home. This investigator showed Mr. Robinson a picture of Akeem Coleman, to which Emmanuel replied that he does not know him.

For further on this interview refer to this investigator's notes along with the video and audiotapes.

000278

Page: 14
02-106294/106295
MISETIC

### #3 Mustafa Whitfield BMN-17 D.O.B. 5-10-1985 622 West 6th Street Wilmington, Delaware 19801 (302)778-2220.

For any comments made by Mr. Whitfield to Patrolman Prado refer to the supplement report completed by Patrolman Prado.

At approximately 0428 hours Detective Diana contacted Mustafa Whitfield's mother, Trina Neal by phone. Ms. Neal would not give permission to interview her son. Mr. Whitfield was not interviewed by this investigator.

### ARREST ACTION:

**\*All three subjects were charged and subsequently arrested on 16 October 2002. The following is a list of their individual charges:**

**Akeem Coleman (2-17-1986)**
Possession of a Firearm During the Commission of a Felony 11/1447
Attempted Carjacking First Degree 11/531
Assault First Degree 11/613
Possession of Deadly Weapon (Handgun) Juvenile 11/1448
Conspiracy Second Degree 11/512

**Mustafa Whitfield (5-10-1985)**
Assault First Degree 11/613
Attempted Carjacking First Degree 11/531
Conspiracy Second Degree 11/512
Wearing a Disguise During the Commission of a Felony 11/1239

**Emmanuel Robinson (3-12-1985)**
Assault First Degree 11/613
Attempted Carjacking First Degree 11/531
Conspiracy Second Degree 11/512
Wearing a Disguise During the Commission of a Felony 11/1239

Emmanuel Robinson was also wanted on an outstanding warrant out of the Justice of the Peace Court #20. He was booked on the below listed charges as well:

Burglary Second 11/825
Conspiracy Second Degree 11/512
Assault Third Degree 11/611
Offensive Touching 11/601
Criminal Mischief 11/811

**\*During an executed search warrant at the residence of Mustafa Whitfield, there were drugs located in his jacket in his room. Mr. Whitfield was subsequently charged and arrested on those charges, which are as follows:**

000279

**Page: 15**
**02-106294/106295**
**MISETIC**
**Mustafa Whitfield (5-10-1985)**
Trafficking in Cocaine 16/4753
Possession with Intent to Deliver a Narcotic Schedule 1 Controlled Substance 16/4751
Possession with Intent to Deliver a Narcotic Schedule 2 Controlled Subsatnce 16/4751
Maintaining a Dwelling for Keeping a Controlled Substances 16/4755

## COURT ACTION:

This investigator signed warrants at the Justice of The Peace Court #20 on 15 October 2002 for the above three defendants for the listed weapon and accompanying charges. These warrants were signed by the Honorable Judge Stallmann of Justice of the Peace Court #20.

Detective Brian Ellis authored a search warrant for the residences of the above three defendants. This search warrant was signed by the Honorable Judge Stallmann on 15 October 2002. For further on this search warrant and the results refer to the below investigative narrative and supplement report completed by Detective Ellis.

The search warrant returns for the above executed search warrants were completed on 22 October 2002 and signed by the Honorable Judge Kenney of the Justice of the Peace Court #20.

Due to the results of the executed search warrants, warrants were signed for Mustafa Whitfield for drug charges on 22 October 2002. These warrants were signed by the Honorable Judge Kenney of the Justice of Peace Court #20.

## INVESTIGATIVE PROCEDURES:

### 15 October 2002

This investigator was notified by Detective Sergeant Robert Emory in regards to a shooting that occurred in the 500 Block of Willing Street.

This investigator responded to the Criminal Investigation Division, where it was learned that there was an attempted carjacking in the 500 Block of Willing Street, where the victim was shot in the foot. It was also learned that all three suspects in the shooting were located and were currently in the turnkey area being detained for further investigation.

With the names of the suspects that were in the turnkey area, Detective Diana put together two separate photo lineups one containing a photo of Akeem Coleman (2-17-1986) and another containing a photo of Emmanuel Robinson (3-12-1985).

At approximately 0130 hours this detective along with Detective Diana responded to 515 West Street Apt. #2 Wilmington, Delaware 19801 and interviewed Francisco Failey. For further on this interview refer to this investigator's notes and above witness

000280

**Page: 16**
**02-106294/106295**
**MISETIC**

interview. He was also shown the two photo lineups created by Detective Diana and could not identify any of the suspects he observed involved in the incident. This detective looked out the second floor bedroom window of Mr. Failey's address, at which point the victim's vehicle could be seen along with most of the 500 block of Willing Street, as it was a well lit area.

At approximately 0230 hours this investigator along with Detective Diana responded to the Christiana Hospital and interviewed the victim. For further on this interview refer to this investigator's notes, above victim interview along with the video and audiotapes.

At approximately 0235 hours this investigator showed the victim the two photo lineups created by Detective Diana. Mr. Meek was shown the lineup containing Emmanuel Robinson, to which he replied that #3 sort of looked like the shooter. The victim was then shown the second photo lineup, at which point he positively identified #3 Akeem Coleman as the shooter.

After speaking to Mr. Meek these investigators spoke to Doctor Denise Dunlap who examined Mr. Meek. For further on this conversation refer to this investigator's notes and above person contacted and the medical report of Mr. Meek's injuries.

At approximately 0330 hours this investigator along with Detective James Diana responded back to the scene, where this investigator created a rough sketch of the 500 Block of Willing Street, which included the streetlights that were on, as well as any porch lights. The temperature was also noted, which was approximately 40 to 45 degrees. Detective Ellis noted the registrations of the vehicles in the street. For further on these sketches and notes refer to this investigator's notes and Detective Diana's supplement report and his notes.

At approximately 0518 hours this investigator along with Detective Diana interviewed Emmanuel Robinson. For further on this interview refer to this investigator's notes and above suspect interview along with the video and audiotapes.

At approximately 0608 hours this investigator along with Detective Campos interviewed Akeem Coleman. For further on this interview refer to this investigator's notes along with above suspect interview and the video and audiotapes.

At approximately 0800 hours this investigator spoke to Mustafa Whitfield's mother, Ms. Neal, by phone. She stated that Mustafa was home by himself all night. She stated that she last saw him from 12:00am to 12:15am in the house by himself.

Both the cell phone and white t-shirt were taken out of the property of Akeem Coleman by this investigator and retained as evidence.

Both white t-shirts that Akeem Coleman and Mustafa Whitfield were wearing were removed from their person and retained as evidence, as they were in plain view.

Page: 17
02-106294/106295
MISETIC

This investigator signed warrants at Justice of The Peace Court #20 for the above listed defendants and booked all three subjects.

Detective Ellis authored a search warrant for the residences of the three defendants, as there have been several other carjackings and robberies in the area. These search warrants were executed as follows:

1. 1118 Rodman Road Wilmington, Delaware 19805 was executed at approximately 1530 hours. There was no property recovered at this address.
2. 714 East 4th Street Apt. 2-C Street Wilmington, Delaware 19801 was executed at approximately 1645 hours. A blue and black in color Nokia Cell Phone Model #5165 with serial #07814819790 was recovered in a bedroom closet of Emmanuel Robinson, which his mother stated to detectives did not belong to him.
3. 622 West 6th Street Wilmington, Delaware 19801was executed at approximately 1600 hours. One clear plastic bag containing 199 black tinted small ziplock baggies and one clear torn off baggie that was tied off at the top. These baggies contained an off white chunky substance, which tested positive for crack/cocaine. Three bundles of clear glassine bags containing blue in color wax paper, which had a design of a stop sign with the word "STOP" written in same and the words "UP TOP" underneath the sign. These bags contained an off white powdery substance, which tested positive for heroin. There were a total of forty-five bags. These drugs were located in the closet of Mustafa Whitfield's bedroom in the right side of his jacket, which had the pocket torn out and led into the lining. The mother of Mustafa Whitfield stated to detectives that the room and the jacket were Mustafa's. Three Polaroid photographs were taken where the drugs were located.

- **For further on these search warrants refer to supplement report completed by Detective Ellis who assisted and located the above items.**

At approximately 1700 hours this investigator finished processing Mustafa Whitfield and was placing him in the juvenile cell with Emmanuel Robinson. While placing him in the cell Emmanuel Robinson asked this investigator what his charges were. This detective informed him that his charges would be Assault 1st Degree, Attempted Carjacking, Conspiracy Second Degree, at which point this investigator was unable to think of the fourth charge. At this point Mustafa Whitfield made a spontaneous utterance which was, "Oh yeah we were wearing masks".

### 16 October 2002

This investigator contacted Akeem Coleman's mother, Jackie Whittle by phone. Ms. Whittle stated that according to her caller I.D. someone called around 4:17am. She asked her husband if someone called and he said no. Ms. Whittle advised that her son is friends with "Manny" as she recognized his name, Mustafa Whitfield from the newspaper. She knows Mustafa Whitfield as "Manny". For further on this conversation refer to this investigator's notes.

**Page: 18**
**02-106294/106295**
**MISETIC**

At approximately 1406 hours this investigator placed the drugs located at 622 West 6th Street Wilmington, Delaware 19801 into the custody of Vice Officer Vincent Disabatino, who is currently assigned to the drug safe of this unit. These items were removed from this officer's temporary evidence locker and then tested weighed, photographed and given to the custody of Corporal Disabatino.

### 18 October 2002

At approximately 1050 hours this investigator spoke to Ms. Alma Meek. For further on this interview refer to this investigator's notes.

At approximately 1135 hours this investigator removed the vehicle key recovered at the scene under case number #30-02-106294. This key was retrieved from Evidence Officer Daniel Sullivan.

At approximately 1140 hours this key was shown to Mr. Meek who positively identified the key as the key to his vehicle. This key was then given to the victim so he could use it to operate his vehicle. For further on this key refer to the supplement report completed by Corporal Rhoades of the Evidence Detection Unit.

At approximately 1142 hours this detective interviewed Anthony Meek. For further on this interview refer to this investigator's notes, victim interview and the video and audiotapes.

At approximately 1305 hours this investigator responded back to the scene with the victim at which point he showed me the relationship of himself to his car and the three defendants. This investigator then completed a rough sketch of this relationship as portrayed by the victim. For further on this drawing refer to the sketch in this investigator's notes.

At approximately 1330 hours this investigator conducted an area search for any witnesses or evidence in the area.

At approximately 1435 hours this investigator located Mr. William Edelin at the Saint Peter Cathedral. For further on this interview refer to above person contacted and this investigator's notes.

At approximately 1445 hours Mr. Edelin gave the house key that he found to this investigator, but has the bottle opener at his residence. For further on these items refer to above person contacted and this investigator's notes.

000283

Page: 19
02-106294/106295
MISETIC

### 21 October 2002

At approximately 1330 hours this investigator spoke to the Assistance Principle of Glasgow High, Mr. Connely, who advised that Akeem Coleman and Emmanuel Robinson although in different grades are both enrolled at Glasgow High.

### 22 October 2002

At approximately 1730 hours this investigator responded to Mr. Edelin's address at which point he handed this investigator the bottle opener that he found.

At approximately 1735 hours this investigator responded to 717 East 4th Street Apt. 2-C and spoke to an Yvonne Brown, who is the mother of Emmanuel Robinson. For further on this investigation refer to this investigator's notes and above person contacted.

At approximately 1740 hours Ms. Brown picked Akeem Coleman out of a photo lineup as an individual she has seen her son with before.

At approximately 1745 hours this investigator spoke to a Bilnesha Brown BFN-16 D.O.B. 8-17-1986 separately from Ms. Yvonne Brown. Ms. Brown is the sister of Emmanuel Robinson. Ms. Brown was shown the photo lineup, in which she identified Akeem Coleman as someone she has seen with her brother, although she does not know his name.

At approximately 2000 hours this investigator spoke to Ms. Neal by phone and advised her about her sons drug charges and if this investigator could speak to her son regarding the drugs. Ms. Neal asked this investigator what the new drug charges were in reference to. This investigator informed her the drugs found in his jacket, to which Ms. Neal replied "O.K."

At approximately 2150 hours this investigator responded to Mr. Meek's address and showed him the house key and the bottle opener, which were removed from this investigator's temporary evidence locker. Mr. Meek positively identified the items as his. These items were then placed back into this investigator's temporary evidence locker.

At approximately 2230 hours this investigator contacted Ms. Jamila Reed by phone to ascertain if she had any other information to add. She replied only that the subject she saw was limping. For further on any statements made by Ms. Reed refer to the original report completed by Patrolwoman Hammond under case number 30-02-106295.

This investigator signed warrants at Justice of the Peace Court #20 on Mustafa Whitfield. For further on these charges refer to the warrant.

000284

Page: 20
02-106294/106295
MISETIC

## 29 October 2002

At approximately 1003 hours this investigator spoke to Kelley Stark of Ferris Detention Center by phone. She advised I could pick Mustafa Whitfield today at 1300 hours to book him on the warrant and process him.

At approximately 1300 hours this investigator and Detective Brian Ellis responded to the Ferris Detention Center, where Mustafa Whitfield was picked up and brought back to central, where he was booked on the listed drug charges.

At approximately 1645 hours this investigator spoke to Ms. Neal by phone and informed her that "Manny" was being arraigned on the drug charges.

## 7 November 2002

A latent fingerprint comparison request was submitted in regards to the latent prints that were lifted from the scene and had them compared to the victim's and the three defendants. For further on these prints refer to the supplement report completed by Corporal David Rhoades.

## 9 November 2002

At approximately 0030 hours this investigator responded to the 500 Block of West Street and met with Patrolman Prado and Patrolman Derbyshire. A rough sketch was completed by this detective in regards to where the weapon was located and where the subjects were seen jumping over the fence and where Akeem Coleman was stopped. For further on this sketch and conversation with the patrol officers refer to this investigator's notes.

## 11 November 2002

At approximately 1500 hours this investigator responded to the Evidence Detection Unit and spoke to Sergeant Thomas Liszkiewicz of the Evidence Detection Unit. Sergeant Liszkiewicz stated that the weapon was test fired and that in his opinion there is a high degree of probability that the casing found at the scene was fired from the weapon located near the defendant's. For further on this refer to the Evidence Detection Unit supplement report.

## 12 November 2002

This investigator received a Laboratory Report from Evidence Detection Officer Corporal Joseph Sammons in which the fingerprint request this investigator placed was met with negative results in regards to the three defendants. There were latent prints that were lifted that belonged to the victim. For further on the results of these comparisons refer to reports completed by Detective Sammons.

Page: 21
02-106294/106295
MISETIC

This investigator contacted ATF Agent Veronica Hnat and faxed her a copy of this detective's ATF letter to have the weapon test fired and a ballistic comparison conducted between the shell casing found at the scene with a test fired shell casing from the weapon located near the defendants. For further on these reports and the results refer to the reports in the case file as well as any future reports that contain the results of the test firing.

### 15 November 2002

At approximately 1500 hours this investigator responded to the FEDEX at 824 North King Street and sent the ATF letters along with the weapon and the spent shell casing to ATF National Laboratory in Rockville, Maryland, per departmental procedures.

### CONCLUSION:

This investigator was notified by Sergeant Robert Emory on 15 October 2002 of a shooting that occurred in the 500 Block of Willing Street. This investigator along with Detective Diana responded to the Criminal Investigation Division where patrol officers had stopped and detained three subjects running from the scene of the shooting. There was also a handgun located along the path where the subjects were seen running. The subjects were brought into the police station for further investigation. Detective Diana was able to complete two separate photo lineups. One containing a picture of Akeem Coleman and another of Emmanuel Robinson. The third subject, Mustafa Whitfield, did not have a photograph in the Live-Scan System.

This detective along with Detective Diana responded to the Christiana Hospital and briefly spoke to the victim. The victim was also shown the two photo lineups. The victim positively identified Akeem Coleman as the shooter. These investigators interviewed the suspects, at which point they gave conflicting stories and denied being involved in a shooting.

The defendants were then charged and booked on the above listed charges. Emmanuel Robinson was also wanted on an outstanding warrant for Burglary charges. The weapon was test fired by the department in which it was declared that there was a high degree of probability that the casing at the scene was discharged from the handgun located near the defendants. The weapon along with the shell casing were sent to the ATF lab for a more intensive analysis. The results of these test are still pending.

Due to several armed robberies and carjackings in the area, search warrants were conducted at the residences of the defendants residences for any weapons or evidence from prior robberies and carjackings. During these search warrants a cell phone was located at the address of Emmanuel Robinson, which did not belong to him. Also located were several amounts of narcotics, which were located in the residence of Mustafa Whitfield. He was subsequently charged for the drug offenses and booked on same. Any further information or investigation regarding this case will be documented on a separate supplement report and submitted. This case can be considered Closed Arrest.

**Page: 22**
**02-106294/106295**
**MISETIC**

**INVESTIGATOR:** Detective Stephen R. Misetic I/7056     *Steph R. Misetic F/7056*

**DATE SUBMITTED:** 3 December 2002

**SUPERVISOR:**_____

**DATE SIGNED OFF:**_____

**CASE STATUS:** Closed Arrest

000287

# WILMINGTON  DEPARTMENT  OF  POLICE

## SUPPLEMENT  REPORT #2

**CASE NUMBER:** 02-106294/106295
**RED NUMBER:**  02-S-55/02-1383

**VICTIM #1:** Anthony Meek BMN-29 ███████████████
**ADDRESS:** ████████████ Wilmington, Delaware 19801

**SUSPECT #1:** Akeem Coleman BMN-16 date of birth 2-17-1986
**ADDRESS:** 1118 Rodman Road Wilmington, Delaware 19805 (302)658-4412

**SUSPECT #2** Emmanuel Robinson BMN-17 date of birth 3-12-1985
**ADDRESS:** 717 East 4th Street Apt. 2-C Wilmington, Delaware 19801 (302)654-9087

**SUSPECT #3** Mustafa Whitfield BMN-17 date of birth 5-10-1985
**ADDRESS:** 622 West 6th Street Wilmington, Delaware 19801 (302)778-2220

**INCIDENT/CRIME:** Assault 1st Degree

**LOCATION OF INCIDENT:** 500 Block of Willing Street Wilmington, Delaware 19801

**DATE/TIME OF INCIDENT:** 14 October 2002 at approximately 2352 hours

**DATE OF REPORT:** 7 July 2003

**INVESTIGATOR:** DETECTIVE STEPHEN R. MISETIC I/7056

## CASE SUMMARY:

On 14 October 2002 at approximately 2352 hours a shooting occurred in which the above victim was shot in the foot. This occurred in the 500 Block of Willing Street. The above three suspects were apprehended running away from the scene. A handgun was located in the area the subjects were first observed by patrol officers, who eventually stopped all three subjects. An original supplement report was already completed by this investigator. This is a second supplement report concerning the actions and investigations regarding this incident since the last report was completed.

000288

Page: 2 of 4
02-106294/ 02-106295
Misetic

### PERSON CONTACTED:

**Julie Willey- Chief Forensic Microscopist Delaware State Police**
**1441 North Dupont Highway Dover, Delaware 19903**
**(302)739-5900.**
    Ms. Willey is a Forensic Microscopist for the Delaware State Police. The white t-shirt recovered at the scene along with hair samples from the suspects and the victim were turned over to her laboratory. For further on her analysis and those results refer to any notes or documents she might have created.

**Martin Ols- Bureau of Alcohol, Tobacco, Firearms and Explosives**
**6000 Ammendale Road Ammendale, Maryland 20705-1250**
**(240)264-3700.**
    Mr. Ols is a Firearms/Toolmark examiner for the ATF. The handgun along with the ballistic evidence in this case was sent to his office to be examined. For any analysis he conducted and the results refer to any notes or documentation he might have created regarding this incident.

### INVESTIGATIVE PROCEDURES:

#### 9 December 2002

    This investigator authored a search warrant, which was approved at Justice of the Peace Court #20 for the head and facial hairs of Mustafa Whitfield, Akeem Coleman and Emmanuel Robinson.

#### 10 December 2002

    At approximately 1546 this investigator responded to the New Castle County Detention Center along with Evidence Detection Officer Roger Cresto and Edward Harrison, who removed hair samples from the above three suspects.

#### 6 January 2003

    At approximately 1415 hours this investigator spoke to Julie Willey of the State Police Crime Lab, in regards to possible hair samples removed from the white t-shirt left at the scene. An appointment was scheduled for 13 January 2003 at 1000 hours.

    At approximately 1430 hours this investigator contacted Anthony Meek by phone in regards to pulling his hair samples. An appointment was scheduled for 1000 hours on 8 January 2003.

#### 8 January 2003

    At approximately 1205 hours Anthony Meek responded to the Criminal Investigation Division, where Evidence Detection Officer Roger Cresto pulled hair samples from him.

000289

Page: 3 of 4
02-106294/ 02-106295
Misetic

At approximately 1220 hours Corporal Cresto transferred custody of the hair samples taken from Anthony Meek and the three suspects. These items were then placed into the temporary evidence locker.

### 9 January 2003

At approximately 0930 hours this investigator contacted Arlene Coleman by phone. She advised she resides at 516 East 9th Street. She advised she does not know if Akeem Coleman came to her house on the night of the shooting, but he does stop by sometimes.

At approximately 1100 hours this investigator attempted to locate a Patricia Norton in the area of 22nd and Jessup Streets. A computer check and an area canvas search were met with negative results.

### 11 January 2003

The mini-cassette tapes were sent up to word processing to be transcribed.

### 12 January 2003

This investigator responded to Justice of the Peace Court #20 with the search warrant returns pertaining to the hair samples removed from the victim and the three suspects.

### 13 January 2003

At approximately 0925 hours this investigator responded to the Support Services Division where the white t-shirt recovered from the scene was turned over to this investigator by Evidence Officer Daniel Sullivan. This investigator then responded to the temporary evidence locker and removed the hair samples.

At approximately 1019 hours this investigator responded to the Delaware State Police Crime Lab in Dover Delaware and transferred custody of the evidence to Julie Willey along with a microscopic analysis request letter. A copy of the evidence receipt and the analysis request letter was placed into the case file.

### 11 March 2003

This investigator received a copy of the 911 calls that were taken on the 14th and 15th of October 2002. This copy was placed into the temporary evidence locker. The first call, in which the name of Pat Watkins was given did not have a call back number and attempts to locate a Pat Watkins in the area of the shooting has been met with negative results. This investigator already spoke to the other caller. For further on this interview refer to original supplement report. The third call was from the victim's mother.

### 25 March 2003

This investigator received the transcribed records pertaining to the recorded interview with Anthony Meeks. This investigator will verify the transcribed records and when a final copy is completed it will be documented on separate supplement report. It should be noted that the mini-cassette tapes that contained the interviews of Akeem Coleman and Emmanuel Robinson could not be transcribed due to static. The tapes were placed back into the temporary evidence locker.

Page: 4 of 4
02-106294/ 02-106295
Misetic

**10 July 2003**

    This investigator received a Laboratory Report from Martin Ols of the Bureau of Alcohol, Tobacco, Firearms and Explosives. This documentation indicated that through analysis it was determined that the ballistic evidence found at the scene was discharged from the handgun found at the secondary scene. For further on this analysis refer to any notes or documentations completed by Agent Martin Ols.

**INVESTIGATOR:** DETECTIVE STEPHEN R. MISETIC I/7056

**DETECTIVE SUPERVISOR:**_____

**DATE COMPLETED:** 11 July 2003

**DATE SIGNED OFF:**_____

**CASE STATUS:** CLOSED ARREST

000291

# WILMINGTON DEPARTMENT OF POLICE

## SUPPLEMENT REPORT #3

**CASE NUMBER:** 02-106294/106295
**RED NUMBER:** 02-S-55/02-1383

**VICTIM #1:** Anthony Meek BMN-29 ███████████████
**ADDRESS:** ███████████████ lmington, Delaware 19801

**SUSPECT #1:** Akeem Coleman BMN-16 date of birth 2-17-1986
**ADDRESS:** 1118 Rodman Road Wilmington, Delaware 19805 (302)658-4412

**SUSPECT #2** Emmanuel Robinson BMN-17 date of birth 3-12-1985
**ADDRESS:** 717 East 4th Street Apt. 2-C Wilmington, Delaware 19801 (302)654-9087

**SUSPECT #3** Mustafa Whitfield BMN-17 date of birth 5-10-1985
**ADDRESS:** 622 West 6th Street Wilmington, Delaware 19801 (302)778-2220

**INCIDENT/CRIME:** Assault 1st Degree

**LOCATION OF INCIDENT:** 500 Block of Willing Street Wilmington, Delaware 19801

**DATE/TIME OF INCIDENT:** 14 October 2002 at approximately 2352 hours

**DATE OF REPORT:** 15 November 2003

**INVESTIGATOR:** DETECTIVE STEPHEN R. MISETIC I/7056

## CASE SUMMARY:

On 14 October 2002 at approximately 2352 hours a shooting occurred in which the above victim was shot in the foot. This occurred in the 500 Block of Willing Street. The above three suspects were apprehended running away from the scene. A handgun was located in the area the subjects were first observed by patrol officers, who eventually stopped all three subjects. An original supplement report was already completed by this investigator. This is a third supplement report concerning the actions and investigations regarding this incident since the last report was completed. Any other investigation regarding this incident will be documented on a separate supplement report under this case number.

Page: 2 of 3
02-106294/ 02-106295
Misetic

## PERSON CONTACTED:

**Amber Moss- Orchid Cellmark**
**2600 Stemmons Freeway**
**Suite #133**
**Dallas, Texas 75207**
    Ms. Moss is a Forensic Analyst for Orchid Cellmark. For any testing and their results she conducted in reference to this case refer to any reports she might have completed.

**Joe Warren- Orchid Cellmark**
**2600 Stemmons Freeway**
**Suite #133**
**Dallas Texas 75207**
    Mr. Warren is a mitochondrial and Y-STR Forensic Analyst. For any testing and their results he conducted in reference to this case refer to any reports he might have completed.

**Patrick Moore- Omega Medical Clinic**
**15 Omega Drive Building K**
**Newark, Delaware 19713**
**(302)266-6369.**
    Mr. Moore is a phlebotomist for the Omega Medical Clinic. For any actions he took in reference to this case refer to any reports or documentation he might have completed regarding same.

## INVESTIGATIVE PROCEDURES:

### 11 August 2003

    This investigator received the handgun and ballistic evidence from ATF, via Fed Ex. These items were placed into the temporary evidence locker until placed back into the Support Services Division.

### 20 August 2003

    At approximately 1845 hours this investigator received the evidence from Julie Willey that was used for hair and fiber analysis. These items were placed into this investigator's evidence locker until transferred to Support Services Division. For further on this evidence refer to copy of her analysis report and the evidence receipts.

### 26 August 2003

    At approximately 1045 hours, Patrick Moore, via a search warrant, removed a blood sample from Mustafa Whitfield. A saliva sample was also requested and received from Mustafa Whitfield. This was conducted at the Gander Hill Prison.

    This investigator removed evidence from the Support Services Division Refrigerator and this investigator's evidence locker and sent same to the Orchid Cellmark Laboratory in Houston, via Fed Ex. This evidence included the shirt located at the scene and the hair samples taken from the shirt by Julie Willey, as well as blood sample and a saliva sample from Mustafa Whitfield.

000293

Page: 3 of 3
02-106294/ 02-106295
Misetic

### 27 September 2003

At approximately 1530 hours, Patrick Moore, via a search warrant removed a blood sample from Akeem Coleman. A saliva sample was also requested and received from Akeem Coleman. This was conducted at the Gander Hill Prison.

At approximately 1540 hours, Patrick Moore, via a search warrant removed a blood sample from Emmanuel Robinson. A saliva sample was also requested and received from Emmanuel Robinson. This was conducted at the Gander Hill Prison.

This investigator removed evidence from both the Support Services Division Refrigerator and this investigator evidence locker. These items were sent to Orchid Cellmark Laboratory in Houston, via Fed Ex. This evidence included blood samples and saliva samples from both Emmanuel Robinson and Akeem Coleman.

### 4 November 2003

Received evidence back from Orchid Cellmark, via Fed Ex. These items were placed into their appropriate locations.

**INVESTIGATOR:** DETECTIVE STEPHEN R. MISETIC I/7056

**DETECTIVE SUPERVISOR:**_____

**DATE COMPLETED:** 23 January 2004

**DATE SIGNED OFF:**_____

**CASE STATUS:** CLOSED ARREST

000294

# WILMINGTON  DEPARTMENT  OF  POLICE

## SUPPLEMENT   REPORT #4

**CASE NUMBER:** 02-106294/106295
**RED NUMBER:**  02-S-55/02-1383

**VICTIM #1:** Anthony Meek BMN-29 ████████████████
**ADDRESS:** ██████████████████ Wilmington, Delaware 19801

**SUSPECT #1:** Akeem Coleman BMN-16 date of birth 2-17-1986
**ADDRESS:** 1118 Rodman Road Wilmington, Delaware 19805 (302)658-4412

**SUSPECT #2** Emmanuel Robinson BMN-17 date of birth 3-12-1985
**ADDRESS:** 717 East 4th Street Apt. 2-C Wilmington, Delaware 19801 (302)654-9087

**SUSPECT #3** Mustafa Whitfield BMN-17 date of birth 5-10-1985
**ADDRESS:** 622 West 6th Street Wilmington, Delaware 19801 (302)778-2220

**INCIDENT/CRIME:** Assault 1st Degree

**LOCATION OF INCIDENT:** 500 Block of Willing Street Wilmington, Delaware 19801

**DATE/TIME OF INCIDENT:** 14 October 2002 at approximately 2352 hours

**DATE OF REPORT:** 15 November 2003

**INVESTIGATOR:** DETECTIVE STEPHEN R. MISETIC I/7056

     This supplement report is being completed to document the whereabouts of the evidence in this case. The trial ended on, in which all three subjects were found guilty and sentenced.

The following items are being retained by the New Castle County Superior Court.

- One Smith and Wesson 9mm semi-automatic handgun model #910 containing serial number #VDM5793.
- One sliver in color house key.
- One silver in color bottle opener with the words "CHIHUAHUA" and "MEXICO" on same.
- One 9mm Luger Hollow Point live round
- One 9mm Luger Shell Casing
- One white in color t-shirt located at the scene
- Two identification badges in the name of Anthony Meek
- $1.60 in United States Currency
- One gold in color fifty-cent piece
- One white in color tube sock
- One blue in color Nike sneaker

000295

Page: 2 of 2
02-106294/ 02-106295 supplement #4
Misetic

   The following items were turned into the Support Services Division Records Department on 26 April 2004 to Corporal Daniel Sullivan.

- One Saliva sample taken from Emmanual Robinson
- One saliva sample taken from Akeem Coleman
- One saliva sample taken from Mustafa Whitfield
- One envelope containing hair samples from a t-shirt left at the scene
- One white in color t-shirt removed from Mustafa Whitfield
- One white in color t-shirt removed from Akeem Coleman
- One black and silver color cell phone removed from the person of Akeem Coleman (serial number #1BK4325515)
- One white in color t-shirt removed from Akeem Coleman

   All other evidence not listed above were retained by this investigator and placed into his evidence locker. Any further actions regarding this case will be documented on a separate supplement report under this case number.

**INVESTIGATOR:** DETECTIVE STEPHEN R. MISETIC I/7056     *Steph S. Misetic I/7056*

**DETECTIVE SUPERVISOR:**_____

**DATE COMPLETED:** 24 April 2004

**DATE SIGNED OFF:**_____

**CASE STATUS:** CLOSED ARREST

000296

# EXHIBIT B

000297

15 Oct. 02
0230hrs.

Anthony Meek

███████████████
███████████

0235hs.

identifies #3 as guy with gun shot twice
does not know him.

1:30 Am left work Dol. Park

wand 1?i.o. Back'N turned care off
three guys. come up
Two guys had t-shirts on face, looked like shirts

hng Gun in hand said give it up
other guy said grab the keys
grabbed on gun. held him i face
fell down with guy on top. guy got up
shot at him missed.
one of the two snatched keys.
take off running chased them
took another shot hit his foot.
hollered through alley way for mom.
went upstairs tol d them to call Police rom called
seemed like they were waiting for him

Run sarth made left towards west street

000298

shooter t-shirt white , Dark pants
average Build    5'10" little shorter
clean shaven

matching outfits   Dark clothing   Dk grey shirt
Slim Build    white scarfs  whole face except eyes
Bin skin
gun grabbed    about his height 5'10" and Build

rone from north   saw them   rone from 6th street
hunting for them.

Gun was Black    semi Automatic

the other  guy  grab his keys
gun didn't grab  said shoot him  shoot him.

didn't lock car
locked doors Rem
Stefan cup with change

"I live Right here"

Tried to kick him and punch him

000299

18 oct 02                                    Review    24 Nov. 02
  142 hrs.                                      Anthony Meek


          Anthony Meek
          ████████████████████


        Works at Delaware Park
        Left around 11:30 P.M.
        Turned down willing street off of 6th street
        Looked up at the corner saw three guys coming down
        Two guys faced masked up One in middle no mask.
        Came off of 6th street did not see them when
        the drove by
        Saw them in the car.
        guy with gun said "give up keys" said it a couple
        of times while pointing gun at his head
        one tried to Duck and come behind
        all came around same side.
        one of the other guys with a mask said get his
        the keys other guys reached for the keys, V-grabbed
        other subject yelled shoot him. Put him in front
        of him as a shield. Struggle ensued. Both had
        keys fell back then got up fired shot
        all three started Running
        Not Sure when he was shot              000300

had t-shirt or scarf. only could see there eyes
could tell they were Black males.


Black gun semi-Automatic
Shoot — t-shirt or white    Dark complextion   Clean shaven
       thicker   Ws height.     Dark Pants


they seemed like they did it before


Height/Height Same    seemed like twins.
White T-shirt over faces
Dark charcoal clg   matching outfits  — seems like
                    street


one of the subjects tried to dart down and came
around   But saw him look at them so  tried to
run around lexus  Ass.  couple cars up  they stopped
him — he saw him.


w/ came around drivers side   all three walked over
drive side


shooter in front  other two surrounded him.


Said "give up the keys" with gun to his head
   in a manner that he noticed turn on T.V. like he
was supposed to know what was going on.


after two off two his fist had

000301

the guy who snatched the keys did not say anything.

the other masked guy said for shooter to "shoot".

Two feet away first shot. was on ground gettn up
Does not know when he shot was wt.

all ran together

Turned around and shot again felt pain in foot

Ran to 5th the Ran towards west all together

Two houses down. Right around 5th street who he shot again.
vict. then 5th. one house on corner

Stoped tunaround like he was aiming and shot
had part of keys — Bottle opener and housekey
pulled it off. Still outstanding "Tiguana" Bottle opener
s. Lopez con. vote

Only asked for car keys.

000302

does not Remember them wearing gloves

hobble through alley to call for his mom.
Lived there for his whole life. except for one-year.

any at window
    you looked like you were shot. Stand at window
    mom head gunshot. Son told her that she
was shot and to call the police.


Fractured foot unable to put pressure on
does not look like he will be able to run again
Seemed like one piece


On a normal day there is always a lot of traffic
around the area Not on this night


Poss guy at 6th + Harrington getting description of
one of the guys with a mask


did not see anyone else in then area
kind of cold that night.

000303

18 oct 02
1142hrs

Anthony Meeks

▓▓▓▓▓▓▓  -29

▓▓▓▓▓▓▓▓▓▓▓ wilmington, DE.

10:30 Am went to work
Delaware Park
11:23 P.m. went home
came into willing street off 6th street

white T-shirt    little        clean shaven
            thick    little shoter     Dupunts.

"7in Silver fuwhite —  Bottle opener
     one house key left  — silver ma

000304

# EXHIBIT C

000305

Juvenile Complaint and Warrant
# In the Justice of the Peace Court
In and for the
## State of Delaware

### State of Delaware vs. **MUSTAFA A. WHITFIELD**

I, STEPHEN MISETIC (07056) of WILMINGTON PD, do hereby state under oath or affirmation, to the best of my knowledge, information and belief that the above-named accused violated the laws of the State of Delaware by committing criminal acts in **New Castle** county on or about the date, or dates, and at or about the location, or locations, as indicated in Exhibit A hereto attached and made a part hereof.

Wherefore, your affiant prays that the above-named accused may be forthwith approached and held to answer this complaint consisting of **4** charges, and to be further dealt with as the law directs.

X _____
Affiant

_____.    Sworn to and subscribed to before me this ____ day of _____, AD

_____
Judge/Master/Commissioner/Court Official

(To be completed by the Judge/Master/Commissioner/Court Official)
A. _____ The crime was committed by a child.
B. _____ A misdemeanor was committed against a child.
C. _____ A misdemeanor was committed by one family member against another family member.
D. _____ Other: Explain _____

Warrant

To any constable or other authorized person:

Whereas, the foregoing complaint consisting of **4** charges, having been made, as listed in Exhibit A which is attached hereto and incorporated herein, and having determined that said complaint has been properly sworn to and having found that there exists probable cause for the issuance of process, based upon the affidavit of probable cause which is attached hereto and incorporated herein as Exhibit B, you are hereby commanded in the name of the State of Delaware, to take **MUSTAFA A. WHITFIELD** accused, and bring same before

### Justice of the Peace Court 20, FORTHWITH, to answer said charges.

GIVEN UNDER MY HAND, this ____ day of _____, AD _____.

_____
Judge/Master/Commissioner/Court Official

000306

Executed on _____ by _____
Case Number: **02 10 009174**   Warrant Number: 30 02 007301

State of Delaware vs. **MUSTAFA A. WHITFIELD**                Case: **02 10 009174**

# Exhibit A

Charge Sequence: 001          Police Complaint Number: 30 02 106295      Arrest Number: 02004504
Charge: **ATTEMPTED CARJACKING FIRST DEGREE TAKES POSSESSION MOTOR VEHICLE DISPLAYS DEAD** In
Violation of 11 <u>Del.C.</u> § 0531 0001 F B
Location: 500 WILLING ST - Wilmington, 19801
TO WIT: MUSTAFA A WHITFIELD, on or about the 14th day of October, 2002, in the County of New Castle,
State of Delaware, did attempt to knowingly and unlawfully take possession of a motor vehicle in the
immediate presence of ANTHONY MEEK by duress of ANTHONY MEEK, and while in possession of the vehicle
was in the company of Akeem Coleman,  who displayed a 9mm handgun to the victim.   The victim was then
told to give up the key which acts under the circumstatnce as he believed them to be constituted  a
substantial step in the course of conduct. planned to culminate in the commission of the crime of
CARJACKING FIRST DEGREE TAKES POSSESSION MOTOR VEHICLE DISPLAYS DEADLY WEAPON in
violation of 11-DE-0836-00a4-F-B


Charge Sequence: 002          Police Complaint Number: 30 02 106295      Arrest Number: 02004504
Charge: **ASSAULT FIRST DEGREE-INTENTIONAL SERIOUS INJURY-WEAPON DANGEROUS INSTRUMENT** In Violation of
11 <u>Del.C.</u> § 0613 00A1 F C
Location: 500 WILLING ST - Wilmington, 19801
TO WIT: MUSTAFA A WHITFIELD, on or about the 14th day of October, 2002, in the County of New Castle,
State of Delaware, was in the company of Akeem Coleman who caused serious physical injury to Anthony
Meeks by discharging two shots at the victim, one stiking the victim in the left foot, causing injury to same.


Charge Sequence: 003          Police Complaint Number: 30 02 106295      Arrest Number: 02004504
Charge: **WEARING A DISGUISE DURING THE COMMISSION OF A FELONY** In Violation of 11 <u>Del.C.</u> § 1239 000A F E
Location: 500 WILLING ST - Wilmington, 19801
TO WIT: MUSTAFA A WHITFIELD, on or about the 14th day of October, 2002, in the County of New Castle,
State of Delaware, did wear a white in color t-shirt over his face  as to disguise himself from the victim during
the commission of an assault first, which is a felony.


Charge Sequence: 004          Police Complaint Number: 30 02 106295      Arrest Number: 02004504
Charge: **CONSPIRACY SECOND DEGREE-AGREEMENT TO ENGAGE IN FELONY CRIMINAL CONDUCT** In Violation of 11
<u>Del.C.</u> § 0512 0001 F G
Location: 500 WILLING ST - Wilmington, 19801
TO WIT: MUSTAFA A WHITFIELD, on or about the 14th day of October, 2002, in the County of New Castle,
State of Delaware, did when intending to promote the commission of a felony, did agree with Akeem Coleman
and Emanual Robinson to engage in conduct constituting the felony of Attempted Carjacking and did commit
an overt act in the furtherance of said conspiracy by committing Attempted Carjacking.

000307

State of Delaware vs. **MUSTAFA A. WHITFIELD**         Case: **02 10 009174**

## Exhibit B

SBI Number: **00317479**                 Also Known As: **MUSTAFE WITFIELD**
Date of Birth/Age: **May 10, 1985 (17)**     Sex: **Male**                          Race: **Black**
Eye Color: **Brown**        Hair Color: **Black**        Height: **5'11"**    Weight: **138 lbs**
Driver's License:                              Social Security Number:**000000000**
Address: **622 W 6TH ST**
         **963 CENTRE ROAD**
         **WILMINGTON, DE 19805**
Phone:
Employer:

Date and Times of Offense: **Between 10/14/2002 at 2352 and 10/15/2002 at 0015**
Location of Offense: **500 WILLING ST - Wilmington, 19801**

Your affiant STEPHEN MISETIC can truly state that:
 1.) That this affiant is employed b ythe City of Wilmington as a police officer and has been for the past six years. This affiant is currently assigned to the Criminal Invetstigation Division.
 2.) That this affiant can state that this incident occurred in the 500 Block of Willing Street, which is located in the City of Wilmington, County of New Castle, State of Delaware.
 3.) That this affiant can state that on 2352 hours of 14 October 2002 wwhile on routine patrol officers in the area of 4th and West Streets, observed three subjects running East on 5th Street then North on West Street. The subjects were described as black males. Suspect #1 was wearing a white t-shirt and dark pants. Suspect #2 was wearing a dark grey sweatshirt and dark pants. Suspect #3 was wearing all dark clothing.
 4.) Your affiant can state that suspect #2 and supect #3 jumped over a fence in the 500 Block of North West Street, traveling east bound. The patrolofficers became suspicious of the subjects, as they appeared to be running with a purpose. The patrol officers decided to stop suspect #1, who was still running northbound in the 500 Block of North West Street.
 5.) Your affiant can state that upon sstopping suspect #1, they observed him sweating and having trouble talking due to running. The patrol officers checked the area that the other two subjects were along with suspect #1 on the East side of North West Street. While checking this area a black in color handgun was located on the sidewalk in the 500 block.
 6.) Your affiant can state that the other two suspects were stopped in the 200 block of West 4th Street. Patrol officers positively identified these subjects that were seen running with suspect #1.
 7.) That this affiant can state that while the suspects were stopped, Wilcom dispatched another patrol vehicle to the 500 Block of Willing Street in reference to a shooting. This location is half a block from where the suspects were seen running together from, moments before the call came over the air.
 8.) That this affiant can state that the victim was located and a scene was also located in the 500 Block of Willing Street. At this scene a 9mm round was located along with a 9mm shell casing. The scene was held until Evidence Detection Unit arrived and collected same. Also located at the scene was a white in color t-shirt.

                                                                    000308

                      _____
                                    Affiant
         Sworn and subscribed before me this 15th day of October AD, 2002

                      _____
                                    Judge/Master/Commissioner/Court Official

State of Delaware vs. **MUSTAFA A. WHITFIELD**          Case: 02 10 009174

9.) That this affiant can state that the victim was transported to Christiana Hospital by ambulance for a gun shot wound to the left foot. The victim was seen by Doctor Dunlap, who treated him for a shattered first Metatarsal bone and a shattered first Proximal Phalanx. He was admitted for the night.

10.) Your affiant can state that the victim waas interviewed at the hospital. The victim stated that while exiting his vehicle in the 500 Block of Willing Street three subjects approached him. Suspect #1 brandished a black in color Semi-automatic Handgun. Suspect #1 was wearing a white in color t-shirt and dark pants. Suspect #2 was wearing dark clothing and a dark grey shirt, while suspect #3 was wearing dark clothing. Both of these suspect"s were donning white in color masks, possibly t-shirts, which covered their entire face, but their eyes.

11.) Your affiant can state that suspect #1 told the victim to "give it up". One of the other two suspects stated, "grab the keys". Either suspect #2 of #3 went to grab for the keys, as they did the victim grabbed this suspect. Both the victim and either suspect #2 or #3 fell back into the brush area along the east side of the street. This suspect got off the ground and suspect #1 fired a shot at the victim. This shot missed and all three suspects ran together south in the 500 Block Of Wiilling Street. The victim then gave chase, at which point suspect #1 stopped, turned around and fired another shot at the Victim. This shot struck the victim in his left foot. The victim was ab able to observe the suspects run east on 5th Street towards West Street, until he lost sight of them. Either supect #2 or #3 told #1 to, "Shoot Him".

12.) That this affiant can state that the victim was shown a photo lineup, at which point he positively identified, Suspect #1, Akeem Coleman BMN-16 D.O.B.of 2-17-1986 as the individual who fired two shots at him.

13.) That this affiant can state that the weapon recovered in the 500 Block of North West Street was a black in color Smith and Wesson 9mm handgun which contained a total of five 9mm rounds, including one in the chamber.

14.) That this affiant can state that the other two subjects who had a white in color object covering their faces were positevely identified as Mustafa Whitfield BMN-17 D.O.B. of 5-10-1985 and Emmanuel Robinson BMN-17 D.O.B. of 3-12-1985. These two subjects along with Akeem Coleman were transported to Central for further investigation.

15.) That this affiant can state that while at central a white in color t-shirt was retrieved from the property of Akeem Coleman that he was not wearing and Mustafa Whitfield was wearing a white t-shirt under a grey sweater

16.) That this affiant can truly state that all attempts to notify the guradians of the juvenile suspects. Ms. Brown, who is the mother of Emmanuel Robinson, stated that we could speak to him. Ms. Neal, who is the mother of Mustafa Whitfield, stated we could not speak to her son. With the number provided by Akeem Coleman an attempt was made to contact his guardian. A male answered the phone and stated that Akeem Coleman did not live there. This was presented to Akeem Coleman, who responded that he gave us the right number.

17.) That this affiant can state that Emmanual Robinson after being read his Miranda Rights, Mr. Robinson stated that he was walking home with Mustafa Whitfield and has no idea of a shooting, nor who Akeem Coleman.

18.) That this affiant can state that Akeem Coleman was read his Miranda Rights and stated that he was walking home to Elsemere from the east side. He does not know the other two subjects and has no idea about a shooting.

Affiant: STEPHEN MISETIC (07056) of WILMINGTON PD

| Victim: | Date of Birth | Relationship Victim to Defendant |
|---|---|---|
| ANTHONY MEEK | 04/26/1973 | Stranger |

000309

<div style="text-align:center">

_____

Affiant

Sworn and subscribed before me this 15th day of October AD, 2002

_____

Judge/Master/Commissioner/Court Official

</div>

State of Delaware vs. **MUSTAFA A. WHITFIELD**          Case: **02 10 009174**

## Approval and Arrest Information

Approved by: **100933 : STALLMAN CHERYL S.**

Approved on: **10/15/2002** at **03:30 PM**

Approval Entered by: **CJPKBUN : KIMBERLY M BUNGY**


Active Arrest Number: **02004504**

Date of Arrest: **10/15/2002** at **1:00**

Arresting Agency: **Wilmington PD**

Arresting Officer: **PTLMN DERBYSHIR**

000310

DATE: 10/15/02

AUTOMATED ARREST REPORT

SBI NUM: 00317479 ARREST DATE: 10/15/02 ARREST NUMBER: 02004504    AGENCY: 30

LOCAL PD IDENT #: _____

DEFENDANT DATA:
 BUSINESS:
 LNAME: WHITFIELD        FIRST: MUSTAFA      MI: A SUF:
 ADDRESS: 622 W 6TH STREET            RD:
 COMMUNITY:                    GRID:
 CITY:              ST: DE ZIP:          CNTY: N
 RACE: B SEX: M EO: N DOB: 05 10 1985 HGT: 511 WGT: 138 HAIR: BLK EYE: BRO
                         SKIN: XXX POB: DE
SOC SEC:         MISC ID TYPE:    NO:        RELIGION:
                         MARITAL STAT:
 FBI:        SMT:        R/L HAND:   ALIEN:
 HOME PHONE:         DAY/NT:____  BUSINESS PHONE:         DAY/NT:____
 EMPLOYER/SCHOOL:
 OCCUPATION:            D.L.NO./STATE:
 MULTIPLE DATA ELEMENTS:
 NICKNAME:
 SMT:
 MISC ID TYPE NO:
                             000311

COMMENTS:

SPOUSE'S NAME:            FIRST:        MI:   SUF:
 ADDRESS:                PHONE:
 CITY:            ST:    ZIP:      AGE:
 RELATIVE:    RELATIONSHIP TO DEFENDANT:
 LNAME:                FIRST:        MI:   SUF:
 ADDRESS:                PHONE:
 CITY:            ST:    ZIP:      AGE:

VICTIM/COMPLAINANT            JUVENILE VICTIM: NO
 BUSINESS:
 LNAME:      MEEK        FIRST  ANTHONY   MI:   SUF:
 ADDRESS: ████████████████        RES.PHONE: ████████████
 CITY: Wilmington       ST: DE ZIP: 19801   BUS.PHONE:

NAME OF PARENT/GUARDIAN/NEXT OF KIN NOTIFIED:
 LNAME:_____ FIRST:_____ MI: _ SUF: _
 DATE/TIME:_____ ____ OFFICER:_____ NO:_____

ARREST LOC:              CITY: WILMINGTON      COUNTY: N
DESCRIBE TYPE OF PREMISE CRIME OCCURRED: _____
PLACE OF CRIME(ADDRESS): 500 WILLING ST Wilmington 19801

VEHICLE INVOLVED: _____ REG NO.: _____ ST: ____ YEAR: ____
HOLD PLACED ON VEHICLE: ___ VEHICLE TOWED TO:_____
NARRATIVE:PLACES FREQUENTED,FACTS OF ARREST,ASSOCIATES,MLTRY SERVICE,EDUCATION
    _____
    _____

 DEFENDANT'S MONEY,PROPERTY(IF SEIZED BY OFFICER):_____ NO: ____
WARRANT CHECK: DELJIS ___ NCIC DATE/TIME COMMITTED:_____
PRINTS TAKEN:STATE _ FEDERAL _ MO CLASS: _____ SUPERVISOR INITIAL:____ NO: ____

DATE: 10/15/02

AUTOMATED ARREST CONTINUATION REPORT

SBI NUMBER: 00317479  ARREST DATE: 10 / 15 / 2002   ARREST NUMBER: 02004504

DEFENDANTS DATA:
 BUSINESS:
 LNAME: WHITFIELD          FIRST: MUSTAFA     MI: A SUF:

ARRAIGNMENT DATE: _____ COURT: ____ JUDGE:
TRIAL DATE    : _____ COURT: ____ JUDGE:

ARREST DISP:_____ DATE: 10 / 15 / 2002
ARRESTING OFFICER: MISETIC         NUMBER: 7056   DIVISION:
ARRESTING AGENCY: 30  COUNTY: N
INVESTIGATING OFFICER:            NUMBER:       AGENCY:

|   | DATE OF CRIME | COMPLAINT NUMBER | GRID NO | SECT NO | GOC | UCR CLASS | CRIME LITERAL | STATUTE |
|---|---|---|---|---|---|---|---|---|
| 1 | 10/14/2002 | 3002106295 | | | | 73 | ATT. CARJACKING | 11 0531 0001 F B |
| 2 | 10/14/2002 | 3002106295 | | | | 13 | ASSAULT 1ST | 11 0613 00A1 F C |
| 3 | 10/14/2002 | 3002106295 | | | | 26 | DISGUISE | 11 1239 000A F E |
| 4 | 10/14/2002 | 3002106295 | | | | 73 | CONSP 2ND | 11 0512 0001 F G |

000312

# EXHIBIT D

000313

Filename:            02-106295.am
Directory:           G:\CRIMINVS
Template:            C:\Documents and Settings\vhooper.WPD\Application
    Data\Microsoft\Templates\Normal.dot
Title:               ANTHONY MEEK - FINAL - 10/8/03
Subject:             STATEMENT - 3/25/03
Author:              DET. STEPHEN MISETIC
Keywords:
Comments:            worked in records 1 to 4 pm.
Creation Date:       3/24/2003 9:37 AM
Change Number:       26
Last Saved On:       10/8/2003 8:42 AM
Last Saved By:       vhooper
Total Editing Time:  308 Minutes
Last Printed On:     10/8/2003 9:34 AM
As of Last Complete Printing
    Number of Pages: 26
    Number of Words:        5,301 (approx.)
    Number of Characters:   30,220 (approx.)

000314

WILMINGTON DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

DATE:                                                    CASE NO. 02-106295

TIME:

LOCATION:  Criminal Investigations Division

PRESENT:    Stephen Misetic and Anthony Meek

Q1    Alright, Mr. Meeks uh, I know we went through briefly about the incident you told me
      briefly what happened.  Uh, perhaps you can go over little more detail and uh you know
      more formal interview here and um start by uh, what's you first name again?

A1    Anthony.

Q2    Anthony, how old are you Anthony?

A2    Twenty-nine.

Q3    What's your date of birth?

A3    ████

Q4    And you live at, again?

A4    ████████████, Wilmington, Delaware.

Q5    What this is was on uh Monday?

A5    Yes.

Q6    And what on Monday what'd you do during that day?

A6    Alright um I went to work, well went to work about ten thirty.

Q7    Okay.

000315

STATEMENT/ANTHONY MEEK
CASE NO. 02-106295
PAGE 6

Q40    What color tee shirt?

A40    White tee shirt um he was darker than me with my complexion, no facial hair.

Q41    So he's clean shaven?

A41    Yeah.

Q42    Uh any size or size of weight or anything?

A42    He looked, he appeared to be my size my height, a little shorter but he was kind a thicker than I was.

Q43    Anything about his speech or anything that was unusual?

A43    Nah.

Q44    Okay um anything else that would stick out on him?  Did, did he have a hat or anything?

A44    No, he ain't have no hat on.

Q45    About uh his pants were you able to uh color or...?

A45    They were dark colored pants.

Q46    Was that the only thing he was um holding was...?

A46    Yeah he he didn't say too much accept you know give up the keys.  Cause again they came around the car and when he said give up, he had the gun at my head he's like give up the keys, give up the keys.  Um they did it as if there was gonna be there was wasn't gonna be any kind of hassle.  Cause they was like they come around so I had my door open.  So they I guess they expected me to give up my keys and get in the car and go about their business.  So I don't know they didn't seem like they (CU) look like they did it before.  You know like it was something they did before.

Q47    Now you ever see this guy before?

A47    I could have but not off the bat no I couldn't tell you.

Q48    Okay um now the other two guys um that were in the white uh masked tee shirts.  Um let's start with, was there any differences between them at all or anything that...?

A48    They looked like twins to me I think they was like twins.

Q49    So when you say twins as far as height and weight or...?

000316

STATEMENT/ANTHONY MEEK
CASE NO. 02-106295
PAGE 7

A49    Yeah, yeah.

Q50    Everything was the same?

A50    Yeah.

Q51    Okay um how about what their clothing?

A51    Uh they had the white tee shirt uh whatever that was over their face and it was like uh a matching outfit like gray or dark black or charcoal uh…

Q52    Okay.

A52    Like a shirt in their pants like a uh was it uh like a I'm trying to think of that (CU) military might wear.  Like you might go to the store and get you know like a matching, a whole outfit.

Q53    Okay.

A53    Like that but it was just that same color (CU) outfit.

Q54    Both of them had on the same or…?

A54    Yeah seemed it seemed to be (CU)

Q55    Okay.

A55    (CU)

Q56    Okay, alright uh I know you said that some of them uh made some statements um actually let me go back.  When when they start walking towards you you said one of them uh one of the guys with the mask um you said he snuck he was coming around?

A56    He tried to yeah that was this was like right when they came around the corner and I guess they saw me look up at them, cause I looked dead at them and he looked like he tried to duck down.  But then like he was trying to duck and come around behind me then then he stopped, then they both all three of them came around from uh towards the driver's side.

Q57    When you now when you came down um you came off of 6th down Willing.

A57    Right.

Q58    So so you're heading South bound at that point?

000317

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MUSTAFA A. WHITFIELD,                    :
                                         :
            Plaintiff,                   :
                                         :
      v.                                 :      C.A. No. 06-541 GMS
                                         :
WILMINGTON POLICE DEPARTMENT,  :
                                         :
            Defendant.                   :

CERTIFICATE OF SERVICE

      I, Andrea J. Faraone, Esquire, hereby certify that on this 8th day of January, 2007, I filed the

Appendix to the Opening Brief In Support of Defendant Wilmington Police Department's Motion

to Dismiss, or in the Alternative for Summary Judgment Vol. III with the Clerk of Court using

CM/ECF which will send notification of such filing(s) that this document is available for viewing

and downloading from CM/ECF, I also mailed via U.S. Mail, postage pre-paid one copy to the

following:


            Mustafa A. Whitfield
            S.B.I. #317479
            Delaware Correctional Center
            1181 Paddock Road
            Smyrna, DE 19977



               /s/ Andrea J. Faraone
            Andrea J. Faraone, Esquire (I.D. #3831)
            City of Wilmington Law Department
            Louis L. Redding City/County Building
            800 N. French Street, 9th Floor
            Wilmington, DE 19801
            (302) 576-2175
            Attorney for Defendant